No. 25-2358

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al.
Plaintiffs-Appellees,

v.

UNITED STATES DEPARTMENT OF HEALTH
AND HUMAN SERVICES, et al.
Defendants-Appellants.

On Appeal from the United States District Court
for the Northern District of California
District Court Case No. 3:25-cv-02847

EMERGENCY MOTION PURSUANT TO CIRCUIT RULE 27-3
FOR STAY PENDING APPEAL
RELIEF REQUESTED BY APRIL 16, 2025

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

MICHAEL A. CELONE
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-2040
michael.a.celone@usdoj.gov
CHRISTINA PARASCANDOLA
KATELYN MASETTA ALVAREZ
JONATHAN K. ROSS
Senior Litigation Counsel

ZACHARY A. CARDIN
Trial Attorney

Attorneys for Defendants-Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ii

CIRCUIT RULE 27-3 CERTIFICATE ..................................................... iii

INTRODUCTION ....................................................................................1

BACKGROUND ......................................................................................2

ARGUMENT ...........................................................................................5

    I.      Defendants Are Likely to Succeed on the Merits of Their Appeal.......5

    II.     Continuing Irreparable Harm to the United States Supports an
            Emergency Stay of the Temporary Restraining Order.......................10

    III. The balance of the equities and the public interest favor a stay..........11

CONCLUSION ......................................................................................12

CERTIFICATE OF COMPLIANCE.......................................................14

CERTIFICATE OF SERVICE ..............................................................14

i

# TABLE OF AUTHORITIES

Page(s)

Cases

*Abbott v. Perez*,
   585 U.S. 579 (2018)..........................................................................7
*Department of Education v. California*,
   604 U.S. ----, 2025 WL 1008354 (U.S. Apr. 4, 2025)................................ passim
*Great-West Life & Annuity Ins. Co. v. Knudson*,
   534 U.S. 204 (2002)..........................................................................8
*Hilton v. Braunskill*,
   481 U.S. 770 (1987)..........................................................................5
*Kiobel v. Royal Dutch Petroleum*,
   569 U.S. 108 (2013)........................................................................10
*Liljeberg v. Health Servs. Acquisition Corp.*,
   486 U.S. 847 (1988)..........................................................................9
*Maryland v. King*,
   567 U.S. 1301 (2012)......................................................................10
*Myers v. United States*,
   272 U.S. 52 (1926)........................................................................10
*Nken v. Holder*,
   556 U.S. 418 (2009)......................................................................10
*Sampson v. Murray*,
   415 U.S. 61 (1974)..........................................................................7

Statutes

8 U.S.C. § 1232(c)(5)..........................................................................3
28 U.S.C. § 455(a) ............................................................................8
28 U.S.C. § 1491(a)(1)......................................................................7, 8
U.S.C. § 455(b)(1)............................................................................8

Rules

Fed. R. Civ. P. 65(b)(2)........................................................................9
Fed. R. Civ. P. 65(c)................................................................. vi, 3, 5

Regulations

45 C.F.R. § 410.1309(a)(4) ....................................................................3

# CIRCUIT RULE 27-3 CERTIFICATE

Undersigned counsel certifies that the following is the information required by Circuit Rule 27-3:

**(1) Telephone numbers and addresses of attorneys for the parties**

Counsel for Defendants-Appellants:

Yaakov M. Roth (yaakov.m.roth@usdoj.gov)
Drew C. Ensign (drew.c.ensign@usdoj.gov)
William C. Silvis (william.silvis@usdoj.gov)
Michael A. Celone (michael.a.celone@usdoj.gov)
Christina Parascandola (christina.parascandola@usdoj.gov)
Katelyn Masetta Alvarez (katelyn.masetta.alvarez@usdoj.gov)
Jonathan K. Ross (jonathan.k.ross@usdoj.gov)
Zachary A. Cardin (zachary.a.cardin@usdoj.gov)
United States Department of Justice, Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-2040

Counsel for Plaintiffs-Appellees:

Adina Bassin Appelbaum (adina@amicacenter.org)
Frederick Evan Benz (evan@amicacenter.org)
Samantha Hsieh (sam@amicacenter.org)
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 899-1412

Lya Ferreyra (lferreyra@immdef.org)
Alvaro M Huerta (ahuerta@immdef.org)
Carson Scott (cscott@immdef.org)
Immigrant Defenders Law Center
634 South Spring Street, 10th Fl.
Los Angeles, CA 90014

(213) 674-9451

Laura Flores-Perilla (laura.flores-perilla@justiceactioncenter.org)
Karen Cassandra Tumlin (karen.tumlin@justiceactioncenter.org)
Esther Hsiao-In Sung (esther.sung@justiceactioncenter.org)
Justice Action Center
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7267


Counsel for Amici Former Officials of the United States Department of Health and Human Services

Benjamin Joseph Bien-Kahn (bbien-kahn@rbgg.com)
Rosen Bien Galvan and Grunfeld LLP
101 Mission Street, Sixth Floor
San Francisco, CA 94105
(415) 433-6830

Counsel for Amici Former Immigration Judges & Former Members of the Board of Immigration Appeals

Ashley Brooke Vinson Crawford (avcrawford@akingump.com)
Akin Gump Strauss Hauer & Feld
100 Pine Street, Suite 3200
San Francisco, CA 94111
415-765-9561

Counsel for Amici Young Center for Immigrant Children's Rights

Shaffy Moeel (shaffy@mlf-llp.com)
Moeel Lah Fakhoury LLP
2006 Kala Bagai Way, Suite 16
Berkeley, CA 94704
(510) 500-9994

Counsel for Amici National Center for Youth Law

Mishan Raini Wroe (mwroe@youthlaw.org)

Riley Safer Holmes & Cancila LLP
456 Montgomery Street, 16th Floor
San Francisco, CA 94104
(415) 275-8550

**(2) Facts showing the existence and nature of emergency**

As set forth more fully in the motion, the district court has extended its temporary restraining order despite overwhelming law and reasoning not only that Plaintiffs cannot show any clear likelihood of success on the merits, but are in fact foreclosed from success. The district court's order is not only plainly wrong and devoid of the required analysis, but requires the government to expend public money that it will be unable to recover when the government prevails, in part because the district court failed to require Plaintiffs to provide a bond under Fed. R. Civ. P. 65(c). Plaintiffs have filed two motions to enforce the temporary restraining order, where the district court could rule that Defendants have failed to comply.

**(3) When and how counsel notified**

Defendants' counsel notified counsel for Plaintiffs by email on April 11, 2025, of Defendants' intention to file this motion. On April 11, 2025, counsel for Plaintiffs responded that they opposed Defendants' motion. Service will be effected by electronic service through the CM/ECF system.

**(4) Submissions to the district court**

Plaintiffs' complaint was filed March 26, 2025. ECF Docket 1, N.D. Cal. No. 25-cv-02847.[1] Plaintiffs moved for a temporary restraining order on March 27, 2025. Docket 7. Defendants opposed a temporary restraining order on March 31, 2025. Docket 24. On April 1, 2025, the district court entered a temporary restraining order enjoining Defendants from withdrawing certain services or funds, "particularly ORR's provision of funds for direct legal representation services to unaccompanied children," pending further proceedings until April 16, 2025. Docket 33.

On April 4, 2025, Defendants moved to dissolve the temporary restraining order and, in the alternative, for the district court to stay the temporary restraining order. Docket 38. The district court has not granted the request for a stay. On April 9, 2025, Defendants moved to recuse the district judge. Docket 47.

On April 10, 2025, the district court extended its temporary restraining order to April 30, 2025. Docket 48.

**(5) Decision requested by**

A decision on the motion for a stay pending appeal is requested as soon as possible, but no later than April 16, 2025.

Counsel for Defendants-Appellants:

---

[1] Docket citations are to No. 25-cv-02847 unless otherwise noted.

vi

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

CHRISTINA PARASCANDOLA
KATELYN MASETTA ALVAREZ
JONATHAN K. ROSS
Senior Litigation Counsel

ZACHARY A. CARDIN
Trial Attorney

/s/ *Michael A. Celone*
MICHAEL A. CELONE
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC  20044
Tel: (202) 305-2040
michael.a.celone@usdoj.gov


Attorneys for Defendants-Appellants

## INTRODUCTION

The district court issued a universal injunction compelling the government to indefinitely fund direct legal representation for unaccompanied alien children through specific contracting arrangements, converting a discretionary, resource-limited federal program into a court-mandated entitlement. The requested relief would upend, not preserve, the longstanding management of legal services for unaccompanied alien children ("UAC")—services that remain subject to available appropriations and the agency's judgment. Even if the district court's order were not beyond the district court's jurisdiction and the scope of the APA, as the Supreme Court recently held in *Department of Education v. California*, 604 U.S. ----, 2025 WL 1008354, at *1 (U.S. Apr. 4, 2025) (per curiam), a closely analogous case, such an order would be outrageous—overriding the relevant statute and regulation, as well as the President's authority to administer those authorities. And the injunction entered is all the more outrageous given the district court is irrefutably conflicted from hearing the case and must recuse. Facing a motion for recusal filed by Defendants, the district judge *extended the TRO* and deemed consideration of her blatant conflict to be the basis for the extension. The district court order entered without jurisdiction by a judge with numerous conflicts imposes irreparable harms on the government and should be immediately stayed.

1

# BACKGROUND

On March 20, 2025, United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR") directed Department of the Interior ("DOI") to partially terminate a contract previously funding direct legal representation services. ECF Docket 31, Attachment 1 (Biswas Decl. ¶¶ 11–13), N.D. Cal. No. 25-cv-02847.[2] This termination was executed through a formal decision memorandum signed by the DOI Acting Assistant Secretary of the Administration for Children and Families ("ACF"). *Id.* ¶¶ 13–14.

Plaintiffs are legal service providers. On March 26, 2025, Plaintiffs filed their Complaint for Declaratory and Injunctive Relief seeking to enjoin the partial contract termination under the Administrative Procedure Act (APA). Docket No. 1. On March 27, 2025, Plaintiffs filed a motion and proposed order for a temporary restraining order to "grant immediate provisional and nationwide relief enjoining" "Defendants from interfering with [certain statutory and regulatory] requirements to provide direct legal representation services to unaccompanied children, including by cutting off access to congressionally appropriated funding." Docket No. 7. On March 31, 2025, Defendants opposed the motion, arguing, among other things, that the APA does not waive sovereign immunity for the monetary relief that Plaintiffs seek,

---

[2] Docket citations are to No. 25-cv-02847 unless otherwise noted.

and that the district court lacks jurisdiction over Plaintiffs' claims because the rights they seek to enforce must be brought in the Court of Federal Claims. Docket 24.

On April 1, 2025, the district court granted Plaintiffs' Motion for Temporary Restraining Order. Docket 33.

> Defendants are ENJOINED from withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4), particularly ORR's provision of funds for direct legal representation services to unaccompanied children. This injunction precludes cutting off access to congressionally appropriated funding for its duration.

*Ibid.* The district court set the injunction to remain in effect until April 16, 2025, and denied the government's request for an injunction bond under Fed. R. Civ. P. 65(c). *Ibid.*

On April 4, 2025, Defendants moved to dissolve the temporary restraining order based on the intervening Supreme Court decision in *Department of Education v. California*, 2025 WL 1008354 at *1 (holding that "the government is 'likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA'" and requiring such cases to be transferred to the Court of Federal Claims), and to shorten time to hear the dissolution motion. Docket 38, 39. Defendants also asked for a stay of the temporary restraining order as alternative relief. On April 7, 2025, Plaintiffs filed an emergency motion to enforce the temporary restraining order. Docket 40. The district court granted the motion to

3

shorten time, and ordered status reports on compliance with the temporary restraining order. Docket 42. On April 11, 2025, Plaintiffs filed a second emergency motion to enforce the temporary restraining order. Docket 53.

On April 9, 2025, Defendants filed a motion seeking recusal of the district judge. That motion contends that the district judge was required to recuse because she was recently a managing attorney at Plaintiff Community Legal Services of East Palo Alto, and had publicly condemned President Trump's immigration policies as "cruel," meaning she had the appearance of bias. Moreover, the motion argued the district judge could not review the case because she has personal knowledge of the one Plaintiff's budget and operations directly relevant to a disputed fact in this case—namely, allegations regarding irreparable harm to the organization. Docket 47. In that motion, Defendants asked the district court to vacate the TRO based on the recusal requirement.

On April 10, 2025, the district court entered an order extending the temporary restraining order to April 30, 2025, asserting that

> Before the Court is Defendants' motion for recusal and reassignment. The Court must address this pending motion before further consideration of the case. Thus, the Court finds that consideration of the motion for recusal constitutes good cause requiring extension of the Temporary Restraining Order dated April 1, 2025 ("TRO").

Docket 48. In other words, the district court found the recusal motion *itself* served as the "good cause" required to extend the TRO for an additional fourteen days.

4

## ARGUMENT

An immediate stay pending appeal is warranted because the government can demonstrate: (1) a strong likelihood of success on the merits of its appeal; (2) irreparable harm absent a stay; (3) that Plaintiffs will not be substantially harmed by a stay; and (4) that the public interest favors a stay. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).

The district court's order is fundamentally flawed. Although the district court is correct that it must adjudicate the recusal motion, that provides no excuse to extend the plainly improper temporary restraining order where a recent Supreme Court decision makes clear both that the district lacks jurisdiction and that the relief under the APA that Plaintiffs seek here is foreclosed. Even if recusal were not a foregone conclusion under the circumstances here, Plaintiffs cannot prevail on the merits and would not suffer irreparable harm absent a TRO. The district court abused its discretion by refusing to dissolve and instead extending the restraining order, particularly given that it rejected the government's request for an injunction bond under Fed. R. Civ. P. 65(c), creating a grave risk that the government would be unable to recover public funds once they are paid to comply with this lawless order.

## I.    Defendants Are Likely to Succeed on the Merits of Their Appeal

On April 4, 2025, the Supreme Court directly addressed several of the issues in this case in *Department of Education v. California*, 2025 WL 1008354. In that

5

case, a group of States challenged under the APA the termination of certain federal grants. *Id.* at *1. A district court granted several States' motion for temporary restraining order and required the government to pay out past-due grant obligations and to continue paying obligations as they accrued. *Ibid.* The government appealed and moved for a stay pending appeal; the court of appeals denied the stay; and the government filed an application with the Supreme Court to vacate the temporary restraining order and requested an immediate administrative stay. *Ibid.* The Supreme Court treated the government's application to vacate the order as seeking a stay pending appeal and granted the application. *Id.* at *2.

In its per curiam opinion, the Supreme Court held that the government was likely to succeed in showing that the district court lacked jurisdiction to order the payment of money under the APA, the relief sought by the States. *Id.* at *1. The Supreme Court stated that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money'" as the district court had ordered the government to continue, and that "the Tucker Act grants the Court of Federal Claims jurisdiction over [such] suits." *Ibid.* It therefore stayed the district court's temporary restraining order.

This Court should stay the district court's order for the same reasons. As a preliminary matter, it is an appealable order. "Although the Courts of Appeals generally lack jurisdiction over appeals from TROs, several factors counsel in favor

6

of construing the District Court's order as an appealable preliminary injunction." *Ibid.* Like the order in *California*, this order "carries many of the hallmarks of a preliminary injunction." *Ibid.* The court held an adversarial hearing, and "the court's basis for issuing the order [was] strongly challenged." *Sampson v. Murray*, 415 U.S. 61, 86-87 (1974). And the order has the same "practical effect of granting … an injunction," as it ordered the reactivation of grants and disbursement of funds. *Abbott v. Perez*, 585 U.S. 579, 594 (2018) (citation omitted).

Further, as in *California*, "the District Court's 'basis for issuing the order is strongly challenged,' as the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *California*, 2025 WL 1008354, at *1 (citation omitted). The Supreme Court made clear that federal district courts lack jurisdiction over claims like Plaintiffs'—which ask a court "to order the payment of money under the APA" or "enforce a contractual obligation to pay money." *Id.* (quotation marks and citation omitted). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1).

Those conclusions apply with equal force in this case. Plaintiffs proceeded under the APA but sought monetary relief. And the district court issued an order "to enforce a contractual obligation to pay money"—the sort of order that lies

7

exclusively in the province of the Court of Federal Claims. *Id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Defendants raised these issues to the district court in their motion to dissolve the temporary restraining order on April 4, the same day the Supreme Court decided *California*. Yet the district court inexplicably *extended*, rather than dissolved, the TRO. Because Plaintiffs' claims are not cognizable under the APA, and rather must be brought in the Court of Federal Claims under the Tucker Act, the district court abused its discretion and Defendants are likely to succeed on the merits of their appeal.

If that were not enough, the district court's stated justification for extending the temporary restraining order is patently insufficient. Defendants filed a recusal motion on April 9, raising the prospect of serious conflicts of interest—conflicts that may divest the district judge of authority over this case—for the court's attention. Specifically, Defendants explained that the district judge presiding over this case previously worked as a managing attorney at Plaintiff Community Legal Services in East Palo Alto (CLSEPA). That experience likely provides her with personal knowledge of CLSEPA's alleged irreparable harm—that loss of funds will impact CLSEPA's ability to operate—requiring recusal under 28 U.S.C. § 455(b)(1).

But at minimum, it raises the prospect that a reasonable person would likely question her impartiality, making recusal proper under 28 U.S.C. § 455(a). Those concerns are particularly acute as the district judge did not disclose her prior

8

employment to Defendants, who discovered it independently. Defendants further identified further context that underscores the appearance of partiality: the district judge has made various statements critical of President Trump's immigration agenda, which underpins this case; and she has personally served as co-counsel with at least one of Plaintiff's lawyers in previous cases involving child migrants. These facts raise serious questions about the appearance of impartiality here.

Yet rather than vacating its temporary restraining order—which, as Defendants explained, would be the proper remedy for a void order entered by a district judge required to recuse, *see Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 870 (1988)—the district court used the pending disqualification motion as its sole justification for extending that order. *See* Docket 48 ("The Court must address this pending motion before further consideration of the case. Thus, the Court finds that consideration of the motion for recusal constitutes good cause requiring extension of the Temporary Restraining Order dated April 1, 2025 ("TRO")). It cannot be that the prospect that an order is *void* provides good cause to *extend* that same order. And the district court offered no other justification for extending the temporary restraining order, which may only have effect beyond 14 days if "the court, for good cause, extends it." Fed. R. Civ. P. 65(b)(2) (also providing that the "reasons for an extension must be entered in the record").

9

Defendants are therefore likely to succeed on the merits of their appeal. This Court should vacate or stay the district court's temporary restraining order immediately.

## II. Continuing irreparable harm to the United States supports an emergency stay of the temporary restraining order

The injunction imposes irreparable harm on the government and public, whose interests merge here. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). Whenever a district court issues a universal injunction against the Executive Branch, the United States suffers a form of irreparable harm. The President is "a representative of the people" and holds "the mandate of the people to exercise his executive power." *Myers v. United States* 272 U.S. 52, 123 (1926). The government has a substantial interest in carrying out the President's policies. Courts play an important role in adjudicating the lawfulness of those policies in justiciable cases, but they irreparably injure our democratic system when they forbid the government from effectuating those policies against anyone anywhere in the Nation. *Cf. Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). And those concerns are heightened when, as here, the injunction undermines the Executive Branch's constitutional and statutory authority over immigration and the admission of aliens, and thereby constitutes an "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013).

10

And even separate from the government's sovereign interests, the temporary restraining order requires the government to disburse public funds that will be spent and never recovered. Again, this case mirrors *California*, in which the district court entered a stay pending appeal. "No grantee 'promised to return withdrawn funds should its grant termination be reinstated,' and the District Court declined to impose bond." *California*, 2025 WL 1008354, at *1. The government is therefore "unlikely to recover the grant funds once they are disbursed." *Id.*

### III. The balance of the equities and the public interest favor a stay

Finally, Plaintiffs are unlikely to suffer irreparable harm if the Court's temporary restraining order is stayed pending appeal. Plaintiffs have not asserted that they will have to cease operations if funds are withheld for the duration of the temporary restraining order—which is less than one month. Nor have they established any other source of certain, immediate irreparable harm; the "risk" of losing staff or expertise they cite is speculative.

And the public interest favors a stay. As explained above, injunctions against the government work substantial harm to the public interest when they forbid the government from effectuating the policies of democratically-elected leaders—and even more so when those injunctions apply against anyone anywhere in the Nation. Further, this order, issued without complying with Rule 65's bond requirement, would require the government to pay out taxpayer funds with no prospect of

11

recovering those funds if it ultimately prevails in the litigation. That concern is heightened when the order at issue was entered by a judge whose background suggests serious concerns about the appearance of impartiality.

The public interest is further served here by respecting Congress's deliberate policy choice to route claims sounding in contract or seeking to recover monies to the Court of Federal Claims. And it is disserved by orders, such as that entered below, that flout Congress's deliberate choice to vest exclusive jurisdiction with the Court of Federal Claims.

The equities and public interest therefore favor a stay.

## CONCLUSION

The Court should grant an emergency stay of the temporary restraining order pending appeal. Given that Plaintiffs are imminently seeking to enforce that temporary restraining order, this Court should also grant an immediate administrative stay while it considers the government's request for a full stay pending appeal.

12

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

DREW C. ENSIGN
Deputy Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

CHRISTINA PARASCANDOLA
KATELYN MASETTA ALVAREZ
JONATHAN K. ROSS
Senior Litigation Counsels

ZACHARY A. CARDIN
Trial Attorney

/s/ *Michael A. Celone*
MICHAEL A. CELONE
Senior Litigation Counsel
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
Tel: (202) 305-2040
michael.a.celone@usdoj.gov

Attorneys for Defendants-Appellants

13

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 27, I certify that foregoing motion complies with the type-volume limitation because it contains 2758 words. This motion also complies with the typeface and type style requirements because it is proportionately spaced and has a 14-point Times New Roman typeface.

/s/ *Michael A. Celone*
MICHAEL A. CELONE
Dated: April 12, 2025      Attorney for Respondent

**CERTIFICATE OF SERVICE**

I hereby certify that on April 12, 2025 counsel for Respondent electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system and that service will be accomplished via the CM/ECF system.

/s/ *Michael A. Celone*

**ADDENDUM**

# TABLE OF CONTENTS

Motion for Temporary Restraining Order
    (March 27, 2025) (Dkt. 7)……………………………………………1

    Exhibits (March 27, 2025)……………….…………..…………...41

Opposition to Motion for Temporary Restraining Order
    (March 31, 2025) (Dkt. 24……………………………………….228

    Exhibits (March 31, 2025) ………………………...………….258

Temporary Restraining Order
    (April 1, 2025) (Dkt. 33)……………….....…………………..……269

Motion to Dissolve Temporary Restraining Order
    (April 4, 2025) (Dkt. 38)……………………...………………...276

Motion to Recuse Judge
    (April 9, 2025) (Dkt. 47)……………………...………………...310

Order Extending Temporary Restraining Order
    (April 10, 2025) (Dkt. 48)………………….…………..………..323

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, <br> 1861 Bay Road <br> East Palo Alto, CA 94303, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br> 200 Independence Avenue, S.W. <br> Washington, DC 20201, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-2847 <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AUTHORITIES IN SUPPORT THEREOF** <br><br> Date:    TBD <br> Time:    TBD <br> Dept:    TBD <br> Judge:    TBD <br> Trial Date:  TBD <br> Date Action Filed:  March 27, 2025 |

## NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER

PLEASE TAKE NOTICE as soon as it may be heard in the United States District Court for the Northern District of California, 450 Golden Gate Ave., San Francisco, CA 94102 that Plaintiffs Community Legal Services in East Palo Alto, Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project, Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance Project, will, and hereby do, move this Court for a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b) or, in the alternative, for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a).

As long as congressional appropriations are available, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior are required to provide funding to legal services providers to provide direct legal representation to unaccompanied immigrant children under 8 U.S.C. § 1232(c)(5) and 45 C.F.R. § 410.1309(a)(4). But on March 21, 2025, Defendants abruptly terminated this long-standing funding for direct legal representation for these unaccompanied children. Accordingly, Plaintiffs seek a temporary restraining order preventing Defendants from violating the Administrative Procedure Act ("APA") by illegally ceasing funding for direct legal representation services for unaccompanied immigrant children in violation of 8 U.S.C. § 1232(c)(5) and 45 C.F.R. § 410.1309(a)(4).

Plaintiffs request that this motion be heard on an expedited basis. The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof that follows; the declarations of Jill Martin Diaz, Laura Nally, Martha Ruch, Melissa Mari Lopez,

2

Roxana Avila-Cimpeanu, Elizabeth Sanchez Kennedy, Marion Donovan-Kaloust, Lisa Koop, Vanessa Gutierrez, Ashley T. Harrington, Joel Frost-Tift, Ana Raquel Devereaux, Wendy Young, Gautam Jagannath, Miguel Angel Mexicano Furmanska, and Daniela Hernández Chong Cuy filed concurrently herewith; the proposed order filed concurrently herewith; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters properly before the Court.

DATED: March 27, 2025

Respectfully submitted,

By: /s/ Alvaro M. Huerta

/s/ Samantha Hsieh

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org
cscott@immdef.org
lferreyra@immdef.org

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (D.C. Bar No. 1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Ave., NW, Suite 701
Washington, D.C. 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

/s/ Karen C. Tumlin

*pro hac vice forthcoming
Attorneys for Plaintiffs

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    A.  Thousands of Unaccompanied Children Rely on Legal Representation Every Year to Exercise Their Legal Rights ........................................................... 2

    B.  Congress Has Directed HHS to Ensure Unaccompanied Children Have Legal Counsel ............................................................................................... 3

    C.  ORR's Own 2024 Regulations Require Funding for Legal Services for Unaccompanied Children Consistent with Available Appropriations ...................... 4

    D.  Defendants Terminate Funding for Direct Legal Representation for Unaccompanied Children. ......................................................................... 6

STANDARD OF REVIEW ..................................................................................... 8

ARGUMENT ........................................................................................................... 8

    I. ......... PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS .......................... 8

    A.  The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA ........................................ 9

    B.  Termination of the Legal Representation Programs Violates the TVPRA .............. 11

    C.  Terminating the Legal Representation Programs Violates the ORR Foundational Rule. ................................................................................. 13

    II. ........ PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR INJUNCTIVE RELIEF ...... 16

    A.  Plaintiffs Face Irreparable Harm ............................................................. 16

    B.  The Balance of Equities ........................................................................ 19

    III. ...... A NATIONWIDE INJUNCTION IS APPROPRIATE ..................................... 21

    IV. ...... PLAINTIFFS SEEK EXPEDITIOUS RESOLUTION OF THEIR CLAIMS ............... 23

CONCLUSION ...................................................................................................... 24

Stay Motion Addendum 004

# TABLE OF AUTHORITIES
## Cases

*Abbott Lab'ies v. Gardner*,
387 U.S. 136 (1967) ..............................................................................11

*United States ex rel. Accardi v. Shaughnessy*,
347 U.S. 260 (1954), *superseded by statute on other grounds* ................13

*AIG Annuity Ins. Co. v. Law Offs. of Theodore Coates, P.C.*,
2008 WL 4543422 (D. Colo. Oct. 10, 2008) .......................................23

*Al Otro Lado, Inc. v. Mayorkas*,
2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) ....................................14

*Alcaraz v. I.N.S.*,
384 F.3d 1150 (9th Cir. 2004) .............................................................13

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...............................................................8

*Ariz. Dream Act Coal. v. Brewer*,
757 F.3d 1053 (9th Cir. 2014) .............................................................16

*Bennett v. Spear*,
520 U.S. 154 (1997) .........................................................................9, 10

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ..............................................................................11

*Bowen v. Mich. Acad. of Fam. Physicians*,
476 U.S. 667 (1986) ..............................................................................11

*Bresgal v. Brock*,
843 F.2d 1163 (9th Cir. 1987) .............................................................21

*Califano v. Yamasaki*,
442 U.S. 682 (1979) ..............................................................................21

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) ...............................................................16

*Carnation Co. v. Sec'y of Lab.*,
641 F.2d 801 (9th Cir. 1981) ...............................................................14

*Chang v. United States*,
327 F.3d 911 (9th Cir. 2003) ...............................................................11

*Darby v. Cisneros*,
509 U.S. 137 (1993) ..............................................................................11

*Disney Enters., Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ...............................................................19

5

*Doe #1 v. Trump*,
    957 F.3d 1050 (9th Cir. 2020) ...................................................................21

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 ..................................................................................21, 22

*E. Bay Sanctuary Covenant v. Trump*,
    932 F.3d 742 (9th Cir. 2018) ...................................................................16

*FDA. v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) .............................................................................16

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ...............................................................................9

*Freedom Commc'ns Inc. v. F.D.I.C.*,
    157 F.R.D. 485 (C.D. Cal. 1994) ............................................................23

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) .............................................................................16

*HIAS, Inc. v. Trump*,
    985 F.3d 309 (4th Cir. 2021) ..................................................................22

*Immigrant Defenders Law Center v. U.S. Department of Homeland Security*,
    No. 2:21-cv-00395, Dkt. 304 (C.D. Cal. Mar. 14, 2025) ...........................9

*League of Women Voters of N.C. v. North Carolina*,
    769 F.3d 224 (4th Cir. 2014) ..................................................................17

*League of Women Voters of U.S. v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ..............................................................17, 19

*Morton v. Ruiz*,
    415 U.S. 199 (1974) .............................................................................13

*Nat'l Council of Nonprofits v. OMB*,
    2025 WL 368852 (D.D.C. Feb. 3, 2025) ..............................................9, 10

*Nken v. Holder*,
    556 U.S. 418 (2009) ...........................................................................8, 19

*Pacesetter, Inc. v. Aortech Intl. PLC*,
    2012 WL 12894007 (C.D. Cal. Nov. 1, 2012) ........................................23

*Pacito v. Trump*,
    2025 WL 655075 (W.D. Wash. Feb. 28, 2025) .......................................12

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ................................................................19

Stay Motion Addendum 006

*State v. Azar*,
    385 F. Supp. 3d 960 (N.D. Cal. 2019), *vacated on other grounds and remanded sub nom. California ex rel. Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) ............................................................................................................. 19

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
    240 F.3d 832 (9th Cir. 2001) .............................................................................. 8

*Torres v. U.S. Dep't of Homeland Sec.*,
    411 F. Supp. 3d 1036 (C.D. Cal. 2019) .......................................................... 15

*Trump v. Int'l. Refugee Assistance Project*,
    582 U.S. 571 (2017) ........................................................................................... 21

*United States v. 1996 Freightliner Fld Tractor VIN1FUYDXYB-TP822291*,
    634 F.3d 1113 (9th Cir. 2011) .......................................................................... 13

*Valle del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) .......................................................................... 16

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) .......................................................................... 22

*Winter v. Nat'l Res. Def. Council*,
    555 U.S. 7 (2008) ........................................................................................... 8, 19

*Zepeda v. I.N.S.*,
    753 F.2d 719 (9th Cir. 1983) ............................................................................ 19

## Statutes

................................................................................................................................ 9

5 U.S.C. § 701(a) .................................................................................................... 9

5 U.S.C. § 701(b)(2) ............................................................................................... 9

5 U.S.C. § 702 ......................................................................................................... 9

5 U.S.C. § 704 ......................................................................................................... 9

5 U.S.C. § 706(a)(2)(A) ........................................................................................ 12

6 U.S.C. § 279(a)(2)(i)(A) ...................................................................................... 5

6 U.S.C. § 279(b)(1)(*I*) ........................................................................................... 5

6 U.S.C. § 279(b)(1)(A) ........................................................................................... 3

6 U.S.C. § 279(g)(2) ................................................................................................ 3

8 U.S.C. § 1101(a)(27)(j) ........................................................................................ 3

8 U.S.C. § 1158(b)(3)(C) ........................................................................................ 3

7

8 U.S.C. § 1232(a)(5)(D) ...................................................................................3

8 U.S.C. § 1232(c)(5) ..............................................................................1  4, 11

28 U.S.C. § 1657(a) .............................................................................23, 24

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4,
   Div. A Tit. I § 1101(8) (2025) .........................................................6, 15

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138
   Stat. 460, 665-666 (2024) ..............................................................15

Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, § 4, 130 Stat.
   460, 461 ...........................................................................12

Pub. L. 118-47 138 Stat. 460, 664 (2024) .................................................5

## Other Authorities

170 Congressional Record H1501-01 ......................................................13

DHHS: Administration for Children & Families, *Justification of Estimates for
   Appropriations Committees* (2024), https://shorturl.at/4VDSL; ...........................14

H. Rep. No. 985, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N.
   5708, U.S.C.C.A.N. 5782 ..............................................................23

https://1.next.westlaw.com/Document/Ib5f6578989d511d9ac45f46c5ea084a3/Vie
   w/FullText.html?transitionType=Default&contextData=(oc.Default)&docume
   ntSection=co_pp_sp_506_923 ..........................................................11

Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the
   Immigration System* (March 2012), https://shorturl.at/KI3Jt .............................4

ORR, Unaccompanied Alien Children Bureau Fact Sheet (March 7, 2025),
   https://acf.gov/orr/fact-sheet/programs/uc/fact-sheet .................................2

S. Rep. 118-84 (2023) .............................................................5, 13, 15

Senate Report No. 118-84 ...............................................................13

Senator Mazie K. Hirono, Letter to HHS and Interior on Legal Services for
   Children in Immigration System (March 3, 2025), https://shorturl.at/RcUr3 ...............7

William A. Kandel, *et al.*, CRS Report R43628, *Unaccompanied Alien Children:
   Potential Factors Contributing to Recent Immigration* (2014) .............................2

## Rules

9th Cir. Rule 27–12 ...................................................................23

## Regulations

45 C.F.R. § 410.1309(a)(4) .........................................................1, 5, 15

Stay Motion Addendum 008

45 C.F.R. § 410.1309(d) ...................................................................................................5

89 Fed. Reg. 34384 .......................................................................................................3,

89 Fed. Reg. 34386 .......................................................................................................4

89 Fed. Reg. 34526 .....................................................................................................5, 14

89 Fed. Reg. 34529 ..........................................................................................3, 4, 14, 15, 20

Stay Motion Addendum 009

## INTRODUCTION

Each year, tens of thousands of unaccompanied immigrant children ("UCs") are referred to the Office of Refugee Resettlement ("ORR") when they are encountered in the United States without an available parent or legal guardian.  Absent intervention from legal services providers, they are forced to navigate our country's complicated immigration processes alone.  Plaintiffs are a group of legal services providers who provide congressionally mandated legal representation and services to UCs in a variety of immigration proceedings.  Recognizing the importance of this representation, Congress has appropriated funding for them since 2012, and continuing through September 2027.  Nonetheless, on March 21, 2025, Defendants abruptly cancelled direct legal representation for UCs under the contract effectuating Congress's mandate.  Without these congressionally mandated funds, Plaintiffs face the impossible choice of continuing to represent their UC clients in violation of Defendants' order and without compensation, or abandoning their core functions.

Recognizing that children navigating complicated legal proceedings need counsel, in 2008, Congress directed the Secretary of Health and Human Services ("HHS") to "ensure, to the greatest extent practicable . . . , that all unaccompanied alien children . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5).  In keeping with that mandate, Congress has funded direct legal representation for UCs since 2012.  In 2024, acknowledging its responsibility to provide these congressionally mandated legal services, ORR issued its Unaccompanied Children Program Foundational Rule ("Foundational Rule") and bound itself to funding legal services providers, so long as congressional appropriations were available.  45 C.F.R. § 410.1309(a)(4).

On March 21, 2025, Defendants ordered an immediate stop to the representation work in clear violation of the Administrative Procedure Act ("APA").  Defendants have provided no

information as to how or if they will now comply with their statutory and regulatory obligations. Defendants have also provided no information to Plaintiffs about how they should deal with their ongoing commitments to represent UCs (including UCs with immigration court dates as soon as this week). As a result, Plaintiffs must choose between several intolerable options: continuing to represent their clients without compensation, drawing down precious or scarce discretionary or reserve funding, cutting other organizational services, laying off or terminating experienced staff, or seeking to withdraw from representation, thereby abandoning their child clients in the middle of legally complex immigration proceedings they likely cannot navigate alone. Defendants' actions are contrary to congressional and regulatory mandate and are arbitrary and capricious because they violate their own regulatory obligations. To prevent irreparable harm to Plaintiffs, to say nothing of irreparable harm to their UC clients, this Court should enjoin Defendants' attempt to terminate direct legal representation for UCs under the APA.

This Court should expedite consideration of this motion under 28 U.S.C. § 1657(a) and grant immediate provisional relief enjoining Defendants' illegal action, which is creating ongoing and irreparable harm to Plaintiffs and their clients.

## BACKGROUND

### A. Thousands of Unaccompanied Children Rely on Legal Representation Every Year to Exercise Their Legal Rights

In the 2024 fiscal year alone, nearly 100,000 new children were identified by federal authorities as UCs and referred to ORR. ORR, Unaccompanied Alien Children Bureau Fact Sheet (March 7, 2025), https://acf.gov/orr/fact-sheet/programs/uc/fact-sheet. These children's journeys to the United States may differ, but all of them are now in the United States without their parents or guardians. William A. Kandel, *et al.*, CRS Report R43628, *Unaccompanied Alien Children: Potential Factors Contributing to Recent Immigration*, at 3, 10 (2014). Of the UCs who moved

Stay Motion Addendum 011

through ORR custody in 2024, nearly a quarter were 12 years old or younger.  ORR, Fact Sheets and Data, *supra*.

Given their inherent vulnerabilities, UCs have special legal rights, *see, e.g.*, 8 U.S.C. § 1232(a)(5)(D), including the right to apply for asylum, withholding of removal, relief under the Convention Against Torture and voluntary departure.  Many UCs also have the right to apply for Special Immigrant Juvenile Status ("SIJS"), which offers a path to lawful permanent resident status but requires state court proceedings that require counsel.  *See* 8 U.S.C. § 1101(a)(27)(j).  UCs may also pursue asylum before U.S. Citizenship and Immigration Services in a non-adversarial process without being subject to the one-year filing deadline applicable to adults.  *See* 8 U.S.C. § 1158(b)(3)(C).  But these rights are meaningless unless children are educated about their rights and equipped with the tools to exercise them, including legal counsel.  89 Fed. Reg. 34384, 34529 (Apr. 30, 2024).  Unaccompanied children primarily learn about and exercise their rights through either full legal representation or limited-scope assistance from a lawyer—often, until March 21, 2025, an attorney funded by Defendants, and provided by Plaintiffs.

**B.  Congress Has Directed HHS to Ensure Unaccompanied Children Have Legal Counsel**

Congress has recognized that UCs are uniquely vulnerable to trafficking, abuse in government custody, and injustices in the immigration legal system.  Through the Homeland Security Act of 2002, Congress gave Defendants Department of Health and Human Services ("HHS") and ORR legal custody of UCs, with the mandate to care for the children.  *See* 6 U.S.C. § 279(g)(2).  Congress also commanded Defendants HHS and ORR to "develop[] a plan to be submitted to Congress on how to ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such [unaccompanied] child."  6 U.S.C. § 279(b)(1)(A).  Acting on this congressional command, in 2005, ORR developed a three-year pilot program to meet the legal needs of UCs through provision of pro bono legal services.  At the end of the pilot

program in 2008, a summary report detailed that volunteer attorneys alone were not sufficient to meet the representation needs of UCs. *See* Olga Byrne & Elise Miller, *The Flow of Unaccompanied Children Through the Immigration System*, at 22–23 (March 2012), https://shorturl.at/KI3Jt. The report concluded that paid attorneys would be required to cover a significant percentage of the representation that UCs needed, spurring Congress to impose additional representation-related requirements on ORR and HHS through the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044 ("TVPRA").

The TVPRA, which Congress passed in 2008 and has regularly reauthorized since then (most recently in 2023), mandates that HHS must provide counsel for UCs: "The Secretary of Health and Human Services *shall ensure*, to the greatest extent practicable . . . that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security . . . have counsel to represent them in legal proceedings or matters." 8 U.S.C. §1232(c)(5) (emphasis added). Defendants have violated this mandate.

## C. ORR's Own 2024 Regulations Require Funding for Legal Services for Unaccompanied Children Consistent with Available Appropriations.

ORR has recognized "that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children." Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024). On April 30, 2024, ORR issued the final "Foundational Rule," which codified in part HHS's 1997 *Flores* settlement. *Id.* Section 410.1309 of the final rule, titled "Legal Services," affirms ORR's position

---

[1] The *Flores* settlement, entered into by the federal government and four noncitizen children in 1997, sets forth requirements regarding the care of UCs while in ORR custody. 89 Fed. Reg. at 34386.

<div align="center">4</div>

that "legal services providers who represent unaccompanied children undertake an important function" and explains ORR's goal of "100 percent legal representation of unaccompanied children." *Id.* at 34526.

The Foundational Rule requires that ORR must—if it has available appropriations—"fund legal service providers to provide direct immigration legal representation for certain unaccompanied children."[2]  45 C.F.R. § 410.1309(a)(4).  To comply with the TVPRA and the Immigration and Nationality Act ("INA"), the rule recognizes ORR must "ensure that all unaccompanied children who are or have been in ORR care have access to counsel" and provides, that "[t]o the extent ORR determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel, ORR shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations."  45 C.F.R. § 410.1309(a)(4), (d).

---

[2] Congress has also required ORR to compile and provide lists of legal services providers "qualified to provide guardian and attorney representation services" for UCs.  6 U.S.C. § 279(b)(1)(*I*).  The Foundational Rule also binds ORR to working with qualified legal services providers to provide orientations and consultations for UCs.  (a)(2)(i)(A).

Stay Motion Addendum 014

release services . . . including . . . access to legal services." *Id.* at 168. Finally, the Senate Report expressed its understanding that the TVPRA requires ORR to fund counsel for UCs: "The Committee also expects these funds will be used to provide access to counsel, consistent with the goals of the [TVPRA] of 2008 for all children to have access to counsel in their immigration proceedings." *Id.* at 169. On March 15, 2025, Congress continued funding at the same levels for UC legal representation. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101(8) (2025)). From December 2023 until March 21, 2025, Defendants satisfied this obligation through contracting with Acacia Center for Justice, who contracted with organizations like Plaintiffs to provide direct legal representation for unaccompanied children.

### D. Defendants Terminate Funding for Direct Legal Representation for Unaccompanied Children.

Despite Congress's consistent funding of legal representation for UCs as mandated by the TVPRA, Defendants' actions undermine congressional appropriations, the TVPRA's mandate, and ORR's Foundational Rule. On March 21, 2025, Defendant DOI sent a letter titled "Notice of Partial Termination for the Government's Convenience" (the "Cancellation Order") to the Acacia Center for Justice, the prime contractor on this contract, who then notified Plaintiffs of the termination. The letter announced that Defendants were terminating funding for direct legal representation for UCs—both in and out of ORR's custody—as of close of business that day, ignoring the requirement to fund these programs under the TVPRA and the Foundational Rule. The letter further commanded the Plaintiffs to "immediately stop work" on any of the active representations of UCs and to stop taking on new engagements. NWIRP Decl. ¶ 10; VAAP Decl. ¶ 13. Up until the March 21 letter, Defendants enabled legal services providers, including Plaintiffs, consistently to provide direct and ongoing representations to tens of thousands of UCs in proceedings, including removal and SIJS proceedings. The letter provided no explanation for

6

the termination nor guidance on how to handle existing representations, including those with imminent court hearings. Defendants were silent as to whether providers could continue existing representations (unfunded), despite the stop-work direction, or must withdraw immediately and (if granted) be forced to leave their clients in the lurch. *See* NWIRP Decl. ¶¶ 9, 11; VAAP Decl. ¶¶ 12, 13, 21; Estrella Decl. ¶¶ 13, 16; RMIAN Decl. ¶ 19.

This is not the first time that Defendants have acted to halt the legal representation of unaccompanied children. About a month earlier, on February 18, 2025, Defendant Department of the Interior ("DOI") and Defendant HHS issued an "Immediate Stop Work Order," ordering legal services providers—including Plaintiffs—to indefinitely "cease all services" and "stop all work" for active legal services. NWIRP Decl. ¶ 9; VAAP Decl. ¶ 12; MIRC Decl. ¶ 21; Public Counsel Decl. ¶ 10; Estrella Decl. ¶ 10; RMIAN Decl. ¶ 11. Although Defendants rescinded the stop work order three days later, Defendants' drastic actions spurred 32 Senators to sign a letter expressing "strong opposition" to the stop work order and noting its violation of the TVPRA. NWIRP Decl. ¶ 9; VAAP Decl. ¶ 12; Estrella Decl. ¶ 10; RMIAN Decl. ¶ 11; *see* Senator Mazie K. Hirono, Letter to HHS and Interior on Legal Services for Children in Immigration System (March 3, 2025), https://shorturl.at/RcUr3.

Despite this strong opposition and TVPRA's mandate, Defendants terminated funding on March 21, 2025, and have further provided no information about whether or how they intend to replace these critical legal services for UCs. Terminating funding for these legal services has devastating and irreparable effects on Plaintiffs, which are all the more devastating for the harm they will do to UCs. Estrella Decl. ¶ 7. For example, VAAP previously furloughed two of its three direct legal service practitioners on staff after the February stop work order, leaving the remaining practitioner to bear two additional full caseloads at a time. VAAP Decl. ¶¶ 15, 19. Even

if Defendants reinstate funding for counsel for UCs at some unknown future time, the providers' funded children's legal programs and the UCs that depend on their vital counsel will have already been dealt a fatal blow via mass layoffs of staff for the nonprofits and private providers, *see, e.g.*, VAAP Decl. ¶¶ 15, 19, and prolonged government custody or deportations for the children—including children who could have raised valid claims to lawful immigration status.

## STANDARD OF REVIEW

Motions for temporary restraining orders are governed by the same standards as motions for preliminary injunctions. *See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (explaining the analysis for a TRO and preliminary injunction are "substantially identical"). A temporary restraining order is warranted where the plaintiffs establish: (1) their likelihood of success on the merits; (2) irreparable harm; (3) the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (citing *Winter v. Nat'l Res. Def. Council*, 555 U.S. 7, 20 (2008)); *see also Stuhlbarg*, 240 F.3d at 839 n.7 (applying preliminary injunction standard to a temporary restraining order). Where the government is the defendant, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

Agency action cannot stand if it is contrary to law. Because Defendants' termination of direct legal representation services is contrary to the TVPRA and ORR's own regulations, Plaintiffs are likely to succeed on the merits.

### A. The Cancellation Order Determines Plaintiffs' Legal Rights and Obligations and is Final Agency Action Reviewable Under the APA.

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992). Persons or organizations, like Plaintiffs here, who are "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, [are] entitled to judicial review thereof." 5 U.S.C. § 702. "[A]gency action" includes not only agencies' affirmative acts, but also their omissions and failures to act. *Id.*; 5 U.S.C. § 551(13).

Under the APA, this Court may set aside and enjoin unlawful agency action, and compel agency action unlawfully withheld, if it is a (1) "final agency action," (2) "for which there is no other adequate remedy in a court," so long as (3) there are no "statutes [that] preclude judicial review" and "agency action is [not] committed to agency discretion by law." 5 U.S.C. §§ 701(a), 704. Plaintiffs satisfy each of these criteria here, and APA relief is therefore proper.

*Final Agency Action*. Under the APA, "agency action" is defined as "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); 5 U.S.C. § 701(b)(2). An agency action is final where two conditions are satisfied: (1) "the action must mark the consummation of the agency's decisionmaking process," and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quotation marks and citations omitted).

Defendants' refusal to fund or otherwise provide direct legal representation for UCs is a final agency action. *See, e.g.*, *Nat'l Council of Nonprofits v. OMB*, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (attempt to "pause" funding and disbursements constituted final agency action). *Immigrant Defenders Law Center v. U.S. Department of Homeland Security*, No. 2:21-

9

cv-00395, Dkt. 304 (C.D. Cal. Mar. 14, 2025), is instructive.  In that case, plaintiffs alleged that the Department of Homeland Security unlawfully denied the rights guaranteed by the TVPRA from unaccompanied children who had previously been processed under the Department of Homeland Security's Migrant Protection Protocols Policy ("MPP"), despite having entered and been designated as UCs.  *Id.* at *21–22.  The court held that plaintiffs met the first requirement because "nothing in the record indicates that the Policy is tentative or that decisionmaking is ongoing." *Id.* at *18. As to the second, the court found the policy at issue was final because it was "an agency action 'from which legal consequences will flow.'"  *Id.* at *19 (quoting *Bennett*, 520 U.S. at 178).

Here, Defendants clearly ceased funding direct legal representation to UCs in violation of an express statutory mandate and their own regulatory frameworks.  The Cancellation Order directed Plaintiffs to stop all work providing direct legal representation to UCs, including existing clients whom Plaintiffs undertook to represent before the Cancellation Order.  This notification is final:  it terminates all funding for and orders a halt to all direct legal representation, leaving only funding for certain Know Your Rights ("KYR") presentations and confidential legal consultations. VAAP Decl. ¶ 13; NWIRP Decl. ¶ 10; RMIAN Decl. ¶ 12; Estrella Decl. ¶ 11.  That order went into effect immediately on March 21, 2025.

As a result, Plaintiffs are forced to choose between continuing to provide unfunded legal representation in the face of extremely limited resources; cutting other vital organizational programs, laying off, furloughing, or terminating staff; or seeking to withdraw from their ongoing representation duties for court hearings, client meetings, and other important preparations for legal proceedings as soon as this week.  VAAP Decl. ¶ 21.  The longer Plaintiffs go without this funding or clarity regarding how to handle their current clients, the fewer services they can provide as they

are forced to withdraw from ongoing representations, cut other core programs, and/or lay off or reassign staff.  VAAP Decl. ¶ 20–22; NWIRP Decl. ¶ 14.  Institutional knowledge will be permanently lost if significant numbers of experienced staff are laid off, irreparably damaging the Plaintiffs' capabilities, regardless of whether funding is ever reinstated.  Thus, this termination undeniably has an immediate effect on parties' rights or obligations.

*No Other Adequate Remedy*.  Plaintiffs do not have any other adequate remedy for their claims.  The Supreme Court narrowly interprets the "other adequate remedy" limitation, stressing that it "should not be construed to defeat the central purpose of providing a broad spectrum of judicial review of agency action."  *Bowen v. Massachusetts*, 487 U.S. 879, 903 (1988); *see also Chang v. United States*, 327 F.3d 911, 923 (9th Cir. 2003) ("generous" APA review provisions must be given "hospitable" interpretation (citing *Abbott Labs v. Gardner*, 387 U.S. 136, 140, 141 (1967))).  Instead, "Congress intended by that provision simply to avoid duplicating previously established special statutory procedures for review of agency actions."  *Darby v. Cisneros*, 509 U.S. 137, 146 (1993).  Here, no such special procedures have been established.

*No Statutory Bar to Review*.  Finally, no statute bars review of Plaintiffs' claims here, and Congress has done nothing to override "the strong presumption that Congress intends judicial review" of the administrative actions Plaintiffs challenge.  *Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 670–71 (1986).

**B.  Termination of the Legal Representation Programs Violates the TVPRA.**

Under the TVPRA, Congress requires that the government "shall ensure, to the greatest extent practicable," that *all* UCs receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).  Canceling funding for and ordering stoppage of direct legal representation services to UCs violates

11

an express congressional mandate.  The Cancellation Order should be held unlawful and set aside. 5 U.S.C. § 706(a)(2)(A).

The TVPRA, requiring Defendants to "ensure [UC legal representation] to the greatest extent practicable," precludes them from terminating the legal representation program and nullifying its congressionally appropriated funding under circumstances here.  *See, e.g.*, *Pacito v. Trump*, 2025 WL 655075, at *18 (W.D. Wash. Feb. 28, 2025) (government agencies violated the APA when they withheld appropriated funds when agencies were "required, 'to the extent of available appropriations,' to ensure provision of support services for resettled refugees").  Defendants terminated this funding and ordered Plaintiffs to cease UC client representation without providing any other avenues of legal services for UCs—failing to "ensure, to the greatest extent practicable," that UCs have legal counsel in their immigration proceedings.  Defendants' Cancellation Order effectively ends meaningful legal representation for UCs by Plaintiffs and forecloses other providers from providing similar legal representation.  VAAP Decl. ¶¶ 20–21.

Although the TVPRA grants Defendants some discretion in *how* to allocate appropriated funds for legal access, Defendants cannot simply cease funding for direct legal representation in its entirety.  *See Pacito*, 2025 WL 655075, at *18.  That is precisely what happened here: Defendants cut off funding for direct legal representation services without providing any guidance or explanation to Plaintiffs regarding how they should deal with their ongoing representations and without any alternative plan for implementing their duties under the statute.  Amica Decl. Ex. 3.

Ultimately, canceling the programs defies express congressional mandates in both the TVPRA and appropriations bills.  *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, § 4, 130 Stat. 460, 461 (incorporating the explanatory statement published at 170 Congressional Record H1501-01, which in turn incorporates Senate Report No. 118-84).  Out of

the $5,506,258,000 the Senate Report specified for the UCP, the Report recommended "no less than the fiscal year 2023 funding level for post-release services; *legal services and access to counsel*; and child advocates," and that such "funds will be used to provide access to counsel, consistent with the goals of the [TVPRA]."  S. Rep. 118-84 at 167–70 (2023) (emphases added).

        After mandating in the TVPRA that Defendants provide legal representation to UCs "to the greatest extent practicable," Congress facilitated the provision of legal representation by appropriating billions of dollars to the UCP program, which includes (among other services) direct legal representation to UCs.  By consistently appropriating funds for this program for more than a decade, Congress not only ensured that it *would* be practicable to provide legal representation to UCs, but also expressly intended to ensure this outcome.  Given that appropriations are available to fund access to direct legal representation, Defendants cannot, consistent with their TVPRA obligations, simply refuse to fund such representation.

**C.  Terminating the Legal Representation Programs Violates the ORR Foundational Rule.**

        The government also is "bound by the regulations it imposes upon itself."  *See United States v. 1996 Freightliner Fld Tractor VIN1FUYDXYB-TP822291*, 634 F.3d 1113, 1116 (9th Cir. 2011).  "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Morton v. Ruiz*, 415 U.S. 199, 235 (1974).  Under the *Accardi* doctrine, parties may bring claims under the APA asserting that an agency has failed to follow its own rules and internal policies.  *See, e.g.*, *Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004).  *Accardi* concerned the failure by the Board of Immigration Appeals to exercise its independent discretion in deciding an appeal as required by the agency's own regulations.  *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954), *superseded by statute on other grounds*.

*Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at *8–9 (S.D. Cal. Sept. 30, 2024) (plaintiffs sufficiently alleged a policy violation based on a rule preamble and alleged substantial hardship based on border turnback policy); *see also Carnation Co. v. Sec'y of Lab.*, 641 F.2d 801, 804 n.4 (9th Cir. 1981) (the standard for an *Accardi* violation is "whether violation of the regulation prejudiced the party involved"). Here, Defendants' actions violate their express commitment in the Foundational Rule, a binding regulation, to fund legal services providers to provide UC legal representation as long as appropriations are available. Plaintiffs are substantially prejudiced because they rely on that funding to provide critical legal services to UCs and will, in some cases, be forced to stop providing that representation to their UC clients. Plaintiffs will have to choose between financial survival and adhering to binding ethical obligations as to existing clients if Defendants' actions are not enjoined. RMIAN Decl. ¶ 14; Estrella Decl. ¶ 15; *see also infra* Section II.A.

ORR has "recognize[d] that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children." 89 Fed. Reg. at 34529; *see also Al Otro Lado*, 2024 WL 4370577, at *9 (preambles may sufficiently bind agencies under *Accardi*). Accordingly, ORR just last year stated its intention to provide "universal legal representation for unaccompanied children by FY 2027." HHS: Administration for Children & Families, *Justification of Estimates for Appropriations Committees*, at 78 (2024), https://shorturl.at/4VDSL; *see also* 89 Fed. Reg. at 34526 ("ORR strives for 100 percent legal representation of unaccompanied children and will continue to work towards that goal to the extent possible."). Thus, in 2024, ORR adopted the Foundational Rule, which states in relevant part:

> To the extent ORR determines that appropriations are available, and insofar as it is
> not practicable for ORR to secure pro bono counsel, ORR *shall fund legal service*

> *providers* to provide direct immigration legal representation for certain unaccompanied children, subject to ORR's discretion and available appropriations.

45 C.F.R. § 410.1309(a)(4) (emphasis added). ORR explicitly noted that "in some cases it is impracticable for ORR to secure pro bono legal services for unaccompanied children," and provided that ORR would fund legal services with available congressional appropriations for those cases. 89 Fed. Reg. at 34529. The Foundational Rule thus explicitly obligates ORR to fund legal services providers to provide direct immigration legal representation, so long as congressional appropriations are available and pro bono counsel is not practicable. *See id.* at 34529 ("ORR has determined that its approach to providing legal services to unaccompanied children by enabling them to access pro bono counsel 'to the greatest extent practicable' and funding legal services for additional unaccompanied children, as resources allow, is consistent with ORR's statutory obligations.").

Defendants' actions on March 21, 2025, subvert these ORR commitments and regulations, violate the *Accardi* doctrine, and are both contrary to law and arbitrary and capricious under the APA. *See Torres v. U.S. Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1068–69 (C.D. Cal. 2019). Congressional appropriations are readily available until September 2027 to fund these legal services, including funds appropriated as recently as March 15, 2025. *See, e.g.*, Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, Div. A Tit. I Sec. 1101(8) (2025); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, Div. D Tit. I, 138 Stat. 460, 665-666 (2024); S. Rep. 118-84, at 169. Nonetheless, without explanation and without a plan to replace these critical legal services, the Cancellation Order violates Defendants' obligations and has caused and will continue to cause Plaintiffs substantial hardship, as described below. *See also infra* Section II.A. Because Defendants' actions violate their own stated policies and substantially prejudice Plaintiffs, the termination order should be enjoined.

## II.  Plaintiffs Satisfy the Remaining Requirements for Injunctive Relief

### A.  Plaintiffs Face Irreparable Harm

A temporary restraining order is appropriate where, as here, the moving party shows that it faces irreparable harm—harm which is (1) "immediate", *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988), and (2) "for which there is no adequate legal remedy." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014).

Here, immediate injunctive relief is necessary to protect Plaintiffs from suffering severe and irreparable harm.  Defendants' abrupt termination of funding for direct legal representation directly interferes with Plaintiffs' missions, immediately impeding their ability to provide critical legal representation that is at the heart of Plaintiffs' core activities.  RMIAN Decl. ¶ 22; VAAP Decl. ¶¶ 21–22; NWIRP ¶¶ 13–15.   There is no question that ceasing funding for legal representation services for UCs and terminating the existing services will cause imminent harm that cannot be later remediated.  MIRC Decl. ¶ 32–33; FIRRP Decl. ¶ 37.  The Cancellation Order prevents Plaintiffs from providing thousands of unaccompanied children with the direct legal representation required under the TVPRA and the Foundational Rule, frustrating Plaintiffs'

16

primary mission of representing these children as contemplated by Congress and the TVPRA. *See, e.g.*, ImmDef Decl. ¶ 2. If this occurs, "'there can be no do over and no redress.'" *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (quoting *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)).

Plaintiffs have relied on Congress's and Defendants' assurances that funding for these critical resources will continue to be available. Amica Decl. ¶ 11; RMIAN Decl. ¶ 18. Cutting off this vital resource threatens immediate and irreparable harm. *See, e.g.*, CLSEPA Decl. ¶ 13; VAAP Decl. ¶¶ 22–24; KIND Decl. ¶¶ 16–19. For example, Immigrant Defenders Law Center has already had to provide 27 staff with layoff notices in response to the Cancellation Order and anticipates additional cuts would be necessary if funding is not restored; these staff losses threaten its ability to continue representing the 1900 UCs it currently represents. ImmDef Decl. ¶¶ 20–22. In Texas, Estrella del Paso currently manages 324 pending cases and predicts the loss of funding will require staff layoffs and increase caseloads for existing staff. Estrella Decl. ¶ 6. The Galveston-Houston Immigration Representation Project expects to lay off most of their Immigrant Children and Youth staff within four weeks. GHIRP Decl. ¶ 21. Sustaining these services without this funding will cost the Northwest Immigrant Rights Project $200,000 a month. NWIRP Decl. ¶ 13. Private providers predict devastating financial consequences, including the potential for bankruptcy. DHCC Decl. ¶ 19; MM Decl. ¶ 18. And these losses do not even account for the organizational knowledge at risk of being lost. Estrella Decl. ¶ 6; FIRRP Decl. ¶ 38; Amica Decl. ¶ 25; ImmDef Decl. ¶ 21.

These harms cannot be remediated or redressed, even if Defendants later provide alternative routes for providing direct legal representation for UCs. The harm to Plaintiffs and their clients is imminent and irreparable. The termination of services took effect immediately upon

Stay Motion Addendum 026

receipt of Defendants' letter on March 21, 2025, which provided no guidance as to what Plaintiffs should do with their existing obligations, including immigration court hearings scheduled for this week. DHCC Decl. ¶ 15; Amica Decl. ¶ 20; ImmDef Decl. ¶ 24. Plaintiffs have ethical obligations to their clients and cannot simply immediately withdraw from representation; indeed, most attorneys will require court permission to withdraw. FIRRP ¶ 34. Plaintiffs and their clients are already experiencing irreparable harm far exceeding the mere loss of funding, including because they have to furlough or layoff staff and increase the caseloads of staff who can stay on. After limited reserves run out, Immdef will be forced "to take drastic action to terminate staff across all positions funded under this contract." Immdef Decl. ¶ 21. Similarly, KIND "anticipate[s] significant layoffs, starting within days" after the termination of funding. KIND ¶ 16. Children's immigration cases "are complex, often take years to complete, and require highly skilled attorneys to competently handle them." *Id.* at ¶ 23. Impacted attorneys and staff have years of individualized experience and wisdom with clients, making rehiring after layoffs impracticable.

The imminent potential harms to children are immediate and severe. For example, "if a child at one of the ORR-subcontracted facilities we serve is identified as having an urgent legal need such as an outstanding removal order, Amica Center—the only legal provider with access to the ORR-subcontracted facility—would not be funded to provide the necessary legal service to protect the child from imminent removal." Amica Decl. ¶ 21. Further, "[a]t this very moment, there are children in ORR custody who need our representation who are not receiving it. This means that children who want voluntary departure will have their return home unacceptably delayed, victims of trafficking will not be able to access the protections they deserve, and children fleeing persecution will not be able to have their day in court." ImmDef Decl. ¶ 25. The Court

cannot later reset the clock.  Absent a temporary restraining order Plaintiffs will suffer harm that cannot later be fixed.

## B.  The Balance of Equities

Finally, in considering whether to grant a temporary restraining order, the Court should "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008)).  Where an injunction will not "substantially injure the other [interested] parties," the balance of equities tips in plaintiffs' favor.  *Nken*, 556 U.S. at 434.

Here, there will be no harm to Defendants if this Court issues a temporary restraining order: the Government "cannot suffer harm from an injunction that merely ends an unlawful practice." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *cf. Zepeda v. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983).  Instead, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations."  *State v. Azar*, 385 F. Supp. 3d 960, 985 (N.D. Cal. 2019), *vacated on other grounds and remanded sub nom. California ex rel. Becerra v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (quoting *Newby*, 838 F.3d at 12) (cleaned up).

Terminating funding for direct legal representation for UCs, without any plan to ensure that current representations are not interrupted, violates Congress's express directive in the TVRPA and ORR's own commitments in the Foundational Rule.  Enjoining Defendants from effectively terminating these services merely prevents Defendants from defying these mandates and shirking their own voluntarily undertaken obligations.  Paying out funds already appropriated for these services cannot harm Defendants in any meaningful way compared to the harms that Plaintiffs and their clients will suffer if this Court does not issue a temporary restraining order.

Maintaining funding for these direct legal representation services furthers critical public interests: ensuring children have access to legal representation and protection from trafficking, as well as promoting efficiency and fairness within the immigration system for thousands of children who have viable claims for immigration relief in the United States. *See* 89 Fed. Reg. at 34529 (recognizing benefit of UC representation to the immigration system generally). Plaintiffs' work with UCs is widely recognized and commended by the legal community writ large, including by Immigration Judges, clerks, and the Department of Homeland Security's field office staff. VAAP Decl. ¶ 11; MIRC Decl. ¶ 19; ImmDef Decl. ¶ 13. The programs promote judicial economy by preventing immigration courts from bearing expenses such as unnecessary status conferences, VAAP Decl. ¶ 11, terminating proceedings for children where jurisdiction is improper, VAAP Decl. ¶ 9; RMIAN Decl. ¶ 10, and efficiently funneling contact with the courts through a single point of contact rather than having 50 or more representatives reaching out individually, MIRC Decl. ¶ 19. Plaintiffs play a key role in ensuring that children's needs are being met while in ORR custody. ImmDef Decl. ¶ 8. For example, Plaintiffs make referrals to Child Advocates, advocate directly with ORR to avoid unnecessary "step ups" for children at risk of being placed in more restrictive detention settings, and request Trafficking Victim designations from the Office of Trafficking in Persons. *Id.* Because Plaintiffs are independent, non-governmental organizations, children often share concerns with Plaintiffs they do not feel comfortable sharing with ORR-subcontracted staff or other stakeholders. *Id.* A temporary restraining order enjoining the Cancellation Order is in the public interest.

If the Court does not issue a temporary restraining order, Plaintiffs and the thousands of UCs they represent will face clear, immediate, and irreparable harms. Defendants themselves, meanwhile, do not face any injury from the issuance of a temporary restraining order to stop their

illegal action.  Given these considerations, the balance of equities weighs heavily in favor of issuing a temporary restraining order here.

### III. A Nationwide Injunction is Appropriate

While injunctive relief must be tailored to the scope of the case, "there is no bar against . . . nationwide relief in federal district or circuit court when it is appropriate." *Bresgal v. Brock*, 843 F.2d 1163, 1170 (9th Cir. 1987).  Moreover, "an injunction is not necessarily made over-broad by extending benefit or protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—if such breadth is necessary to give prevailing parties the relief to which they are entitled."  *Id.* at 1170–71.  Accordingly, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) (cleaned up).  The appropriate injunctive relief "often depend[s] as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l. Refugee Assistance Project*, 582 U.S. 571, 579–80 (2017).

Here, because "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff," a nationwide injunction is necessary to provide Plaintiffs complete relief.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020) (nationwide scope of injunction proper to provide complete relief).  Defendants' decision to terminate direct legal representation directly violates the TVPRA and the Foundational Rule as to every legal services provider and will cause irreparable harm if allowed to proceed.  A nationwide injunction is the only way to effectively grant Plaintiffs the relief they seek: the preservation of their mission to provide critical legal services for UCs across the country who would otherwise be left to navigate the immigration system alone.  It is also the only way to ensure that Defendants comply with the congressional mandate and their own

regulatory obligations to provide legal representation to UCs to the greatest extent practicable

Without a nationwide injunction, Defendants may continue to deny funding to other nonprofit

organizations providing similar services, preventing thousands of UCs from receiving legal

representation and assistance, and forcing Plaintiffs to make an impossible choice between serving

their mission unfunded or turning their backs on vulnerable clients.  Plaintiffs, whose primary

mission and core organizational activities include critical direct legal representation for these

children, will be forced to either deplete their reserves by continuing to provide as much direct

legal representation services as possible or turn their backs on vulnerable clients.  Notably,

Defendants—who, consistent with congressional appropriations, already allocated funding for

direct legal representation—will not face any harm from a nationwide injunction requiring them

to continue funding legal representation as planned.  Thus, the balance of equities weighs heavily

in favor of a nationwide injunction.

Courts have recognized that "a fragmented immigration policy would run afoul of the

constitutional and statutory requirement for uniform immigration law and policy."  *Washington v.*

*Trump*, 847 F.3d 1151, 1166–67 (9th Cir. 2017).  "For these reasons, in immigration cases, [this

Court] consistently recognize[s] the authority of district courts to enjoin unlawful policies on a

universal basis." *E. Bay Sanctuary*, 993 F.3d at 681 (quotation marks and citations omitted).

Moreover, plaintiffs are located throughout the country, and "[d]ifferent interpretations of

executive policy across circuit or state lines will needlessly complicate agency and individual

action," *see E. Bay Sanctuary*, 993 F.3d at 681, and piecemeal injunctive relief for the more than

80 providers nationwide would be impractical and difficult to administer.  *See HIAS, Inc. v. Trump*,

985 F.3d 309, 326–27 (4th Cir. 2021).  Accordingly, a nationwide injunction is appropriate in this

case.

## IV. Plaintiffs Seek Expeditious Resolution of their Claims

Under 28 U.S.C. § 1657(a), courts "shall expedite the consideration of any action . . . if good cause therefor is shown." Actions for preliminary or temporary injunctive relief "are named the highest priority civil actions," and "special consideration" should be given to "actions asserting federal rights." *Freedom Commc'ns Inc. v. F.D.I.C.*, 157 F.R.D. 485, 486 (C.D. Cal. 1994). Further, "[l]itigants who can persuasively assert that there is a special public or private interest in expeditious treatment of their case will be able to use the general expedition provision." H. Rep. No. 985, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 5708, 1984 U.S.C.C.A.N. 5782.

Courts have found that "good cause" is shown where the effective relief hinges on appropriate timing. *See, e.g.*, *Pacesetter, Inc. v. Aortech Intl. PLC*, 2012 WL 12894007, at *1 (C.D. Cal. Nov. 1, 2012) (expediting when a regularly scheduled motion would exceed the time allotted in defendant's Rectification Notice); *see also* 9th Cir. Rule 27-12 (allowing for expedited briefing and hearing "upon showing of good cause"). Actions also may be expedited where one party's income stream is dependent on the outcome of the case. *See, e.g.*, *AIG Annuity Ins. Co. v. Law Offs. of Theodore Coates, P.C.*, 2008 WL 4543422, at *3 (D. Colo. Oct. 10, 2008).

Here, funding for the direct legal representation that Plaintiffs provide to UCs has already abruptly been rescinded. Plaintiffs have been ordered to stop work and no longer receive funding, effective March 21, 2025. NWIRP Decl. ¶ 10; VAAP Decl. ¶ 13. Not only will Plaintiffs be irreparably injured, *see supra* Section II.A, but the thousands of children whom Plaintiffs and other service providers assist will also be harmed if these services are not restored. VAAP Decl. ¶ 21; NWIRP Decl. ¶¶ 14–15; Estrella Decl. ¶ 16; RMIAN Decl. ¶ 21. With every passing day that funding is blocked for these services, more children will appear in court proceedings across the country without any guidance or assistance to help them navigate these complex proceedings even

23

as provider organizations stretch their resources to fulfill their missions.  Estrella Decl. ¶ 7; VAAP Decl. ¶ 9.  In addition to the harm to these children's due process rights, the loss of representation will cause dysfunction and confusion in the immigration system, including the immigration courts.  VAAP Decl. ¶¶ 9, 11; RMIAN Decl. ¶ 10; MIRC Decl. ¶ 19.  Accordingly, there is sufficient "good cause" to expedite the consideration of this motion under 28 U.S.C. § 1657(a).

<div align="center">

**CONCLUSION**

</div>

Defendants' actions violate the APA.  Because this conduct will immediately cause Plaintiffs irreparable harm, this Court should grant immediate provisional and nationwide relief enjoining Defendants' illegal actions and preserving the status quo pending a final judgment.

Stay Motion Addendum 033

Respectfully submitted,

March 27, 2025

/s/  Alvaro M. Huerta                              /s/  Samantha Hsieh

IMMIGRANT DEFENDERS LAW CENTER      AMICA CENTER FOR IMMIGRANT
Alvaro M. Huerta (CA Bar No. 274787)         RIGHTS
Carson A. Scott (CA Bar No. 337102)          Adina Appelbaum (D.C. Bar No.
Lya Ferreyra (CA Bar No. 340148)             1026331)*
Immigrant Defenders Law Center               Samantha Hsieh (V.A. Bar No. 90800)*
634 S. Spring St., 10th Floor                Peter Alfredson (D.C. Bar No.
Los Angeles, CA                              1780258)*
(213) 634-0999                               Evan Benz (N.C. Bar No. 49077)*
ahuerta@immdef.org                           Amica Center for Immigrant Rights
cscott@immdef.org                            1025 Connecticut Ave., N.W., Suite 701
lferreyra@immdef.org                         Washington, D.C. 20036
                                             (202) 331-3320
                                             adina@amicacenter.org
                                             sam@amicacenter.org
JUSTICE ACTION CENTER                        peter@amicacenter.org
Esther H. Sung (CA Bar No. 255962)           evan@amicacenter.org
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*    *pro hac vice forthcoming
JUSTICE ACTION CENTER                        Attorneys for Plaintiffs
P.O. Box 27280
Los Angeles, CA 90027
(323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

25

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| | Case No. 3:25-cv-2847 |
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO,<br>1861 Bay Road<br>East Palo Alto, CA 94303, *et al.*, | |
| Plaintiffs, | |
| v. | **DECLARATION OF ALVARO M. HUERTA** |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, | |
| 200 Independence Avenue, S.W. | |
| Washington, DC 20201, *et al.*, | |
| Defendants. | |

1

I, Alvaro M. Huerta, declare as follows:

1.    I am an adult over the age of 18 and a resident of the state of California. The information set forth herein is true and correct of my own personal knowledge and if asked to testify thereto, I would do so competently.

2.    Pursuant to Local Civil Rule 65-1(a)(5), immediately prior to making this application to the Court, I provided Pamela Johann, Chief of the Civil Division of the United States Attorney's Office of the Northern District of California, with actual notice that Plaintiffs are filing this motion, along with electronic copies of the complaint and the brief accompanying this motion, via e-mail before completing this electronic filing.

Dated: March 27, 2025           <u>/s/ Alvaro M. Huerta</u>
                                      Alvaro M. Huerta

Stay Motion Addendum 036

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| | Case No. 3:25-cv-2847 |
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, <br> 1861 Bay Road <br> East Palo Alto, CA 94303, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> 200 Independence Avenue, S.W. <br><br> Washington, DC 20201, *et al.*, <br><br> Defendants. | **[PROPOSED] ORDER TO SHOW CAUSE TO DENY PRELIMINARY INJUNCTION** |

Upon reading the accompanying Memorandum of Law, dated March 26, 2025, and upon all prior pleadings and proceedings had, and good cause being alleged, it is hereby:

Enjoining Defendants from interfering with the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and the Office of Refugee Resettlement's ("ORR") Foundational Rule, 45 C.F.R. § 410.1309(a)(4) requirements to provide direct legal representation services to unaccompanied children, including by cutting off access to congressionally appropriated funding.

1

**FURTHER ORDERED** that pending a hearing and determination of the Order to Show Cause, the Cancellation Order shall be enjoined;

**FURTHER ORDERED** that service upon Defendants of a conformed copy of this Order to Show Cause, together with copies of the papers in support thereof, shall be made upon counsel for Defendants by electronic service through ECF, and email, on or before the __ day of _____, 2025, shall be deemed good and sufficient service thereof; and it is

**FURTHER ORDERED** that Defendants' opposition papers, if any, shall be served so as to be received by counsel for Plaintiffs, on or before the __ day of _____, 2025.

_____
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO,<br>1861 Bay Road<br>East Palo Alto, CA 94303, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>200 Independence Avenue, S.W.<br><br>Washington, DC 20201, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-2847<br><br><br><br><br>**[PROPOSED] TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

1

**AND NOW**, this ___ day of _____, 2025, upon consideration of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, the memorandum and evidence in support thereof, and Defendants' response thereto, it is **HEREBY ORDERED** that Plaintiffs' Motion is **GRANTED** as follows:

> Enjoining Defendants from interfering with the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and the Office of Refugee Resettlement's ("ORR") Foundational Rule, 45 C.F.R. § 410.1309(a)(4) requirements to provide direct legal representation services to unaccompanied children, including by cutting off access to congressionally appropriated funding.

FURTHER ORDERED that pending a hearing and determination of the Order to Show Cause, the Cancellation Order shall be enjoined.

_____
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

Case No. 3:25-cv-2847

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

**DECLARATION OF ROXANA AVILA-
CIMPEANU (FIRRP) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

### DECLARATION OF ROXANA AVILA-CIMPEANU FOR THE FLORENCE IMMIGRANT & REFUGEE RIGHTS PROJECT

I, Roxana Avila-Cimpeanu, make the following statement on behalf of the Florence Immigrant & Refugee Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.

1. My name is Roxana Avila-Cimpeanu. I am a licensed attorney and a member in good standing in the State Bar of Arizona. I am currently employed as Deputy Director of the Florence Immigrant & Refugee Rights Project ("Florence Project" or "FIRRP"). I joined the Florence Project on September 6, 2016, and have served in my current role since September 2024. Before I assumed my current position, I previously served as Children's Legal Program Manager, Managing Attorney for the Children's Pro Bono Program, Pro Bono Mentor, Staff Attorney, and Law Graduate with the Florence Project's Children's Legal Program serving unaccompanied immigrant children in Arizona.  During my time at the Florence Project, I have personally provided free legal services, including friend of court services, direct representation, legal orientation and education, and *pro bono* mentorship, to at least 140 children. Additionally, as Children's Legal Program Manager and Deputy Director I have supervised attorneys, pro bono volunteer attorneys, law graduates, accredited representatives, legal assistants, intake specialists, and social workers who have provided free legal services, both direct representation and pro se services, to thousands of individuals detained in Office of Refugee Resettlement "ORR" and ICE custody in Arizona.

### Florence Project's Mission and Scope

2. Founded in 1989, the Florence Project is a 501(c)(3) non-profit legal services organization with offices in Tucson, Phoenix, and Florence, Arizona. The Florence Project's mission is to provide free legal and social services to detained adults and children facing immigration removal proceedings in Arizona. On any given day, there are thousands of people detained and facing deportation proceedings in Arizona, including adults in rural detention centers in Eloy and Florence, Arizona and unaccompanied children who are or were previously in the custody of the Office of Refugee Resettlement ("ORR") in shelters in the Phoenix and Tucson metropolitan areas. With no public defender structure in immigration removal proceedings, the vast majority of people facing removal are forced to go unrepresented in immigration court due to poverty or lack of access to counsel, this includes unaccompanied children who are in the country without a parent or legal guardian. The Florence Project's vision is to ensure that all immigrants facing removal have access to counsel, understand their rights under the law, and are treated fairly and humanely.

3. The Florence Project is the sole 501(c)(3) non-profit organization dedicated to providing free immigrant legal services to unaccompanied children in Arizona. Through our attorneys, accredited representatives, law graduates, intake specialists, legal assistants, social workers, and network of pro bono attorneys, the Florence Project provides free

legal education and free representation and social services to thousands of unaccompanied children who are facing deportation proceedings in Arizona.

### **Florence Project's Services Under the Unaccompanied Children's Program**

4. The Florence Project began providing legal services to unaccompanied children who were detained and facing deportation proceedings in Arizona in 2000. At the time, unaccompanied children were detained in the custody of the former Immigration and Naturalization Service, ("INS"), the same agency that managed adult immigration detention and removal, in jail-like facilities in Central Arizona. Those facilities were ill-equipped to manage the special needs of children and children regularly suffered harmful treatment–for example, routine strip searches before attorney visits, prolonged detention, placement in solitary confinement, and other restraints. In 2002 as part of the general restructuring of immigration enforcement under the Homeland Security Act, and in recognition of the special needs of children, Congress moved away from the adult detention model and transferred the care and custody of unaccompanied immigrant children to the Office of Refugee Resettlement "ORR". At or about that same time, children began to be detained in shelter facilities in the Phoenix area. The Florence Project subsequently opened an office in Phoenix to better facilitate serving these unaccompanied child clients. In 2014, ORR opened additional shelters in the Tucson area and, again, the Florence Project opened a Tucson office to serve those clients. The Florence Project has continuously served unaccompanied children detained in Arizona since 2000.

5. As it pertains to unaccompanied children, in order to carry out our mission of providing free legal and social services to unaccompanied children facing removal proceedings in Arizona, the Florence Project's Children's Legal Program and Children's Social Services Team has a number of main work components that involve providing unaccompanied children with legal education and know your rights presentations, legal screenings, legal advocacy, friend of court assistance, and direct representation both from Florence Project attorneys and through pro bono placements. Each of these facets of Florence Project's work is addressed in more detail below.

6. First, the foundational level of our services to unaccompanied children are based on providing age-appropriate legal education services and "know your rights" presentations and conducting individual legal screenings(intakes) with all unrepresented children in ORR custody in Arizona. Under the UCP, Florence Project staff ensure that every unaccompanied child who is detained in ORR custody in Arizona receives age-appropriate, basic "know your rights" information and an intake in a language they understand within 10 business days of their arrival in an Arizona ORR shelter facility, where possible, in keeping with 45 CFR 410.1309(a)(2)(i)(B). For children who are reunified to a sponsor before Florence Project staff are able to meet with them, staff call the child and provide a know your rights presentation and intake over the phone. Every year, Florence Project staff provide these educational services to tens of thousands of children in Arizona; in 2023 alone, Florence Project staff provided 17,514

unaccompanied children with a "know your rights" presentation. These are critical services because unaccompanied children almost universally lack resources to afford legal representation and, without the Florence Project, would not have meaningful access to accurate and age-appropriate resources to help them understand their rights, responsibilities, or legal options.

7. Second, Florence Project attorneys also attend every detained Unaccompanied Minor children's docket in the Phoenix and Tucson Immigration Courts and, where allowed by the judge and appropriate, serve as Friend of Court for any cases in which the child is still seeking and likely to attain reunification with a sponsor or family member, and the Court requires additional information to assess next steps. Because the Trafficking Victims Protection Reauthorization Act ("TVPRA") requires that unaccompanied children "be promptly placed in the least restrictive setting that is in the best interest of the child," many of the children to whom we provide educational "know your rights" services eventually reunify with sponsors elsewhere in the United States. As a result, Florence Project staff do not immediately enter as counsel on every child's case in Arizona, but we do ensure that no child is alone in court by being present and to help provide critical information to the Court regarding the status of the reunification process, best language, special vulnerabilities and other critical information, where appropriate and allowed by the Court.

8. Third, the Florence Project provides non-representational legal advocacy for non-represented children in ORR custody. This includes advocating with ORR shelters for things like communication in the proper language, access to medical care, religious accommodations, access to education, access to proper food, access to communication with family and sponsors, and access to counsel. Through this type of non-representational advocacy, the Florence Project works to ensure that children in ORR care are being treated with dignity, respect, and are not subject to discrimination or mistreatment, and that the shelters are abiding by laws surrounding the treatment of children.

9. Fourth, every year Florence Project attorneys provide direct representation to hundreds of unaccompanied children in Arizona; in 2023 alone Florence Project attorneys represented 1,091 unaccompanied children in Arizona. Excepting cases of ethical conflict, Florence Project attorneys represent all unaccompanied children who are placed into Long-Term Foster Care ("LTFC") facilities in Arizona, as well as other unaccompanied children who remain in ORR custody during their removal proceedings or as they approach "aging-out" of the age of minority by turning 18. Additionally, Florence Project attorneys represent unaccompanied children who have passed through ORR custody and reunified with family members or sponsors here in Arizona, or have been placed in the Unaccompanied Refugee Minor Program in Phoenix, AZ. In all these cases, Florence Project's representation of these unaccompanied children can include representation before the Immigration Courts and the United States Citizenship and Immigration Services ("USCIS"), as well as representation in Arizona State Court juvenile or probate proceedings where necessary and appropriate for children who have been abandoned, abused, or neglected.

10. Fifth, Florence Project also has two specialized direct representation teams, which are partially funded by UCP. The first is the Children's Trafficking Response Team, which works to educate and guide staff and community stakeholders and partners on how to identify and support child survivors or trafficking, or children at risk of trafficking. This team is partially funded by UCP and works directly with unaccompanied minors who are at risk of or have survived trafficking, whether in the U.S., their country of origin, or on their journey to the U.S. The second in the Released Representation team which focuses on providing direct legal and social services to children who were formerly detained by ORR and living in the Phoenix metropolitan area.

11. The Sixth and final major component of the Florence Project's Children's Legal Program is our Children's Pro Bono Team, who receive pro bono case referrals from Children's Program staff and then connect unrepresented unaccompanied children with pro bono counsel from law firms or pro bono private immigration practitioners. Each year, our pro bono team places dozens of cases with volunteer attorneys before the immigration court, USCIS, Arizona state courts, and Board of Immigration Appeals and provides full-service mentorship, ongoing training, and technical support on those cases. Pro bono screening and mentorship in cases before the agency also are funded and conducted, through the UCP contract.

12. As of February 28, 2025,  the Florence Project provided free legal services to unaccompanied children at 24 shelters located in the State of Arizona, primarily in the Phoenix and Tucson metropolitan areas. These shelters have a combined capacity to detain over 2,000 children on any given day. Of these, 18 facilities are located in Maricopa County and 6 are located in Pima or Pinal counties. These shelters include 3 LTFC facilities as well as 3 transitional foster care facilities that serve particularly vulnerable or special needs populations such as children under the age of 13, siblings detained together, teens who are parenting or pregnant, and children with special needs. Unaccompanied children in Arizona with active immigration court cases generally are docketed on either the Phoenix or Tucson immigration court dockets and, as noted above, Florence Project staff ensure that no detained unaccompanied child in Arizona stands alone in immigration court, either by representing children or being present to provide Friend of the Court services as deemed appropriate and approved by the Court.

13. The Florence Project currently employs 114 full time staff who are dedicated to directly providing services under the UCP and whose positions are largely funded through U.S. Department of Health and Human Services ("HHS") funding. Specifically, Florence Project employs 1 Program Manager and 1 Associate Program Manager as well as 9 managing attorneys, 9 managing legal assistants, and 1 managing social worker who directly oversee and train staff providing UCP legal services, help manage legal and contractual compliance, and directly provide legal services under the UCP themselves.

---

[1] On February 28, 2025, Florence Project staff began to learn of "stop placement orders" and an accompanying depopulation of various shelters we have historically served. The reason, scope, and anticipated duration of the stop placement order and accompanying depopulation remain unclear at this time as do any possible plans for opening potential replacement shelter services in our region.

Additionally, Florence Project employs 21 staff attorneys and law graduates, and 4 accredited representatives who provide direct representation, legal consultation, and legal education and screenings under the UCP;  1 pro bono Managing Attorney who oversees the Pro Bono Program, screens volunteer attorneys, places cases, and supervises the Pro Bono team, and 2 pro bono mentors who provide technical support to pro bono attorneys; 49 legal assistants and intake specialists who help provide know your rights presentations and legal screenings under attorney supervision; 9 social workers; and 3 legal administrative assistants who support the team with UCP related data entry and billing requirements.  Due to staff turnover, internal transitions, and promotions, the Florence Project also has 20 open positions that are contemplated under the Florence Project's UCP that we have yet to backfill. In addition to our regular full-time employees noted above, the Florence Project also currently hosts 3 Immigrant Justice Corps ("IJC") fellows and one Equal Justice Works ("EJW") Fellow who work in conjunction with our general staff to represent unaccompanied children in removal proceedings.

14. Staff providing representation and "know your rights" presentations to children in ORR facilities routinely travel to each of the 24 shelter facilities in person to conduct client interviews and screenings, prepare clients for hearings, as well as provide legal education, legal screenings, and other legal support to detained children. Florence Project staff are typically present in shelters anywhere from 3-5 days a week. The Florence Project represents unaccompanied children in removal proceedings in immigration court, affirmative relief such as seeking asylum before USCIS, U-visas and T-visas, Special Immigrant Juvenile Status ("SIJS") applications both before the agency and in state courts for necessary predicate orders, BIA appeals, and petitions for review to the Ninth Circuit Court of Appeals.

15. For every child that passes through ORR in Arizona, the Florence Project monitors to make sure that the child is on track for reunification with a sponsor. If the shelter indicates that a child does not have a sponsor, or if the child has been detained for an extended period of time, or if the child's case merits entering of representation, the Florence Project will place the case with an in-house attorney or accredited Representative, or with a volunteer pro-bono attorney from the community.

16. The Florence Project currently directly represents over 800 children under the UCP contract. Some are children still in detention, and many are children who have been released from ORR and are living in Arizona, and have been waiting for their cases to be resolved for years due to government backlogs. Some cases take up to 6 years to conclude at the Legal Permanent Resident stage, and the presence of an attorney is critical during that long time span since Immigration Law changes at a rapid rate.

17. These various services provided under the UCP, from education through full representation are a critical safety net for unaccompanied children who are or have been in ORR custody. The children the Florence Project serves are often extremely vulnerable – they have often experienced significant trauma, have been abused, abandoned, or neglected. Many have experienced discrimination, trafficking, or harm in their country of origin or en route to the United States. We routinely work with children who identify as

LGBTQ. We also regularly work with children who are experiencing symptoms of significant disabilities including mental health conditions as well as medical disabilities that can directly impact their ability to participate in proceedings, for example vision or hearing impairment. Moreover, some of our child clients are very young such that their age presents unique barriers to their ability to participate in their legal cases. The Florence Project also serves facilities that specialize in young or "tender aged" children under the age of 13, where the children we at times encounter children who are so young that they do not know even their parent's names (aside from "mom" or "dad"). Florence Project staff have even represented children who were pre-verbal, with at least one client who was only six-months old. For such children, the UCP is a critical safety net since, without the UCP, the vast majority of these particularly vulnerable children would be left without any information and most likely would face significant barriers to adequately and efficiently preparing their cases without counsel, nor would a child be well-positioned to pay the thousands of dollars required to retain counsel. Indeed, almost universally, unaccompanied children lack sufficient resources and knowledge to obtain private counsel and the Florence Project is the only non-profit organization that provides free legal services to unaccompanied children who are detained by ORR in Arizona. Without the services the Florence Project provides under the UCP, unaccompanied children in Arizona would be forced to go through their legal process entirely alone, without a lawyer. However, immigration law is famously complex and given the educational/literacy barriers, language barriers, developmental stage barriers, age barriers, and emotional and mental hurdles caused by past discrimination, trauma, and harm, the vast majority of our child clients would be simply incapable of navigating their legal proceedings without assistance from trusted, independent legal and social service providers like the Florence Project. Additionally, a significant number of the children we work with are eligible for Special Immigrant Juvenile Status ("SIJS"), which requires proceedings and findings before state juvenile courts, which children simply cannot obtain without the assistance of counsel.

18. Looking at SIJS in particular is useful to understanding how complicated and specialized the work the Florence Project does with unaccompanied minors is. SIJS requires attorneys to be well-versed and competent to represent clients in not one, but two complicated areas of law: immigration removal defense and state court child welfare processes, which vary from state to state. In Florence Project's experience, not only do our advocates need to be completely fluent in both areas to advocate in individual client's cases, but historically we have had to do a great deal of education for both the state courts and the immigration courts about what the other side of the coin looks like and how the other court system operates. This requires regular stakeholder outreach, developing strong relationships with courts, and participating in opportunities to educate judges and court staff, extending even to formal trainings where courts have requested such support, to ensure cases that involve both systems are able to move forward effectively and efficiently.

19. In addition to representing clients in their immigration proceedings, Florence Project represents clients in various forms of advocacy that arise incident to their custody. In this context, Florence Project staff play a critical role in building trust with clients and being a

constant, dependable point of contact who is independent and not part of the United
States government, which allows these vulnerable youth to share information regarding
abuse or mistreatment these children have experienced both before, during, and after their
custody by the U.S. government. Because we build this trusting connection with the
children we serve, Florence Project clients have not only felt comfortable sharing
examples of abuse and violence they experienced in their countries of origin and during
their journeys to the United States that are critical to developing their legal cases for
relief here in the United States, but also regularly share information about abuses they
experienced while in the custody of the United States government.

20. Examples of the types of abuses our unaccompanied children clients have reported to us,
and about which the Florence Project has engaged in advocacy on our clients' behalf,
include lack of access to proper food, religious services, regular communication with
parents or potential sponsors, clothing, hygiene items, parenting ability, and appropriate
medical care in both Customs and Border Patrol ("CBP") and ORR custody; verbal and
physical assaults in CBP custody; physical abuse and sexual assaults in ORR custody;
and attempted trafficking and/or grooming by ORR staff. Because we begin working with
these children within days of their arrival into ORR custody, Florence Project staff often
are the first to learn about harmful government policies – things like widespread family
separations in 2017-2018 and the unlawful use of dental imaging as the sole basis to
redetermine a child's age as a justification for moving a minor into adult ICE custody.
Because we are independent legal service providers, we have the unique ability to
advocate on our clients' behalf to raise awareness and push back against such harmful
policies.

21. For example, Florence Project staff screen each child for abuse or mistreatment at CBP
facilities prior to their arrival in ORR through questions designed to ensure that
children's legal rights are respected and that children are treated humanely by CBP.
Many children the Florence Project encounters report being held for extended periods of
time beyond that allowed by the TVPRA, lacking proper food, being held in ice-cold
facilities or cages, having possessions, including religious items and medical items
removed, and being verbally and physically abused by CBP officers. We have heard
stories of young mothers not being provided with blankets or diapers for their babies. In
fact, over the last year alone, the Florence Project has documented over 150 complaints
on behalf of children and filed at least 30 formal complaints with the Office of Civil
Rights and Civil Liberties to seek official review and redress over abusive treatment or
conditions children face while in CBP custody.[2] For many children, it can take some time
before they feel willing to open up regarding abuse or harm they have experienced.
Limiting funding for legal service providers like the Florence Project to exclusively know
your rights presentations and intakes, will limit opportunities for Florence Project staff to
build the type of trusting relationship with these children that enables children to feel

sufficiently safe to disclose abuse experienced, particularly abuse experienced at the hands of U.S. Government officials. This will create circumstances that put children in increased danger of abuse and harm by government officials and allow abusive CBP officials to continue to act with increasing impunity, emboldened by the knowledge that children will have few, if any, opportunity to report harm or resources necessary to do so in a way that would potentially result in any accountability. This directly undermines the Florence Project's mission to ensure that all people facing deportation are treated fairly and humanely. Florence Project's ability to build meaningful trusting relationships with unaccompanied children under the UCP helps our staff identify disturbing patterns and trends in the types of abuses our children clients report. The role of possible representation is particularly crucial in cases where serious trends of harm appear, as was the case, for example, when Florence Project staff were some of the first to note and blow the whistle on how the Trump administration's "Zero Tolerance" border prosecution policy resulted in widespread separations of minor children from their parents at the border. The type of public advocacy and media that eventually brought a halt to that egregious family separation policy is only possible under portions of the UCP that allow for additional legal services and representation, a fact that is surely not lost on this second Trump administration in this decision to eliminate all portions of funding that allowed the Florence Project to advocate for our children clients in this way.

22. Beyond advocating for our clients when they have experienced more extreme abuses and harm while in ORR or CBP custody, Florence Project staff also routinely support clients with other types of advocacy which are equally necessary to ensure the rights of vulnerable children are properly respected. This type of advocacy can include advocating for less restrictive or more appropriate placements in custody as well as the least restrictive placement when a child turns 18. It also includes advocating for access to proper medical care and treatment in custody – from everything for advocating that a client with vision impairment be given glasses so they could see, to advocating that a client with serious medical condition such as a coma is placed in a facility that is equipped to care for their needs. We help our clients file complaints with oversight agencies to document and resolve myriad of issues that arise as a result of our clients' custody and vulnerable status.

23. Many of our child clients also speak languages other than English or Spanish and our staff not only provide them with legal services and education in a language they understand, as required by the Foundational Rule, but also advocate that they have appropriate language access in immigration court as well as other spaces, including ORR communications and medical appointments. For example, our child clients frequently report to Florence Project staff that ORR staff insist on communicating with them in Spanish, despite that fact the child does not speak Spanish or prefers another language. Children also report to Florence Project staff being discriminated against by shelter staff for speaking indigenous language, or African languages. Many indigenous children or children who are part of a minority have experienced discrimination at home due to their ethnicity, race, or national origin, and it can be difficult for them to advocate for themselves for access to communication in their best language, especially if the shelter staff are displaying prejudice or discrimination against them. Ensuring that

communication takes place in the appropriate language that a child understands is critical and this is even more true when shelters or judges are attempting to share important information with the child. Florence Project staff not only regularly advocates that important government communications be conducted in the child's best language, but also meet with children in detention, build trust with our clients, and empower them to assert their language rights themselves.

24. Florence Project staff also often advocate for the medical needs of children. Florence Project staff have seen countless examples of ORR not taking adequate measures to protect the health of children. Attorneys have advocated for visits to medical professionals who were able to diagnose conditions requiring surgery or medication, including for broken arms and necessary blood transfusions. Staff have learned of special medical needs from children that the shelter did not know about, which resulted in children receiving life-saving treatment. Staff have advocated for proper dental care for children who had a difficult time eating due to mouth pain. Children have also reported ORR staff misrepresenting the purpose of medical visits, children being told they are going to routine dental appointments only to later learn that the dental exams were actually completed for the purposes of age redetermination to facilitate transferring minors into adult ICE custody. Staff have also pushed back in cases where ORR was attempting to pressure minors to return to home country before proper medical care could be assured for things like traumatic brain injuries, or other conditions.

25. The Florence Project also regularly advocates for First Amendment protections, particularly access to religious activities, including ensuring that children are taken to services, are given the proper diet, and are provided with adequate space and time to complete religious rites. Children who observe fasting have been denied food after breaking fast, have had nighttime prayers interrupted, and have faced discrimination at the hand of ORR staff for their religious observances. In such cases, the Florence Project plays a critical role as an independent third party able to both identify potential first amendment and civil rights violations and empower our child clients to assert their rights as well.

26. Florence Project staff also frequently work with ORR and shelter staff to ensure that shelter staff refrain from the unauthorized practice of law. ORR staff are not legally trained and are not lawyers with the associated privilege and confidentiality – they are not able to advise children as to their legal rights or counsel them on their legal options. Despite these known facts and rules against unauthorized practice of law, in many cases ORR staff have provided legal advice to children, which more often than not has been incorrect, harmful, or contrary to the child's wishes.  Florence Project attorneys regularly correct mistakes by ORR staff, for example, when ORR staff submit case assistance requests through the Office of Trafficking in Persons ("OTIP"). The Florence Project has observed countless cases where ORR staff's submission was denied due to a lack of understanding of the requirements of an OTIP request for assistance, the child's life, the legal definitions of trafficking, or a combination thereof. In such cases, Florence Project attorneys have re-submitted requests and received OTIP approvals for case assistance for children who have rightly been determined to be survivors of severe forms of trafficking.

27. The Florence Project has long enjoyed a cooperative stakeholder relationship with our Arizona immigration courts. Beginning from the initial call to action by an Immigration Judge that led to the creation of the Florence Project, Immigration Judges in Arizona have consistently engaged with and welcomed the Florence Project's legal education services. In the context of unaccompanied children, both the Phoenix and Tucson Immigration Courts have a long history of working collaboratively with the Florence Project. For example, in both courts this cooperative stakeholder relationship has allowed for the coordination of specialized dockets for unaccompanied children. The Florence Project has worked with the court and individual judges to ensure the children's docket are as child-friendly as possible, with one judge even electing to wear a more informal Hawaiian shirt instead of the traditional black robes. For decades, the vast majority of judges on the children's docket have welcome Florence Project attorneys to serve as friend of court to assist the court by sharing important information, such as updates regarding likelihood and timeline of reunification, the child's best language, and other information necessary to properly and efficiently adjudicate children's cases. This cooperation has included everything from willingness to provide Florence Project staff space in the physical courtrooms to conduct pre-court orientations to children before their hearings, to smaller acts of appreciation, including swearing in Florence Project law graduates into the bar. Judges in Phoenix and Tucson have long relied on the Florence Project as a resource to which they may refer respondents who are confused or unclear about the next step in their immigration court process. Judges in Phoenix have also allowed the Florence Project to serve as friend of court over the Government's objection, in acknowledgement of the critical information provided for children's cases. In both EOIR and ICE stakeholder meetings, government partners routinely express thanks and emphasize the value of the services the Florence Project provides.

### UCP Stop Work Order, Stop Work Recission, and Subsequent Termination of all but CLIN 1 Funding Under UCP Contract

remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication of poor performance."

29. On February 18, 2025, shortly after receiving the stop work notice, Florence Project leadership promptly notified all staff regarding receipt of the UCP stop work order and provided additional specific instruction to staff who provided services under the UCP clarifying how they would need to change aspects of their work to follow that order. However, because the Florence Project's mission is to provide free legal and social services to unaccompanied children in Arizona, we also immediately began to discuss how we could potentially transition the critical services that had been conducted under the UCP to other legal access mechanisms, specifically legal access as envisioned by provisions of the TVPRA mandating that "to the greatest extent practicable...that all unaccompanied alien children who are or have been in the custody of [HHS or DHS] have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." As such, we also provided instruction to staff on how we envisioned ensuring continuity of legal and social services for children in ORR shelters served by the organization without government funding, at least for the short term.

30. Just three days after it was abruptly issued, the UCP stop work order was just as abruptly rescinded on February 21, 2025. Like the original stop work order, the cancellation of said order came via email notification from the UCP prime contractor and the actual recission order from the government contracting office provided little to no information as to why the stop work order had been issued originally or why that decision had now been reversed. It simply stated that the stop work order had been cancelled and that all activities under the contract could be resumed.

31. In the three-day window in which the UCP stop work order was in effect, Florence Project staff were consistently allowed to continue to access our child clients in ORR custody without interruption from shelter or ORR staff using our own funds to support this work. As of this date, it is not clear what, if any, reimbursement for those services Florence Project will receive.

32. On March 21, 2025, again without warning, the Florence Project learned that HHS through the U.S. Department of Interior contracting officer, terminated almost all aspects of the current UCP contract. Again, the Florence Project learned about the nearly complete termination of services under the UCP contract through an email notification from the government prime contractor on the UCP program, the Acacia Center for Justice, at approximately 8:15 a.m. Arizona time. The termination was effective the same day we received it, March 21, 2025. As noted, HHS terminated the contract with respect to three of the four contract line numbers ("CLINs"): CLIN 2, which funds legal representation for unaccompanied children, as well as shelter advocacy and other non-representation services, such as pro bono referrals, friend of court services, and data

tracking[3]; (3) Attorney recruitment project and IJC fellows; and (4) Spanish language instruction and interpretation. CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, which funds Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR custody. Per the termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS has not provided any justification for the termination of these services other than, allegedly, the "Government's convenience."

33. On March 21, 2025, shortly after receiving the notice of termination of CLINs 2, 3, and 4 under the UCP contract, Florence Project leadership promptly notified all staff regarding the terminations and provided additional specific instruction to staff who provided services under the UCP clarifying how they would need to change aspects of their work to follow that order. That guidance explained to staff the different ways in which aspects of the critical legal services we provide children would be treated moving forward. For those key legal services falling under CLIN 1 – initial KYRs and legal consultations – Florence Project leadership explained to impacted staff that these services can and would continue without pause, explaining details like the fact that staff can and should use Acacia resources for third-language interpretation for such services. However, for those other critical and core aspects of our work with unaccompanied children – notably our direct representation of said children, friend of court and docket presence, and data entry – the Florence Project leadership communicated that such work would no longer fall under the UCP, staff may not refer to these programs as being through Acacia or the UCP, and staff cannot use Acacia interpretation resources to support such cases. Per instructions from Acacia regarding documenting "unavoidable work" on open cases under the terminated CLINs for possible, but not guaranteed, reimbursement through a potential termination settlement, Florence Project leadership requested that Florence Project staff continue to carefully document time, mileage, and data for internal purposes for any work done on represented cases or other parts of the terminated CLINs. Additionally, because the Florence Project's mission is to provide free legal and social services to unaccompanied children in Arizona, with a core value of ensuring that no child ever stands alone in immigration court, we also immediately began to discuss how we could potentially transition the critical representational, shelter advocacy,and friend of court services that had been conducted under terminated CLINs of the UCP to other legal access mechanisms. As such, we also provided initial instruction to staff on how we envision ensuring continuity of legal and social services for children appearing pro se before EOIR as well as those whom we were already representing under CLIN 2 without government funding. However, Florence Project funding is such that, without a massive new source of revenue to support such efforts, the Florence Project will only be able to sustain these efforts at our current level based on general funding for a short period of time.  Finally, we notified staff in our children's program targeted communication that, given the loss of UCP funding, we had to hold on responding to any new case referrals

---

[3] On March 25, 2025, Florence Project received word that the government was considering moving data reporting requirements from CLIN 1 to CLIN 2, a process that still must undergo bilateral negotiation on pricing.

and refrain from entering into any new attorney/client relationships for unaccompanied children in Arizona.

## **Organizational Harm Caused By Loss of UCP Contract Services**

34. As an initial matter, the termination of CLINs 2, 3, and 4 under the UCP contract will cause serious financial harm to the Florence Project. The UCP subcontract constitutes a major portion of the Florence Project's overall annual budget, with an average value of approximately 12 million per option year on the full contract. The terminated CLINs represent – depending on the option year being considered – a lost value of over 8 to nearly 10 million dollars of funding that supports Florence Project's core legal and social services for unaccompanied children. Moreover, the termination of the majority of the UCP contract also means that the Florence Project will also have to pay out-of-pocket for interpretation services for the child clients we currently directly represent – over 800 children with whom we entered into representation in good faith specifically under this contract – for those who do not speak either Spanish or English. Given the vast number of clients we serve and the many languages they speak, this also represents a significant additional expense. For example, in one month, Florence Project staff reported requiring at least 11,000 minutes of interpreter time. Without language support through the UCP contract, this cost will be incurred by the Florence Project.

35. As noted above, over 100 staff members' salaries are directly funded by the UCP subcontract and the loss of more than 70% of the funding for the Children's Program means that the Florence Project now faces needing to pay for those salaries using general funding sources. The Florence Project's ability to pay staff to continue our core work providing legal and social services to unaccompanied children, work that is mandated by statute and regulation, will become fiscally untenable in a matter of months unless the terminated CLINs are reinstated, or another massive influx of alternative funding can be identified.

36. The termination of all but a small portion of the UCP funding reflects the Government's intent to permanently shrink in size and end the provision of these critical legal and social services to unaccompanied children. This is cause for serious concern as to the Florence Project's overall budget, staffing plans, staff morale, longstanding community and stakeholder relationships, and the ability to keep qualified and trained staff with the organization. At the outset, due to transitions, internal promotions, and staff departures, the Florence Project's UCP subcontract contemplates 20 additional positions that are currently open. However, as a direct result of this termination, the Florence Project is undergoing a hiring pause on all currently unfilled positions. This hiring pause extends beyond only those positions that would have been funded under the UCP; rather it touches hiring for all currently open positions across the organization, with very few exceptions, given that general funding will need to be tapped to cover the substantial lost funding for salaries that would have been covered under the UCP. Thus, staff and programs across the organization, not only within the Children's Program, feel both the negative financial and morale ripple effects of this loss of UCP funding.

37. Moreover, the uncertainty around the budget and the Florence Project's long-term ability to pay our staff's salaries with general funds or fundraising is creating a sense of overwhelm and stress among remaining staff, both on the directly impacted team as well as on other teams, which negatively affects morale and people's sense of job security. While the Florence Project hopes to avoid immediate layoffs, unless the terminated CLINs are reinstated or some miracle fundraising occurs, it is extremely likely that the all-but-total termination of funding under the UCP will necessitate substantial downsizing of the Children's Program staffing. Indeed, Florence Project leadership has determined that, based on this lost funding, layoffs will be necessary unless funding is reinstated, or we receive miracle fundraising. As such, Florence Project leadership is beginning the managerial and administrative preparation for likely layoffs. Because the Florence Project is a unionized workplace, for most of our staff, the Florence Project must comply with specific terms of our collective bargaining agreement ("CBA") regarding communication with the union about termination, notice prior to termination of employment, and severance payments. This, in itself, results in the Florence Project incurring additional financial burdens in the form of legal expenses to plan for potential necessary layoffs with our labor and employment counsel to ensure compliance with our CBA and applicable laws as well as the financial loss of severance pay to any employees who may be subject to layoffs.

38. It is also critical to note that people are not like cogs in a machine where one can be interchangeably and readily replaced by another; once layoffs are announced and/or begin in earnest, the Florence Project will lose staff and, with them, their experience, expertise, and work towards our mission. Even if funding were to be restarted, we would not be able to simply replace lost staff with equally qualified and experienced people. We would have to invest significantly in recruitment and training any new or replacement staff, which poses additional costs to the organization. Moreover, in the uncertain world of non-profit services, an organization's reputation as a relatively steady or secure place to work carries great weight in that organization's ability to recruit and keep qualified staff. Thus, if we must undergo significant lay-offs due to lack of funding, the harm to the Florence Project's reputation as being able to offer reasonably secure employment will be irreparably undermined, which will make it exceedingly difficult for us to hire to replace positions even if funding is eventually restored.

39. Additionally, the termination of all portions of the UCP contract touching on representation of clients substantially harms both the Florence Project and our clients because the termination notice, it seems, provided no guidance, support, or wind-down process for the cases in which our attorneys have already entered. Florence Project attorneys are currently entered on over 800 UCP cases in Arizona. As is the case with all of Florence Project's services, our representation of these children is entirely free of charge to the clients. As attorneys, we have ethical obligations to our clients, particularly those with imminent court appearances or key case filings or other deadlines. We cannot ethically simply stop representing our child clients – doing so would not only be morally wrong but also would subject the Florence Project to substantial legal liability and our attorneys to discipline from the bar. Beyond this fact, we must also take into account the

particular vulnerabilities of our clients – such as their young age, their lack of financial resources and in many cases their inability to work in order to raise funds for paid counsel, language and education barriers, and the technical complexity of many of their case – when determining whether terminating or otherwise limiting our representation would be ethical or appropriate. As a result, minimally, the Florence Project will certainly incur significant expenses to continue representation to our clients who we are ethically obligated to continue representing despite the termination of these funds. And, given that our mission continues to be to provide free legal and social services with a vision of ensuring that all unaccompanied children have access to counsel and are treated fairly and humanely, Florence Project continues to be dedicated to seeking means to continue representation of all of our clients, current and prospective, as well. This means that our development efforts have been diverted from other critical initiatives to instead attempt to replace as much as possible this lost funding and to try to reduce the impact of this massive loss.

40. The complete termination of all CLINs touching on representation services, shelter advocacy, friend of court services, and more will irreparably harm the people that the Florence Project serves and severely hamper our ability to provide our core services. Indeed, just prior to the announcement of the termination of these programs, Florence Project staff noted DHS in Phoenix advancing cases of children in ORR custody, speeding up the removal process. Similarly, in the Tucson EOIR, Florence Project staff recently noted the appearance of children's names on the court docket even where there is no evidence that Notices to Appear have even been filed yet with the courts in those cases and no notice of hearing listed on the EOIR Automated Case information system, raising serious questions both about accelerating the court process for children and doing so in ways that may not comport with statutes, regulations, or due process. However, without funding to provide representation or even appear as friend of court, it has become unclear how Florence Project staff can best advocate regarding the legal propriety of placing children on a 'rocket docket' or scheduling children for court before charging documents have even been filed. It is not realistic to expect children to navigate the complexities of immigration court on their own in general, much less on an expedited timeline. Additionally, our staff have recently experienced judges denying reasonable requests, such as administrative closure for children with claims for relief before USCIS. I personally witnessed an Immigration Judge in Phoenix conduct group master calendar hearings rife with due process issues in which children were forced to answer the judge's questions related to notice, service, and, notably, best language out loud and all at once. Practices such as these all but guarantee that, without robust UCP services in place continuously, children's cases will be expedited in a way that deny children the opportunity to reunify with sponsors and will result in children being ordered removed not because of the merits of their case, but because of their age, developmental stage, lack of education or language abilities, and lack of knowledge or understanding of the legal requirements.

41. The due process cost of so many unaccompanied children potentially losing experienced pro bono counsel across the state of Arizona, and indeed the nation, at the same time, is

also going to be unmeasurable. Florence Project staff currently represent many children who will suffer immediate harm if we are unable to continue representing them pro bono.

42. For example, Florence Project attorneys currently represent a set of siblings who fled their country of origin after their mother died and their sister was murdered in front of one of the siblings. All three have applications for asylum pending before USCIS and they have been recently approved for SIJS with deferred action. Both are processes that will require additional complicated legal work, including potential asylum interviews and adjustment of status applications among other things, which will require the assistance of an attorney. Additionally, given the rapidly changing landscape in immigration law, policy, and enforcement, it is apparent that these children will likely require additional support for legal counsel while their process is pending. Indeed, just recently, despite having actively been participating in their immigration process – they had attended USCIS  biometric appointments and receiving approved I-360 Petition for Special Immigrant Juvenile Status with deferred action, and the immigration court case was already concluded with non-opposition by DHS to allow them to move forward with the USCIS process – despite all of this, armed immigration enforcement officers came to their home claiming they were "missing" and demanding to speak to them about their cases. While seasoned attorneys work diligently to keep abreast of changes in immigration law, policy, and enforcement and have training in how to respond to a situation like this, it is unreasonable to expect children like these siblings to do the same on their own. Additionally, with three children all needing legal services, the cost to hire private counsel would be a significant financial burden their sponsor. As such, the elimination of funding to support children like these would seriously harm these clients and cut to the very core of the Florence Project's mission and services.

43. In another example, Florence Project staff attorneys recently learned about two separate cases of children, both babies, under the age of two-years-old who are in one of the Arizona tender-aged shelters who are currently not getting reunified with their parents and require additional advocacy for the government to follow protocols established under the *Ms. L. v. ICE* settlement agreement – a settlement agreement arising out of the massive violation of rights of children and parents that occurred under "zero tolerance" family separation policies from 2017 to 2018. Like most two-year-olds, both of these children are pre-verbal and unable to advocate for themselves about anything, much less complicated matters involving legal settlement agreements and reunification policies. However, given the current termination of representation under the UCP, there is no funding to represent these children or even advocate for them in any way short of full representation. As such, Florence Project managers are currently assessing to what extent we will be able to help these extremely young children without any funding, knowing that we must either absorb the cost of representation for these extremely vulnerable children by drawing down on general funding or reassigning funds from other programs or stand by and allow the rights of these children to be violated.

44.  Elimination of funding for the UCP program also creates an untenable system whereby access by legal advocates to children in detention will be left up to the government

offices and workers, who are at times the very people abusing and trafficking children. With this funding eliminated, children will have to pay for attorneys out of pocket, a concept which boggles the mind, especially considering the dearth of experienced immigration pro bono counsel in the United States. Moreover, there is already a serious shortfall of attorneys in Arizona who have the specialized experience needed to work on detained children's cases, which pose unique issues of law. The pool of attorneys willing to do the work is even smaller for children's cases, as many children's cases require additional expertise in juvenile law in Arizona, which all FIRRP attorneys have, but which many private practioners do not. Indeed, while immigration court is a federal system which allows attorneys barred in any state to represent clients, only attorneys barred in the state of Arizona may represent clients in state court proceedings; many private immigration attorneys who practice in Arizona (who may be barred outside of Arizona and legally work on federal immigration cases) may not even be qualified to represent unaccompanied children who require these state court proceedings.

45. Without federal funding for UCP work, access to counsel also will be largely left up to the ORR shelters. If this were to pass, it would create a clear conflict of interest, as ORR is often the perpetrator of abuse, mistreatment, or failure to follow legal protections for children. With the recent dismantling of the ORR Ombudsman office, and the Office of Civil Rights and Civil Liberties, children detained in ORR custody are placed in a system with even less independent oversight and accountability than before, which makes access to free counsel more important than ever.

46. Finally, elimination of access to the unaccompanied children who are detained in ORR custody for representation, for the first time since we began working with unaccompanied children 25 years ago, is deeply disruptive to our core legal service model and will directly harm children who will be deprived free legal and social services, attorneys to represent them in court or assist as friend of court when they are waiting to reunify with family members. Unaccompanied children, particularly those who are placed in LTFC shelters, or who remain in ORR custody during their removal proceedings, or who are near to turning 18 and require immediate urgent action on their cases to protect their rights, all groups children who the Florence Project now routinely represents as a matter of course, will have no means to pay any private attorney to represent them, leaving those who are in many ways the most vulnerable most likely to be denied their basic rights. The loss of funding to support these services cut deeply at the Florence Project's core mission and vision.  Children will no longer have caring advocates they can trust, who will get to know their cases through expert and age-appropriate methods and advocate for their expressed interests. Even the threat of loss of access and the resulting uncertainty it has caused within our staff has had a profound impact on the morale of our staff who have dedicated their careers to serving unaccompanied children; now, facing the termination of all but the most basic KYR services to the thousands of children we serve is devastating to staff morale.

47. Additionally, FIRRP's vision that every person facing removal have access to counsel, understand their rights, and be treated fairly and humanely is also severely undermined by the elimination of the UCP. First, for the majority of children in ORR custody in

Arizona, Florence Project attorneys and staff working under the UCP are likely their only access to counsel and opportunity to receive pro bono representation. Eliminating access to representation and friend of court services under the UCP will ensure that children are forced into removal proceedings – proceedings we have already seen are being accelerated and conducted in part using mass hearings that violate due process – without counsel. Termination of all but CLIN 1 of the UCP will effectively guarantee that more children in ORR custody in Arizona will go through their removal proceedings without an attorney to represent them or even help them navigate the system during their court process. No child should be expected to be able to learn immigration law and present a complex legal case against a trained government attorney, often in a language they do not understand, on their own.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of March, 2025 in Phoenix, Arizona.

_____
Roxana Avila-Cimpeanu
Deputy Director
Florence Immigrant and Refugee Rights Project

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION DANIELA HERNÁNDEZ CHONG CUY IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

### DECLARATION OF DANIELA HERNÁNDEZ CHONG CUY
### FOUNDER, DIRECTING ATTORNEY AND OWNER OF THE LAW OFFICE OF
### DANIELA HERNÁNDEZ CHONG CUY

*I, Daniela Hernández Chong Cuy, make the following statements on behalf of myself and the Law Office of Daniela Hernández Chong Cuy. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Daniela Hernández Chong Cuy and I am the founder, owner and Directing attorney of the Law Office of Daniela Hernández Chong Cuy, a Professional Corporation. ("Law Office of D. H. CH. C."). Based in Pasadena, California, the Law Office of D. H. CH. C. provides comprehensive legal representation to unaccompanied immigrant children formerly in the custody the Office of Refugee Resettlement ("ORR") in Los Angeles, San Bernadino, Ventura, and Riverside counties. We are also the sole legal service provider for two ORR long-term foster care facilities: Building Bridges Foster Family Agency in Ontario, CA, and MarSell Wellness in Montebello, CA.

3. In order to carry out this mission, the Law Office of D. H. CH. C. has several main work components: (1) Representing children in long-term foster care under ORR custody in immigration proceedings; (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings; and (3) Providing educational services in the form of legal education "know your rights" ("KYR") presentations for unaccompanied minors under the Post-release Initial Legal Service ("PILS") program.

4. The Law Office of D. H. CH. C. has been providing legal services for unaccompanied immigrant children in California since May 2023. In May 2023, as subcontractors of the Unaccompanied Children's Program, we began providing legal representation for children detained in an LTFC in Ontario, California, and for unaccompanied minors who were no longer in ORR custody in Los Angeles, San Bernardino, Ventura, and Riverside counties. In 2024, our services under the contract expanded to include a second LTFC facility in Montebello, California, and to cover a larger number of released unaccompanied children.

1

5. Since 2023, our office has initiated a combined total of 75 cases. In 2024, we initiated representation for 15 children in long-term foster care and 27 children that have been released from previous ORR custody—a total of 42 children just that year. Just in the first few months of 2025 alone, we have initiated representation of eight unaccompanied minors in long-term foster care, which is likely explained due to the uptick of children in need of long-term care.

6. Currently our office has 60 open cases under the ORR contract. To fulfill our duties as a provider of legal services for unaccompanied minors, I have had to restructure my business model and the clientele my Law Office serves, limiting the number of private clients I can take at any given time to accommodate the growing demand of competent legal service providers for this vulnerable population.

7. With U.S. Department of Health and Human Services ("HHS") funding, the Law Office of D. H. CH. C. has maintained four staff members dedicated to providing legal services to unaccompanied immigrant children.  Specifically, our team is composed of two full-time attorneys, including myself, and two full-time paralegals. Our fourth and most recent hire was welcomed to our team in October 2024.

8. Staff providing representation and KYR presentations to children in long-term foster care regularly travel to meet each child in person to conduct client interviews and prepare clients for Immigration Court hearings. Our staff visits the facilities at least once a month, with in-person visits often occurring on a bi-weekly basis. The LTFC clients can also request a virtual meeting with their attorney for faster and more convenient scheduling; we take these sorts of meetings at least twice a week. In-person visits can range from one to four hours, depending on the legal work to be done and the youth served on each visit. Child representation requires a trauma-informed approach, so the work cannot be rushed. The clients will set the tone and pace for our work and conversations.

9. In addition to providing representation in removal proceedings before the Immigration Court, we provide representation for unaccompanied children before United States Citizenship and Immigration Services ("USCIS") and California Family, Probate, and Dependency court as needed.  A majority of the children we represent are eligible for Special Immigrant Juvenile Status ("SIJS"), a critical form of immigration relief for children who have suffered abuse, abandonment, or neglect. SIJS proceedings are especially pertinent to children in long-term foster care, who require dependency courts to designate an institutional caregiver to ensure their well-being.  Many children we serve are also eligible for asylum, as they fear persecution in their countries of origin.  Our office provides services not only to initiate their asylum applications, but to accompany them to their critical asylum interview before USCIS.  Other children we serve are eligible for U Nonimmigrant Visas, as they have been victims of criminal activity in the United States,

thus we provide representation before the necessary law enforcement agencies to prepare their case.

10. A large part of our ORR contract focuses on serving unaccompanied children in long-term foster care.  Unaccompanied immigrant children are placed in long-term foster care when they have no one in the United States who is available to care for them.  These children require a particular form of representation, due to the increased vulnerability of not having an adult to be released to in the United States.  Due to their circumstances, children in long-term foster care do not have the financial resources to pay for an immigration attorney. Further, many of these children experienced severe abuse, neglect, or persecution in their countries of origin, and require trauma-informed advocates to help them navigate the complex world of immigration law. We have clients as young as two years old, who would be unable to represent themselves before any court or government agency or to find a paid attorney. We represented a client belonging to the Hazara/Suni ethnic and religious minority who fled Afghanistan after the takeover by the Taliban regime in 2021; we helped him prepare and present his asylum application before the Los Angeles Asylum Office, and file other applications for relief before USCIS, all complex procedures he would be unable to navigate on his own, due to age, and cultural and language barriers. We have an indigenous Raramuri client, a 16-year-old girl who has no known direct relatives either in Mexico or in the United States; we provided representation for the appointment of an institutional guardian in state court and just received notices of approval of her SIJS application. We advocated before multiple stakeholders so that a family of four young children from Angola be released from ORR custody to reunify with their family in Canada.  None of these clients would have been able to seek relief without our assistance.

11. Our work is critical not only in preserving our clients' access to justice, but in ensuring that the Immigration Court's juvenile docket runs efficiently. The consistency in the way we have provided legal representation for our detained clients and prepared applications for relief during the past two years has led to an efficient management of the juvenile docket at the Immigration Court in Santa Ana, California, where our cases are routinely terminated or administratively closed.  This avoids unnecessary delays, alleviates the Court's and ICE's case load, and directs resources where they may be best and most efficiently used. Our advocacy for our clients ensures that the due process rights of children in immigration proceedings are respected without need of the Immigration Court mandating unnecessary continuances of their proceedings, or without requiring that the Immigration Judge take additional time to explain to the children before them their rights in those proceedings and how they could in theory advocate for themselves.  In every court appearance, Immigration Judges have expressed their gratitude for our work.

12. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs).

3

Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025

13. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children as well as other non-representation services such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2, and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities, and CLIN 5, which funds Immigrant Justice Corps fellows who represent children not covered under other CLINs. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

14. On March 21, 2025, I was notified via email communication by the Acacia Center for Justice that a stop work order had been issued for all the legal work we do under the unaccompanied children's program. Immediately, I communicated this message to my team, ordering them to cancel any activity that was not strictly necessary to fulfill our ethical duties and giving them the rest of the guidelines necessary to comply with the order.

15. When I learned about the stop work order and termination of the contract, my office staff was in State Court attending to guardianship hearings for LTFC clients, and in the LTFC program we serve. As soon as I was able to speak with them, I informed my staff to cease all work under the contract. Our office is scheduled to appear in Court on Friday, March 28, 2025, on two separate cases, and to prepare for asylum interviews with the Asylum Office and respond to USCIS notices before April 1, 2025. Until I am able to determine how to proceed on each one of the cases without being in violation of the rules of professional conduct, I plan to appear in Court for our scheduled cases, and to attend all legal and court mandated deadlines, so long as it is financially feasible.

16. Earlier today, the Lead Case Manager for one of the LTFCs my office serves, requested that I make arrangements to speak with our clients tomorrow, March 27, 2025, to inform them of the termination of the contract, per the request of their Regional Director. At this point, I continue to navigate the ethical implications of the termination of the contract and

4

the impact this will have on representation of my detained and non-detained clients. I respectfully declined the program's request and informed them that termination of the contract does not automatically terminate legal representation, and that I will schedule to speak with the minors as soon as I am able to provide them with clear responses of the full extent of the implications of the termination of the contract.

17. Currently, the funds we receive for our unaccompanied children's work accounts for 70-75% of our overall budget. Similarly, most of the work we perform on our daily operation relates to these contracts. As a small firm, our entire staff is affected by a loss of unaccompanied children's funding. Before we entered into this contract with ORR, my Law Office was not dependent on this funding, but its demands have required me to restructure my Law Office's clientele and expand my staff. From May 2023 to September 2024, we managed to operate with two attorneys and one paralegal; we welcomed the fourth member of our team in October 2024. Because my office is a private practice, the partial termination of this program will have a severe financial impact on the operation of my Law Office. Within two months I will not be able to cover the financial obligations towards my staff or cover the cost of our daily operations. As a private practice, we are established as an "S" corporation, and do not have the tax structure or lobbying capacity necessary to secure the external funding required to solvently continue providing these types of legal services without the payment previously contracted.

18. For the duration of the original stop work order which occurred on February 18, 2025, we were fortunate enough to continue providing the strictly necessary legal services to our existing clients and fulfill our ethical duties with minimum repercussions. Still, we were forced to reschedule appointments with clients and provide services like attending court hearings without knowing if we were going to be compensated for the work done, while avoiding unnecessary stress or burden for our clients.

19. The effects of the current termination on our office are immediate. The impact on our morale is severe, as it forces us to restrict communications and services presented to our clients to the bare minimum, which is contrary to our client-centered approach. Moreover, it will not be possible to provide a living wage to my staff and quality legal services to my clients as a Law Office without unaccompanied children's funds. A shutdown of the unaccompanied children's program income leaves us in the precarious situation of having *de facto* 60 new unfunded clients, from our total of approximately 150 clients, to whom we have a duty to continue to provide service, at least for the foreseeable future. Under the California Rules of Professional Conduct, attorneys in general *may* withdraw from their representation if they are paid for services if the client breaches the agreement and the attorney gives them reasonable time to secure new representation, amongst other conditions. However, the representation contract we entered with the children from the unaccompanied children's program is pro bono. That is, our attorneys cannot unilaterally terminate their client's legal representation solely for lack of payment or professional

5

funding, particularly because it would be highly prejudicial for them as unaccompanied children while they are detained or underage. Under Rule 1.16(d), a lawyer shall not terminate representation until they have taken reasonable steps to avoid reasonably foreseeable prejudice to the rights of the client, such as giving the client sufficient notice to permit the client to retain other counsel or obtain a copy of their legal file. It is very difficult to see a scenario under which our young clients under long-term foster care, ages 2-17, would be able to retain legal counsel on their own or to be able to present competent representation that would make our withdrawal permissive under California Rules.

20. Continuing to operate with at least 60 unfunded clients for the foreseeable future will likely bankrupt my small business. It will force me to incur significant debt to try to once again redistribute the ratio of my client portfolio to serve additional private clients. With my reduced staff, and considering that we already serve over 150 clients, it would be nearly impossible to manage a clientele restructuring while maintaining a full staff and sound finances.

21. In addition, on January 8, 2025, my house was completely destroyed in the Eaton fire, in Altadena, California. This forced my family of three, including my two-year old, to be displaced. It was not until March 1, 2025, that we were able to secure temporary housing. The disaster my family experienced disrupted my business operations. While my office continued working, and the rest of my staff was spared from the fire, I had to take extraordinary measures to be able to respond to the stop work order and the financial implications that followed.

22. When I started the Law Office of D. H. CH. C. in 2020, I wanted to create a private law practice that could provide both a balanced environment for my staff and provide services so that clients of all backgrounds and resources could find competent and caring legal services. To this day, we aim to provide zealous, competent and holistic representation to our clients in the immigration system, whether detained or non-detained, and at all stages of their immigration removal proceedings. Our mission is still to provide client-centered and trauma-informed legal representation. I hope that we can carry on with this vision without it leading to financial ruin.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 26 of March 2025, in Pasadena, CA.

_____

**Daniela Hernandez Chong Cuy**
**Directing Attorney/Owner**
**Law Office of Daniela Hernández Chong Cuy**
**UCP Legal Service Provider**

7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

Case No. 3:25-cv-2847

**DECLARATION OF ANA RAQUEL
DEVEREAUX (MIRC) IN SUPPORT
OF PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION**

## DECLARATION OF ANA RAQUEL DEVEREAUX

## SENIOR MANAGING ATTORNEY FOR MICHIGAN IMMIGRANT RIGHTS CENTER

*I, Ana Raquel Devereaux, make the following statements on behalf of the Michigan Immigrant Rights Center. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Ana Raquel Devereaux, and I am a Senior Managing Attorney at the Michigan Immigrant Rights Center (hereinafter, "MIRC"). MIRC is a non-profit organization that provides free legal services for children and other non-citizens who have suffered abuse, trafficking, and persecution. MIRC is the only organization serving unaccompanied children in the custody of the Office of Refugee Resettlement (hereinafter, "ORR") in Michigan and the primary organization providing legal services to children in the unaccompanied refugee minor program in Michigan and to children released from ORR custody to sponsors in Michigan.

2. Michigan Immigrant Rights Center (MIRC) is a legal resource center for Michigan's immigrant communities. MIRC works to build a thriving Michigan where immigrant communities experience equity and belonging. The Michigan Immigrant Rights Center is a program of                                      . MIRC has five local offices throughout the state of Michigan which provide direct legal services to unaccompanied children and also provide general community immigration legal services. Our five local offices are located in Detroit, Ypsilanti, Lansing, Grand Rapids, and Kalamazoo. These five offices are supported by a statewide structure within MIRC to provide training, administrative and supervisory support, community engagement, and pro bono support.

3. In order to carry out this mission with respect to providing legal services to unaccompanied children, MIRC has several main work components: (1) Providing educational and pro se services in the form of legal education "know your rights" ("KYR") presentations, conducting individual consultations (intakes), and conducting pro se workshops with all unrepresented children in ORR custody in Michigan; (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings; and (3) Representing children in ORR custody in immigration proceedings. We further host Immigrant Justice Corps (IJC) fellows to represent unaccompanied children in removal proceedings and provide Spanish-language support for staff representing unaccompanied children.

4. MIRC has been providing legal services for unaccompanied immigrant children in Michigan since 2009 at a smaller scale and with a dedicated unaccompanied children's

1

team beginning in 2017 when MIRC received its first subcontract to serve children in ORR custody in Michigan. That first contract focused on providing KYR presentations, legal screening, support for hearings, and representation as needed for all children in short-term ORR custody in Michigan and providing universal immigration representation to all children in long-term ORR custody in Michigan.

5. Since 2017, the ORR bed capacity in Michigan for short and long-term shelters and foster care facilities has expanded significantly to its current capacity of 335 short-term beds and 122 long-term beds. In 2021, MIRC's subcontract expanded to permit MIRC to offer representation to children in Michigan who have been released from ORR custody and are in removal proceedings. MIRC has grown its capacity to represent released children from 240 to 565. Additionally, in 2021, an Emergency Intake Site was opened in Michigan with 225 beds. MIRC served all of the children in that facility by providing KYR presentations, conducting intakes, and conducting pro se workshops with all unrepresented children in ORR custody in Michigan, and offering representation, especially when the facility turned over its population and housed most of the Afghan Unaccompanied Minors who arrived in ORR custody and the contract provided for and required asylum and work authorization for these youth while in ORR custody. MIRC continues to serve all ORR beds in Michigan and remains ready to expand to serve any additional facilities that serve unaccompanied children in the state and to reach as many released children for representation as is within our capacity, which we have continually expanded to address the unmet need in the state of Michigan. At this time, we serve the following facilities: BCC Caminos Nacional – Michigan Children's Home Society, Bethany Christian Services – Wedgwood Christian Services, Bethany TLC, Bethany USCCB (Bellaview and Casa del Sol), LIRS – BCS MI Kalamazoo LTFC – Casa de Esperanza, LIRS – BCS MI Kalamazoo LTFC TGH – Hacienda De Luz, Samaritas LTFC, LIRS–BCS MI Alma Shelter, LIRS–BCS MI East Lansing TFC, LIRS–BCS MI Grand Rapids Shelter – TAC, LIRS–BCS MI Grand Rapids TFC, LIRS–BCS MI Holland TFC, LIRS–BCS MI Muskegon TFC, USCCB Catholic Charities West Michigan TFC, Samaritas Shelter – Grand Rapids, Samaritas URM – LIRS – Lansing, MI , Bethany Christian Services URM – USCCB – Kalamazoo, MI , Bethany Christian Services URM – USCCB/LIRS – Grand Rapids, MI , Bethany Christian Services URM – LIRS – Traverse City, MI.

6. With U.S. Department of Health and Human Services (HHS) funding, MIRC currently has 147 positions serving children in and released from ORR custody in Michigan. Specifically, these 147 positions encompass 113 full-time employee's worth of funding and dedicated services to unaccompanied children. Of these roles 58 are attorney staff roles (including attorney managers), 3 of which are Immigration Justice Corps Attorney Fellows, 47 are paralegals (all of whom are either DOJ-Accredited or are working towards their DOJ-Accreditation), 13 are paralegal supervisors, and the remaining staff

2

focus on data reporting, administrative case support, case intake, training, and communication.

7. Staff providing representation and KYR presentations to children in ORR facilities regularly travel to each facility in person to conduct client interviews, prepare clients for hearings, as well as provide legal education, individual consultations, and pro se workshops for pro se children. MIRC serves children in 9 short-term facilities, which range in size from 12 beds to 36 beds. Each week, MIRC staff visit the facility one to two days to provide KYRs and intakes with each child who has arrived within the last week and also to provide follow-up services to children who have been at the facility for an extended time or are otherwise in need of representational legal services. Additionally, the children come to our offices one additional day during the week as that additional time is usually required to complete all the services within the contractually required 7-10 business day period after their arrival in custody. Additionally, we have 8 long-term ORR facilities in Michigan, ranging in bed size from 8 to 32. When children arrive to long-term ORR facilities, MIRC assigns an attorney/paralegal team to meet with the child and offer representation within 30 days of their arrival.

8. For children released from custody, the children are either referred through the Acacia-facilitated referral system, UCORD, or by calling our intake line, once we determine that the child meets the eligibility criteria while offices are accepting new cases, we then meet with the child within 30 days to offer representation. For children with whom we have entered representational agreements, MIRC's legal teams represent children in state and immigration court, file petitions with USCIS, file motions and petitions with the immigration court, file mandamus and habeas actions in the Eastern and Western Federal District Courts in Michigan, file appeals with the Michigan Court of Appeals, USCIS, EOIR, the BIA (and in similar cases, we have proceeded as far at pursuing appeals in 6th Circuit Federal Court of Appeals, but it has not been necessary yet for a case under this contract), as well as pursue other advocacy efforts within ORR and other spaces where unaccompanied children are detained and/or receive services.

9. Children in short-term ORR custody have just arrived in this country and generally have never been in a formal custodial system. They speak many different languages and have a variety of educational backgrounds, ranging from no formal education to middle school level schooling, including high school-age children because they have rarely had high school educational opportunities. Due to all of these factors, they are not yet equipped with the resources to fully understand what rights they have while in custody and it is essential for them to meet with legal services providers to understand that they have a right to bodily safety, contact with family, medical care, and educational services, among other rights guaranteed in the Flores Settlement and the Foundational Rule. Additionally, the immigration legal system is extremely complex and nuanced, and without an orientation with a legal service provider, it would be near impossible for children, let

3

alone the non-attorney staff at these short-term custodial sites to be able to explain, to understand critical pieces of the system that affect them, including the importance of keeping addresses up to date and attending immigration hearings (and even how to understand the notices that arrive indicating when a hearing will occur).

10. A reality that must be addressed is that children in custody are incredibly vulnerable by the nature of a custodial system where the vulnerability factors for sexual and physical abuse are extremely prevalent. A bad actor may take advantage of these systemic vulnerabilities. If these children do not have access to legal counsel that is independent from ORR and the organizations that sub-contract to provide the custodial services, these children surely will face even greater levels of abuse in custody. MIRC intervened and represented children in 2023 when there was an instance of systemic sexual abuse of children in short-term custody in one of the ORR Michigan facilities. MIRC worked to represent individual children, supporting them in reporting to law enforcement and participating in the prosecution of the crime, and holding agency staff and ORR leadership accountable for ensuring further protections are put in place for future children in custody at that facility. Additionally, MIRC represented individual children who faced abuse in ORR foster homes and as soon as the child disclosed the circumstances to MIRC, we ensured they received protection and there was accountability for the individual and systemic failures that harmed the child.

11. In Michigan, if MIRC did not provide these services under the HHS contract, it would be impossible for the majority of the children to receive representation. The private bar in Michigan is relatively small and generally at capacity. Very few private immigration practitioners take children's cases, due to the specialty area of law it encompasses. The few attorneys who do take the cases will charge $10,000 on average, which is outside of reach for most children released to the community and impossible for all children in ORR custody who by definition have no family or financial support in the country. Before MIRC began working under the contract, we would receive frequent calls from staff at the ORR facilities asking us to take the cases because no one else would do so, but without offering any funding for the work. We turned down a large number of these cases due to a lack of capacity.

12. Since MIRC's founding in 2009, MIRC has engaged in recruitment and mentorship of pro bono attorneys to the fullest extent possible, but a significant challenge has been that in the state of Michigan, pro bono attorneys do not generally have immigration expertise, only speak English (and unwilling to pay for interpretation for pro bono cases), and are unwilling to commit to the timeframe of children's immigration cases or with the special care needed when working with children. Only recently have we had some small success involving pro bono attorneys in our children's work, and it has been because the HHS contract funds language support for the pro bono attorneys and we have a dedicated team to train and support those pro bono attorneys. Even with this support, the pro bono

4

attorneys will usually only offer support in small ways and rarely or never take on full cases for representation.

13. A few other small non-profit legal service providers exist in the state of Michigan, but all of them are quite small and have only had capacity to focus on primarily adult and USCIS-only representation, leaving no other non-profit options for children in removal proceedings aside from MIRC.

14. In addition to MIRC providing the only available and financially accessible legal representation for unaccompanied immigrant children in the state of Michigan, MIRC dedicates significant resources to ensuring the staff MIRC hires are culturally humble, are passionate about serving immigrant children, are trained in best practices for trauma-informed and child-friendly legal services, follow strict child abuse prevention guidelines, and as much as possible share cultural, linguistic, and experiential backgrounds with our child clients.

15. Under the unaccompanied child legal services program, since 2017, MIRC has entered representation for 1,697 children, provided 5,686 Know Your Rights sessions, 4,061 legal screenings, and identified 6,158 potential pathways for relief for our young clients. We have represented children as young as 10 months old. In 2024, MIRC offered legal services and representation to children who spoke 62 different languages MIRC has filed asylum for 725 children, with an 83% approval rate, and filed 351 applications for permanent residency, with 155 of those already approved (the remaining are pending). MIRC currently has over 900 cases open for unaccompanied children in removal proceedings. These numbers result in real, meaningful changes in the lives of children and families, children who grow up to thrive and be part of our communities.

16. MIRC has represented children fleeing abuse, including those who were regularly whipped with electric cords or who faced ongoing sexual abuse with no hope of protection from their communities. MIRC has reunited children with loved ones–children should have the opportunity to be children and the law requires them to be placed in the least restrictive environment feasible, the best place for a traumatized child is with the family or community members with whom they feel most comfortable. These were courses of action that required a lawyer due to their complexity, the legal expertise required, the many logistical barriers within USCIS and immigration court. Without legal representation, these children would have been forced to return to situations of abuse, persecution, and lack of safety due to the inability for a child to meaningfully present their case.

17. We have also represented children who have been trafficked, such as children who were forced to do dangerous work and beaten when they were too sick to go to work. One of the most powerful tools that traffickers use is the threat of deportation to intimidate their

5

targets. Taking lawyers away from children strengthens traffickers' hands. Many times our legal services have prevented children from falling through the cracks–sometimes by identifying abuse in custody and supporting children in coming forward to authorities about such abuse and sometimes by helping children who find themselves in an unsafe situation obtain safe housing or meet other needs to escape violence.

18. In addition to the work we do for children in and released from ORR custody in Michigan, we also work to connect children with counsel when they are moved to an ORR placement outside of Michigan or are released out of state. We work with the child and use the information we obtained during intake consultation to prepare a referral and have staff dedicated to following up to do our best to connect children to free legal counsel in their new location.

19. MIRC is well respected among the local state courts, immigration courts, ICE, USCIS, and local ORR subcontractor staff. MIRC developed norms with each ORR-subcontracted facility by having quarterly meetings to work through logistics and continue to uphold best practices on behalf of the children in custody. Staff from these agencies regularly express their gratitude for MIRC staff and how essential they are for the children. MIRC and the immigration court staff developed a weekly call framework where MIRC efficiently funnels the matters needing the court's attention through one central point of contact, rather than having more than fifty representatives reaching out individually to get questions answered or provide information. The court regularly approaches MIRC for support for pro se respondents and in support of MIRC remaining on the court *pro bono* list (MIRC is the only organization on that list in Michigan). MIRC regularly engages with ICE and USCIS both in representational settings and in stakeholder engagement contexts respectfully and collaboratively on behalf of the clients when possible. One of Detroit's Immigration Judges recently took some time after a hearing to thank our staff member for working for MIRC and for all the great and important work MIRC does.

20. Additionally, MIRC received the Champion of Change award in 2024 from the Governor's Task Force on Child Abuse and Neglect and Children's Advocacy Centers of Michigan, as part of the nomination for the award, Veronica Thronson, leader of the Michigan State University College of Law's Immigration Clinic, was quoted as praising MIRC as follows:

> The nominee has been a champion for children since its inception, through direct representation of children and their families in seeking protection in immigration and state contexts... These children have been abused, neglected, or abandoned in the State of Michigan. MIRC's team has grown from two attorneys to its current size of [, with] staff members focused specifically on protecting the rights of children in federal custody in Michigan, achieving permanent protection for

6

children through state and federal courts, and advancing the law to create the greatest access to these protections for all children in Michigan. MIRC has stood in the gap during family separation under the Zero Tolerance policy and ensured that all children in Michigan were reunited with their families according to their wishes. Further, MIRC has held the federal government and its subcontractors accountable when children's rights were violated in federal care in Michigan, in licensed and unlicensed facilities. The nominee has led efforts to try to ensure responses to abuse in custody are trauma-informed and provide the protection needed for children in care.  Illustrative of the difference that the nominee's services have made in the lives of children, in 2023 alone, the nominee served over one thousand children through Know Your Rights presentations, legal screenings, and direct representation in immigration, state court, and before immigration agencies. Also in 2023, the nominee secured state court protections in multiple counties and began a path toward citizenship for hundreds of immigrant children. More stable immigration status allows children to thrive in all other aspects of their lives.

The nominee recently added an innovative team to address social, emotional, and physical needs, which has already assisted over 150 children. The nominee has increased knowledge of protections for immigrant children in state courts throughout Michigan, creating a safety net for children across the state. These children who are released to sponsors or relatives frequently went without access to an attorney before the nominee's programming emerged to serve them. MIRC has been the leader in appellate cases that have enshrined protections available under the law to immigrant children who have been abused, neglected, or abandoned. In particular, the nominee has won two critical appeals that serve as seminal case law impacting immigrant children in Michigan.

The nominee leads several collaborative efforts with stakeholders to enhance outcomes for children, through joint advocacy, training, and resource sharing. As new populations of immigrant children enter the state, the nominee has taken a leading role in assisting service providers to be ready to welcome children in a culturally informed and humble manner. Where necessary, the nominee has advocated on behalf of children whose religious and cultural needs were not fully met by other service providers and to ensure that children who are victims of sexual assault, human trafficking, and other crimes are met with a holistic and culturally sensitive response. For example, the nominee has worked with law enforcement to inform them of the impact of trauma on specific populations, such as youth arriving from Afghanistan who had been evacuated during the Taliban's takeover and who had been separated from their families.

The nominee has also championed change through legislative advocacy at the

7

state level to enhance protections for children who are harmed through child labor, to expand access to Medicaid to children in need, and to ensure language access for state services. In particular, the nominee has partnered with state legislators to increase protections for children exposed to exploitative labor practices, partnering with various stakeholders and leaders to testify on the needs of children to local, state, and national media.

Overall, MIRC has changed the landscape of representation for immigrant children for the better in ways that are measurable in the law and the experience of children and their families in the community. Over the years, thousands of children have safety, stability, and the opportunity to thrive in no small part due to the team focused on the rights and representation of immigrant children in Michigan that the nominee has been able to cultivate and grow and seeks to keep doing so to continue to serve children.

21. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs): 1. KYR presentations and legal services for pro se children in ORR facilities; 2. Legal representation for unaccompanied children not in ORR custody; 3. Legal representation for unaccompanied children in ORR custody; 4. Spanish language tutoring for organizational staff who work with children; and 5. Immigrant Justice Corps fellows who represent children not covered under other CLINs. Without further elaboration on duration or reasoning, the stop work order states that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance."

22. Some MIRC staff were on a virtual meeting led by the Acacia Center for Justice on other matters when the Acacia Center for Justice received notice of the stop work order around 1:00 PM EST. Information was shared on that call and an email was sent shortly thereafter to the entire network. We then immediately had to sort out what this meant in practice and how to ensure every staff member received the information and began to act accordingly. We had an urgent leadership meeting to understand the stop work order and attended an Acacia call hosted on the topic of the stop work order and then held a meeting for our team to explain what we knew at that point, which was very little.

23. During the stop work order, MIRC used a small fund reserve to ensure our clients had the best possible service for as long as possible. The stop-work order did not cut off legal representation for children who are already represented. Because MIRC's lawyers had already filed paperwork with the court and USCIS as the attorney of record for our cases, they are obligated to continue representation or face the possibility of sanctions or bar complaints — unless they ask a judge to be removed from the case, which takes time and

8

has very specific ethics rules that guide how to make this request and when and if a judge will grant it. These reserves can only carry our staff for a few weeks. Roughly 80% of MIRC's budget is funded through the unaccompanied children's HHS funding. If we lose this funding in the long term, we would expect to let go of all of 113 employees, in other words, we do not expect meaningful replacement funding that would allow us to carry on the work under this contract. We would also need to seek to withdraw from all of the 1,205 open cases under the contract and would need to use reserves to have staff focus on that work. The reserves are a critical part of MIRC's long-term sustainability, so the Stop Work Order and any other loss of funding under this contract affects MIRC's other work in the community for other vulnerable populations.

24. During the stop work order, we paused offering KYRs and intakes for children in ORR custody and focused on using our limited resources to maintain our ethical obligations to current child clients.

25. Time spent on stop-work order logistics cost us valuable time in needing to communicate, understand, and change our case management practices to account for the change under the stop-work order. More than that, it has caused a significant feeling of instability, stress, and low morale. MIRC's highly trained, experienced, and specialized staff are beginning to put in their resignation notices to go to jobs that have more funding security. MIRC has built an outstanding reputation as an employer and has been able to attract unusually high quantities of staff to our work, compared to similar local non-profits, because of our commitment to the community, our stable funding, and our efforts to train and support our staff in their work. This reputation is being significantly undermined by the stop work order and the subsequent lack of security around the ongoing funding of the contract and it will make it harder to attract new staff in the future to replace those who have left during this time.

26. When the stop work order was rescinded, MIRC resumed providing all services under the UCP contract. On March 21, 2025, MIRC received notice of ORR's termination of CLINs 2, 3, and 4 of the Acacia UCP contract, effective at the close of business that day.

27. MIRC currently represents over one thousand children under the Acacia UCP contract CLINs 2 and 3 work. These cases involve representation before Michigan local state courts, USCIS, and the Detroit Immigration Court. Without CLIN 2, 3, and 4 funding, MIRC will begin an immediate process to withdraw from these cases. Even though we have made significant efforts to fundraise with individual, foundation, and local government funding, there is no meaningful replacement for the funding offered for representational services of unaccompanied children under the UCP contract. Our alternate fundraising may allow us to keep as many as 100-200 cases open, which would leave over 800 children whose representation we will need to withdraw from immediately. While we will begin our efforts to withdraw from the cases for which we

9

did not obtain alternate funding, the process of withdrawal takes some time with ensuring the proper wrap-up tasks have been completed so the client is not unduly prejudiced by the withdrawal and counsel needs to formally seek to withdraw where we have entered appearances before tribunals, which takes time and is subject to the decision of the judge on each case.

28. While we have attempted to do the most we could for each client before we were in the position, we still have many clients for whom no relief has been filed because we have only begun working on their cases recently or there were external hurdles to accomplishing our initial goals in the case. Almost every one of the children MIRC represents qualifies for protection under the immigration law, however, it is a lengthy, arduous, and legally complex process that allows us to usher the client to the point of receiving the immigration status they qualify for. Many of the children whom we will no longer be able to represent due to the termination of CLINs 2, 3, and 4 of the UCP contract will be unable to secure new counsel and be unable to navigate the immigration processes without counsel, and so will be left without protections they qualified for and will be deported to situations where they would face abuse, neglect, persecution, separation from critical caregivers and services. In all of this, expecting these children to face the immigration system without counsel will have deprived these children of their right to due process under the law.

29. CLINs 2, 3, and 4, comprise about 75% of MIRC's budget. Of the 113 full-time employee's worth of funding in our UCP budget, about 98 of those are in CLINs 2, 3, and 4. If funding from CLINs 2, 3, and 4 is not restored within a few days, MIRC will need to proceed to provide layoff notices to the majority of staff funded under those CLINs. We are able to use some of the funds we raised to allow us to provide staff a short notice period to withdraw from cases and honor their rights as employees. Even this little bit of essential transition period after a layoff notice, will cost MIRC at least 1.2 million dollars of funds drawn from other sources that take away from MIRC's ability to serve other vulnerable populations.

30. However, if the restoration of CLIN 2, 3, and 4 funding is delayed any more than a week and we have already given staff their layoff notices, we expect most staff will still seek to depart, even if funding is restored, because of the uncertainty and individualized detriment to their morale to know they specifically were not retained. Even as we have been nearing the end of the contract period, more and more staff have been departing, especially our more seasoned staff, because the earlier stop work order gave them concern for the future of the funding.

31. If the restoration of CLIN 2, 3, and 4 funding is delayed any more than a month, and we would be in a position to have to rehire for the work, it would be unlikely that most of the laid-off staff would be interested in returning. Before this season of funding uncertainty,

MIRC has been close to exhausting the hiring pool of those interested in and able to do work under the UCP contract, especially where attorneys are concerned, and so I expect our success in bringing on new staff would be limited, to begin with, and it would cost us the months of labor in recruiting, hiring, onboarding, and building their familiarity with the work that it takes to return to the staffing norm we have now.

32. Beyond the cost to the staff themselves, the cost to the clients of closing cases, laying off staff, then having to bring on new staff, and trying to reach out to clients to try to offer them representation again is devastating, specifically shattering those relationships of trust which have taken so much to build. A stable and trusting relationship is critical for children. They will have no reason to trust our ability to continue to keep their cases and they will have to build relationships with new people, assuming they are available, which is already hard for anyone having to share the most traumatic details of their life story in order to pursue immigration relief, but it is especially hard for a child in that situation.

33. The uninterrupted and ongoing funding of this work with unaccompanied children is critical to the protection of children from harm in custody and against the significant risk posed by going through removal proceedings without counsel and the subsequent harm that would result from removal. Not only that, but the stability of this funding is critical to MIRC's ongoing work as an anchor immigrant rights organization.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.

Executed on the 22 of March 2025, in Lansing, Michigan.

Ana Raquel Deveraux (P79145)
Senior Managing Attorney
Michigan Immigrant Rights Center

11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-2847 <br><br> **DECLARATION OF JILL MARTIN DIAZ, ESQ. (VAAP) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## DECLARATION OF JILL MARTIN DIAZ, ESQ.
## EXECUTIVE DIRECTOR FOR VERMONT ASYLUM ASSISTANCE PROJECT

*I, Jill Martin Diaz, make the following statements on behalf of Vermont Asylum Assistance Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Jill Martin Diaz (they/them pronouns and Mx. honorific), and I am the Executive Director at Vermont Asylum Assistance Project (VAAP; www.vaapvt.org). VAAP is a nonprofit immigration law firm dedicated to expanding access to critical legal services for noncitizens across Vermont. VAAP grew from years of grassroots advocacy to meet low-income Vermonters' increasingly urgent needs for structured, equitable, and trauma-informed immigration representation. Today, VAAP is Vermont's only firm dedicated to providing legal services to indigent unaccompanied immigrant children exiting detention, other youth and adult subpopulations in removal proceedings.

2. VAAP is a legal services organization committed to expanding access to immigration legal knowledge and direct services. We envision a Vermont where noncitizens fully understand and access their legal rights, and where immigrant and mixed-status families feel a true sense of belonging, regardless of legal status. Founded in 2021 by grassroots volunteers, VAAP incorporated as an independent 501(c)(3) in late 2023. Now guided by an 11-member board and staffed by a supervising attorney and three legal advocates, including two pending admission to practice, VAAP is mobilizing dozens of pro bono attorneys and transforming Vermont's immigration legal landscape through direct representation, pro bono coordination, technical assistance, and advocacy at the state and federal levels.

3. In order to carry out this mission, VAAP has several main work components, including: (1) Providing educational and pro se services in the form of legal education "know your rights" ("KYR") presentations, conducting individual consultations (intakes), and conducting pro se workshops with all unrepresented children exiting ORR custody into Vermont; and (2) Representing unaccompanied minors who are not in ORR custody in immigration proceedings. We further host Immigrant Justice Corps (IJC) fellows to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children.

4. VAAP has been providing legal services for unaccompanied immigrant children in Vermont since 2024. This marked a significant milestone for access to justice as VAAP doubled its staff and brought Vermont its first-ever IJC Legal Fellows: Cameron Briggs Ramos and Emma Matters-Wood. Both are Unaccompanied Children Program (UCP) fellows who started in September 2024 and expanded VAAP's intake criteria to not only include legal services for immigrant youth and over-18 UCs but also to guarantee universal

1

representation for all under-18 UCs exiting ORR custody into Vermont (noting Vermont lacks any ORR facilities in-state.).

5. Since VAAP added two full time IJC UCP fellows to our staff in September 2024, we have begun serving a combined annual number of around 135 immigrant children including: (a) about 15 under-18 unaccompanied children leaving ORR custody and seeking full-scope representation on asylum, Special Immigrant Juvenile Status (SIJS), or related humanitarian relief; (b) about 20 factually unaccompanied children who were not so-designated and/or were over-18 at intake and are also seeking full-scope representation; and (c) about 100 derivative beneficiary children included in their parents' *pro se* asylum applications filed at VAAP-supervised pro bono legal clinics.

6. With U.S. Department of Health and Human Services (HHS) funding, VAAP currently has hired two full time staff members dedicated to providing legal services to unaccompanied immigrant children. Specifically, VAAP employs IJC UCP Fellow Emma Matters-Wood on a full-time basis directly serving clients statewide for a renewable one-year contract period from September 1, 2024, through August 31, 2025; and IJC UCP Fellow Cameron Briggs Ramos on a full-time basis directly serving clients statewide for a two-year contract period from September 1, 2024, through August 31, 2026.

7. VAAP staff providing representation and KYR presentations to children leaving ORR facilities to a Vermont parent or caregiver regularly meet clients to conduct client interviews, prepare clients for hearings, as well as provide legal education, individual consultations, and pro se workshops for pro se children. The kinds of legal matters VAAP represents children in include removal proceedings in immigration court, affirmative relief like asylum before USCIS, SIJS in state court, and advocacy in terms of equal access and enjoyment of state law-based rights and remedies.

8. As Vermont's foremost immigration technical assistance provider and main conduit between regional and national communities of practice and local communities, the unmet need for KYR services/pro se workshops and/or legal representation is astonishing. These unmet needs are due to, for example, unaccompanied children not being able to afford representation, age of children, trauma, language barriers, geographic isolation, technological and transportation barriers isolating rural parts of the state, lack of attorneys due to remoteness of Vermont towns, and scant amount of nonprofit and private immigration attorneys in the region.

9. Vermont-based children trying to apply for various kinds of relief and/or advocate for themselves without an attorney find it functionally impossible to access their removal proceedings in the Boston and Chelmsford Immigration Courts, as Vermont lacks public transportation, services, and awareness and only represented parties can access virtual proceedings. Caregivers for unrepresented Vermont children as young as five years old have contacted VAAP letting us know that without a cash grant for transportation and

2

overnight accommodation and meaningful language access assistance, they would be unable to get the children to Immigration Court let alone to assist them to prepare and file the children's meritorious applications for legal relief. When VAAP has been able to offer representation—universally to eligible UCs through the IJC UCP Fellows, and ad hoc to other immigrant children in Vermont—we have successfully stabilized children's status by securing relief including SIJS; and promoted judicial economy by terminating proceedings for children where court jurisdiction is improper.

10. As a hybrid direct presentation/pro bono coordination service provider, VAAP provides full-scope direct representation to about 35-40 children each year through our two IJC UCP Fellow positions. VAAP also mobilizes limited assistance for dozens more who are derivative beneficiaries of primary asylum seeker clinics accessing pro bono services on a limited basis in VAAP-coordinated attorney-for-the-day clinics.

11. Numerous judges, clerks, and staff of local state and immigration courts, as well as the Department of Homeland Security's field office staff, have commended VAAP staff for promoting more streamlined, fair, and efficient through their legal work. For example, on several occasions Chelmsford and Boston Immigration Courts have thanked us for helping to prevent unnecessary status conferences, at least, and at best for giving previously unrepresented parties the precious chance to fully developing their clearly meritorious claims for relief. Representing Vermont children also prevents the courts from interfacing with confused respondents about their travels and allows Vermont respondents to appear efficiently via Webex video conferencing.

12. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

13. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective on the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN1, which funds KYR

presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

14. Through social media/word-of-mouth, VAAP staff Emma and Cameron were the first to become aware of the February 21 and March 21 orders threatening their funding, exacerbating the adverse impacts them and their clients. On February 21, the information VAAP staff received was incomplete and changing, and as their supervisor I was not equipped to either confirm or deny rumors until IJC provided written guidance a few hours later, which they supplemented in the days that followed with a town halls for IJC hosts and a one-on-one meeting with me. On March 21, VAAP staff were first to learn about the new order, doing so from their peer fellows hosted by other organizations. Again, I confirmed shortly thereafter with IJC, this time in person since the order was issued while IJC was gathered in New York City for its inaugural alumni convening.

15. This funding loss is devastating to VAAP's financial picture. Currently, the number of immigrant children VAAP currently represents under the CLIN2 subcontract is about 15 and growing, as our contract is new and VAAP was in the process of conducting outreach with referring partners statewide to connect incoming children with us as counsel—an onerous piece of work considering Vermont lacks any in-state ORR detention. For context, Office of Refugee Resettlement-originated funding, including but not limited to our CLIN2 subcontract, accounts for about half of VAAP's overall operating budget and accounts for about 75% of the funding VAAP needs to host our two IJC UCP fellows. As a newer organization with limited cashflow and mostly reimbursement-based funding sources, VAAP cannot administer payroll without UCP contract funding, and may need to furlough its two IJC UCP fellows. Indeed, when the Stop-Work Order was first announced in February, VAAP temporarily furloughed our two IJC UCP fellows effective immediately causing financial harm to the fellow and to VAAP and legal harm to VAAP clients including children in proceedings. When IJC UCP Fellows are furloughed, I am rendered the sole remaining direct legal service practitioner on staff and must absorb two full-time caseloads in addition to my existing full-time administrative, fiscal, and professional duties. Only with IJC's commitment of an expedited reimbursement for expenses incurred last quarter plus an additional 30 days of prepaid funding for the month of March was VAAP able to restore Emma and Cam to full-time after a 48-hour furlough.

16. Notably, the February Stop-Work order conspicuously co-occurred with the *J.O.P. v. Department of Homeland Security* class settlement deadline of February 24, 2025, the date when unaccompanied children class members were required to file their asylum applications with USCIS at pain of waving initial USCIS jurisdiction over their claims. VAAP staff were placed in the impossible posture of either working without pay to meet professional duties to several class member clients or leaving the work piled onto my

4

catastrophically overloaded docket at risk of permanent legal harm to clients and professional liability for VAAP. VAAP staff worked without pay to meet their child clients' deadlines, causing undue delay to their own contingency planning to replace lost income and prevent rent arrearage and loss of housing.

17. Moreover, since February, the threat to UCP funding has closed VAAP to new legal intakes, including for unaccompanied children in deportation proceedings. Intake closure comes at a time when DHS is ramping up enforcement and detention activities in our northern border state, causing an increasing volume of indigent Vermont children and youth to enter removal proceedings in Boston and Chelmsford Immigration Courts without counsel.

18. For existing clients, VAAP staff describes the act of strategizing on individual cases or managing their overall dockets long term as "impossible," since they are finishing each workday without knowing whether they will be returning the next. Funding threats and associated uncertainty of employment is threatening legal service quality and making it difficult for VAAP staff to prioritize among increasing, overlapping case emergencies.

19. For example, one CLIN2 subcontract client from Sudan has a pending asylum application and an approved USCIS Form I-360 granting Special Immigrant Juvenile Status. Prior to seeking refuge in Vermont, Sudanese law enforcement repeatedly refused to offer client with protection from the physical and verbal attacks he faced for reasons relating to his nationality, ethnicity, and religion. The child client was being held in ORR custody for an extended period in a southern U.S. state, since the SIJS sponsoring organization required proof of counsel in Vermont before permitting the child to be released here. Client was on his way to release to Vermont with VAAP's offer of full-scope representation, which we have suddenly rescinded considering this funding loss. The child clients' navigation of removal proceedings *pro se* from his unnecessarily prolonged detention hangs in the balance.

20. Another CLIN2 subcontract client from Mexico has a pending asylum application and was just beginning the SIJS process when funding was cut. Prior to seeking refuge in Vermont, the child witnessed neighbors, friends, and peers his age tortured and killed by cartel members and their families, and all were denied assistance by local police. When the client began receiving threats that the same would happen to him, he fled. Since arriving in the United States, a severe health condition and hospitalizations have made client's court appearances literally impossible to access without resource-intensive assistance from counsel including home visits to his rural Vermont town. Resultantly, he was up against the *J-O-P-* deadline to file his asylum application and receive the benefits to which he was entitled and nearly lost out in spite of his and counsel's heroic efforts to overcome his health condition and make his filing deadline. They were just able to submit client's meritorious asylum application in time, despite the odds they were up against. Client will not be able

5

to continue pursuing his applications for relief without counsel, given his young age and fragile health.

21. Yet another CLIN2 subcontract client from Mexico has a pending asylum application with an upcoming biometrics appointment. Prior to seeking refuge in Vermont, the now 10-year-old child's uncle was murdered in his presence. The same group that murdered his uncle threatened our child client and attempted his kidnapping, at which point he fled for his life to the United States. Unfortunately, our client and the family he reunited with in the United States were then subjected to severe forms of labor trafficking. After all of this, our client made his way to Vermont and had just managed to secure our representation and to file his asylum claim when funding was cut. This young child needs our legal assistance to access his upcoming biometrics appointment, to understand and prepare evidence substantiating his claims, and to share his story in an asylum interview. The child client will be unable to complete his interview without the assistance of counsel, as he is incredibly shy and has either panic attacks or breaks into inconsolable sobs when he attempts to speak about it.

22. The uncertainty of future funding has prompted VAAP's difficult decision to not renew the contract of the one paralegal advocacy/program coordination person on staff and eliminate the position. Now, VAAP staff is shrinking from four to three, and potentially to one, at a time when the complexity and volume of unmet legal service needs are increasing.

23. In the interest of prioritizing professional duties owed to child clients above all else, VAAP is also forgoing administrative work that would reimburse staff for work-related expenses and replace lost funding to sustain VAAP's ongoing operations. My professional duties to clients and fiscal duties to the future of VAAP are now in direct conflict because of this contract cancellation. As a result of these sudden, unplanned resource constraints, existing child clients are waiting longer to hear back from VAAP regarding clients' increasingly frightened requests for clarification and assistance.

24. Without restored funding, I will likely be the only full-time attorney at VAAP within the next four-to-six weeks, rendering me solely responsible for the firm's existing attorney-client duties as well as all existing fiscal and administrative ones. My resource constraints and conflicting professional and administrative duties would require me to keep our intake closed and to withdraw from representation in all child clients' removal proceedings. This would irreparably harm clients' legal claims for relief and increase their likelihood of deportation, as there are no other legal service providers of this type serving Vermont. Harm to VAAP clients is harmful to VAAP's mission-based staff. That said, continued representation of clients under ethical obligations without funding is also harmful to staff.

25. Even if VAAP can diversify funding at the last minute to prevent IJC UCP staff from becoming re-furloughed because of contract cancellation, the harm of February's stop-work order continues to distract staff energy and drain organizational morale. One of VAAP's fellows, Cameron, was forced to sit the February Bar Exam during her temporary

6

furlough period. She described herself as being distracted from her final days of study because of severe worry over what would happen to her clients' cases during her furlough, in addition to the stress of how she would pay Burlington, Vermont's exorbitant rent. The other fellow, Emma, was unable to avoid working without pay, especially in Cameron's absence. She made the difficult decision to forgo finishing bereavement leave to which she was entitled at the time, given a family loss she was grieving during the same period.

I declare under the penalty of perjury that the foregoing is true and correct.

Executed on the 25 of March 2025, in Burlington, Vermont.

/s/ Jill Martin Diaz

**Jill Martin Diaz, Esq.**
**Executive Director, Vermont Asylum Assistance Project**

7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION OF MARION ("MICKEY") DONOVAN-KALOUST (IMMDEF) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**DECLARATION OF MARION DONOVAN   ALOUST**
**DIRECTOR OF LE   AL SERVICES FOR IMMI   RANT DEFENDERS LA    CENTER**

*I, Marion Donovan-  aloust, make the following statements on behalf of myself and Immigrant Defenders   aw Center.  I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

*in absentia*



**Immi rant De enders La  Center**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-2847 <br><br> **DECLARATION OF JOEL FROST-TIFT (PUBLIC COUNSEL) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# DECLARATION OF JOEL FROST-TIFT,
## SENIOR SUPERVISING ATTORNEY FOR PUBLIC COUNSEL'S IMMIGRANTS' RIGHTS PROJECT, UNACCOMPANIED CHILDREN'S TEAM

*I, Joel Frost-Tift, make the following statements on behalf of Public Counsel. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Joel Frost-Tift, and I am the Senior Supervising Attorney of the Unaccompanied Children's Team at Public Counsel, a nonprofit public interest law firm in Los Angeles dedicated to advancing civil rights and racial and economic justice, as well as to amplifying the power of our clients through comprehensive legal advocacy. Public Counsel is one of the primary organizations dedicated to providing legal services to indigent unaccompanied immigrant children who are released from Office of Refugee Resettlement (ORR) custody throughout the greater Los Angeles area.

2. The Unaccompanied Children's team is the largest of four teams within the Immigrants' Rights Project at Public Counsel. The Immigrants' Rights Project practices holistic, trauma-informed advocacy, recognizing that our clients come to us with extraordinary strengths, but also vulnerability due to the violence many have experienced through forced migration and our dysfunctional immigration system. Our team of advocates collaborates with immigrant clients and communities to fight fearlessly for legal protections and a just immigration system.

3. In order to carry out this mission, Public Counsel represents unaccompanied children who are not in ORR custody in immigration proceedings. We further host Immigrant Justice Corps (IJC) fellows to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children.

4. Public Counsel has been providing legal services for unaccompanied children funded by U.S. Department of Health and Human Services (HHS) in the greater Los Angeles area since 2014. Public Counsel serves around 200 unaccompanied children each year.

5. Public Counsel currently has 14 staff members funded by HHS who are dedicated to providing legal services to unaccompanied children. They are a supervising attorney, a program manager, six staff attorneys, one IJC fellow, one social worker, one case coordinator, and three paralegals.

6. Public Counsel provides full scope representation, which includes representation in state courts, in removal proceedings before the immigration court, in appellate proceedings before the Board of Immigration Appeals, in petitions for review in the U.S. Court of Appeals for the Ninth Circuit, and in applications for affirmative humanitarian relief like asylum and Special Immigrant Juvenile Status before USCIS. Our staff frequently

1

represent clients in the Los Angeles, Orange County, and Van Nuys immigration courts, the Los Angeles Asylum Office, and state courts in Los Angeles, Orange, San Bernardino, Riverside, Ventura and Santa Barbara counties. We also provide Know Your Rights services to communities throughout Southern California.

7. Public Counsel has witnessed pro se children in court struggle to articulate their claims due to their age, language barriers, and the complexity of immigration law. Most of these children cannot afford private attorneys, so the loss of the HHS funding would prove devastating for them since it would greatly decrease the number of providers who could represent them.

8. Our Unaccompanied Children's team receives referrals from existing clients, the community, and the online Acacia Center for Justice referral database system. Once we receive a referral we conduct a brief phone screening, followed by a more in-depth intake before initiating representation of a child by signing a representation agreement. When we have capacity to take on cases, we accept all cases that are eligible under HHS funding guidelines where the child resides within our service area.

9. Immigration judges have often expressed gratitude to Public Counsel for the efficiency we bring to their dockets, and they have referred children to Public Counsel. They have remarked to our clients that they are lucky to have such quality representation.

10. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all four Contract Line Numbers (CLINs) of the contract for which Public Counsel is a subcontractor of the Acacia Center for Justice: (1) KYR presentations and legal consultations for pro se children in ORR facilities; (2) Legal representation for unaccompanied children not in ORR custody; (3) Legal representation for unaccompanied children in ORR custody; and (4) Spanish-language tutoring for organizational staff who work with children. Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance."

11. Members of Public Counsel learned of the stop work order suddenly on February 18, 2025, when we received communications from the Acacia Center for Justice and from the Center for Gender and Refugee Studies abruptly informing us that trainings and officer hours had been cancelled. Then, just as suddenly, HHS rescinded the stop work order on February 21, 2025.

12. On March 21, 2025, again without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated this same contract with Acacia Center for Justice for which Public Counsel is a subcontractor. This termination was effective the

Stay Motion Addendum 099

same day, March 21, 2025. HHS terminated the contract with respect to three of the four Contract Line Numbers CLINs: (1) CLIN2, Legal representation for unaccompanied children not in ORR custody; (2) CLIN3, Legal representation for unaccompanied children in ORR custody; and (3) CLIN4, Spanish-language tutoring for organizational staff who work with children. For now, HHS has left in place only CLIN1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors—which includes Public Counsel—to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

13. HHS provides about $1 million per year in funding for 14 of the 15 staff members on Public Counsel's Unaccompanied Children's Team. This accounts for about 5% of Public Counsel's annual operating budget. Without this funding, we will be unable to maintain this staffing of the Unaccompanied Children's team. This loss of staff would have a devastating impact on our ability to continue to represent unaccompanied children.

14. The partial contract termination and the uncertainty of continued HHS funding have had a serious deleterious effect on morale within the organization. Members of our staff have stated their intention to look for other jobs because of the need for reliable continued employment. The anxiety that the  partial contract termination and the uncertainty has caused our staff as well as the time we have devoted to contingency planning have impacted our ability to focus squarely on representing our clients. In addition, we are unable to take on new clients due to the funding uncertainty.

15. Children without representation are much more likely to be denied relief and ordered removed to countries where they fear harm, contrary to Public Counsel's mission of advancing civil rights and justice for all.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 22nd of March 2025, in Burbank, CA.

_____

Senior Supervising Attorney
Unaccompanied Children's Team
Public Counsel

3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, | **DECLARATION OF VANESSA GUTIERREZ (NWIRP) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| Plaintiffs, | |
| v. | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| Defendants. | |

# DECLARATION OF VANESSA GUTIERREZ
## DEPUTY DIRECTOR FOR NORTHWEST IMMIGRANT RIGHTS PROJECT

*I, Vanessa Gutierrez, make the following statements on behalf of Northwest Immigrant Rights Project. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Vanessa Gutierrez, and I am the Deputy Director at Northwest Immigrant Rights Project ("NWIRP") who oversees NWIRP's Unaccompanied Children Program ("UCP"). NWIRP provides legal services to unaccompanied immigrant children and youth who have been released from Office of Refugee Resettlement ("ORR") custody to sponsors throughout Washington State.

3. NWIRP has provided legal services through UCP since 2022. We expanded to provide In-Person Post-Release Legal Services to children and youth released from emergency ORR facilities in 2023, and we expanded again to provide representation to youth entering the

1

URM program in February 2025. NWIRP has over 500 open UCP cases in which we are providing direct legal representation to unaccompanied children and youth released from ORR custody.

4. With funding from the U.S. Department of Health and Human Services (HHS), NWIRP currently has 20.9 full-time equivalent (FTE) staff members dedicated to providing direct legal services to unaccompanied immigrant children and youth. Specifically, we have a directing attorney, 3.65 FTE supervising attorneys, 8.7 FTE staff attorneys, 7 FTE legal advocates, and one social services advocate. In addition to these staff, NWIRP has three FTE Immigrant Justice Corps (IJC) fellow attorneys who provide direct representation for unaccompanied children and youth in removal proceedings.

5. NWIRP UCP staff represent unaccompanied children and youth in removal proceedings in immigration court, BIA appeals, affirmative relief before USCIS (including asylum, Special Immigrant Juvenile (SIJ) classification, Adjustment of Status, T visas and U visas), and state court cases (including dependencies, minor guardianships, parenting plans, and vulnerable youth guardianships). Staff must regularly travel to the Seattle Immigration Court, and occasionally the Portland Immigration Court, as well as state courts throughout Washington for court filings and hearings.

6. NWIRP's UCP Program provides critical legal services to unaccompanied children and youth, who are not guaranteed appointment of counsel in removal proceedings. Most unaccompanied children and youth in our state lack the financial resources to be able to hire private immigration attorneys. There are not many attorneys in Washington state who provide representation in removal proceedings for unaccompanied children and youth or in state court for SIJ-eligible children and youth, especially on a low bono or pro bono basis. Due to their young age (we have represented UCP clients as young as 1 year old), the trauma they may have experienced, language barriers, and the complexity of immigration law, it is not realistic to expect unaccompanied children and youth to attempt to apply for immigration relief before USCIS, pursue state court cases, or advocate for themselves in immigration court without an attorney.

7. NWIRP successfully serves children and youth in rural and urban areas of Washington State. When we receive a referral for a UCP-eligible child, we direct the referral to the UCP team at the NWIRP office that covers the county where the child lives and schedule an individual consultation. If the child would like NWIRP to represent them in their immigration case, we accept their case on a universal representation basis, without regard for the type of relief they may qualify for or the strength of their case. We then assign their case to an attorney, or a legal advocate working in collaboration with an attorney. When possible, for children and youth who are eligible for SIJ classification, we try to place their state court case with a pro bono attorney. We regularly engage in pro bono recruitment and mentorship, and we periodically offer training to pro bono attorneys. When NWIRP is

unable to find a pro bono attorney, we take on the state court case in-house. We provide in-house representation on the immigration case before the immigration court and USCIS.

8. For most of NWIRP's UCP clients, we represent them in their first appearance in immigration court. Many of our UCP clients have never been to any court ever in their life before their first immigration court hearing. Before their hearing, their assigned NWIRP attorney meets with them to explain what to expect during the hearing, including who will be present, what the layout of the courtroom will be, what the immigration judge may ask during the hearing, what their NWIRP advocate may say on their behalf, and what some possible outcomes of their hearing may be. We review the factual allegations and charges of removability in their Notice to Appear with them, and we review the forms of immigration relief that we have already discussed with them, making sure they fully understand and that we answer any questions they have. This preparation helps put the child or youth more at ease, helps ensure their presence at their scheduled hearing, and helps the hearing run more efficiently and smoothly because the child better understands what is happening.

9. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all four Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS later rescinded the stop work order without explanation on February 21, 2025. Even this short lapse in funding negatively impacted NWIRP's UCP work. The stop work order created confusion among staff over how to categorize and memorialize the work they continued to do on behalf of our clients, adding extra timekeeping requirements that took away valuable time that could have been spent advocating for clients. During the stop work order, we continued the direct representation and legal services without interruption, as ethically required by the Rules of Professional Conduct in Washington State, but we did not know if we would ever be reimbursed for our work while the stop work order was in effect. Even after NWIRP submitted a Request for Equitable Adjustment for the work completed while the stop work order was in effect, it was communicated to NWIRP that our submissions are "not" official invoices and that our submission "does not" guarantee reimbursement and we were told that it "will ultimately be decided by the government."

10. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs):

3

CLIN2, Legal representation for unaccompanied children as well as other non-representation services such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2, and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. For NWIRP, this results in a full termination of our entire UCP contract. HHS provided no justification for the partial termination other than "the Government's convenience."

11. NWIRP learned about this contract termination through an email communication from Acacia Center for Justice, sent at 8:15 a.m. on March 21, 2025 to NWIRP's Executive Director, Malou Chávez. The title of the email was "Urgent: Notice of Partial Termination for the Government's Convenience." Acacia hosted a meeting for further discussion of the contract termination.

12. While NWIRP is still considering how to respond to the contract termination, we are committed to continuing to represent existing clients, at least in the short term. Our organization's ability to continue representing clients long-term depends on many factors, including whether any case continuity funding might be available to support the winding down of the contract through HHS.

13. UCP funding represents approximately 10% of NWIRP's overall annual budget. Loss of funding impacts 28 staff (20.9 FTEs) at NWIRP. Over the short-term, NWIRP aims to maintain all positions to ensure continuity of representation. The organization will do so by borrowing from its reserves and by seeking support from donors and is currently in the process of determining how long this solution will sustain the services previously funded by the UCP contract. Sustaining services will cost NWIRP at least $200,000 per month. Since NWIRP provides extensive legal services beyond its UCP contract, it must consider all of its mission-focused work when determining use of limited reserve funding or donor resources. Any funds that NWIRP directs to sustain services under this contract take away from other critical services that NWIRP is committed to providing in the community, especially during this period of exponentially-increased demand for immigration legal services. We anticipate that NWIRP will be unable to sustain services over the long-term and will need to reduce its staff accordingly.

14. The UCP contract termination detrimentally impacts NWIRP's mission to promote justice by defending and advancing the rights of immigrants through direct legal services, systemic advocacy, and community education. Research has shown that unrepresented children and youth are more likely to be issued an order of removal, even if they have a strong immigration claim, demonstrating the high need for legal representation in these cases.

While NWIRP aims to continue representation in as many cases as possible, we will have extremely limited capacity to assist children and youth who need representation in the future, negatively impacting their chances of gaining immigration relief and likely changing the trajectory of their lives.

15. Having to turn away youth from services is difficult for our committed legal staff, many of whom are immigrants themselves and share an understanding of the experiences the children and youth are facing. Contract termination will undoubtedly negatively impact the morale of staff who already work under challenging conditions in the immigration system.

I declare under penalty of perjury under the laws of the District of Columbia that the foregoing is true and correct.

Executed on the 21st of March 2025, in Wenatchee, Washington.

*Vanessa D. Gutierrez*

**Vanessa Gutierrez**
**Deputy Director**
**Northwest Immigrant Rights Project**

5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>        Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>        Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION OF ASHLEY T. HARRINGTON (RMIAN) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**DECLARATION OF ASHLEY T. HARRINGTON**
**CHILDREN'S PROGRAM MANAGING ATTORNEY FOR THE**
**ROCKY MOUNTAIN IMMIGRANT ADVOCACY NETWORK**

*I, Ashley T. Harrington make the following statements on behalf of the Rocky Mountain Immigrant Advocacy Network.  I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Ashley T. Harrington, and I am the Children's Program Managing Attorney at the Rocky Mountain Immigrant Advocacy Network ("RMIAN"). RMIAN is a Colorado-based nonprofit organization that provides free immigration legal and social services to individuals in civil immigration detention, as well as to immigrant children and families. Through its staff attorneys, paralegals, social workers, and a network of hundreds of *pro bono* attorneys, RMIAN provides legal education and free legal representation to low-income immigrants who otherwise would not be able to afford an attorney.

2. RMIAN's primary programs are 1) the Detention Program which provides free legal services to individuals in civil detention; 2) the Children's Program which provides free legal services to children and families in immigration proceedings; and 3) the Social Service project which provides comprehensive supportive services to particularly vulnerable individuals, children and families.

3. RMIAN is the primary organization dedicated to providing legal services to indigent unaccompanied immigrant children in Colorado. Specifically, RMIAN provides free legal representation to unaccompanied children who have been released from the Office of Refugee Resettlement ("ORR") to sponsors, to unaccompanied children who have been placed in the Unaccompanied Refugee Minors program, and to unaccompanied children in ORR Long-Term Foster Care. RMIAN previously also provided free legal services to children in ORR short-term shelters in Colorado.

4. RMIAN has been providing legal services for unaccompanied immigrant children in Colorado through U.S. Department of Health and Human Services (HHS) funding since the first ORR short-term shelter opened in Colorado in 2019. RMIAN provided know-your-rights presentations, individual legal screenings, legal representation and referrals to hundreds of youth in ORR custody in Colorado from December 2019 through May 2023 when the shelters closed.

5. RMIAN has continued providing representation to unaccompanied children who were released from ORR custody—both from the shelters in Colorado as well as shelters all over the country. With HHS funding, RMIAN is currently representing 160 unaccompanied children, including unaccompanied children released to individual sponsors and children released into the Unaccompanied Refugee Minor Program. In addition, RMIAN recently

1

expanded its services to provide representation to children in the ORR Long-Term Foster Care program placed in Colorado.

6. With HHS funding, RMIAN currently employs approximately six full-time-equivalent staff dedicated to providing legal services to unaccompanied immigrant children. This includes a managing attorney, staff attorneys, a law clerk, coordinators, a paralegal, and an administrative assistant.

7. RMIAN represents unaccompanied children in removal proceedings in immigration court and in humanitarian relief applications before U.S. Citizenship and Immigration Services, including asylum, Special Immigrant Juvenile Status, U and T nonimmigrant status, adjustment of status to lawful permanent residency, and applications for employment authorization. In addition, RMIAN staff attorneys and pro bono partners represent children in state court proceedings, including guardianship, allocation of parental responsibilities and child welfare proceedings.

8. RMIAN has initiated representation with unaccompanied children as young as two years up to those on the eve of their eighteenth birthday. None of these children are fluent in English or have received higher education. These children's cases require navigating a complicated maze of laws and legal processes necessary to secure lawful status and defend from deportation. Most require analysis of both state and federal laws and require simultaneous applications and motions before the immigration court, a State court and U.S. Citizenship and Immigration Services. Each of these forums have specific, detailed procedures that must be followed to ensure cases don't result in rejection or denial. Children's legal cases often take several years to ultimately result in lawful permanent residency, requiring constant monitoring and regular required filings during the lengthy process. It would be virtually impossible for a child to successfully navigate all the requirements to avoid deportation and successfully obtain lawful status without an attorney.

9. The unaccompanied children RMIAN represents have often been through complex and significant trauma. Many of RMIAN's child clients have been subjected to sex and labor trafficking, child abuse, neglect and abandonment, sexual abuse and other violence. Many of the applications for legal protection require detailed declarations and interviews regarding the trauma and abuse these children have endured—something that would be incredibly difficult to endure without a trauma-informed attorney's assistance.

10. RMIAN's services are not only beneficial to the children in removal proceedings, but also to immigration judges, court staff and government attorneys. RMIAN has built strong relationships with Denver's immigration judges and staff as well as attorneys for the Immigration and Customs Enforcement Office of the Principal Legal Advisor (OPLA). RMIAN routinely meets with immigration judges and staff along with OPLA to discuss how to improve services and efficiency. RMIAN has worked jointly with OPLA to request and obtain dismissal of removal proceedings for dozens of unaccompanied children

2

pursuing relief applications with U.S. Citizenship and Immigration Services, thereby preserving the court and OPLA's time and resources for cases ripe for resolution by the court. In addition, when a RMIAN attorney enters their appearance with the immigration court, typically the next hearing is cancelled and written deadlines are provided, thereby saving the court's limited time for other cases. RMIAN routinely receives requests from immigration court staff and judges to assist unaccompanied children and families with anything from a change of address form to a screening for potential human trafficking. RMIAN ensures that children are fully informed of their rights and options and, wherever possible, that they have expert legal representation to navigate the immigration legal system more efficiently and effectively. Without RMIAN, removal proceedings would take far longer and the dockets would be clogged with cases that are not even under the court's jurisdiction while a child is pursuing legal status with U.S. Citizenship and Immigration Services. Immigration judges and court staff regularly express gratitude for the ways in which RMIAN's services assist the court.

11. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

12. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025.HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows and Randstad placements who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

13. RMIAN received news of both the stop work order and the notice of contract termination from the Acacia Center for Justice via email. RMIAN staff had to immediately pivot from

providing representation to children to informing all staff of the stop work order and contract termination and planning for its impact on RMIAN's services and funding.

14. Funding from HHS for unaccompanied children's legal services comprises approximately 15% of RMIAN's total annual budget and 26% of its Children's Program Budget—approximately $772,000 this year. Because there are currently no ORR shelters in Colorado, RMIAN does not receive any funding for CLIN1 services to children in ORR custody. Thus, the partial contract termination serves as a complete termination of all funding for RMIAN's work under the contract.

15. HHS funding currently allows RMIAN to employ approximately six full-time-equivalent staff positions, including attorneys, a law clerk, coordinators, a paralegal and an administrative assistant. It remains uncertain whether staff and client cases could be shifted to other funding sources. RMIAN would need to pull from its reserves and limited unrestricted funds to continue paying staff and providing representation to unaccompanied children. This would only be possible on a temporary basis until layoffs would need to be considered.

When news of the stop work order broke, RMIAN received panicked calls from children, their caregivers, foster care providers, and case managers worried that the stop work order meant that RMIAN would no longer provide representation. Similar panic ensued following the news of the contract termination. Instead of focusing on preparing children's legal applications, RMIAN staff had to respond to countless calls and inquiries about how the stop work order and contract termination would impact its child clients. While RMIAN has been able to provide temporary reassurance that children will continue to be represented using RMIAN's reserves and limited unrestricted funding, its staff will be unable to provide such assurances long-term.

17. RMIAN firmly believes that no child should be forced to navigate immigration legal proceedings alone, and that every child deserves to have an attorney to inform them of their rights and options and to represent them in any defenses they may qualify for under the law. In reliance on the government's consistent funding, RMIAN has been steadily building its Children's Program to be able to increase how many children it is able to serve each year. RMIAN hopes to continue expanding programming and staffing so that more unaccompanied children in Colorado have access to expert legal representation. However, without HHS funding, not only will RMIAN not be able to provide representation to any additional children, but the ability to provide continued representation to current child clients is also under threat.

18. RMIAN has relied upon the government's consistent funding of legal services for unaccompanied children in building its Children's Program, and in crafting the representational agreements RMIAN has executed with child clients. In reliance on the government's consistent funding consistent with congressional appropriations, the

4

TVPRA, the Foundational Rule, and in accordance with RMIAN's subcontract with Acacia, RMIAN's representation agreements with most unaccompanied children include a commitment to continue representation through obtaining asylum, U/T nonimmigrant status, or permanent residency, if they are eligible for this relief under U.S. law. For most of RMIAN's clients, this means that it has promised to continue representation for several years due to extreme delays and backlogs in processing and adjudications of these relief applications.

19. RMIAN has legally and ethically binding obligations to its clients to continue providing representation despite this halt in funding. Ethical rules require attorneys to continue representation to the conclusion of the matters undertaken on behalf of clients. Withdrawal may only be permitted under ethical rules if withdrawal would not be materially adverse to the client's case. Withdrawal from children's cases would be materially adverse because they cannot competently represent themselves in matters before the immigration court, the state court, or before USCIS, they could not afford private counsel to represent them, and withdrawal would more than likely lead to their cases being denied—resulting in their removal.

20. RMIAN is committed to continuing to represent its child clients despite this termination of funding. However, it will have to pull from limited reserves and unrestricted funding to do so, and may have to consider staff layoffs. Ultimately, if significant layoffs become necessary, despite the significant detrimental impact on clients, RMIAN may need to consider withdrawing from clients' cases if it does not have sufficient staff to continue representation.

21. RMIAN will have to dedicate its limited staff time to fundraising to try to raise the funds necessary to continue providing representation, with no guarantee of success. This diverts limited time and resources away from providing representation. It also diverts limited funding for representation of other clients as well as funding that allows for staff leave and benefits, staff wellness initiatives, and necessary organizational infrastructure. The stop work order caused great distress among staff, but was short-lived. The termination of funding has significantly impacted staff morale and caused staff stress and concern about whether they will continue to have a job and be able to provide for themselves and their families. Even if layoffs don't become immediately necessary, this worry may cause staff to leave RMIAN for employment that is more securely funded. This would leave RMIAN short-staffed and place more of the burden to continue representation on fewer staff, and would increase the likelihood RMIAN would have to consider withdrawal from clients' cases.

22. Any interruption, reduction or termination in HHS funding significantly harms RMIAN and its mission to provide legal representation to unaccompanied children.

5

I declare under penalty of perjury that the foregoing is true and correct.

 Executed on the 22nd day of March 2025, in Westminster, Colorado.

_____

**Ashley T. Harrington, Esq.**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION OF GAUTAM JAGANNATH (SJC) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## DECLARATION OF GAUTAM JAGANNATH, ESQ.
## EXECUTIVE DIRECTOR FOR SOCIAL JUSTICE COLLABORATIVE

*I, Gautam Jagannath, Esq., make the following statements on behalf of SOCIAL JUSTICE COLLABORATIVE. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Gautam Jagannath, and I am the Executive Director at Social Justice Collaborative ("SJC"). We are based in Berkeley, California in the San Francisco Bay Area and have been provided full-scope deportation defense services for low-income noncitizens all over the nine Bay Area counties as well as the California central valley. SJC is one of the primary organizations dedicated to providing legal services to indigent unaccompanied immigrant children who are not in detention as well as those held in Office of Refugee Resettlement ("ORR") custody throughout Northern and Central California.

2. Our organization teams are composed of administration, executive staff, attorneys, legal assistants, social workers and other individuals who work together in units to represent clients, ensure that their needs are met and that we continually prevail in court. Because we are a legal services organization, we operate like a law office and our teams depend on having lawyers and legal assistants work on all aspects of the case, from intake to work-up and preparation for trial.

3. In order to carry out this mission, SJC has several main work components, but relevant to the instant litigation, we represent unaccompanied minors who are not in ORR custody in immigration proceedings. We further host Immigrant Justice Corps ("IJC") fellows to represent unaccompanied children in removal proceedings. Our programs at SJC are unique because we have always provided full-scope representation to vitally underserved minors as well as families, but we also provide access to wrap around services including social workers to help navigate challenges of newcomer life in the United States.

4. SJC has been providing legal services for unaccompanied immigrant children in California since 2012. Since our inception, we have always taken cases for any indigent immigrant in California, we represent thousands of families a year. Our unaccompanied minor clients represent about a third of all we represent in immigration proceedings. Specifically, SJC serves a combined annual number of around over 400 unaccompanied children. Roughly

1

for at least the fiscal year 2024, our representative breakdown for these minors was 35% adjustment of status, 38% asylum proceedings, 25% special juvenile status. The residue balance is composed of U/T nonimmigrant relief, refugee petitions and other applications. Naturally, a lot of work authorizations are not included for all these children to get kids the benefits, both entitlements and means tested that they deserve in California. That represents over 200 applications just in FY 2024.

5. With U.S. Department of Health and Human Services ("HHS") funding, SJC currently has hired three (3) staff members, all of whom are IJC fellows, dedicated to providing legal services to unaccompanied immigrant children. Specifically, one is a California lawyer and two of the staff members are law graduates with pending bar admission results.

6. Staff providing representation to children regularly conduct client interviews, prepare clients for hearings, as well as provide legal education, individual consultations, and attend court hearings and other appointments for clients as well as their families. SJC represents children in all stage of removal proceedings in immigration court, BIA appeals, petitions for review at the Ninth Circuit, affirmative relief like asylum before USCIS, SIJS predicates in state court.

7. In recent months, we have had several referrals come from youth-serving professionals who are actively trying to find help for the children they work with. Even those who regularly refer to legal service providers are hitting roadblocks. Waitlists are closed. Pro bono and nonprofit providers are overwhelmed. Paying for legal services is out of reach for the vast majority of adult immigrants let alone children who need to be in school.

8. We routinely place cases for that have made their way through the immigration system to pro bono counsel at our firm partners through our legal clinics. These legal clinics are held frequently throughout the year and would be severely, albeit indirectly, affected by the loss of funding through this grant.

9. In 2023, SJC's new Special Immigrant Juvenile ("SIJ") Task Force completed its first full year. The task force was created in response to the growing demand for legal representation for minors. This was based on an increased number of intakes and referrals. However,

Stay Motion Addendum 116

conversations with partners across various sectors made it clear this was not an isolated issue. It reflected broader, statewide, and national trends.

10. SJC is one of the few organizations who works in areas considered legal deserts in California. In some of these regions, we are one of the only organizations offering any legal services, including full-scope removal defense. We do not merely fill forms for clients and wish them luck. Even in more populated counties where other providers exist, the demand still far exceeds what's available.

11. A partner recently shared that a very young immigrant child believed that carrying a red card—a know-your-rights resource widely distributed in immigrant communities—would prevent them from being detained if stopped. While red cards are an important tool for asserting one's rights, this child was under the impression that the card functioned more like a legal shield. It's easy to understand how a young person, without legal guidance, could draw that conclusion not knowing much more.

12. Stories like this make it painfully clear that general information, no matter how widely shared, is not a substitute for individualized legal support. Children need someone who can walk them through their options and answer their questions. That is where SJC often comes in. We have a team of legal professionals working up and prevailing on legal status, but we also are providing social workers to support our children.

13. We currently have clients who are not yet one year old. Even without considering trauma, language barriers, or lack of resources, there is no path forward for a child that young without help. But of course, we do have to consider those things. Many of our clients are indigenous and do not speak Spanish, a language many assume they would speak. These minors often face not only trauma and language access issues but also deep cultural barriers and a long-standing experience with systems that overlook or ignore them. This makes it extremely difficult—if not impossible—for children to find legal representation, let alone secure it in time to meet the deadlines in their cases.

14. Immigration Judges ("IJ's") have over the past decade and more have expressed gratitude to SJC staff attorneys for the efficiency our providers bring to their dockets, which are often

3

expedited, and caseload management.  It is not uncommon for the EOIR based in San Francisco, Concord and Sacramento to make referrals of minors to SJC's intake team. Many IJs appreciate our work product because we are known for bringing cases fully prepared for trial, well developed, and often fully documented.  We have often been able to engage in stipulations with government counsel to avoid unnecessary continuances and appeals especially for minors.

15. Our organization repeatedly earns praise from the California State Bar, as we are an IOLTA funded legal service provider.  We are also regularly praised by the California Department of Social Services who has continuously renewed contractual awards with SJC since 2015. We recently have been praised for maintained a shared vision centered on program assessment, we advance diversity and inclusion, we emphasize excellence, achieve goals, foster communication, engage staff at all levels, and ensure proper training and resource management. SJC exhibits a strong client-centered delivery system with programming aligned to our vision and funding requirements. We also demonstrate cultural competence through understanding of diverse community needs and histories, effectively engage with eligible populations, and establish appropriate partnerships with government and community organizations.

16. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

17. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers

4

(CLINs):  CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

18.  We learned of the contract cancellation through an email from a statement put out by Jojo Annobil, the CEO of Immigrant Justice Corps.

19. The terminated funding accounts for roughly 8% of our organization's total budget.  SJC had been funded to represent roughly 45 unaccompanied minors per year under CLIN 2. The staff affected would be three IJC fellows.  If we had to lose this funding and there was no new funding to be secured, we would be forced to lay off these fellows ASAP because we do not have operating budget to sustain their work.  We have not yet secured any additional or new funding to secure these fellows.

20. The funding loss is a huge blow to our immigrant communities and morale of staff.  We have been fortunate enough to survive almost a decade and a half without a single layoff and yet this could be our first.

21. For example, the SJC cases of Y, JS, and MHC represent particularly compelling scenarios for continued IJC funding support. All three individuals are currently not in active removal proceedings. Each presents strong affirmative relief claims requiring immediate legal intervention—specifically through asylum and SIJS pathways—demonstrating clear harm if representation were terminated. Financial barriers are insurmountable for all three cases: Y's family faces demonstrable poverty alone, JS as a dependent high school student has no income source, and MHC's family lacks financial means for private representation. Critically, none of these clients have any alleged gang affiliations or criminal history. Furthermore, each client has been released to documented sponsors with lawful immigration status—Y to a U.S. resident sponsor with a Social Security number, JS to a

<div align="center">5</div>

sponsor with asylum-based residency, and MHC to a sponsor with SIJS-based residency—all people with valid legal status. Without sustained IJC funding, these vulnerable youth with strong relief eligibility would face the complex immigration processes without counsel, dramatically reducing their likelihood of securing protection despite qualifying under established legal criteria.

22. In the face of these layoffs, we may be forced to try and refer out the clients such as the ones described above who were previously represented by our IJC fellows. However, we know that all organizations doing this work are overly burdened and many cannot take new cases. As noted above, all providers are overburdened. Thus, it is highly unclear whether we would be successful in referring out our affected clients.

23. If we are unsuccessful in referring these clients to other organizations, then we believe under California law and relevant legal ethics that we would be forced to continue representation of clients without ORR funding. This would lead to further depletion of limited resources. This patently hurts staff morale, especially when our other staff are already working at and above their full capacity. Trying to competently represent affected clients without sufficient funding will likely lead to burn-out and result in other staff resigning or leaving for other jobs, thereby further harming our organization and the clients.

---

I declare under penalty of perjury under the Laws of the United States that the foregoing is true and correct.

Executed on the 25th of March 2025, in Berkeley, California, United States.

*Gautam Jagannath*
_____
Gautam Jagannath, Esq.
Executive Director
SOCIAL JUSTICE COLLABORATIVE
1832 Second Street
Berkeley, CA 94710
(p) 510.992.3964

6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-2847 <br><br> **DECLARATION OF LISA KOOP (NIJC) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**DECLARATION OF LISA   OOP**
**NATIONAL DIRECTOR OF LE   AL SERVICES**
**FOR T   E NATIONAL IMMI   RANT JUSTICE CENTER**

*I,   isa   oop, make the following statements on behalf of the   ational Immigrant Justice Center*
   *IJC .  I certify under penalty of perjury that the following statement is true and correct*
*pursuant to 28 U.S.C. § 1746.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-2847 <br><br> **DECLARATION OF MELISSA MARI LOPEZ (ESTRELLA DEL PASO) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# DECLARATION OF MELISSA MARI LOPEZ
## EXECUTIVE DIRECTOR
### ESTRELLA DEL PASO

*I, Melissa Mari Lopez, make the following statements on behalf of Diocesan Migrant and Refugee Services doing business as Estrella del Paso. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

. My name is Melissa Mari. Lopez, and I am the Executive Director at Diocesan Migrant & Refugee Services doing business as Estrella del Paso ("Estrella del Paso"). Estrella del Paso is the largest provider of free immigration legal services in West Texas and New Mexico. Estrella del Paso is based out of El Paso, Texas but provides legal services to populations living anywhere in West Texas and the state of New Mexico who have removal proceedings venued in the El Paso, Texas before the El Paso Non-Detained Immigration Court, the El Paso Detained Immigration Court, or the Otero Detained Immigration Court. Estrella del Paso is the primary organization in West Texas and New Mexico providing legal services to indigent, unaccompanied immigrant children who are not in detention as well as those detained in Office of Refugee Resettlement (ORR) custody in El Paso County.

. Estrella del Paso was founded in 1986 to provide immigration legal services, advocacy, and community outreach to protect the rights of immigrants in West Texas and New Mexico, and advance justice in the spirit of the Gospel. We believe all people are made in the image of God and are welcome in our community. Our organization currently employs 78 people. There are 6 legal units and two units who do not provide legal representation. The two units that do not provide legal representation are the Refugee Services unit and our Administrative team, which includes our Operations team, Communications team, Data team, Development team, and Executive team. Each legal unit is tasked with assisting different migrant populations. Among the six legal units is our Unaccompanied Children Program, which employs a team of 28 people. The Unaccompanied Children Program staff is exclusively dedicated to working with unaccompanied children housed at local ORR shelters as well as children released from ORR shelters, or children who are released to Estrella del Paso's designated geographic zone. In terms of staff, the Unaccompanied Children's Program accounts for more than one third of our entire organizational staff.

. Our work in the Unaccompanied Minors Program is consist with our mission. Our Unaccompanied Children Program has several main work components and is tasked with (1) Providing educational and pro-se services in the form of legal education "know your rights" ("KYR") presentations, conducting individual consultations (intakes), and case monitoring for all unrepresented children in ORR custody in El Paso County, Texas; (2)

1

Representing unaccompanied minors who are not in ORR custody in immigration proceedings; and (3) Representing children in ORR custody in immigration proceedings. We further host an Immigrant Justice Corps (IJC) fellow to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children. Our organization is also comprised of other work components such as our Legal Orientation Program ("LOP") and Immigration Court Help Desk ("ICH"), through these units we provide educational and pro se services in the form of legal education "know your rights" ("KYR") presentations/orientations, conduct individual consultations/orientations (intakes), and conduct pro se workshops with all unrepresented non-detained noncitizens who have hearings before the El Paso Non-detained Immigration court as well as detained noncitizens in the custody of Immigration and Customs Enforcement ("ICE") at facilities located in El Paso, Texas and Chaparral, New Mexico; (2) We attempt to connect unrepresented noncitizens who cannot afford a lawyer with pro bono attorneys or refer them for in-house representation by Estrella del Paso; (3) Estrella del Paso also provides in-house representation to people in removal proceedings through our Removal Defense unit and as mentioned herein through our Unaccompanied Children's Programs; (4) Through our affirmative legal services program, Estrella del Paso provides representation before United States Citizenship and Immigration Services ("USCIS") and United States Department of State ("DOS"). Within our affirmative legal services program, we have two subunits specifically dedicated to assisting religious workers and survivors of crime and human trafficking.

- Estrella del Paso has been providing legal services for unaccompanied immigrant children in El Paso County, Texas since 2007. Estrella del Paso was initially contacted by the VERA Institute of Justice ("VERA") in March of 2007 to oversee the Unaccompanied Immigrant Children's program in El Paso, Texas. Initial services under this first contract included the provision of Know Your Rights presentations to all unaccompanied children detained in El Paso, Texas and screening their cases for relief from removal, and to gather statistics on the unaccompanied children as well to develop a pro bono program model in El Paso, Texas to recruit, train, and mentor pro bono attorneys to represent the children in their immigration removal proceedings. Our initial contract was for provision of these services at three ORR shelters. Since the opening of the program in 2007 the need for services has only increased. In 2007, we provided services to approximately 546 children. In 2022, we provided services to 6,073 children, that number increased in 2023 to 7,449 children, and in 2024 to 4,921 children. The number of shelters in our area has also expanded from 3 permanent shelters to as many as 8 with the need in some years for the opening of emergency intake sites at places like Tornillo, Texas; Fort Bliss Army Base; and a facility in Pecos, Texas. Though the initial contract was limited to educating unaccompanied children, the con ract was eventually expanded to include legal representation for unaccompanied children appearing before the El Paso Immigration Court as well as

2

children released from ORR custody to the larger El Paso region. From the inception of our program in 2007 until today, Estrella del Paso has provided services to approximately 47,498 children. Last year alone, we provided services to 4,921 children and undertook representation of 117 children.

. With United States Department of Health and Human Services (HHS) funding, Estrella del Paso currently employs 28 staff members dedicated to providing legal services to unaccompanied immigrant children. Specifically, all 28 of our staff members are full-time employees. Our Children's Program Director is an attorney who has been licensed to practice law since 2010. She oversees the program and supervises the work of 7 Managing Attorneys, 4 Legal Assistants, 1 IJC Law Fellow, 3 Data Clerks, 3 Social Service Providers, and 9 Orientation Specialists. Together the team of 28 provides services to all detained children located throughout the 8 shelters in El Paso County. The shelters are spread throughout the county, the closest shelter is approximately 2 miles from our office while there are shelters 16 miles west of the office and shelters up to 31 miles east of the office. ORR funding provides both funding and the necessary access to the shelter and to the children detained in the shelters. Without ORR funding, we would be unable to continue providing these services.

. Staff providing representation and KYR presentations to children in ORR facilities regularly travel to each facility in person to conduct client interviews, prepare clients for hearings, as well as provide legal education and individual consultations. Our attorneys often appear as Friend of the Court in cases where children have been reunified outside of the El Paso, Texas Immigration Court Jurisdiction. Our representation of children is all encompassing, we have some clients we have represented for years from the time they were at the shelter to the time when they get released and ultimately obtain lawful status in the United States. A large part of our representation caseload involves representing children for Special Immigrant Juvenile Status ("SIJS"). Once a child obtains SIJS status, it can be several years before they qualify to obtain their lawful permanent residency, in the meantime their case remains open with our organization, meaning our representation of children often spans several years. At present, we have 324 pending cases, losing funding for this program, will pose an extreme hardship to our organizational capacity as it will mean not only laying off the attorneys, specifically trained to handle these cases but also inheriting a high case load to be worked by less staff, causing us to have to turn other work away.

. According to the Census Bureau, 18.3 percent of the population of El Paso, Texas and 17.8 percent of the population of New Mexico live in poverty, surpassing the national average of 11.5 percent. El Paso and its surrounding areas are not home to large corporations or law firms. Most attorneys who practice any type of law in this region tend to be solo

3

practitioners who cannot afford and do not have the capacity to take on pro-bono matters. Because there are no large law firms or corporations in this region, there is very limited access to attorneys who can provide pro-bono services. Likewise, El Paso is not home to any law schools. The closest law schools to El Paso are Texas Tech University School of Law based in Lubbock, Texas and the University of New Mexico School of Law based in Albuquerque, New Mexico. Both schools are several hundreds of miles away from the Immigration courts we serve and do not currently have the capacity to take on very many cases. Given that this region is impoverished, it is hard for an organization like ours to rely on local private philanthropy to fund the necessary services. Given the large geographic region we serve, the services provided by the unaccompanied minors program to unaccompanied children in our region are crucial. Most children cannot afford private attorneys, and most private attorneys in our area cannot afford to take on pro bono matters, especially in the case of children at shelters due to the extra level of logistical planning required for attorneys to visit their clients at shelters versus having the client visit the attorney at their office. Without our program, the children detained at the 5 shelters operating in El Paso County would largely go without counsel.

.  In addition to providing direct representation, legal screenings and know your rights presentations to children sheltered in El Paso County and released in El Paso County and Dona Ana County, our team also provides referrals to children who end up living outside our geographic zone. The mission of our team is to try and obtain legal counsel for all children even when children do not live in our geographic zone. In 2024, our team was able to provide 7,174 referrals. Referrals consist of notifying children and their sponsors of local attorneys and non-profits in their areas who may be able to take on their cases. Often, our team can make a direct referral to other legal services providers if the children we serve are going to an area where there is an Acacia funded legal services provider to take over the child's case. This "warm hand off" amongst providers ensures a continuum of representation and that the child not only appears for all their court hearings but also often ensures the child is on the best pathway to later obtain lawful status in the United States of America.

.  Estrella del Paso has an excellent and long-standing relationship with our local Immigration Judges, (Executive Office for Immigration Review [EOIR]), USCIS (United States Citizenship and Immigration Services), ORR Shelters, and Immigration and Customs Enforcement (ICE) officers. At the El Paso Non-Detained Immigration Court, there is a dedicated docket for unaccompanied detained and non-detained children. The judges who oversee these dockets have often expressed gratitude with our team as we represent most children who appear before the court, but we also provide the court with ti ely updates on the children's cases. As mentioned earlier, for children that end up being docketed before our court but who ultimately reunify outside of the El Paso immigration

4

court jurisdiction area, we provide Friend of the Court services, so those children's cases get transferred elsewhere. Likewise, we assist the court in efficient docket management by notifying the court ahead of time of rare language interpretation needs so that the court can coordinate the need for these interpreters ahead of scheduled hearings. The judges appreciate that in many of the cases that we enter representation on, we are often successful in obtaining the termination of the case and thereby reducing the docket load the court has as we pursue legalization for our clients through affirmative means. As for the shelters, we maintain daily communication with them and provide training for shelter staff on how to avoid the unlawful practice of law and how our office can help children. Often children at the shelter are scared about what comes next for them and our office helps to dissipate that fear by providing know your rights presentations and explaining to children the options available to them in the United States. Our office also assists ICE in cases where a child wishes to repatriate to their home country. In those cases, we reach out to our local ICE office and work together to honor the child's wishes and assure their return to their home country as soon as possible – this work reduces the workload of the El Paso Immigration courts.

. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all four Contract Line Numbers (CLINs): 1. KYR presentations and legal services for pro se children in ORR facilities; 2. Legal representation for unaccompanied children not in ORR custody; 3. Legal representation for unaccompanied children in ORR custody; and 4. Spanish language tutoring for organizational staff who work with children. Without further elaboration on duration or reasoning, the stop-work order states that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation on February 21, 2025.

. On March 21, 2025, also without warning, we learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds legal services for unaccompanied children. This termination was effective on the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro-se children in ORR facilities. Per

the partial termination, HHS ordered Acacia and all subcontractors to stop work immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination o her than "the Government's convenience."

. On Friday, March 21, 2025, at 8:29 AM, I received an email from the Acacia Center for Justice notifying me of the near complete termination of the funding by HHS for the services mentioned in this affidavit. This information was then communicated to the entire Unaccompanied Children Program at Estrella del Paso.

. As a result of the near complete termination of funded services, Estrella del Paso had to immediately place 2 Data Entry Clerks, 4 Managing Attorneys, 9 Orientation Specialists, and 2 Social Service Providers on furlough. 4 Legal Assistants were temporarily reassigned to two other departments to avoid the need to immediately furlough them; however, this reassignment is temporary and likely only feasible for two weeks. At the end of two weeks, these 4 Legal Assistants will also be furloughed. Given the lack of advance notice of termination, the decision to furlough staff in lieu of immediate termination allows Estrella del Paso Management and the Board of Directors to fully discuss the impact of the termination as well as the details of the termination notice and make decisions in the best interest of the entire organization. This termination raises immediate concerns about Estrella del Paso's obligation to clients whom we represent. As attorneys, we have an ethical obligation to our clients. We cannot ethically withdraw from representing clients simply because the government made the decision to terminate the funding. We entered representation agreements with every client while under a government subcontract providing funding for representation and with the expectation that funding would continue throughout the entire course of representation, especially given we were required to enter representation pursuant to the contract. Additionally, the government's shift to five-year contracts made their commitment to continued funding more secure from our perspective.

. After staff were furloughed, we began an immediate review of all pending cases. We are in the process of assessing each case and determining what needs to be done to ensure continuity of our representation. Given that the notice of termination was just received yesterday, we are still in the process of triaging our case load and trying to figure out what next steps we will need to take. We are committed to our ethical and legal obligations to our clients, and our assessment of our obligations under the various jurisdictions in which our attorneys are licensed requires our representation continue despite the termination of funding.

. The Unaccompanied Children's Program accounts for about forty percent of our overall organizational budget. The Unaccompanied children's Program is by far our largest unit – employing 28 full-time individuals. Prior to the termination, our Unaccompanied

Children's Pro ram was funded at a monthly cost of approximately $284,000 per month. As a result of this nearly complete termination of funding, we believe our new anticipated monthly funding will be approximately $53,000 per month. However, given the nature of the termination and lack of details provided, we are unsure of the exact amount of continued funding. If the final funding total is lower than the funding currently being received, there will be a need to furlough additional staff. The current funding, if it remains level, will partially cover the salaries and benefits of the remaining 6 staff; however, it will not cover the true costs of running the program. This will require Estrella del Paso to continue representing our clients and run the remaining portion of the program at a deficit for the organization. The costs of the Unaccompanied Children's Program are so high that running the program absent reimbursement would be fiscally irresponsible. The carrying costs of this program threaten to completely decimate our cash flow if not reimbursed monthly. As a non-profit organization with limited savings, we are in the precarious position of terminating staff as any prolonged closure of the program or prolonged reimbursement for work done by program staff threatens to leave our organization running at a deficit. This would also impact other programs at our organization as any money depleted from our savings cannot be easily replenished as this programs sole source of funding comes from this contract. There are no other sources of funding for this team. Our organization prides ourselves in providing completely free legal services since late 2022. With this termination, it will be necessary to use reserve funds to ensure continuity of representation for unaccompanied children clients. The depletion of our reserve funds would likely require us to abandon our 100% free legal services program and begin charging for legal representation in certain cases once more.

. Despite the termination order and the lack of funding, Estrella del Paso staff would be ethically required to continue representing the hundreds of children whose cases are currently pending without any funding. This ethical obligation would cause further financial obligations and distress for the organization as we would have to continue to employ sufficient staff to continue to represent all children without any financial assistance. This would be a detriment to the entire organization and affect our ability to carry out our nearly 40-year mission of service that has assisted more than half a million people. This termination has already had a significant impact on the morale of our team. The broader Estrella del Paso team is frustrated, angry, and absolutely devastated by the furlough of 18 of their co-workers. The remaining 6 Unaccompanied Children Program staff are gutted by the loss of their co-workers, but they are committed to continuing the work on their behalf. I admire their commitment; however, I am concerned about the long-term effects of this termination on their mental and physical health as well as morales. The remaining 6 employees will need to undertake work that prior to March 21, 2025, was done by a team of 30. This level of work and expectation by the federal government is untenable.

7

I declare und r penalty of perjury that the foregoing is true and correct.

Executed on the 22nd of March 2025, in El Paso, Texas.

Digitally signed by Melissa M.
Lopez
Date: 2025.03.24 13:23:15 -06'00'

**Melissa Mari Lopez**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

COMMUNITY LEGAL SERVICES IN EAST
PALO ALTO, *et al.*,

        Plaintiffs,

    v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES, *et al.*,

        Defendants.

Case No. 3:25-cv-2847

**DECLARATION OF LAURA NALLY
(AMICA CENTER) IN SUPPORT OF
PLAINTIFFS' MOTION FOR A
TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

**DECLARATION OF LAURA NALLY,**
**PROGRAM DIRECTOR FOR THE CHILDREN'S PROGRAM AT AMICA CENTER**
**FOR IMMIGRANT RIGHTS (FORMERLY CAPITAL AREA IMMIGRANTS' RIGHTS**
**("CAIR") COALITION)**

*I, Laura Nally, make the following statements on behalf of Amica Center for Immigrant Rights. I certify under penalty of perjury that the following statements are true and correct pursuant to 28 U.S.C. § 1746.*

1.      My name is Laura Nally, and I am the Program Director overseeing the Children's Program at Amica Center for Immigrant Rights ("Amica Center"), formerly known as the Capital Area Immigrants' Rights ("CAIR") Coalition. Amica Center is a Washington, D.C.-based nonprofit legal services organization that strives to ensure equal justice for all indigent immigrant men, women, and children at risk of detention and deportation in the Washington, D.C. area and beyond, through providing pro bono legal services and representation. I am an attorney licensed in Virginia and the District of Columbia and have been practicing immigration law for more than 15 years. I joined the Children's Program at Amica Center in August 2019.

2.      Amica Center operates three main programs: the Detained Adult Program ("DAP"), the Children's Program ("DUCs" or the "Children's Program"), and the Immigration Impact Lab. DUCs' work specifically focuses on offering legal services and representation to unaccompanied immigrant children held by the Office of Refugee Resettlement ("ORR") at ORR-subcontracted facilities, including shelter and foster care programs, as well as children in ORR Unaccompanied Refugee Minor ("ORR URM") programs in the greater Washington, D.C. and Baltimore areas.

3.

1

4.      To provide these services, Amica Center's Children's Program now has 33 full-time and 4 part-time staff members. Specifically, the Children's Program employs a program director, deputy program director, three managing attorneys, one supervising attorney, five senior attorneys, six staff attorneys, one Immigrant Justice Corps ("IJC") Attorney Fellow, two contract attorneys, two managing paralegals, four senior paralegals, seven paralegals, one senior program associate, and three social services staff members. Several additional positions are currently vacant due to challenges hiring qualified attorneys in a climate of funding uncertainty. We rely on funding from the U.S. Department of Health and Human Services ("HHS"), distributed to us through the Acacia Center for Justice as sub-contractor, to fund over 96% of our program.

5.      Children's Program staff work to provide legal support, direct representation, and social services to unaccompanied immigrant children who are currently or have been released from ORR custody at juvenile facilities in Washington, D.C., Virginia, and Maryland. Our goals are to educate children about their rights and their legal options while in ORR custody, ensure that their needs are being met and their rights respected, and to represent children in pursuing any immigration relief or applications for which they may be eligible.

6.      This work has two principal work components: (1) providing legally-required "Know Your Rights" presentations to children held in ORR-subcontracted facilities; conducting age-appropriate and trauma-informed one-on-one legal screenings for eligibility for immigration relief; referring children reunified outside of our geozone to other legal service providers; and preparing and accompanying all detained unaccompanied children in our geozone to their court appearances; and (2) providing in-house direct legal representation to unaccompanied children in immigration court, before federal agencies, and in state court to pursue immigration relief and applications, as well as referring cases to and mentoring pro-bono attorneys.

7.      To deliver KYR, legal screening, and other non-representational services, Amica Center staff travel in person to each ORR-subcontracted facility on a weekly basis. In calendar year 2024, we provided "Know Your Rights" trainings and intakes to nearly 1,600 children in more than 20 languages. In 2023, our team developed a specialized KYR presentation using cartoon animals to provide age-appropriate services to tender age (under 12) children. Amica Center utilizes a weekly visit model to ensure that all children receive these initial services within 10 days of their arrival in ORR custody. Depending on the children's language needs, multiple Know Your Rights presentations may be provided on any given day. Most children do not understand why they are being held in government custody, that they will be placed in removal proceedings, or that legal protections exist for children under U.S. immigration law. Our staff are trained not only to break down complex information and topics in age- and culturally-appropriate ways, but to utilize active engagement strategies to ensure that children are fully engaged and focused on the material and able to ask questions. Children then immediately receive a legal screening with a staff member

2

trained in trauma-informed and child-friendly interviewing. It is not uncommon for a legal screening to take place over multiple meetings if a child is too emotionally overwhelmed to tell their story or needs time to build trust before recounting traumatic events.

8.  The Children's Program also provides a crucial suite of nonrepresentational services including court preparation, courtroom assistance and accompaniment, and legal referrals. When a child in an ORR-subcontracted facility is scheduled for an appearance in immigration court, we meet individually with the child to explain what to expect in court and then appear alongside the child as "Friend of the Court" to share information and updates with the immigration court such as the child's expected reunification location. We also help children with matters related to their placement and rights within the ORR system. When a child is expected to remain in ORR custody until their 18th birthday, we have assisted the ORR-subcontracted facility staff to identify suitable post-18 placements such as transitional housing programs for young adults and liaised with the Immigration and Customs Enforcement ("ICE") Field Office Juvenile Coordinator to advocate for the child's release to a community-based program rather than transfer to ICE detention. When we identify a child to be a potential victim of trafficking, we refer them to the Office on Trafficking in Persons ("OTIP") for a determination of eligibility for benefits and services under federal law.

9.  Amica Center staff offer full legal representation to children in the ORR-subcontracted facilities we serve who do not have a viable ORR sponsor, who are placed into an LTFC program, who wish to return to their home countries, whose immigration proceedings advance to a point where they are expected to make substantive decisions about their legal case, and who are confirmed to be reunifying into our geozone to ensure continuity of legal services. We also initiate representation for particularly vulnerable children, including victims of trafficking, children who have experienced abuse or neglect in custody, or children who have been placed in restrictive settings or out-of-network placements.

10. Between March 30, 2024, and March 20, 2025, we initiated representation with 192 children in ORR-subcontracted facilities and ORR URM programs. Children's Program attorneys represent unaccompanied children in removal proceedings before the Hyattsville, Baltimore, Annandale, and Sterling Immigration Courts and the Board of Immigration Appeals ("BIA"). DUCs staff also represent children in applications with U.S. Citizen and Immigration Services ("USCIS") including asylum, Special Immigrant Juvenile Status ("SIJS"), family-based and humanitarian (U and T) visas, Temporary Protected Status ("TPS") and self-petitions under the Violence Against Women Act ("VAWA"). In addition to providing direct legal services, Amica Center staff also work to recruit, train, and supervise teams of pro bono attorneys who represent unaccompanied children in immigration proceedings and applications for immigration status. These pro bono attorneys are a critical part of Amica Center's mission and model which allows us to leverage

3

volunteer legal services to more efficiently represent children. Approximately 15% of cases currently open with the Children's Program are placed with pro bono attorneys.

11.     Amica Center's Children's Program has continuously received HHS funding since 2015. We currently have more than 850 open cases that were initiated and continuously funded through HHS funding. Children released to sponsors or transitional living programs live throughout the Washington, D.C. and Baltimore, MD metropolitan areas, including in the suburbs of Virginia and Maryland. Specific bar licensure is required to represent children in SIJS cases in each of the three jurisdictions where we practice, and this affects how case assignments are made among our attorneys. Due to the significant backlogs in state courts, USCIS, and the immigration courts, children's immigration cases often take years to resolve before an eligible child is granted asylum, a U or T visa, or lawful permanent residence.

12.     The need for legal representation and other support services for unaccompanied children— especially those in government custody and those facing deportation—is truly critical. Immigration law and procedures are incredibly complex and becoming more so every day. The overwhelming majority of unaccompanied children that we encounter in ORR-subcontracted facilities do not have the means to pay for a qualified private immigration attorney to represent them. ORR-subcontracted facilities are often located in rural areas where there are limited or no pro bono resources. For example, one of the ORR-subcontracted facilities that we serve is located approximately two hours away from Washington, D.C., the closest metropolitan area, by car and far from any other potential service providers.

13.

14.     In our experience, other government stakeholders including immigration judges, ORR-subcontracted facility staff, and the DHS Office of the Principal Legal Advisor ("OPLA") attorneys also prefer and appreciate when an unaccompanied child is represented by counsel. We frequently appear as Friend of Court to relay important updates regarding a child's reunification to OPLA and the immigration court and to coordinate appropriate changes of address and changes of venue. ORR-subcontracted facility staff often have questions for us about the logistics for children's appearances in court. Immigration judges

4

have sometimes requested that we enter appearances for children if the judge has doubts about the child's competency or understanding of their legal options. We also play a critical role in identifying and referring children for appointment of a Child Advocate. For children who are reunifying outside of our geozone, we provide legal referrals, either directly to another Acacia Center network provider or by providing a list of potential pro bono or low-cost resources directly to the child and sponsor. Because capacity for free and low-cost representation is overstretched in most areas, however, these resources can be very difficult to access.

15. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a Stop Work Order for Legal Services for Unaccompanied Children, effective immediately, which extended to "all activities" under the contract. Attached hereto as **Exhibit 1** is a true and correct copy of the Stop Work Order, dated February 18, 2025. Without further elaboration as to duration or reasoning, the Stop Work Order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." Ex. 1 at 1. HHS then rescinded the Stop Work Order without explanation on February 21, 2025. Attached hereto as **Exhibit 2** is a true and correct copy of the Stop Work Order Recission, dated February 21, 2025.

16. The chilling effect of the February Stop Work Order has had lasting effects on the Children's Program. Two staff members, including one Senior Paralegal and one IJC Attorney Fellow, have accepted employment with private immigration firms and cited as the deciding factor the job insecurity generated by doubts about the security of our HHS funding. This climate of uncertainty has also had a chilling effect on hiring qualified attorney candidates to fill existing vacancies, which in turn increases the caseloads of existing staff and has a negative effect on morale and retention.

17.

18. Our program was notified of the Partial Termination via an email from the Acacia Center for Justice shortly after 11 AM on March 21. We called a teamwide meeting several minutes

5

later to share the news with staff and answer their questions. Although our staff are understandably concerned about their job security and their ability to obtain future employment due to the sweeping expanse of the cuts to funded legal representation for children, their overwhelming response was to look for solutions for how to continue to represent the clients who trust and rely on us for their legal cases.

19. The abrupt termination of CLIN 2 funding for representation and associated services represents a loss of approximately 30% of Amica Center's total annual budget and 75% of the budget for the Children's Program. Amica Center has not yet set a timeline by which decisions would need to be made regarding staff layoffs or the discontinuation of any major aspects of our work. However, all work on cases where representation was undertaken during the preceding 10 years of HHS funding through the Acacia Center for Justice is now being funded using general operating funds. The organization has taken this position due to our ongoing ethical obligations to our clients and to preserve our ability to continue providing high-quality representation to those clients by minimizing the loss of qualified staff members. Amica Center cannot continue to fund this casework using general operating funds indefinitely. We are urgently seeking funding from other sources, but the collective impact of a nationwide shutdown is so great that the gap cannot be filled by private donors. To the extent that cases initiated under HHS funding could be transferred to funding streams held by other Amica Center programs (for example, state or local funding currently being used for adult representation), this would interfere with Amica Center's mission to maximize representation for indigent immigration men, women, and children at risk for detention and deportation by directly supplanting the organization's ability to represent other affected individuals.

20. The alternative—to immediately withdraw from representation in our 850 affected cases—is antithetical to our ethical obligations as attorneys and our values as a mission-driven organization. In many of the open legal cases for our child clients, there are upcoming hearings or deadlines which mean that withdrawing from the case would not be possible. Across the Children's Program, we have six clients scheduled for hearings with local immigration courts between March 24 and March 27. Not only is it nearly logistically impossible to withdraw from an immigration matter in that time frame, since withdrawal requires leave of the immigration judge, it is also impossible to do so without prejudicing the client's legal interests. We have dozens of open matters pending with state courts for children who are eligible for SIJS. In addition to upcoming hearings, there are ongoing time-sensitive legal requirements in those cases, including service of process on opposing parties, requests for orders of default, and other procedural requirements that, if not timely completed, could lead to dismissal or significant delay. Pro bono attorneys are heavily reliant on mentorship from experienced in-house immigration attorneys and at risk of committing errors or omissions in their cases without mentorship.

6

21.    Although KYR presentations and legal screenings remain funded for now through CLIN 1, significant, interrelated pieces of our work have been terminated, the consequences of which are immediate and severe. For example, if a child at one of the ORR-subcontracted facilities we serve is identified as having an urgent legal need such as an outstanding removal order, Amica Center—the only legal provider with access to the ORR-subcontracted facility—would not be funded to provide the necessary legal service to protect the child from imminent removal. Many children who enter ORR custody with prior removal orders are eligible to have their immigration court proceedings reopened, but doing so requires filing a motion as quickly as possible, something which children simply cannot do without the help of an experienced attorney. Similarly, without timely access to competent legal services, older children are at risk of losing access to protections based on their age. A 17-year-11-month-old child who has been severely abused by their parent(s), for example, is eligible under federal law to petition for Special Immigrant Juvenile Status until age 21. In Virginia, however, the Juvenile and Domestic Relations ("JDR") court, must make the necessary findings of fact regarding eligibility, must obtain jurisdiction before the child turns 18. Without access to legal representation who can initiate the necessary proceedings before the child's 18th birthday, that child's right and ability to seek protection through SIJS is functionally eliminated.

22.    One of the children currently represented by the Children's Program is a four-year-old boy from Haiti, referred to here as "Jean." He is currently in an ORR URM program living with foster parents in Virginia. Jean entered the United States shortly after he turned three years old and was placed in ORR custody. After it was determined that there were no viable sponsors for him in the United States, Jean was released from custody to an ORR URM program served by Amica Center. Amica Center coordinated with the HHS-funded legal provider which had been working with him at his ORR placement to transfer his legal case and substitute counsel on all of his pending matters to avoid an interruption in representation. Jean has a TPS application pending, is eligible for SIJS and is in removal proceedings. SIJS findings for Jean would be made through his open foster care proceeding in Virginia, and he is scheduled for a hearing on April 2, 2025. His Amica Center attorney has been working to prepare the necessary motion and proposed order in advance to ensure that the matter can be heard at the upcoming hearing. Jean is also scheduled for a Master Calendar Hearing in early June at which it is obvious that he could neither engage with the proceeding nor provide relevant updates to the court regarding his other pending legal matters to the court other than through counsel.

23.    The interruption and subsequent termination of funding for representation and nonrepresentational services to unaccompanied children has already frustrated Amica Center's mission and threatened the sustainability of our work. Providing a legal screening without the ability to refer a child for long-term representation, connect them to benefits

and services for victims of trafficking, or prepare and accompany them to court, fundamentally restricts the efficacy of that legal orientation and screening.

24.

25. If the Children's Program were forced to lay off staff due to sudden and unexpected termination of funding, it would be a drain on our organizational expertise in the delivery of legal representation and other services to the unaccompanied immigrant children held in ORR custody. The collective experience of our specialized staff would be nearly impossible to recover and would hobble our ability to deliver high-quality services to unaccompanied children in ORR custody in the Capital region, even if funding were restored to similar levels in the future. The level of investment required to hire and train new staff, fellows, volunteers, or interns would divert significant director and manager time and resources from the continued provision of representation to existing clients and have a lasting impact on the morale and retention of supervisors and managers. My own time over the past month has been overwhelmingly diverted from essential case supervision and legal guidance in a rapidly changing area of immigration practice, to responding to threats to our funding and program stability.

26. The continued funding of this work is critical to ensuring that children do not experience irreparable harm to their ability to access legal protections in the United States. Children who have spent months and years building trust and rapport with an attorney or legal advocate will be faced with the prospect of navigating a complicated and increasingly hostile legal system alone or urgently seeking out either the few remaining low-cost resources for representation in this space or the resources to pay for private counsel, reliving and recounting some of their most personal and traumatic experiences with a stranger.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25 of March 2025, in Alexandria, Virginia.

*Laura Nally*

8

_____

Director, Detained Children's Program
Amica Center for Immigrant Rights
1025 Connecticut Ave. NW, Suite 701
Washington, D.C. 20036
P: (202) 916-8179
laura@amicacenter.org

9

# Exhibit 1



**United States Department of the Interior**

INTERIOR BUSINESS CENTER
Washington, DC 20240

████████████████████████████

Acacia Center for Justice
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

February 18, 2025

Re: Immediate Stop Work Order

Dear ████████████████

This letter constitutes an official Stop Work Order for **all activities** under Contract
140D0422C0009 – Legal Services for Unaccompanied Children.

In accordance with FAR 42.1303, the Government hereby directs your firm to stop all work
associated with the scope of Contract 140D0422C0009. Therefore, your firm shall cease all
services and the ordering of supplies.

All subcontractors shall be notified immediately that a stop-work order has been issued to the
prime contractor. The stop-work order shall remain in place until you are notified otherwise by
the CO.  As soon as feasible and prior to the lifting of the stop-work order, appropriate action
shall be taken to either terminate the contract or extend the period of performance, if necessary.
The stop work order is being implemented due to causes outside of your control and should not
be misconstrued as an indication of poor performance by your firm.

Please do not hesitate to contact me with any questions or concerns.

Sincerely,



# Exhibit 2



## United States Department of the Interior

### INTERIOR BUSINESS CENTER
Washington, DC 20240

Acacia Center for Justice
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

February 21, 2025

Re: Cancelation of Stop Work Order

Dear

This letter cancels the Stop Work Order issued February 18, 2025. Acacia Center for Justice may resume **all activities** under Contract 140D0422C0009 – Legal Services for Unaccompanied Children.

If Acacia intends to submit a Request for Equitable Adjustment under FAR 52.242-15, please submit it to the Contracting Officer no later than 30 days after the receipt of this letter.

Please do not hesitate to contact me with any questions or concerns.



# Exhibit 3



[redacted]

*is hereby* ***partially terminated*** *for the Government's convenience*

*Termination for the Government's convenience*

**Subject to the terms of this contract, the Contractor shall be paid an amount for direct labor hours (as defined in the Schedule of the contract) determined by multiplying the number of direct labor hours expended before the effective date of termination by the hourly rate(s) in the contract, less any hourly rate payments already made to the Contractor plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system that have resulted from the termination**

*final* ____

[redacted]

3/25/2025

*Acknowledgment of Notice*

[redacted]

[redacted] D
D

d [redacted]

2 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | Case No. 3:25-cv-2847 <br><br> **DECLARATION OF MARTHA RUCH (CLSEPA) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## DECLARATION OF MART␣A RUC
## LEAD IMMI␣RATION MANA␣IN␣ATTOREY FOR CLSEPA

*I, Martha␣uch, make the following statements on behalf of myself and Community␣egal Services in␣ast Palo Alto␣C␣S␣PA␣. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

**Mart  a Ruc**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>　　　　　Defendants. | **DECLARATION OF ELIZABETH SANCHEZ KENNEDY (GHIRP) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## DECLARATION OF ELIZABETH SANCHEZ KENNEDY
## EXECUTIVE DIRECTOR FOR GALVESTON-HOUSTON IMMIGRANT
## REPRESENTATION PROJECT (GHIRP)

*I, Elizabeth Sanchez Kennedy, make the following statements on behalf of the Galveston-Houston Immigrant Representation Project (GHIRP). I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

1. My name is Elizabeth Sanchez Kennedy, and I am the Executive Director at the Galveston-Houston Immigrant Representation Project. GHIRP is a legal services organization that was launched in October 2020 with a mission to build a resilient, diverse community by providing comprehensive representation and holistic legal services to immigrants in need. GHIRP's legal services range from outreach and education to complex litigation in the Galveston-Houston area. Our legal team provides holistic and comprehensive representation to immigrants in the community, including unaccompanied minors, adults, and women, children, and families.

3. GHIRP's Immigrant Children & Youth program is dedicated to representing indigent unaccompanied immigrant children who are not in detention as well as those held in Office of Refugee Resettlement (ORR) custody throughout the Galveston-Houston area. This program was directly impacted by the termination of funds dedicated to unaccompanied immigrant children. Core to GHIRP's mission and legal services, is providing representation to unaccompanied immigrant children and youth. GHIRP was founded with funding for unaccompanied immigrant children and our first year of services focused almost exclusively on legal services for detained and released unaccompanied immigrant children. The contract termination, which cuts funding dedicated to one of our main legal services, perceptibly impairs our core business activities.

4. In order to carry out our mission, GHIRP has several main work components: (1) providing educational and pro se services in the form of legal education "know your rights" (KYR) presentations, conducting individual consultations (intakes), and conducting pro se services with unrepresented children in ORR custody in the Greater Houston Area; (2) representing unaccompanied minors who are not in ORR custody in immigration

1

proceedings; (3) representing children in ORR custody in immigration proceedings; (4) referring children for pro bono legal services outside of the Galveston-Houston area; and (5) providing social services to unaccompanied children. We further host an Immigrant Justice Corps (IJC) fellow to represent unaccompanied children in removal proceedings and provide Spanish-language tutoring for staff representing unaccompanied children.

5. GHIRP has been providing legal services to unaccompanied immigrant children in Galveston and Houston since 2020, when the organization was founded. Since the organization opened, our legal services dedicated to unaccompanied immigrant children have expanded each year. In 2020, we provided direct representation to approximately 35 unaccompanied immigrant children. In 2021, GHIRP initiated services in a newly opened ORR facility in Houston (Children's First Residential Care TX Gasmer), providing KYR presentations, intakes, direct representation, social services, and referrals for children who were released to other jurisdictions. In 2023, GHIRP began providing the same legal services to unaccompanied children in a second ORR shelter named LSSS Upbring Krause Children's Center. GHIRP's direct representation services dedicated to children who are not in custody have also expanded, from 35 cases in our first year of existence (2020) to now serving approximately 300 clients per year (2025). Currently, GHIRP serves a combined annual number of nearly 1,500 children per year, including approximately 1,500 children detained in ORR custody, approximately 300 children receiving direct representation services per year, 120-150 children receiving social services per year, and approximately 35-50 children receiving *pro se* assistance per year.

6. Wholly with U.S. Department of Health and Human Services (HHS) funding, GHIRP has hired 19 staff members dedicated to providing legal services to unaccompanied immigrant children. Specifically, our team comprises seven (7) attorneys, one (1) Department of Justice Accredited Representative, nine (9) legal assistants, and two (2) social services coordinators. As executive director, I oversee the program, support the managing attorney, and provide mentorship to the legal team. All staff on GHIRP's Immigrant Children & Youth team are full time employees, and one of the attorneys is an Immigrant Justice Corps fellow. Through this contract, we serve recently arriving children in the ORR facilities, as well as released children in the community.

7. GHIRP's Immigrant Children & Youth team serves detained children who are between the ages of six (6) and seventeen (17) years old, and non-detained children of all ages. We provide legal services to children within seven to ten (7-10) business days of their arrival to the ORR facilities, if not sooner.

8. GHIRP staff provide detained services in the facilities two to four (2-4) times per week, for approximately two to four (2-4) hours or more each visit. Staff providing direct representation and KYR presentations to children in ORR facilities regularly travel to each facility in person to conduct client interviews, prepare clients for hearings, gather evidence,

as well as provide legal education, individual consultations, and pro se legal services. Our team also provides "friend of court" legal services so that children appearing in court without an attorney do not have to appear alone. The courts function more efficiently when legal representatives are involved as "friend of court" as they explain technical requirements at preliminary hearings and move the cases along while protecting their rights. GHIRP's legal team also advocates for children in ORR custody seeking release or transfers, reporting disclosed physical or sexual abuse while in custody, and ensuring that their basic needs are met by the facility and staff (such as language access and access to education and recreation). If and when a child is released to a location outside of our geographic area, we refer children for legal services in the location where they are going.

9. The GHIRP legal team is trained to provide child-friendly, trauma-informed, culturally competent services to tender aged children, as well as pre-teen and teenage children. When we meet the children for the first time, they can be confused, vulnerable, and they often do not understand the complex immigration system that they must navigate. Many children do not understand where they are, why they are in a shelter, or that they have rights. Through our KYR presentations we teach them about their rights, the immigration system, and what they must to do seek relief in the United States. We also explain what their obligations and rights are after they leave the ORR shelter.

10. Our staff teaches children about how to identify harmful behavior by caretakers. The goal is to provide complex information to children of all ages in a way that they can comprehend and retain. The GHIRP legal team tailors presentations and individual consultations to meet the needs and capacities of each child. We developed materials and resources specific to all age groups so that children remain engaged and empowered by our services. During individual consultations, our staff are trained to meet each child at their developmental level to ensure that the intake is effective and comprehensive. We have seen firsthand how this information and engagement in our services is critical to preventing trafficking and abuse after minors leave the facility, as well as safeguarding their legal rights in the immigration system.

11. The GHIRP legal team provides representation to detained children appearing in immigration court and those who are released to the Galveston-Houston area. We identify children who are eligible for legal relief and assist them in preparing their case from the initial filing of the application or appearance in court, to the finality of their case. We represent children in matters before the Houston immigration courts, the Board of Immigration Appeals, federal district courts and petitions for review in circuit courts, as well as children seeking affirmative relief before USCIS and the USCIS Houston Asylum Office, and family court petitions in state court. Our legal team represents children seeking humanitarian relief such as asylum, U-visa and T-visa applications, Special Immigrant Juvenile visa petitions, and VAWA petitions. GHIRP conducts pro se workshops for children who qualify for legal relief but cannot obtain an attorney to represent them.

3

12. Many children that receive our legal services do not speak English, have experienced trauma, and do not have the resources to hire an attorney. Some clients are so young they cannot read or write in their own language, much less present a legally sufficient case in English in an adversarial court system. We have represented non-verbal children, children with mental and physical disabilities, and parenting children who have been sexually abused from a young age. Given their particular vulnerabilities, many of our young clients do not have the resources to hire a private attorney and they cannot present a legally sufficient case before the court without an attorney by their side. GHIRP's free, accessible representation is their only chance to meaningfully participate in their case and obtain a fair outcome.

13. GHIRP attorneys regularly appear before juvenile docket Immigration Judges for our clients that are unaccompanied immigrant children. The attorneys are knowledgeable about legal issues specific to immigrant children and understand the preferences of the judges including required motions and evidence to be filed before hearings. This familiarity with the juvenile judges and issues ensures efficient adjudication of cases, or dismissals of removal proceedings where relief is available outside of the court. By frequently appearing with children in the courts, GHIRP attorneys are able to effectively prepare our child clients for hearings, eliminating the stress and trauma of appearing before an Immigration Judge.

14. Without warning, on February 18, 2025, HHS (through the U.S. Department of the Interior) issued a national contract stop work order for Legal Services for Unaccompanied Children, effective immediately, which extended to all five Contract Line Numbers (CLINs). Without further elaboration on duration or reasoning, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance." HHS then later rescinded the stop work order without explanation to GHIRP on February 21, 2025.

15. On March 21, 2025, also without warning, GHIRP learned that HHS (through the U.S. Department of the Interior) partially terminated the current contract with Acacia Center for Justice (to which our organization is a subcontractor) that funds GHIRP's legal services for unaccompanied children. This termination was effective the same day, March 21, 2025. HHS terminated the contract with respect to 3 of the 4 Contract Line Item Numbers (CLINs): CLIN 2, Legal representation for unaccompanied children, as well as other non-representation services, such as referrals and data tracking; CLIN 3, which funds Immigrant Justice Corps fellows who represent unaccompanied children not covered under CLIN 2; and CLIN 4, Spanish language tutoring for organizational staff who work with children. For the time being, HHS has left in place only CLIN 1, which funds KYR presentations and confidential legal consultations for pro se children in ORR facilities. Per the partial termination, HHS ordered Acacia and all subcontractors to stop work

4

immediately on CLINs 2, 3, and 4. HHS provided no justification for the partial termination other than "the Government's convenience."

16. I received notification of the contract termination by email. I notified the Immigrant Children & Youth team that the contract was terminated effective immediately, and that work on cases under the contract should stop due to a lack of funding. As a team, we assessed our cases that are currently in progress, our clients' reliance on our representation, immediate next steps for clients, and work that needed to be prioritized given the time-sensitive nature of the cases.

17. Notification of the contract termination has significantly impacted our organization, staff, and clients. GHIRP currently represents 292 clients with funding from the current contract with Acacia Center for Justice. Our youngest client is two (2) years old. We represent clients who have imminent hearings, filing deadlines, and time-sensitive motions before the court. Our clients are scheduled to appear in court as soon as April 2, 9, and 10, 2025. The April 2, 2025 hearing is for a detained client who needs to file relief and be prepared to plead in his second setting in Immigration Court, which has necessitated urgent work to prepare an application this week. Another client has an Individual Hearing on April 9, 2025 that will require substantial attorney preparation time, in addition to working closely with the client on his testimony, and another client has a filing deadline for that same day.

18. Some cases require complex legal arguments, such as our client who is contesting the judge's jurisdictional decision related to his asylum claim. The law entitles this client to explicit procedural due process protections for unaccompanied children, including filing his asylum application with the asylum office first. Our attorney has filed two separate motions and appeared at a hearing related to this issue and is scheduled to appear again in court to resolve the matter. Our young client will not be able to advocate for his rights alone if we are forced to abruptly withdraw from his case.

19. GHIRP's IJC Fellow represents "Evelyn," a 12-year-old girl from Mexico who has endured significant abuse starting at a very young age. Before entering the United States, she was labor trafficked at the young age of 5 years old and endured physical and sexual abuse at the hands of her caretakers who were her extended family members. We assisted Evelyn in filing her asylum application and are in the process of gathering documentation and information to file a T-visa application. These forms of relief will ensure that she can stay in the U.S. with her sponsor and heal from her past trafficking and abuse. Evelyn was issued a Notice to Appear and will soon be required to appear in the Houston Immigration Court. To withdraw from her case at this stage would likely result in her abandoning both forms of relief and being forced to return to the very dangers she fled.

20. GHIRP also represents "Rosa," a 15-year-old girl from Honduras, in her immigration case seeking both SIJS and asylum. When we met Rosa, she was incapable of speaking due to

5

her severe trauma. She would sit silently with her attorney, picking at her skin and repeating nervous ticks due to her extreme discomfort and anxiety. Through multiple meetings and building rapport, Rosa disclosed her history of parental abandonment and neglect, as well as surviving sexual abuse in her home country. She continues to display extensive distress related to her past trauma. GHIRP filed her asylum application (which is currently pending) and her family court case is pending in state court, which forms the basis for an application for SIJS. Rosa is not capable of complying with family court requirements for service of process, establishing parentage, and meeting the legal standards for the requested proposed order without an attorney representing her. Furthermore, she will soon be required to appear in the Houston Immigration Court and will need her trusted attorney to represent her in those proceedings as well.

21. These clients have an expectation that GHIRP will timely prepare their case, appear in court on their behalf, and complete the case in accordance with our attorney-client representation agreements. In order to comply with our client obligations, we have had to utilize operating expenses that were set aside for other purposes because we are not able to halt legal representation on a moment's notice.

22. GHIRP's legal team will not withdraw from client cases immediately. Our management team is determining how long we can continue representing our clients without funding, considering the number of clients we represent, the procedural posture of each case, and the staff capacity for casework with a reduced team due to funding. Due to the sudden contract termination, we must decide which cases to retain, and which staff will remain at the organization (if any). GHIRP attorneys and representatives have an ethical duty to represent our current clients and to advocate for their interests. To abruptly withdraw from our clients' cases will be detrimental to their legal case, and a direct impairment to our existing core activities. Clients will age out of legal relief, may be forced to abandon relief due to missed filing deadlines, and/or they will not be able to pursue their cases in court effectively alone without representation. Our attorneys are the attorney of record in immigration court and state court, and judges may not allow for our withdrawal at such a late stage of the case. If they do allow for withdrawal, our young clients will not have the time and resources to obtain new counsel within the courts' deadlines and/or scheduled hearings.

23. The financial impact of the contract termination profoundly affects GHIRP, as the entire contract for legal services for unaccompanied children represents approximately 45% of our organizational budget and staff. Our organization served 2,625 immigrants in the community last year, of which 1,469 (or 57%) were unaccompanied children receiving services through this contract. GHIRP is not able to maintain the same level of legal services for unaccompanied minors without HHS funding, and we will be required to lay off most of our Immigrant Children and Youth staff in approximately four weeks. We will rely on unrestricted funds and savings to pay staff during this time, however, drawing down

6

on these funds will destabilize the organization as a whole. This will divert unrestricted funds away from other services, as these resources typically cover gaps in funding between contract cycles on other grants, underfunded programs, or new initiatives that are responsive to emerging needs of the community.

24. GHIRP's staff members serving immigrant children and youth are exceptionally passionate about providing legal services to children and are currently distraught by the recent contract termination. All have had formal and/or on-the-job training related to educating and representing children and youth and have developed unique skills to provide child-friendly legal services. Over the years, our team has built rapport with our clients, assisted them in navigating personal and legal issues, and dedicated a significant amount of time and resources to zealously advocating for their clients. Through our services, we hope to achieve our goals of obtaining safety and stability for our clients so that they can thrive. An interruption in services risks re-traumatizing them and causing them to lose the progress they have made so far in their trajectory toward opportunity. The abrupt contract termination has impacted staff morale and caused incredible amounts of stress. Having to withdraw representation may be a violation of our ethical duties to our clients and will likely lead to their deportation, placing our clients in harm's way. Our children view our team as a reliable support, which many clients lack in other aspects of their lives. These consequences deeply impact our staff, who are dedicated, compassionate professionals.

25. Such results are antithetical to our values and impede our ability to carry out GHIRP's mission.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on the 25th of March 2025, in Houston, Texas.


  /s/ Elizabeth Sanchez Kennedy
**Elizabeth Sanchez Kennedy**
Executive Director

6001 Savoy Drive, Ste. 400
Houston, Texas 77036
Ph: (713) 588-2260
Email: Chiqui@ghirp.org

7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, <br><br> Defendants. | **DECLARATION OF WENDY YOUNG (KIND) IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

# DECLARATION OF WENDY YOUNG,
## PRESIDENT OF KIDS IN NEED OF DEFENSE

I, Wendy Young, make the following statements on behalf of KIND, Inc. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the following statements are true and correct.

1. My name is Wendy Young, and I am the President of KIND, Inc., doing business as Kids in Need of Defense ("KIND"). KIND is the leading international not-for-profit organization devoted to protecting the rights and well-being of unaccompanied and separated children. Founded in 2008, KIND now has seventeen locations across the United States that have provided legal rights education to more than 78,000 children, and legal representation in immigration matters to more than 17,000 children in the United States. KIND staff provides legal services to unaccompanied immigrant children who are in the custody of the Office of Refugee Resettlement (ORR) of the Department of Health and Human Services (HHS) at 20 short-term shelter care or foster care facilities, five long-term foster care programs, and three Unaccompanied Refugee Minor (URM) programs served by KIND's offices in Atlanta, GA; Boston, MA; Fresno, CA; Hartford, CT; Houston, TX; Los Angeles, CA; New York, NY; Sacramento, CA; and Seattle, WA. KIND also serves children released from ORR care and living in the communities served by those offices and by our offices and locations in Baltimore, MD; the District of Columbia; Jacksonville, FL; Newark, NJ; Northern Virginia; Orlando, FL; Providence, RI; and San Francisco, CA.

2. KIND provides representation and other services to migrant children in part through its staff, and in part through pro bono partnerships with nearly 900 law firms, corporations, law schools, and bar associations, whose lawyers provide children with pro bono representation with training and support from KIND. KIND also provides psychosocial support to children and families; works to address the root causes of child migration; and advocates for laws, policies, and practices to improve the protection of unaccompanied children within the U.S. and abroad.

      (1) During children's time in ORR custody, KIND conducts educational "know your rights" ("KYR") presentations that provide unaccompanied children with information about the immigration system, their rights and responsibilities, and what to expect in immigration court. KIND also conducts legal screenings to assess each child's protection needs and evaluate options for legal relief as well as making appropriate referrals for further legal or social services during or after ORR custody. As needed, KIND may also support children in requests for release on recognizance or with notifications relating to changes of address and venue.

1

(2) During ORR custody, if a child is required to attend immigration court, KIND will educate the child about immigration court processes and prepare them to attend the hearing, and will accompany the child to court in the capacity of "friend of the court" or, in limited circumstances, as attorney of record.

(3) During ORR custody, KIND may provide legal representation for certain children where services as "friend of the court" are not sufficient for the child's needs – for example, for children who are required to enter pleadings in their immigration removal proceedings during their time in ORR care, or children who are placed in federal long-term foster care.

(4) Many children who live in communities served by KIND following release from ORR custody receive free legal representation through KIND's network of pro bono attorneys and/or KIND staff.  The KIND mentor assigned to each pro bono attorney offers specialized training programs and guidance on substantive law and skills needed for representing children, addresses the pro bono attorney's questions, consults on case strategy, offers access to psychosocial services and other resources, and provides support at all phases of a child's immigration case.  KIND staff and KIND pro bono attorneys represent children in proceedings before the immigration courts, in administrative proceedings before U.S. Citizenship and Immigration Services (USCIS), in ancillary proceedings in state courts, and occasionally before the Board of Immigration Appeals, federal district courts, or federal courts of appeal.

4.  KIND's five original offices began providing legal services for released unaccompanied immigrant children through pro bono partnerships in January 2009, with two of those offices adding services for detained children later that year. Over time, KIND's programming expanded to include additional locations in the United States, plus a program dedicated to serving children separated from their parents.  Beyond the United States, KIND has staff in Mexico, Central America, and several countries in Europe, with a focus on protection, family unity, and strengthening child protection systems and access to lawful immigration pathways. KIND works with organizational and private sector partners to harness additional capacity in those regions.

5.  For the period January 2022 through December 2024 inclusive, KIND's subcontract with Acacia supported know-your-rights presentations and legal screenings to over 16,900 children in ORR custody, immigration legal representation for approximately 6,700 children through KIND and its pro bono attorneys, and psychosocial services for approximately 2,400 children.  During the same period, through other contracts and other

resources, KIND and its pro bono partners additionally represented approximately 3,700 children, and KIND provided psychosocial services to approximately 1,100 children.

6.    In or about March 2022, KIND entered into a subcontract with the Vera Institute of Justice to deliver specified legal services to children arriving in the United States as unaccompanied children, renewable annually over a five-year period. KIND's current contract with Acacia Center for Justice is a novation of that contract. The KIND-Acacia subcontract is in turn funded by a contract between Acacia and ORR. All of KIND's seventeen locations in the United States deliver legal and social services funded through its subcontract with Acacia. From 2009 through 2021, KIND served children pursuant to subcontracts with Acacia's predecessor, the Vera Institute for Justice.

7.    KIND staff regularly travel to almost twenty ORR shelter care and transitional foster care facilities in person, while one shelter regularly arranges for groups of children to visit the local KIND office in person due to capacity limitations at the ORR facility. The frequency of these visits varies with need, but on average, each KIND site held about four visits per month during 2024. KIND uses these visits to provide know-your-rights presentations, conduct legal screenings, prepare clients for court hearings, or conduct individual legal consultations. KIND staff also represent children placed in federal long-term foster care and in the Unaccompanied Refugee Minors program.

8.    Immigration removal proceedings are adversarial proceedings commenced by the Department of Homeland Security before immigration courts within the Department of Justice. Unaccompanied children, including very young children, are named as "respondents," and must answer charges of removability and bear the burden of proof to establish a defense to forcible removal to countries where their rights, well-being, safety, or even their lives were at risk. The free legal and psychosocial services provided by KIND, and by other ORR-funded legal services providers, are essential to protecting the basic rights of children facing this process. Unaccompanied children do not have the financial resources to hire private counsel at market rates, and in KIND's experience, few have family members of such means. Without free services, unaccompanied children -- including very young, pre-verbal, and non-walking children -- would be forced to represent themselves through complex legal processes, facing trained and experienced government counsel while striving to present evidence and legal arguments in their own defense.

9.    Legal screenings by KIND staff for children in ORR custody serve to determine whether it is unsafe for a child to return to their country of origin, and to identify options for available legal relief in the United States. These assessments are necessary prerequisites to placement with pro bono attorneys who primarily practice in areas of law other than immigration, and depend on KIND for case assessments, training, practice guidance, and ongoing mentorship. KIND's pro bono partners contributed approximately 1,487,244

3

hours of legal services, valued at over $889,000,000 dollars from 2009 to 2023. Thus, pro bono representation with KIND mentorship multiplies the effectiveness of the funding ORR provides to KIND.

10. Through legal representation by KIND or its pro bono partners, children pursue one or more forms of humanitarian relief, such as protection from parental maltreatment through special immigrant juvenile status, asylum based on a fear of persecution, T- or U-visas that protect victims of trafficking or other serious crimes, or temporary protected status based on untenable conditions in the country of origin. Children's immigration cases have long timelines: in KIND's experience, while a small proportion of cases resulting in permanent status are completed within two years, the majority take five to seven years to complete, with some taking longer. The chief reason is adjudication timelines. The immigration court backlog currently stands at well over 3.6 million cases, with wait times between hearings typically stretching to months or years. Moreover, most applications for humanitarian relief are adjudicated outside immigration courts. In 2024, USCIS stated that over 1.1 million asylum applications were pending before it, and applicants for other forms of relief likewise face years-long delays, most notably, the years-long waits for the limited supply of visas affecting special immigrant juveniles waiting to apply for green cards. These delays are beyond the control of children and their advocates. In addition, the process of preparing children's applications for relief is time-consuming for several reasons. First, depending on the relief sought, evidentiary support for applications may include elements that require time and effort to obtain, such as: state juvenile court orders issued after evidentiary hearings; attestations by state or federal law enforcement officers; and/or medical, psychological, or other expert evaluations. In cases where a child's initial request for relief is not approved, further time may be required to respond to requests for evidence or notices of intent to deny, as well as for appellate processes. Second, children in general, and particularly those who have experienced traumatic events, will need time to develop trust in unfamiliar adults and in the legal process itself, as the American Bar Association has recognized in cautioning against pressuring children to discuss distressing experiences before they are ready to do so. Third and more generally, preparation of a child's case takes time due to the capacity limitations inherent in children's ongoing cognitive and emotional development. As a principal drafter of the 2008 TVPRA explained, a child "usually knows nothing about U.S. courts or immigration policies and frequently does not speak English . . . . The majority of these children have been forced to struggle through an immigration system designed for adults." (Cong. Rec. S10886 (Dec. 10, 2008) (Sen. Feinstein)). State codes of professional responsibility typically require attorneys representing children with diminished capacity to maintain a normal attorney-client relationship to the greatest extent possible, and under American Bar Association standards, children must be afforded the right to meaningfully participate in decision-making in their cases. Accordingly, best practices for representing unaccompanied children contemplate applying trauma-informed and child-sensitive practices and

4

affording sufficient time to support the child client's understanding of the proceedings and deliberation on matters affecting the child's well-being. Fourth, children are not self-sufficient, so their participation in preparing a legal case depends on facilitation by individual or institutional caregivers who may present time constraints that are beyond a child's control – for example, something as simple as a caregiver being unable to obtain leave from work to transport a child to a session with an attorney or expert. In sum, representing children in immigration matters requires a sustained multi-year time commitment in order to meet stringent evidentiary burdens, present effective advocacy, and support children in navigating complex and high-stakes processes.

11. Officials with government agencies have repeatedly recognized how KIND's work contributes to their efficient and effective operations in handling children's cases. Among other contributions, at the request of agency officials, KIND staff have conducted numerous training programs on topics relating to children's immigration matters for staff of the immigration courts, USCIS, and the ICE Office of the Principal Legal Advisor (OPLA), which represents the government in removal proceedings. As one example among many, after KIND staff presented to USCIS asylum office staff on child-friendly interviewing techniques, senior officials of the office sent handwritten notes thanking KIND staff for the program. The office director stated, "I know our officers will greatly benefit from it!" and one training officer added, "We hope we can make it an annual event."

12. Another example is a well-received initiative by KIND's Boston office to accelerate the successful completion of numerous pending cases of KIND clients awaiting adjudication of their applications for lawful permanent residency (LPR) status, also known as a green card. LPR applicants have already cleared high legal standards and progressed through years-long waiting lists, only to wait again for scheduling of a merits hearing date in immigration court. To alleviate that bottleneck, during 2021, KIND staff identified dozens of clients who were immediately eligible to adjust status, lacking only a date on the court's calendar for an adjustment hearing. Normally, just a handful of cases would be scheduled for an adjustment hearing on a given date, but through KIND's coordination with OPLA attorneys and immigration court staff, 50 adjustment-ready cases were calendared on two selected dates in May and November 2021. By organizing required information to share with OPLA in advance, KIND helped to ensure a smooth and efficient hearing for each case. The court approved 21 cases on the May 2021 date, 25 children on the November 2021 date, and the remainder on follow-up dates. Both the immigration court and OPLA praised KIND for efficiencies that resulted in removing cases in bulk from the court's crowded docket as the KIND clients received permanent status.

13. On the afternoon of February 18, 2025, Acacia emailed KIND a redacted copy of a nationwide order that HHS (through the U.S. Department of the Interior) issued to stop work under the Legal Services for Unaccompanied Children contract, effective

<div align="center">5</div>

immediately. The stop-work order applied to all lines of work performed under the contract, including KIND's work on KYR presentations and legal screenings for children in ORR facilities, and legal representation for unaccompanied children in and outside ORR custody. Without further elaboration, the stop work order stated that it "shall remain in place until you are notified otherwise" and "is being implemented due to causes outside of your control and should not be misconstrued as an indication for poor performance."

14. Based on the directives in the stop-work order, KIND instructed staff to immediately suspend visits to facilities served under the contract, stop accepting new referrals, cancel intake meetings with prospective clients, and not sign retainer agreements to take on new clients. KIND also instructed staff to continue critical ongoing work necessary to fulfill professional responsibilities to clients, including meeting filing deadlines and attending scheduled hearings and administrative interviews with clients. On the afternoon of February 21, 2025, KIND learned from Acacia that HHS had rescinded the stop-work order, without explanation.

15. On March 21, 2025, Acacia informed KIND via email that Acacia had received a notice partially terminating Contract 140D0422C0009, under which KIND is a subcontractor, for the government's convenience. Acacia stated that the contract was terminated effective that same date for three of the four Contract Line Numbers (CLINs), and directed that work stop immediately under CLIN2, Legal representation for unaccompanied children not in ORR custody; CLIN3, which funds Immigrant Justice Corps fellows to represent unaccompanied children separately from those represented through CLIN 2; and CLIN4, Spanish language tutoring for organizational staff who work with children. KIND understands that only CLIN1, which funds KYR presentations and confidential legal consultations for unrepresented children in ORR facilities, remains in place, and is awaiting guidance from Acacia regarding whether there will be revisions to the relevant task orders, such as modifications to KYR services and any attendant budget or staffing changes.

16. Partial termination of the Acacia contract deprives KIND of the funding KIND relies on to employ approximately 350 professionals actively engaged in delivering or supporting the legal representation of some 6,700 clients. KIND cannot retain employees once contractual funding sources are unavailable, and we anticipate significant layoffs, starting within days of the contract termination. This interruption of employment disrupts the productivity, career development, and morale of scores of qualified and experienced workers who are skilled and experienced in serving unaccompanied children, and who cannot easily find replacement opportunities due to the broad geographic scope of the partial contract termination. More importantly, the partial contract termination makes the qualifications and experience of these employees unavailable to children in need of specialized services. Most funding KIND has received through other sources is dedicated to employing staff who provide specified services to additional clients through other

6

programs, and thus such employees and funding cannot compensate for the needs created by the partial contract termination.

17. Partial termination of the Acacia contract will disrupt thousands of attorney-client relationships on which children have relied, for multiple years in some cases, and leaves children without support for the completion of their pending cases. The sudden disruption of an established attorney-client relationship would be a blow for children who have invested time to develop a relationship of trust, particularly in the wake of traumatic experiences that led them to migrate in search of safety. This is particularly so because child clients benefit from a trauma-informed and child-centered practice as is cultivated at KIND. Many children served through KIND face impending deadlines or events in their cases. As of the date of this declaration, approximately 200 clients represented by KIND staff or by pro bono attorneys receiving KIND's mentorship are scheduled for master or individual hearings in immigration courts in the next 60 days. This includes clients with immigration court hearings docketed for March 25, March 27, and April 8. A similar number of other required actions are scheduled in KIND's cases in the next 60 days, including hearings in state court proceedings, deadlines to respond to requests for evidence in connection with immigration applications, and other filing deadlines and events.

18. KIND relied on contractual funding to commence representation in thousands of matters that, as discussed above, require years to complete. ORR's partial termination of the contract will not automatically suspend pending removal proceedings nor resolve pending applications for relief. Nor will the partial contract termination automatically suspend deadlines in children's cases, such as requirements to file an application or motion within a specified time period or before a client reaches a specified age. KIND retains professional obligations toward these thousands of vulnerable clients. By issuing the partial termination order with immediate effect, ORR has not even provided a timeline for communicating the changed circumstances to KIND's thousands of clients; nor for attending to time-sensitive client needs or impending deadlines; nor for any accommodation of a lawyer's ethical obligations to a client under such circumstances, be they fulfilled through continued representation with alternative financial support, substitution of counsel, or withdrawal from representation.

19. The partial termination of the Acacia contract impedes KIND's mission of ensuring that no child appears in immigration court without high-quality legal representation. For all of the reasons discussed here, KIND believes that the partial termination of the Acacia contract will upset children's serious reliance interests in ongoing attorney-client relationships, diminish fairness, implicate due process considerations, impede the efficiency and effectiveness of court and agency processes due to increased numbers of unrepresented children, and thereby risk severe harm to children who have relied on their attorneys to see their claims for protection and relief through to conclusion.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on the 25th of March 2025, in Falls Church, Virginia

_____ /s/ Wendy Young_____

Wendy Young
President
Kids in Need of Defense
PO Box 27839
Washington, DC 20038

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

|  |  |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.*,<br><br>         Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>         Defendants. | Case No. 3:25-cv-2847<br><br>**DECLARATION OF MIGUEL ANGEL MEXICANO FURMANSKA IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**DECLARATION OF MIUEL ANEL MEXICANO FURMANSA MANAIN ATTORNEY AND ONER OF TE LAOFFICE OF MIUEL MEXICANO**

*I, Miguel Angel Meicanourmanska, make the following statements on behalf of myself and theaw Office of Miguel Meicano, PC. I certify under penalty of perjury that the following statement is true and correct pursuant to 28 U.S.C. § 1746.*

*J.O.P. v. DHS*

(207 of 348), Page 207 of 348
Case: 25-2358, 04/14/2025, DktEntry: 5.1, Page 207 of 348
Case 3:25-cv-02847-AMO   Document 7-19   Filed 03/27/25   Page 7 of 7

Mi uel An el Mexicano Furmans a
Mana in  Attorney O  ner
La   O  ice o  Mi  uel Mexicano, PC
UCP Le  al Service Provider

(208 of 348), Page 208 of 348
Case: 25-2358, 04/14/2025, DktEntry: 5.1, Page 208 of 348
Case 3:25-cv-02847-AMO   Document 17-2   Filed 04/26/25   Page 40 of 44

IMMIGRANT DEFENDERS LAW CENTER
Alvaro M. Huerta (CA Bar No. 274787)
Carson A. Scott (CA Bar No. 337102)
Lya Ferreyra (CA Bar No. 340148)
Immigrant Defenders Law Center
634 S. Spring St., 10th Floor
Los Angeles, CA
(213) 634-0999
ahuerta@immdef.org

lferreyra@immdef.org

JUSTICE ACTION CENTER
Esther H. Sung (CA Bar No. 255962)
Karen C. Tumlin (CA Bar No. 234691)
Laura Flores-Perilla (CA Bar No. 355645)*
JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
esther.sung@justiceactioncenter.org
karen.tumlin@justiceactioncenter.org
laura.flores-perilla@justiceactioncenter.org

AMICA CENTER FOR IMMIGRANT RIGHTS
Adina Appelbaum (D.C. Bar No. 1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*pro hac vice forthcoming

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, 1861 Bay Road East Palo Alto, CA 94303; | CASE NO. 3:25-cv-2847 |
| | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| SOCIAL JUSTICE COLLABORATIVE, 1832 Second Street Berkeley, CA 94710; | |
| AMICA CENTER FOR IMMIGRANT RIGHTS, 1025 Connecticut Avenue NW, Suite 701 Washington, DC 20036; | |
| ESTRELLA DEL PASO, 2400A E. Yandell Drive El Paso, TX 79903; | |
| FLORENCE IMMIGRANT AND REFUGEE RIGHTS PROJECT, | |

1

PO Box 654
Florence, AZ 85132;

GALVESTON-HOUSTON IMMIGRANT
REPRESENTATION PROJECT,
6001 Savoy Drive, Ste. 400
Houston, TX 77036;

IMMIGRANT DEFENDERS LAW CENTER,
634 South Spring Street, 10th Floor

NATIONAL IMMIGRANT JUSTICE CENTER,
111 W. Jackson Boulevard, Suite 800
Chicago, IL 60604;

NORTHWEST IMMIGRANT RIGHTS
PROJECT,
615 Second Avenue, Suite 400
Seattle, WA 98104;

ROCKY MOUNTAIN IMMIGRANT
ADVOCACY NETWORK,
7301 Federal Boulevard, Suite 300
Westminster, CO 80030;

VERMONT ASYLUM ASSISTANCE
PROJECT,
P.O. Box 814 Elmwood Avenue
Burlington, VT 05402,

                    Plaintiffs,

        v.

UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
200 Independence Avenue, S.W.
Washington, DC 20201;

OFFICE OF REFUGEE RESETTLEMENT,
Administration for Children and Families
Mary E. Switzer Building
330 C Street, Room 5123
Washington, DC 20201;

DEPARTMENT OF THE INTERIOR,
1849 C Street N.W.
Washington, DC 20240,

2

1

2        Defendants.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Stay Motion Addendum 186

**INTRODUCTION**

1.      Every day, in immigration courts across the country, unaccompanied children stand (or sit, with legs dangling over chairs, or are held in caretakers' arms) in front of federal immigration judges, across from Department of Homeland Security lawyers, in adversarial removal proceedings. Thousands of other unaccompanied children are not in removal proceedings—but nonetheless must navigate the country's complex immigration laws as they attempt to complete complicated and lengthy applications allowing them to seek lawful status in the United States. These children, including babies and toddlers, arrived in the United States without a parent or legal guardian. The vast majority do not speak English; the babies do not speak at all. Most do not have the means to hire a lawyer.

2.      In one case, a one-year-old named Johan appeared in the Phoenix Immigration Court in 2018 with a bottle of milk and a purple ball—but without a parent or legal guardian. The judge in Johan's case was "embarrassed to ask" if Johan understood the proceedings. Turning to Johan's attorney, the judge addressed the absurdity of the legal theater playing out in his courtroom: "I don't know who you would explain it to, unless you think that a 1-year-old could learn immigration law." Sasha Ingber, *1-Year-Old Shows Up In Immigration Court*, NPR (July 8, 2018), https://perma.cc/ALU7-RM6V. Johan's story is not unusual, and demonstrates that the *only* way that many unaccompanied children can navigate the immigration legal system is with the help of a lawyer.

3.      Each unaccompanied child has their own individual story, but there are common themes. While many unaccompanied children are from Central America and the "Northern Triangle" countries of Guatemala, Honduras, and El Salvador, unaccompanied children come from all over the world. Most speak Spanish; some only speak indigenous Central American languages. Few speak much English. Many fled their home countries for their personal safety, escaping from gang violence, sexual violence, political violence, extreme poverty, and other dangers, only to experience further violence

4

and even trafficking during their long and dangerous journeys north to the United States. No matter their country of origin or spoken language, all are incredibly vulnerable.

4. Recognizing the needs of these children who are attempting to navigate the complex immigration system on their own, Congress enacted laws to provide special protections for unaccompanied children in that system. These include the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), which requires that the government "shall ensure, to the greatest extent practicable," that all unaccompanied children receive legal counsel to represent them in "legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." Pub. L. No. 110-457, § 235(c)(5), 122 Stat. 5044, 5079.

5. More recently, the Department of Health and Human Services' ("HHS") Office of Refugee Resettlement ("ORR") issued a Foundational Rule, published in 2024, meant, in part, to carry out the agency's obligations under the TVPRA as well as the earlier 1997 settlement in *Flores v. Reno* (which dictates certain government obligations to unaccompanied children). Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384 (Apr. 30, 2024) (codified at 45 C.F.R. pt. 410 (the "Foundational Rule")). The Foundational Rule requires the government to "fund legal service providers to provide direct immigration legal representation" to unaccompanied children if there are "available appropriations" and to ensure children receive a legal orientation, consultation with a lawyer, and ongoing access to lawyers. 45 C.F.R. § 410.1309(a) (2024).

6. Congress has appropriated funds to ensure as many unaccompanied children as possible are represented by lawyers. For fiscal year 2024, for example, Congress appropriated more than $5 billion for Defendants to deliver services to unaccompanied children under various statutory obligations, which includes funding to provide legal representation for unaccompanied children under the TVPRA "to the greatest extent practicable." This appropriation is now available to fund legal representations through September 30, 2027.

5

7.     For more than a decade, until March 21, 2025—under different presidential administrations and changing immigration policies—the government fulfilled its obligations under the TVPRA and ongoing congressional appropriations to fund legal representation for unaccompanied children.  Through this funding, every unaccompanied child in government custody (at shelters run by ORR, under the authority of HHS) had the opportunity to receive a group "know your rights" session and an individual legal screening, and many children received direct legal representation from legal service providers.  These representations helped bridge the significant gap in legal access for unaccompanied children, only a small number of whom can afford paid representation or are able to independently retain a pro bono attorney.  They also helped immigration courts function efficiently and avoided forcing immigration judges and government lawyers to engage directly with children in responding to immigration charges and related questions around relief from removal.

8.     Plaintiffs are legal service providers that, until March 21, 2025, provided representation and related services to unaccompanied children with funding from Defendants.  Plaintiffs furthered the TVPRA's goals and the requirements in the TVPRA and the Foundational Rule by providing basic legal services to unaccompanied children and by representing unaccompanied children in immigration court, affirmative immigration proceedings, and related state court proceedings.

9.     Now, Plaintiffs have largely had to stop taking on new clients and face the real threat of not being able to continue their ongoing representations.  For example, without funding from Defendants, Plaintiff Community Legal Service in East Palo Alto has had to stop taking on new unaccompanied children clients—even if the children face upcoming court dates without a lawyer—and if it cannot find other funding sources, its ability to represent existing clients (taken on in reliance on continued funding from Defendants) will be in jeopardy.  Plaintiffs' inability to serve new clients or provide certainty for existing clients is an enormous harm to their mission to serve as many unaccompanied children as possible.

10.     Plaintiffs' clients range in age from infants to teenagers, all of whom depend on Plaintiffs for critical legal counsel.  For example, Plaintiff Immigrant Defenders Law Center represents a 16-year-old girl and her one-year-old son in cases that were funded by Defendants until March 21, 2025.  Beginning at the age of six years old, the girl was sex trafficked by her family in Mexico.  After giving birth to her son, she fled to the U.S. to save him from the same fate.

11.     On March 21, 2025, without warning, Defendant the U.S. Department of the Interior ("DOI") sent a notice terminating the contract line items through which Defendants HHS and ORR had provided funding for counsel for unaccompanied children and ordering Plaintiffs to "immediately stop work" on their ongoing funded representations (the "Cancellation Order").  Defendants issued this order despite the TVPRA's mandate that the government provide unaccompanied children with legal counsel to the greatest extent practicable and despite the existence of congressionally appropriated funds to pay for precisely these services through at least September 30, 2027.  As a result, many of the approximately 26,000 unaccompanied children around the country represented by attorneys through now-terminated funding from Defendants—including children with immigration court hearings scheduled for the following business day—were placed at imminent risk of being cut off from their lawyers.  The children subject to this risk include many children now facing imminent removal from the United States despite being prima facie eligible for immigration relief.

12.     The Cancellation Order flies in the face of the TVPRA and the Foundational Rule.  In addition to interrupting and obstructing attorney-client relationships, contrary to the mandate to provide legal counsel to unaccompanied children, it also defeats the broader purpose of both the TVPRA and the Foundational Rule.  Through the funded representations, Plaintiffs play a key role in identifying and helping child trafficking victims, fulfilling one of Congress's primary objectives in the TVPRA (to "protect [unaccompanied children] from mistreatment, exploitation and trafficking").  *See* TVPRA, Pub. L. No. 110-457, § 235(c)(5), 122 Stat. 5044, 5079 (2008).  By subverting Congress's funding of

7

counsel for unaccompanied children, Defendants ensure more children will remain separated from their families, fewer trafficking victims will be identified and protected, and more children will be at risk of being trafficked in the future.

13. Defendants' actions will also cause chaos throughout the immigration legal system and are particularly harmful because they come at a time when the government is reinstating expedited docketing for removal cases for unaccompanied children. Unaccompanied children across the country have immigration court dates this week, at which some will now appear without an attorney. Other children have impending deadlines to apply for immigration relief for which they are eligible, but will need an attorney's assistance to submit their application.

14. As a consequence of Defendants ordering Plaintiffs to stop providing direct legal services, many unaccompanied children will never speak to a lawyer, will never apply for immigration relief for which they are eligible, will remain in tenuous status for longer, and will not understand what is happening as they are rushed through adversarial removal proceedings. Immigration judges will be left to carry the burden, on their own, to expend limited government resources to educate child respondents (some only a few months old) on arcane immigration law and apply the law to their cases, without a full understanding of the reasons the children left their countries or the realities facing their removal. This will cause immigration judges to spend more time on cases for unaccompanied children at a time when the immigration court backlog is already at an all-time high.

15. Plaintiffs seek to enjoin Defendants from ceasing funding for legal representation of unaccompanied children, an action contrary to Congress's TVPRA mandate and subsequent congressional funding, contrary to Defendant ORR's own Foundational Rule on funding for counsel for unaccompanied children, and in violation of the Administrative Procedure Act ("APA").

16. Plaintiffs respectfully ask this Court to grant declaratory and injunctive relief, declaring that Defendants are violating the law and requiring them to continue funding legal representation

8

consistent with the TVPRA and the Foundational Rule.  Plaintiffs ask this Court to enjoin Defendants nationwide from refusing to fund counsel for unaccompanied children in violation of the TVPRA and the Foundational Rule.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the claims alleged in this Complaint under 28 U.S.C. § 1331, as they arise under federal law, including the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232, and the 2024 Unaccompanied Children Program Foundational Rule (the "Foundational Rule"), 89 Fed. Reg. 34384.

18.     The APA waives the U.S. government's sovereign immunity where, as here, federal agencies have acted in a manner that is arbitrary and capricious, an abuse of discretion, or otherwise in violation of the law.  5 U.S.C. § 706(2)(A).

19.     The Court has authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and Rule 57 of the Federal Rules of Civil Procedure.

21.     Venue properly lies in the Northern District of California under 28 U.S.C. § 1391(e)(1)(C) because Defendants are "officer[s]," "employee[s]," and "agenc[ies]," of the United States acting in their official capacities, and because Plaintiffs Community Legal Services in East Palo Alto and Social Justice Collaborative are California non-profit organizations headquartered in and providing services in the Northern District.  No real property is involved in this action.

22.     Venue is proper in the San Francisco Division because "a substantial part of the events or omissions giving rise to the claim occurred" in this Division.  28 U.S.C. § 1391(b)(2).  Plaintiff Community Legal Services in East Palo Alto is headquartered in San Mateo County, in this Division,

9

Plaintiffs Community Legal Services in East Palo Alto and Social Justice Collaborative both conduct substantial business in this Division including by serving unaccompanied children living in the San Francisco Division and in San Francisco Immigration Court, and Defendants' conduct has caused harm to these Plaintiffs in this Division by harming their ability to represent and serve unaccompanied children in the San Francisco Division.

<div align="center"><strong>PARTIES</strong></div>

**A.      Plaintiffs**

23.      Plaintiffs are nonprofit organizations that have received funding from Defendants HHS and ORR to provide legal representation and other legal services to unaccompanied children. Plaintiffs share a mission to expand access to legal information and services for unaccompanied children, and to ensure that as many unaccompanied children as possible are represented by a lawyer.

24.      Plaintiff Community Legal Services in East Palo Alto ("CLSEPA") is a nonprofit organization in East Palo Alto, California. CLSEPA serves unaccompanied children in San Mateo County and Santa Clara County. Through funding from Defendants, CLSEPA provided legal representation for non-detained unaccompanied children. CLSEPA currently represents 23 unaccompanied children in cases formerly funded by Defendants.

25.      Plaintiff Social Justice Collaborative ("SJC") is a nonprofit organization in Berkeley, California, operating across the Bay Area and in California's central valley—including in areas where it is one of the only organizations offering legal services to immigrants. It serves unaccompanied children in San Francisco Immigration Court, Concord Immigration Court, and Sacramento Immigration Court. Through funding from Defendants, SJC provided legal representation to about 45 non-detained unaccompanied children per year and hosted Immigrant Justice Corps fellows.

<div align="center">10</div>

unaccompanied children in the greater Washington, D.C. and Baltimore areas, appearing before the Baltimore, Hyattsville, Sterling, and Annandale Immigration Courts. Through funding from Defendants, Amica Center provided legal orientations for children in ORR custody, legal representation for children in ORR custody and released from ORR custody, and hosted an Immigration Justice Corps fellow. Amica Center currently represents more than 850 unaccompanied children in cases formerly funded by Defendants.

27. Plaintiff Estrella del Paso ("Estrella") is a nonprofit organization based in Texas and the largest provider of free immigration legal services in West Texas and New Mexico. It serves unaccompanied children appearing before the El Paso Immigration Court and has provided legal services for unaccompanied children in El Paso since 2007. Through funding from Defendants, Estrella provided legal services to indigent, unaccompanied immigrant children who are not in detention, as well as those in ORR custody in El Paso County, and conducted "know your rights" presentations and individual consultations. Estrella currently represents 324 unaccompanied children in cases formerly funded by Defendants.

28. Plaintiff Florence Immigrant and Refugee Rights Project ("Florence Project") is a nonprofit organization in Arizona. The Florence Project has provided legal services for unaccompanied children in Arizona since 2000. It serves unaccompanied children in Tucson Immigration Court and Phoenix Immigration Court, and in 24 ORR shelters. Through funding from Defendants, the Florence Project provided legal orientations, legal representation for detained and non-detained unaccompanied children, Spanish-language tutoring, and hosting for Immigrant Justice Corps fellows. The Florence Project is the only non-profit organization that provides free legal services to unaccompanied children in Arizona and currently represents more than 800 unaccompanied children in cases formerly funded by Defendants.

11

29.     Plaintiff Galveston-Houston Immigrant Representation Project ("GHIRP") is a nonprofit organization in the Galveston-Houston area of Texas.  It serves unaccompanied children in the Galveston-Houston area and Houston Immigration Court.  Through funding from Defendants, GHIRP provided legal orientations, legal representation for detained and non-detained unaccompanied children, and hosting for Immigrant Justice Corps fellows.  GHIRP currently represents 292 unaccompanied children in cases formerly funded by Defendants.

30.     Plaintiff Immigrant Defenders Law Center ("ImmDef") is a nonprofit organization in Los Angeles, California.  It serves unaccompanied children in three Immigration Courts:  Van Nuys, West Los Angeles, and Santa Ana.  ImmDef provided legal orientations and direct legal representation through funding from Defendants for nearly 2,000 detained and non-detained unaccompanied children, along with Spanish-language tutoring for attorneys, and hosting for Immigrant Justice Corps fellows.  ImmDef currently represents nearly 2,000 unaccompanied children in cases formerly funded by Defendants.

31.     Plaintiff National Immigrant Justice Center ("NIJC") is a nonprofit organization headquartered in Chicago, Illinois and has provided services to unaccompanied children for more than 40 years.  It serves unaccompanied children in Chicago Immigration Court.  Through funding from Defendants, NIJC provided legal orientations and individual consultations as well as representation to unaccompanied children in immigration proceedings both in and out of ORR custody.  NIJC currently represents approximately 500 unaccompanied children in cases formerly funded by Defendants.

32.     Plaintiff Northwest Immigrant Rights Project ("NWIRP") is a nonprofit organization located in Washington State.  It serves unaccompanied children in Seattle Immigration Court (and occasionally Portland Immigration Court), and has provided free immigration legal services for over 40 years.  Through funding from Defendants, NWIRP provided legal services to unaccompanied immigrant children and youth who have been released from ORR custody throughout Washington

12

State. NWIRP currently represents approximately 500 unaccompanied children in cases formerly funded by Defendants.

33. Plaintiff Rocky Mountain Immigrant Advocacy Network ("RMIAN") is a nonprofit organization in Colorado. It serves unaccompanied children in Denver Immigration Court. Through funding from Defendants, RMIAN provided legal representation for non-detained unaccompanied children and Spanish-language tutoring for staff. RMIAN is the primary organization providing free legal services to unaccompanied children in Colorado. RMIAN currently represents 160 unaccompanied children in cases formerly funded by Defendants.

34. Plaintiff Vermont Asylum Assistance Project ("VAAP") is a non-profit organization in Vermont. It serves unaccompanied children in Chelmsford Immigration Court and Boston Immigration Court. Through funding from Defendants, VAAP provided legal representation for detained and non-detained unaccompanied children, and hosting for two Immigrant Justice Corps fellows. VAAP provides legal services to about 135 unaccompanied children annually, with 35-40 full scope direct representations each year. Serving unaccompanied children in Vermont is particularly urgent because unaccompanied children in Vermont are often unable to access removal proceedings in far-away Boston and Chelmsford without legal assistance—and VAAP is the only legal services provider for unaccompanied children in Vermont.

35. For years, Plaintiffs heeded Congress's call to provide critical legal services to unaccompanied children. Plaintiffs collectively represent thousands of unaccompanied children, including children in removal proceedings and children applying for affirmative forms of immigration relief, and their organizational missions and ethical obligations compel them to represent these clients to the best of their abilities. Defendants' Cancellation Order severely limits Plaintiffs in performing their respective missions to provide legal representation the law requires be made available to unaccompanied children. To pay for existing representations, Plaintiffs face the need to use up any

13

discretionary or reserve funding, and to lay off employees. If Plaintiffs are unable to maintain staffing levels necessary to handle their current caseloads, they will have to assess their ability to meet ongoing ethical and court-required obligations to their clients and may be forced to withdraw from ongoing cases.

36. For many Plaintiffs, these consequences are imminent or already occurring. For example, ImmDef has already been forced to give layoff notices to 27 staff to try to stay financially viable and able to serve unaccompanied children for as long as possible. SJC will have to lay off its three Immigrant Justice Corps fellows if it cannot find other funding. To maintain its representations, Estrella has had to furlough 18 of the 28 employees in its unaccompanied children program. VAAP has had to not renew the contract of one of its four employees and may have to furlough another two employees—leaving it with only a single remaining employee. In four weeks, GHIRP will have to lay off most of its 19 employees who provide services to unaccompanied children.

**B.     Defendants**

37. Defendant HHS is the department of the federal government that receives appropriations from Congress to fulfill its statutory obligations under the TVPRA to aid and provide legal representation to unaccompanied children to the greatest extent practicable. HHS most recently received an appropriation for services (including provision of counsel) required under the TVPRA for unaccompanied children on March 23, 2024, in the 2024 Further Consolidated Appropriations Act. *See* Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D, tit. II, 138 Stat. 460, 664–65 (2024) (funding continued through September 30, 2025, by the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A, tit. I, § 1101(8) (2025)). This appropriation extends funding for services under the TVPRA through September 30, 2027. *See id.*

38. Defendant ORR is the office of HHS (situated within HHS's Administration for Children and Families Division) that oversees services for unaccompanied children under the TVPRA

14

and is the agency that passed the Foundational Rule in 2024 through notice-and-comment rulemaking. Defendant ORR's Unaccompanied Alien Children Bureau is the government body that interacts most directly with unaccompanied children.

39.     Defendant DOI is the department of the federal government primary contractor listed for the contract through which Defendants HHS and ORR provided the required funding for counsel for unaccompanied children.  DOI issued the Cancellation Order on March 21, 2025.

### STATEMENT OF FACTS

**A.     HHS And ORR Are Required By Law To Care For Unaccompanied Children.**

40.     "Unaccompanied child" is defined by statute as any individual younger than 18 and without lawful immigration status, who has no parent or legal guardian who is in the United States able to provide care and physical custody.  *See* 6 U.S.C. § 279(g)(2).  Once a child is identified as unaccompanied under this definition, they are treated as unaccompanied even if they are later released to a sponsor—the "unaccompanied" designation applies throughout their time navigating U.S. immigration law.

41.     In the 2024 fiscal year, nearly 100,000 children, toddlers, and babies were identified by federal authorities as being unaccompanied children.  These children entered the United States without their parents for many reasons, most commonly because they were separated from their parents on their way to the United States, because they were trafficked to the United States, because they were separated from their families by immigration authorities after entering the United States, or because they fled their home countries without their parents.  A large majority of the children are from Central America and arrived in the United States after a long and dangerous journey north to the U.S.-Mexico border. Many fled unspeakable violence in their home countries and arrived in the United States only to face detention and deportation on their own.

15

42.     The United States has long struggled to care for unaccompanied children.  Change has come as Congress has recognized that unaccompanied children are uniquely vulnerable to trafficking, abuse in government custody, and injustices in the immigration legal system.

43.     Until 2002, the former Immigration and Naturalization Services detained unaccompanied children, treating them similarly to detained noncitizen adults.

44.     The Homeland Security Act of 2002 changed this model, giving Defendants HHS and ORR legal custody of unaccompanied children, with the mandate to care for these children.  *See* 6 U.S.C. § 279(a).

45.     In 2008, the TVPRA imposed further responsibilities on HHS and ORR's custody of unaccompanied children, including that HHS and ORR "shall ensure, to the greatest extent practicable . . . that all unaccompanied alien children . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).

### B.  Unaccompanied Children Have Special Legal Rights.

46.     Unaccompanied children have special legal rights, including the right to go through full removal proceedings before an immigration judge, unlike other individuals who may be put through expedited removal proceedings.  *See* 8 U.S.C. § 1232(a)(5)(D).  If an unaccompanied child applies for asylum, they are entitled to go through the non-adversarial process of an asylum determination through DHS's Asylum Office—instead of in immigration court, where an immigration judge would preside over an adversarial hearing between a DHS lawyer and the unaccompanied child.  *See* 8 U.S.C. § 1158(b)(3)(C).  Unaccompanied children also have the right to apply for other forms of immigration relief, like Special Immigrant Juvenile Status, Withholding of Removal, relief under the Convention Against Torture, and U or T visas.

47.     Although U.S. law guarantees unaccompanied children these rights, the children are not able to avail themselves of these rights unless the children understand their rights, are equipped with

16

the tools to exercise them, and are given legal counsel. For this reason, Congress and ORR have both

recognized the importance of providing unaccompanied children with legal representation—and taken

steps to maximize the number of unaccompanied children represented by attorneys. The TVPRA

requires Defendants to provide legal representation to unaccompanied children to the greatest extent

practicable, and Congress has consistently appropriated funds annually to pay for that representation.

48.    And all children (unaccompanied or otherwise) are protected by regulations that prevent

immigration judges from accepting an admission of removability from respondents under the age of

18—unless the respondent is represented by an attorney or other designated individual. *See* 8 C.F.R.

1240.10(c).

49.    ORR, recognizing its obligations under the TVPRA, committed to providing legal

representation to children unable to secure counsel, subject to ORR's discretion to the extent it

determines appropriations are available. ORR "strives for 100 percent legal representation of

unaccompanied children." 89 Fed. Reg. 34384, 34526 (Apr. 30, 2024).

**C.    The TVPRA Requires Defendants to Provide Legal Services to Unaccompanied Children.**

51.    Acting on this congressional command, ORR contracted with the Vera Institute for

Justice in 2005 to administer what was then called the "Unaccompanied Children Pro Bono Project"

(the "Project"). The Project was a three-year pilot to develop and test ways to meet the legal needs of

unaccompanied children through pro bono legal services.

52.    Through the Project, ORR and Vera collaborated to design a program of subcontracting

with nonprofit legal service organizations to provide basic legal orientation to unaccompanied children,

17

to screen their cases to identify those with potential claims for relief from removal, and to recruit and train volunteer lawyers to represent children in immigration court. Initially, the nonprofit legal service providers were not permitted to use government funding to provide direct representation.

53. At the end of the pilot period in 2008, Vera issued a report to ORR, explaining that volunteer attorneys alone could not represent all unaccompanied children in ORR custody. Accordingly, the government could not meet its goal of ensuring that a significant percentage of unaccompanied children were represented unless it funded attorneys to represent them.

54. On the heels of this pilot program, Congress imposed additional mandates on ORR and HHS in the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"). The TVPRA mandates HHS to provide counsel for unaccompanied children:

> **The Secretary of Health and Human Services shall ensure**, **to the greatest extent practicable** and consistent with section 292 of the Immigration and Nationality Act (8 U.S.C. 1362), **that all unaccompanied alien children who are or have been in the custody of the Secretary or the Secretary of Homeland Security**, and who are not described in subsection (a)(2)(A), **have counsel to represent them in legal proceedings or matters** and protect them from mistreatment, exploitation, and trafficking. To the greatest extent practicable, the Secretary of Health and Human Services shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge.

8 U.S.C. § 1232(c)(5) (emphasis added).

55. In other words, the TVPRA directs that Defendants "shall ensure, to the greatest extent practicable . . ." that unaccompanied children have counsel to represent them in legal proceedings. If Defendants have funding they can spend to provide counsel for unaccompanied children, they must spend that funding to provide such counsel.

**D.** **Defendants Satisfied Their Congressional Mandate To Provide Legal Services To Unaccompanied Children By Paying Plaintiffs With Funding Appropriated By Congress.**

18

the greatest extent practicable." *See* Supplemental Appropriations Act, 2009, Pub L. 111-32, tit. VIII, 123 Stat. 1859, 1884 (2009); Consolidated Appropriations Act, 2010, Pub. L. 111-117, div. D tit. II, 123 Stat. 3034, 3249–3250 (2009); Consolidated Appropriations Act, 2012, Pub. L. 112-74, div. F tit. II, 125 Stat. 786, 1077 (2011); Consolidated Appropriations Act, 2014, Pub. L. 113-76, div. H tit. II, 128 Stat. 5, 376 (2014); Consolidated and Further Continuing Appropriations Act, 2015, div. G tit. II, Pub. L. 113-235, 128 Stat. 2130, 2479 (2014); Consolidated Appropriations Act, 2016, Pub. L. 114-113, div. H tit. II, 129 Stat. 2242, 2612 (2015); Further Continuing and Security Assistance Appropriations Act, 2017, Pub. L. 114-254, 130 Stat. 1005, 1011 (2016); Consolidated Appropriations Act, 2017, Pub. L. 115-31, div. H tit. II, 131 Stat. 135, 531 (2017); Consolidated Appropriations Act, 2018, Pub. L. 115-141, div. H tit. II, 132 Stat. 348, 728 (2018); Department of Defense and Labor, Health and Human Services, and Education Appropriations Act, 2019 and Continuing Appropriations Act, 2019, Pub. L. 115-245, div. B tit. II, 132 Stat. 2981, 3082 (2018); Consolidated Appropriations Act, 2021, Pub. L. 116-260, div. H tit. II, 134 Stat. 1183, 1582 (2020); Consolidated Appropriations Act, 2022, Pub. L. 117-103, div. H tit. II, 136 Stat. 49, 458 (2022); Consolidated Appropriations Act, 2023, Pub. L. 117-328, div. H tit. II, 136 Stat. 4459, 4870 (2022); Continuing Appropriations and Ukraine Supplemental Appropriations Act, 2023, Pub. L. 117-180, div. A sec. 147, 136 Stat. 2114, 2124 (2022); Further Consolidated Appropriations Act, 2024, Pub. L. 118-47, div. D tit. I, 138 Stat. 460, 664-665 (2024) (funding continued through September 30, 2025, by the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A tit. I Sec. 1101(8) (2025)).

57.    Until 2012, funds for legal representation were used only to match unrepresented unaccompanied children with available pro bono counsel.  In 2009, the House Appropriations Committee—following the passage of the TVPRA—explained that "legal representation is absolutely critical to ensure that children understand their rights as they navigate the legal process to determine their status in the United States."  H. Rep. 111-220, at 165.  The Committee commended the earlier

19

pilot program for legal representation for unaccompanied children and included funding "to continue and expand this initiative" "to work towards ensuring that all unaccompanied alien children understand their legal rights and have access to pro bono representation." *Id.* at 165-66. But success of this program to match unaccompanied children with volunteer attorneys was highly dependent on local circumstances, and it was clear pro bono representation alone could not meet the representational needs of unaccompanied children.

58. Beginning in 2012, funding became available to pay lawyers dedicated to representing unaccompanied children, in addition to referring them to pro bono counsel.

59. Over time, ORR and Congress have directed that funded representation be expanded again and again. In reports accompanying appropriations bills, Congress has built on its mandates for funded legal representation for unaccompanied children over the years. For example, in 2018 the Senate Appropriations Committee noted "that services provided by qualified and independent legal counsel to [unaccompanied children] can increase the efficiency and effectiveness of immigration proceedings and significantly reduce the failure-to-appear rate of children who are released from HHS custody. The Committee recommendation directs ORR to continue the scope and funding of these legal services at no less than fiscal year 2017 levels." S. Rep. 115-289, at 150.

60. In 2019, the House Appropriations Committee directed funding specifically for "qualified and independent legal services for unaccompanied children, including but not limited to know-your- rights orientations, legal screenings, court preparation and assistance, **representation**, and pro bono referrals" and recommended expanding funded representations. H. Rep. 116-62 at 145 (emphasis added).

61. In 2020, the House Appropriations Committee recommended "no less than $30,000,000 to be spent in fiscal year 2021 for **direct representation** services to children" and encouraged "ORR

20

to work with legal service providers to develop a strategy to minimize the risks of any child having to go to immigration court without independent legal counsel." H. Rep. 116-450 at 180 (emphasis added).

62. In 2021, the House Appropriations Committee again supported funded representations, instructing that there should be even more funded representation for unaccompanied children released from ORR custody and that such direct representation "shall be made available to children **up to the funded capacity**." H. Rep. 117-96, at 211 (emphasis added).

63. In 2022, the House Appropriations Committee again supported "the continued expansion of independent legal services for unaccompanied children" and directed that funded representations should "be made available to children **up to funded capacity**." H. Rep. 117-403, at 200 (emphasis added).

64. Until March 21, 2025, the Acacia Center for Justice ("Acacia") managed a network of 89 legal services organizations (including Plaintiffs) in 159 offices across the country providing representation to unaccompanied children through funding from HHS and ORR, under a contract between Acacia and DOI (contracting on behalf of HHS and ORR).

65. This contract had four funded line items:

1. Work in ORR shelter facilities, including "know your rights" presentations, intakes to connect detained children with attorneys, and initial screenings with detained children;

2. Full legal representation for children in and out of ORR custody, as well as other non-representation services such as "friend of court" services in hearings for unaccompanied children appearing in immigration court or preparing forms without attorneys;

3. Immigrant Justice Corps fellows who represent unaccompanied children not covered by the second line item;

21

66.     As of March 21, 2025, Plaintiffs and other attorneys across the country represented approximately 26,000 children, toddlers, and babies—who arrived in the U.S. without parents or other caregivers—through funding appropriated by Congress and delivered under this contract.

**E.    Past Government Statements Acknowledge The Benefits Of Funding Counsel For Unaccompanied Children and Babies**

67.     The importance of legal representation for unaccompanied children is borne out in immigration court statistics.  Increasing representation for unaccompanied children makes immigration courts run more efficiently, leads to more unaccompanied children who qualify for immigration relief receiving that relief, and leads to more unaccompanied children without a case for relief requesting voluntary departure instead of unnecessary proceedings.

68.     Unrepresented children effectively never receive relief from removal.   A 2024 Congressional Research Service report explained that from 2005 to 2017, 90% of unaccompanied children in removal proceedings without a lawyer were removed and *less than 1% received some form of immigration relief* (only 308 children out of nearly 90,000).  *See* "Unaccompanied Alien Children: An Overview," CONGRESSIONAL RESEARCH SERVICE (Sept. 5, 2024), https://www.congress.gov/crs-product/R43599.  On the other hand, only 21% of represented unaccompanied children received a removal order over the same time period, and 73% attain some form of relief, including asylum and other paths to lawful permanent resident status.  Moreover, a greater percentage of unaccompanied children with attorneys chose to depart the country voluntarily than those without lawyers, showing the role attorneys play in helping children understand both their options and—in some circumstances—their lack of options.

69.     Represented children are also more likely to attend their hearings than unrepresented children, and more likely to understand what happens in their cases, easing the burden on immigration judges to explain proceedings.  From 2005 to 2017, 76% of all unaccompanied children continued to appear as scheduled for their cases—but for represented unaccompanied children, that rate was a near-

22

perfect 97%.  *See* Alyssa Snider and Rebecca DiBennardo, "Representation Matters: No Child Should Appear in Immigration Proceedings Alone," VERA INSTITUTE OF JUSTICE (Dec. 2021), https://vera-institute.files.svdcdn.com/production/downloads/publications/representation-matters.pdf.

70.     ORR has acknowledged "that most unaccompanied children need legal services to resolve their immigration status and that representation appears to have a significant impact on both the court appearance rate and the outcome of cases for unaccompanied children."  Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024) (to be codified at 4 C.F.R. pt. 410).

**F.     Immigration Judges And Other Government Officials Regularly Praise Plaintiffs' Work, Which Makes Their Jobs Easier**

71.     In the past weeks, immigration judges have expressed their concern that Plaintiffs might no longer be working in their courtrooms and helping courts function smoothly.  Plaintiff Community Legal Services in East Palo Alto prioritizes positive interactions with immigration judges and adopts a proactive approach to advocacy, working with ICE counsel to ensure that their clients can advance their cases without missing school—a benefit to everyone involved.

72.     A judge in Chicago Immigration Court specifically expressed her concern that NIJC might not be available anymore to represent unaccompanied children appearing before her.  Judges praise NIJC's work as allowing the court to operate efficiently and with confidence that unaccompanied children are making informed decisions and have been screened for relief and other needs.

73.     Plaintiff the Florence Project was created after a call to action by an immigration judge. The Florence Project works with the court and individual judges to coordinate the specialized docket for unaccompanied children, serving as friend of the court frequently.  Judges show their appreciation for the Florence Project's work by giving its staff space in courtrooms to conduct pre-hearing orientations for children and even by swearing in Florence Project staff who have just been admitted

23

to the Arizona Bar.  In stakeholder meetings with the government, government partners routinely thank the Florence Project for its work and emphasize the value of the services it provides.

74.     Immigration judges and other stakeholders rely on Amica Center's services. Immigration judges rely on Amica Center's friend of court services and ask Amica Center to enter appearances in cases where the judge doubts the child understands their legal options or is competent to appear in court.  ORR shelter staff lean on Amica Center to answer questions about court appearances for the children they house.

75.     Immigration judges overseeing dedicated dockets for unaccompanied children in El Paso express gratitude for the work Estrella does both in its representations and its friend of court services.  Judges appreciate that Estrella helps them reduce their docket loads.  ORR shelter staff appreciate Estrella's help and training in caring for unaccompanied children.

76.     Immigration judges and government attorneys regularly thank RMIAN for its work, and RMIAN and government employees work together to improve immigration court efficiency in Denver. RMIAN saves the court and the government unnecessary time and effort by obtaining dismissal in cases where dismissal is proper and by avoiding unnecessary status hearings.  The Denver Immigration Court regularly asks RMIAN to provide friend of court services to assist unaccompanied children with anything from a change of address form to a screening for potential human trafficking.

77.     Judges, clerks, and other immigration court staff, and DHS field office staff praise VAAP's work as making the immigration legal system more fair and efficient.  VAAP's services help immigration courts avoid unnecessary proceedings and help unaccompanied children efficiently appear in court remotely.

## G.    In 2024, ORR Issued A Foundational Rule On Funding For Legal Services For Unaccompanied Children

78.     On April 30, 2024, ORR issued a final rule following full notice-and-comment rulemaking:  the "Unaccompanied Children Program Foundational Rule," which took effect July 1,

24

2024. Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34529 (April 30, 2024) (to be codified at 4 C.F.R. pt. 410). The rule is meant to codify regulations "consistent with ORR's statutory duties" and "responsibilities for coordinating and implement the care and placement of unaccompanied children . . . under the Homeland Security Act of 2002 (HSA) and the [TVPRA]." *Id.*, 89 CFR 34384.

79. Section 410.1309 of the Foundational Rule is titled "Legal Services." *Id.*, 89 Fed. Reg. 34526. This section of the Foundational Rule affirms ORR's belief that "legal services providers who represent unaccompanied children undertake an important function" and stated, "ORR strives for 100 percent legal representation of unaccompanied children and will continue to work towards that goal to the extent possible." *Id.*

80. The Foundational Rule requires that unaccompanied children in ORR custody *must* receive a legal orientation from "an independent legal service provider" and a "confidential legal consultation with a qualified attorney." *Id.*, 89 CFR 34603.

81. The rule also provides that ORR must—if it has available appropriations—"fund legal service providers to provide direct immigration legal representation for certain unaccompanied children." *Id*.

82. To comply with the TVPRA and INA, the rule recognizes ORR must "ensure that all unaccompanied children who are or have been in ORR care have access to counsel" and provides, "ORR may make grants, in its discretion and subject to available resources . . . or contracts under this section . . . for the purpose of providing immigration legal representation, assistance and related services to unaccompanied children." *Id*.

**H.** **In 2024, Congress Reauthorized Funding For The Services, And That Funding Is Available Today**

83. On March 23, 2024, Congress passed H.R. 2882, the Further Consolidated Appropriations Act of 2024, which appropriated funding for many federal departments and programs,

including Defendants HHS and ORR.  Congress specifically appropriated funds "for carrying out . . . section 235 of the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008," the TVPRA.  Pub. L. 118-47 138 Stat. 460, 664.  Section 235 of the TVPRA includes the requirement to provide funding for counsel for unaccompanied children "to the greatest extent practicable"—so the appropriation was, in part, meant to pay for this representation.  8 U.S.C. § 1232(c)(5).

84.     The Senate Report accompanying the 2024 appropriations bill commanded Defendant HHS to fund the Services.  The Senate Committee on Appropriations specified there should be "$5,506,258,000 for the Unaccompanied Children [UC] program."  S. Rep. 118-84, at 167.  It went on to direct, "The Committee recommendation includes no less than the fiscal year 2023 funding level for post-release services; legal services and access to counsel; and child advocates.  The Committee expects HHS will continue to expand child-welfare focused post-release services . . . including . . . access to legal services."  *Id.* at 168.

85.     The Senate Report expressed its understanding that the TVPRA requires ORR to fund counsel for unaccompanied children:  "The Committee also expects these funds will be used to provide access to counsel, consistent with the goals of the Trafficking Victims Protection Reauthorization Act of 2008 **for all children to have access to counsel in their immigration proceedings.**"  *Id.* at 169 (emphasis added).

86.     On March 15, 2025, Congress continued funding at the levels set in the Further Consolidated Appropriations Act.  Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, div. A tit. I sec. 1101(8) (2025).

87.     This appropriated funding for counsel for unaccompanied children is now available to Defendants through September 30, 2027.  The initial 2024 appropriation extended for two years, through September 30, 2026, Pub. L. 118-47 138 Stat. 460, 664, and the Full-Year Continuing Appropriations and Extensions Act of 2025 further extended the appropriation by another year, Pub.

26

L. 119-4, div. A tit. I sec. 1103 ("Appropriations provided by this division that, in the applicable appropriations Act for fiscal year 2024, carried a multiple-year or no-year period of availability shall retain a comparable period of availability").

## I. Defendants Abruptly Shut Down And Later Resumed Funding For Counsel For Unaccompanied Children Without Explanation

88.     Despite Congress's consistent funding of legal representation for unaccompanied children, consistent with the TVPRA, Defendants seek to undermine congressional appropriations and the TVPRA's mandate.  On Tuesday, February 18, 2025, without warning, Defendant DOI and Defendant HHS issued a "Stop Work Order" to Acacia, ordering service providers—including Plaintiffs—to "cease all services" and "stop all work" for those services under the contract between Acacia and DOI.  The order included no end date; it indefinitely suspended the services.  The stop work order gave no explanation, but said it had nothing to do with how the legal services were being run: "The stop work order is being implemented due to causes outside of [Acacia's] control and should not be misconstrued as an indication of poor performance by [Acacia]."  Nevertheless, the order explained, the stop work order could lead Defendants to "terminate the contract."

89.     Three days later, and after significant backlash, on Friday, February 21, 2025, Defendants voluntarily rescinded the stop work order without explanation.

## J. On March 3, 2025, 32 Senators Reminded Defendants That Ending Funding For Counsel For Unaccompanied Children Violates the TVPRA

90.     On March 3, 2025, 32 Senators wrote to HHS Secretary Robert F. Kennedy, Jr. and DOI Secretary Doug Burgum to express their "strong opposition" to the now-rescinded stop work order and to note their "concern[] about the chaos and confusion it caused for legal services providers and the children they serve."  Sens. Ossoff, Hirono, et al, *Letter to Secretary Robert F. Kennedy, Jr. and Secretary Doug Burgum* (Mar. 3, 2025), accessible at https://www.hirono.senate.gov/ imo/media/doc/250305lettertohhsandinterioronlegalservicesforchildreninimmigrationsystem.pdf.

27

91.     The Senators explained that the stop work order—and any other attempt to stop funding counsel for unaccompanied children—is a violation of the TVPRA: "**Pausing or terminating the provision of legal services to unaccompanied children under this contract runs directly counter to the requirements of the Trafficking Victims Protection Reauthorization Act** (TVPRA) and places 26,000 unaccompanied children at increased risk of trafficking, exploitation, and other harm. The TVPRA, passed by Congress in 2008 on a bipartisan basis, requires the Department of Health and Human Services (HHS) to ensure, to the greatest extent practicable, that all unaccompanied children have counsel to represent them in legal proceedings and protect them from mistreatment, exploitation, and trafficking. Shirking this statutory mandate heightens the risk of harm for these uniquely vulnerable children." *Id.* (emphasis added).

92.     The Senators went on to explain that representation makes it more likely that unaccompanied children will appear at their hearings, less likely that the government will lose track of unaccompanied children, and less likely that the unaccompanied children will be trafficked. *Id.* at 2.

93.     The Senators requested a briefing from Defendants about why the stop work order was issued and Defendants' "plan for compliance with your statutory mandate to ensure that children have counsel in immigration proceedings." *Id.*

94.     Plaintiffs are not aware of any response from Defendants to the Senators.

**K.     On March 21, 2025, Defendants Again Stopped Funding Counsel for Unaccompanied Children**

95.     Although Defendants rescinded their February 18, 2025 stop work order, they apparently continued to look for ways to avoid the TVPRA's and Foundational Rule's requirement that they fund legal representation for unaccompanied children. On March 21, 2025, Defendant DOI sent a letter titled "Notice of Partial Termination for the Government's Convenience" to Acacia (the "Cancellation Order"). The letter announced that Defendants were terminating funding for contract line items two through four: legal representation for unaccompanied children—both in and out of

28

detention—and other legal services like "friend of court" assistance in *pro se* matters, Immigrant Justice Corps fellows, and Spanish-language tutoring.  The letter further commanded Acacia and Plaintiffs to "immediately stop work" on these representations.

96.    On information and belief, Defendants have no plans to fund any legal representation for unaccompanied children—whether by reinstating the cancelled contract line items or by finding alternative ways to pay lawyers to represent unaccompanied children.

97.    The Cancellation Order took effect at close of business on Friday, March 21, 2025, and Plaintiffs represent clients with immigration court hearings that were scheduled for Monday March 24, 2025—the very next business day.  Yet Plaintiffs received no guidance from Defendants regarding how those representations should continue—forcing them to choose between seeking to withdraw from their representations or attempting to continue representing their clients unfunded.  Their clients are at risk of losing access to the legal counsel provided by the TVPRA and Foundational Rule.

**L.    Defendants' Termination Of Funding To Represent Unaccompanied Children Frustrates Plaintiffs' Missions, Causes Plaintiffs Irreparable Harm, and Serves No Legitimate Purpose.**

98.    Terminating funding for attorneys to represent unaccompanied children has devastating and irreparable effects, even more so for the harm it does to unaccompanied children.  Even if Defendants reinstate funding for counsel for unaccompanied children at some unknown future time (an unlikely supposition), the funded representations, the non-profits and attorneys that administer them, and the unaccompanied children that receive vital counsel from them already will have been dealt an irreparable blow.

99.    **Defendants' actions will cause Plaintiffs to lay off employees and lose huge percentages of their overall funding.**  For Plaintiffs, the funding Congress has consistently appropriated to provide services under the TVPRA is existentially important.

29

100.     For example, funding for the services Defendants have illegally cancelled makes up approximately 55% of ImmDef's budget and pays for 113 of ImmDef's approximately 200 employees. The cancelled funding made up nearly half of VAAP's and GHIRP's operating budgets, 30% of Amica Center's budget, over 25% of NIJC's budget, 15% of RMIAN's budget, and 10% of NWIRP's budget. The Florence Project received about $12 million a year from the now-cancelled funding, which supported more than 100 employees.

101.     Many organizations will have to lay off staff.  SJC will soon have to lay off its three Immigrant Justice Corps fellows unless it can find another source of funding for their salaries, ImmDef has already been forced to give layoff notices to 27 staff, Estrella has had to furlough 18 of the 28 employees in its unaccompanied children program, GHIRP will have to lay off most of its 19 children's program staff in four weeks, and VAAP has had to not renew the contract of one of its four employees, and may have to furlough another two employees—leaving it with only a single remaining employee.

102.     **Because Plaintiffs' mission is to serve unaccompanied children, they will incur huge losses to keep doing so.**  Plaintiffs' ethical responsibilities to their clients and commitment to their mission of serving as many unaccompanied children as possible mean that Plaintiffs cannot simply cut off services and representations for unaccompanied children.  The organizations will hold on for as long as they can without funding from Defendants, but the impacts will be harsh whether they are immediate or sightly delayed.

103.     For example, CLSEPA has had to stop taking on new clients, even if they are unaccompanied children in removal proceedings without an attorney.  CLSEPA is seeking new funding to continue existing representations of unaccompanied children, but is faced with the risk of having to withdraw from ongoing representations—which is entirely antithetical to CLSEPA's mission to serve immigrants in Santa Clara and San Mateo counties.

30

104.    SJC is facing the prospect of having to lay off three Immigrant Justice Corps fellows who represent unaccompanied children and may be forced to try to find other organizations that can take on their clients.

105.    Estrella faces a budget deficit of more than $200,000 per month to maintain its services for unaccompanied children without funding from Defendants.  To continue representing the 324 unaccompanied children clients it took on in reliance on funding from Defendants, Estrella will have to operate at this significant deficit, threatening Estrella's other programming.  Once Estrella's reserves are depleted, it will likely not be able to offer free legal representation in many circumstances.

106.    The Florence Project is drawing on general funds to sustain its services for unaccompanied children but will likely have to conduct significant layoffs of its team of more than 100 employees who are dedicated to serving unaccompanied children.  Still, the Florence Project is determined to continue its representations of more than 800 unaccompanied children—even without the funding it relied on when it entered into the representations—though it will cost the organization significantly to continue this work.

107.    To support their existing Immigrant Children and Youth staff, GHIRP will have to rely on unrestricted funds and savings, destabilizing the organization as a whole. This will divert unrestricted funds away from other services, as these resources typically cover gaps in funding between contract cycles on other grants, underfunded programs, or new initiatives that are responsive to emerging needs in their community.

108.    ImmDef has 1,900 cases that were funded by Defendants.  ImmDef estimates its reserve funding will be exhausted within 6 months, and to hang on that long it will have to dramatically cut its staffing.  Just to position itself to survive in the short-term, ImmDef has had to lay off 27 staff.  Once ImmDef's reserves run out, it will have to terminate all 113 staff formerly funded by money appropriated by Congress to provide services under the TVPRA.  As ImmDef has to cut staff, it will

31

be unable to reallocate its 1,900 formerly funded cases to other attorneys—so it will be unable to competently represent existing unaccompanied child clients.

109.  NWIRP will have to spend at least $200,000 per month to sustain its services for unaccompanied children that were previously funded by Defendants.

110.  NIJC is transferring employees away from its children's services to try to make it feasible to maintain a limited staff to attempt to sustain existing representations.

111.  RMIAN will have to draw from its financial reserves and the limited funding it receives that is not pre-allocated for restricted purposes to delay layoffs, and it cannot provide long-term assurances to its clients that they will not be left without lawyers if RMIAN cannot afford to keep its unaccompanied children staff employed.

112.  VAAP's remaining staff of three are stretched as they try to continue to support their clients.  Two of those three may soon need to be furloughed, leaving only one attorney for all of VAAP's clients.

113.  **Every harm to their clients is a severe harm to Plaintiffs' mission to help their clients.**  Plaintiffs' clients are significantly harmed by the uncertainty they now face, as Plaintiffs may be forced to withdraw from ongoing representations.  The cases Plaintiffs took on in reliance on funding from Defendants are complex and often take years to resolve, and clients will be harmed if they are no longer represented by Plaintiffs.

32

attorneys remaining on staff to represent him at his interview when it is scheduled, and ImmDef is helpless to provide him any assurances.

115.    In representations formerly funded by Defendants, SJC represents—for example—three individuals not in active removal proceedings, with strong cases for affirmative immigration relief that would allow them to stay in the country.  None of these clients could afford to hire a lawyer, but with free representation from SJC each has a clear path to relief.  If SJC cannot continue to represent them, they will be unlikely to secure the relief they qualify for.

116.    The Amica Center represents a four-year-old boy from Haiti in a case formerly funded by Defendants.  The four-year-old has a hearing in the process of obtaining SIJS relief on April 2, 2025. He also has an immigration court hearing in early June.  Without an attorney, the four-year-old could not engage in these proceedings or obtain any of the immigration relief for which he is eligible.  The Amica Center is continuing to represent him and its other unaccompanied child clients, though continuing its now-unfunded representations is very costly to the organization.

117.    The Florence Project currently represents a set of three siblings who fled their home country after their mother died and their sister was murdered.  All three siblings have pending asylum applications and are in the process of obtaining SIJS relief.  Both the asylum and SIJS processes require complex legal work, and the siblings would have little hope of obtaining relief without an attorney. Were the three to lose their Florence Project lawyer—previously funded by Defendants—they would be severely harmed, a result antithetical to the Florence Project's mission.

118.    **Defendants' illegal actions prevent Plaintiffs pursuing their missions.**  Because Plaintiffs' missions are founded on the belief that no child should face a trained government prosecutor alone, Plaintiffs also suffer significant harms to their missions because without funding from Defendants, they cannot take on new clients.  Every unaccompanied child in ORR custody who needs but does not receive representation because Defendants have ceased funding legal representation under

33

the TVPRA is a harm to Plaintiffs, as organizations that exist to serve these children and to ensure as few as possible go without a lawyer. Unrepresented children will be unable to apply for voluntary departure to return home, children who have been trafficked will be unable to access the protections afforded to them by U.S. law, and children with strong cases for asylum who fled persecution in their home countries will be unable to apply for asylum. These impacts are unacceptable for Plaintiffs.

119. If Plaintiffs are forced to shut down or stop providing services to unaccompanied children entirely, these mission harms will be even more acute because entire populations will be left unserved. For example, SJC serves remote areas of California's central valley where there are few other resources for unaccompanied children, VAAP is the only legal service provider for unaccompanied children in Vermont, RMIAN is the primary free legal service provider for unaccompanied children in Colorado, and for the majority of unaccompanied children in ORR custody in Arizona, the Florence Project represents their only access to counsel and only opportunity to receive free legal representation.

**120. Defendants' illegal actions are also causing collateral harm to other parts of Plaintiffs' missions.** While work serving unaccompanied children is a large portion of what most Plaintiffs do, many Plaintiffs also serve other immigrant populations—but Defendants' illegal refusal to fund legal representation has knock-on effects that harm all of Plaintiffs' efforts and other missions.

121. The Florence Project has had to institute a hiring freeze and cannot fill twenty open positions that would be dedicated to serving unaccompanied children. Because the Florence Project is having to use general funding to maintain its representations of unaccompanied children, it has also had to freeze hirings in all non-unaccompanied-children service areas across the organization, limiting its ability to carry out other elements of its mission to provide legal services to immigrants.

34

122.    As GHIRP draws down its savings to continue serving its unaccompanied child clients, the financial strain threatens its other programming, which also relies on GHIRP maintaining funds to cover gaps in funding for those other programs.

123.    For ImmDef, transferring funds from other efforts to try to sustain legal representations of unaccompanied children for as long as possible will mean cutting back on other services it planned to provide for immigrants, including pro se clinics.  ImmDef has also had to stop providing any non-essential support for its clients (like paying for medical exams required for certain adjustment of status applications), though its mission is to support its clients as much as possible.  And ImmDef has had to freeze all hiring across its organization, hampering its ability to fulfill its overall mission of providing legal services to immigrants.

124.    NWIRP is being forced to draw from its reserves, at the expense of using that money for the other services it provides immigrants in Washington state.

125.    RMIAN will be forced to dedicate its already-limited staff time to fundraise to try to cover the gap left by the cancelled funding.  RMIAN is concerned that its staff might take other jobs with organizations that are more securely funded.

126.    Because VAAP is a small organization, its remaining staff of three has struggled to keep up its legal work and field client questions, and has been unable to engage in basic administrative work to keep the organization running.

<div align="center">

**FIRST CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Not in Accordance with Law**

</div>

127.    Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

128.    The Administrative Procedure Act ("APA") authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law."  5

<div align="center">35</div>

U.S.C. § 706(2)(A).  Defendants' cancellation of funding for counsel to represent unaccompanied children violates the TVPRA.

129.    The TVPRA requires Defendants HHS and ORR to "ensure, to the greatest extent practicable . . . that all unaccompanied . . . children who are or have been in the custody of [Defendants HHS and ORR] . . . have counsel to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." 8 U.S.C. § 1232(c)(5).  This language in the TVPRA is and has been understood to require Defendants HHS and ORR to fund attorneys to represent unaccompanied children.

130.    Congress has consistently and specifically appropriated funds to Defendants HHS and ORR to provide services required by the TVPRA, including funding legal representation.  These congressionally appropriated funds remain available to Defendants to pay for legal representation through September 30, 2027.

131.    On March 21, 2025, Defendants terminated the contract line items that funded legal representation under the TVPRA.  On information and belief, Defendants are not funding the required legal representations for unaccompanied children in any other way.  Instead, the Cancellation Order ends government-funded legal representation for unaccompanied children despite the availability of appropriated funding for such representations through at least September 30, 2027—two-and-a-half years from now.

132.    By ending funding for legal representation of unaccompanied children despite the availability of appropriated funds for this purpose, Defendants violate the TVPRA's mandate to provide counsel for unaccompanied children "to the greatest extent practicable."  Funds remain available for this purpose, and Defendants are subverting congressional appropriations and the TVPRA by failing to fund legal representation for unaccompanied children.

36

133.     Because Defendants' termination of funding for counsel for unaccompanied children is not in accordance with the TVPRA, it is "not in accordance with law" within the meaning of the APA and should be set aside.

<div align="center">

**SECOND CLAIM FOR RELIEF**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
***Accardi* Doctrine**

</div>

134.     Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

135.     The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Defendants' cancellation of funding for counsel to represent unaccompanied children violates the APA under the *Accardi* Doctrine because it violates ORR's own policies and regulations.

136.     Longstanding Supreme Court caselaw mandates that agencies must adhere to their own policies and regulations, and that failure to do so violates the APA. *See U.S. ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954), *superseded by statute on other grounds*; *see also Alcaraz v. I.N.S.*, 384 F.3d 1150, 1162 (9th Cir. 2004) ("The legal proposition that agencies may be required to abide by certain internal policies is well-established.").

137.     The 2024 Unaccompanied Children Program Foundational Rule requires the government to "fund legal service providers to provide direct immigration legal representation" to unaccompanied children if there are "available appropriations" and to ensure children receive a legal orientation, consultation with a lawyer, and ongoing access to lawyers. 89 CFR 34604.

138.     The ORR Unaccompanied Alien Children Bureau Policy Guide expressly states that "ORR funds legal service providers (LSPs) to provide direct immigration legal representation or representation in non-immigration related matters to the extent of available appropriations, and insofar as it is not practicable for ORR to secure pro bono counsel." *See* "ORR Unaccompanied Alien Children

<div align="center">37</div>

Bureau Policy Guide: Section 3.7.2 Direct Legal Representation," OFFICE OF REFUGEE RESETTLEMENT (revised Aug. 1, 2024), https://acf.gov/orr/policy-guidance/unaccompanied-children-program-policy-guide-section-3#3.7.2.

139.    By ending funding for legal representation of unaccompanied children despite the availability of appropriated funds for this purpose through at least September 30, 2027, Defendants violate the Foundational Rule's mandate to provide counsel for unaccompanied children to the extent there are appropriated funds available to do so and violate ORR's policy of funding legal service providers "to the extent of available appropriations."  Defendants' violations of ORR's own rule and policy violate the APA.

140.    Because Defendants' termination of funding for counsel for unaccompanied children violates the Foundational Rule and ORR's own Policy Guide, it violates the APA and should be set aside under the *Accardi* Doctrine as "arbitrary, capricious, an abuse of discretion [and] otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### THIRD CLAIM FOR RELIEF
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A)
### Arbitrary and Capricious

141.    Plaintiffs incorporate herein by reference paragraphs 1 through 126 as if fully rewritten herein.

142.    The APA authorizes this Court to set aside agency action that is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

143.    Defendants have given no reasoned justification for their abrupt cancellation of mandated and appropriated funding for legal representations for unaccompanied children.  The Cancellation Order gives no reasoning at all.  And the February stop work order expressly disclaimed that it was issued for any "poor performance" of the legal representations.

38

144. There is significant evidence that providing legal representation improves efficiency in immigration court and conserves immigration court time and resources. Cancelling funding for legal representation will only make immigration courts operate less efficiently.

145. In addition, Defendants' unlawful cancellation of funding for legal representations directly undermines Plaintiff organizations' missions to provide representation for as many unaccompanied children as possible. Defendants have "entirely failed to consider an important aspect of the problem" by failing to consider the impact to Plaintiffs and their clients. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

146. Because Defendants' termination of the Programs is arbitrary and capricious, Plaintiffs ask that the Court set aside Defendants' actions as violative of the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

1. Declare that Defendants' actions violate the APA because they are "arbitrary, capricious, an abuse of discretion, or otherwise in violation of the law."

2. Declare that Defendants are required to continue funding legal representation to unaccompanied children, consistent with the TVPRA and ORR's Foundational Rule.

3. Set aside Defendants' actions that violate the APA.

4. Enjoin Defendants nationwide from ceasing to fund counsel to represent unaccompanied children in violation of the TVPRA and the Foundational Rule.

5. Award Plaintiffs' counsel reasonable attorneys' fees under the Equal Access to Justice Act, and any other applicable statute or regulation; and

6. Award such other relief as this Court may deem just and proper.

Respectfully submitted,

March 26, 2025

s/ *Alvaro M. Huerta*                              s/ *Karen C. Tumlin*
IMMIGRANT DEFENDERS LAW CENTER          JUSTICE ACTION CENTER

Alvaro M. Huerta (CA Bar No. 274787)          Esther H. Sung
Carson A. Scott (CA Bar No. 337102)           Karen C. Tumlin
Lya Ferreyra (CA Bar No. 340148)              Laura Flores-Perilla
Immigrant Defenders Law Center                JUSTICE ACTION CENTER
634 S. Spring St., 10th Floor                 P.O. Box 27280
Los Angeles, CA                               Los Angeles, CA 90027
(213) 634-0999                                Telephone: (323) 450-7272
ahuerta@immdef.org                            esther.sung@justiceactioncenter.org
cscott@immdef.org                             karen.tumlin@justiceactioncenter.org
lferreyra@immdef.org                          laura.flores-perilla@justiceactioncenter.org

s/ *Samantha Hsieh*
AMICA CENTER FOR IMMIGRANT
RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)*
Samantha Hsieh (V.A. Bar No. 90800)*
Peter Alfredson (D.C. Bar No. 1780258)*
Evan Benz (N.C. Bar No. 49077)*
Amica Center for Immigrant Rights
1025 Connecticut Avenue NW, Suite 701
Washington, DC 20036
(202) 331-3320
adina@amicacenter.org
sam@amicacenter.org
peter@amicacenter.org
evan@amicacenter.org

*pro hac vice* forthcoming

40

JS-CAND 44 (Rev. 12/2024)

# CIVIL COVER SHEET

This civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket. Instructions are on the reverse of this form.

| I. PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| Community Legal Services in East Palo Alto; (see attachment) | United States Department of Health and Human Services; (see attachment) |

| County of Residence of First Listed Plaintiff: San Mateo County <br> *Leave blank in cases when United States is plaintiff.* | County of Residence of First Listed Defendant: <br> *Use ONLY in cases when United States is plaintiff.* |
|---|---|

| Attorney or Pro Se Litigant Information *(Firm Name, Address, and Telephone Number)* <br> Alvaro M. Huerta (see attachment) | Defendant's Attorney's Name and Contact Information *(if known)* |
|---|---|

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] U.S. Government Plaintiff
- [x] U.S. Government Defendant
- [ ] Federal Question *(U.S. Government Not a Party)*
- [ ] Diversity

## III. CAUSE OF ACTION

Cite the U.S. Statute under which you are filing: *(Use jurisdictional statutes only for diversity)*
5 U.S.C. 702

Brief description of case: Violation of Administrative Procedure Act

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| 150 Recovery of Overpayment & Enforcement of Judgment | 330 Federal Employers' Liability | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | **PERSONAL PROPERTY** | 740 Railway Labor Act | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 460 Deportation |
| | 350 Motor Vehicle | 371 Truth in Lending | 790 Other Labor Litigation | 880 Defend Trade Secrets Act of 2016 | 470 Racketeer Influenced & Corrupt Organizations |
| 153 Recovery of Overpayment of Veteran's Benefits | 355 Motor Vehicle Product Liability | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 360 Other Personal Injury | 385 Property Damage Product Liability | **IMMIGRATION** | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 190 Other Contract | 362 Personal Injury -Medical Malpractice | | 462 Naturalization Application | 862 Black Lung (923) | 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 465 Other Immigration Actions | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | | 864 SSID Title XVI | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities– Employment | 535 Death Penalty | | 871 IRS–Third Party 26 U.S.C. § 7609 | [x] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | 446 Amer. w/Disabilities–Other | **OTHER** | | | 950 Constitutionality of State Statutes |
| 245 Tort Product Liability | 448 Education | 540 Mandamus & Other | | | |
| 290 All Other Real Property | | 550 Civil Rights | | | |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] Original Proceeding
- [ ] Removed from State Court
- [ ] Remanded from Appellate Court
- [ ] Reinstated or Reopened
- [ ] Transferred from Another District
- [ ] Multidistrict Litigation–Transfer
- [ ] Multidistrict Litigation–Direct File

## VI. FOR DIVERSITY CASES ONLY: CITIZENSHIP OF PRINCIPAL PARTIES

*(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

| Plaintiff | Defendant | |
|---|---|---|
| [ ] | [ ] | Citizen of California |
| [ ] | [ ] | Citizen of Another State |
| [ ] | [ ] | Citizen or Subject of a Foreign Country |
| [ ] | [ ] | Incorporated or Principal Place of Business In California |
| [ ] | [ ] | Incorporated and Principal Place of Business In Another State |
| [ ] | [ ] | Foreign Nation |

## VII. REQUESTED IN COMPLAINT

- [ ] Check if the complaint contains a **jury demand.**
- [ ] Check if the complaint contains a **monetary demand.** Amount:
- [ ] Check if the complaint seeks **class action** status under Fed. R. Civ. P. 23.
- [x] Check if the complaint seeks a **nationwide injunction** or Administrative Procedure Act vacatur.

## VIII. RELATED CASE(S) OR MDL CASE

*Provide case name(s), number(s), and presiding judge(s).*

## IX. DIVISIONAL ASSIGNMENT pursuant to Civil Local Rule 3-2

*(Place an "X" in One Box Only)*

- [x] SAN FRANCISCO/OAKLAND
- [ ] SAN JOSE
- [ ] EUREKA-MCKINLEYVILLE

| DATE 03/26/2025 | SIGNATURE OF ATTORNEY OR PRO SE LITIGANT /s/ Alvaro M. Huerta |
|---|---|

(249 of 348), Page 249 of 348 Case: 25-2358, 04/14/2025, DktEntry: 5.1, Page 249 of 348
Case 3:25-cv-02825-WHO Document 17-20 Filed 03/27/25 Page 4 of 44
JS-CAND 44 (rev. 12/2024)

# COMPLETING THE CIVIL COVER SHEET

Complete the form as follows:

**I.** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.

**Attorney/Pro Se Litigant Information.** Enter the firm name, address, telephone number, and email for attorney of record or pro se litigant. If there are several individuals, list them on an attachment.

**II.** **Jurisdiction.** Under Federal Rule of Civil Procedure 8(a), pleadings must establish the basis of jurisdiction. If multiple bases for jurisdiction apply, prioritize them in the order listed:

(1) *United States plaintiff.* Jurisdiction based on 28 U.S.C. §§ 1345 and 1348 for suits filed by the United States, its agencies or officers.

(2) *United States defendant.* Applies when the United States, its agencies, or officers are defendants.

(3) *Federal question.* Select this option when jurisdiction is based on 28 U.S.C. § 1331 for cases involving the U.S. Constitution, its amendments, federal laws, or treaties (but use choices 1 or 2 if the United States is a party).

(4) *Diversity of citizenship.* Select this option when jurisdiction is based on 28 U.S.C. § 1332 for cases between citizens of different states and complete Section VI to specify the parties' citizenship. Note: Federal question jurisdiction takes precedence over diversity jurisdiction.

**III.** **Cause of Action.** Enter the statute directly related to the cause of action and give a brief description of the cause. Do not cite jurisdictional statutes unless jurisdiction is based on diversity. Example: U.S. Civil Statute: 47 U.S.C. § 553. Brief Description: Unauthorized reception of cable service.

**IV.** **Nature of Suit.** Check one of the boxes. If the case fits more than one nature of suit, select the most definitive or predominant.

**V.** **Origin.** Check one of the boxes:

(1) *Original Proceedings.* Cases originating in the United States district courts.

(2) *Removed from State Court.* Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. § 1441. When the petition for removal is granted, check this box.

(3) *Remanded from Appellate Court.* Check this box for cases remanded to the district court for further action, using the date of remand as the filing date.

(4) *Reinstated or Reopened.* Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) *Transferred from Another District.* Check this box for cases transferred under Title 28 U.S.C. § 1404(a). Do not use this for within-district transfers or multidistrict litigation (MDL) transfers.

(6) *Multidistrict Litigation Transfer.* Check this box when a multidistrict (MDL) case is transferred into the district under authority of Title 28 U.S.C. § 1407.

(7) *Multidistrict Litigation Direct File.* Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

**VI.** **Residence (citizenship) of Principal Parties.** Mark for each principal party *only* if jurisdiction is based on diversity of citizenship.

**VII.** **Requested in Complaint.**

(1) *Jury demand.* Check this box if plaintiff's complaint demanded a jury trial.

(2) *Monetary demand.* For cases demanding monetary relief, check this box and enter the actual dollar amount being demanded.

(3) *Class action.* Check this box if plaintiff is filing a class action under Federal Rule of Civil Procedure 23.

(4) *Nationwide injunction.* Check this box if plaintiff is seeking a nationwide injunction or nationwide vacatur pursuant to the Administrative Procedures Act.

**VIII.** **Related Cases.** If there are related pending case(s), provide the case name(s) and number(s) and the name(s) of the presiding judge(s). If a short-form MDL complaint is being filed, furnish the MDL case name and number.

**IX.** **Divisional Assignment.** Identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated." Note that case assignment is made without regard for division in the following case types: Property Rights (Patent, Trademark and Copyright), Prisoner Petitions, Securities Class Actions, Anti-Trust, Bankruptcy, Social Security, and Tax.

**Additional Plaintiffs:**

Amica Center For Immigrant Rights; Estrella Del Paso; Florence Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project; Immigrant Defenders Law Center; National Immigrant Justice Center; Northwest Immigrant Rights Project; Rocky Mountain Immigrant Advocacy Network; Social Justice Collaborative; Vermont Asylum Assistance Project.

**Additional Attorney or Pro Se Litigant Information:**

IMMIGRANT DEFENDERS LAW CENTER

Alvaro M. Huerta (CA Bar No. 274787)

Carson A. Scott (CA Bar No. 337102)

Lya Ferreyra (CA Bar No. 340148)

Immigrant Defenders Law Center

634 S. Spring St.,

10th Floor Los Angeles, CA

Telephone: (213) 634-0999

JUSTICE ACTION NETWORK

Esther H. Sung (CA Bar No. 255962)

Karen C. Tumlin (CA Bar No. 234691)

Laura Flores-Perilla (CA Bar No. 355645)*

JUSTICE ACTION CENTER

P.O. Box 27280

Los Angeles, CA 90027

Telephone: (323) 450-7272

AMICA CENTER FOR IMMIGRANT RIGHTS

Adina Appelbaum (D.C. Bar No. 1026331)*

Samantha Hsieh (V.A. Bar No. 90800)*

Peter Alfredson (D.C. Bar No. 1780258)*

Evan Benz (N.C. Bar No. 49077)*

Amica Center for Immigrant Rights

1025 Connecticut Avenue NW, Suite 701

Washington, DC 20036

Telephone: (202) 331-3320

**Additional Defendants:**

Office of Refugee Resettlement; Department of Interior

YAAKOV M. ROTH
Acting Assistant Attorney General
WILLIAM C. SILVIS (DCBN 485572)
Assistant Director
MICHAEL A. CELONE (MDBN 1312170145)
CHRISTINA PARASCANDOLA (DCBN 468479)
KATELYN MASETTA ALVAREZ (OHBN 97857)
JONATHAN K. ROSS (NCBN 50203)
Senior Litigation Counsels
ZACHARY A. CARDIN (MDBN 1812110052)
Trial Attorney

      U.S. Department of Justice, Civil Division
      Office of Immigration Litigation
      General Litigation and Appeals Section
      P.O. Box 878, Ben Franklin Station
      Washington, DC 20044
      (202) 305-2040
      Michael.A.Celone@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *ET AL.*, | Case No. 3:25-cv-02847-AMO |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| v. | |
| UNITED STATES DEPARTMENT OF | Date:  April 1, 2025 |
| | Time: 10:00 a.m. |
| | Location:  Courtroom 10 |
| Defendants. | |
| | Hon. Araceli Martínez-Olguín |
| | United States District Judge |

1

## TABLE OF CONTENTS

2   I.      INTRODUCTION ...................................................................................................1

3   II.     BACKGROUND .....................................................................................................2

4   A.      Legal Framework ....................................................................................................2

5          1.      The Homeland Security Act ("HSA") ............................................................2

6          2.      The Trafficking Victims Protection Reauthorization Act ("TVPRA") .............3

7          3.      The Foundational Rule.......................................................................................3

8          4.      Appropriations Acts and Congressional Intent ................................................4

9          5.      The Current Contract and Termination Decision...............................................5

10  III.    STANDARDS OF REVIEW .................................................................................6

11  IV.     ARGUMENT ..........................................................................................................6

12  A.      Plaintiffs cannot demonstrate that they are likely to succeed on the merits. ...................6

13         1.      Plaintiffs lack standing because they are not within the zone of interests that
                   8 U.S.C. § 1232 is intended to protect. ..............................................................6
14

15         2.      The APA does not waive sovereign immunity for the monetary relief
                   Plaintiffs seek.....................................................................................................8

16         3.      This Court lacks jurisdiction over Plaintiffs' claims because the rights they
                   seek to enforce must be brought in the Federal Court of Claims.......................11
17

18         4.      Plaintiffs cannot show that a favorable decision in this case would likely
                   redress their alleged injuries. .........................................................................13

19         5.      The Termination Contract Termination at Issue Does Not Violate the APA ...................14

20         6.      The Foundational Rule Does Not Require Funding for Taxpayer-funded
                   Direct Immigration Legal Representation Consistent with Available
21                 Appropriations. ...............................................................................................15

22  B.      Plaintiffs Will Not Face Irreparable Harm Without a TRO.......................................17

23  C.      The Balance of the Equities and Public Interest Weigh Against Entry of a Temporary
           Restraining Order................................................................................................19
24

25  D.      If the Court issues a TRO, it should require Plaintiffs to Post Security. ...................21

26  V.      CONCLUSION.....................................................................................................21

    CERTIFICATE OF COMPLIANCE

27

28

1

## **TABLE OF AUTHORITIES**

2

## **CASES**

3

*Al Otro Lado, Inc. v. Mayorkas*,
4
  2024 WL 4370577 (S.D. Cal. Sept. 30, 2024) ................................................................. 15

5

*Arcamuzi v. Continental Air Lines*, Inc.,
  819 F.2d 935 (9th Cir. 1987) ...................................................................................... 18
6

7

*Ariz. Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) .................................................................................... 18
8

9

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015) ...................................................................................... 19
10

11

*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*,
  501 U.S. 1301 (1991) .................................................................................................. 19
12

*BFP v. Resolution Trust Corp.*,
13
  511 U.S. 531 (1994) ...................................................................................................... 8

14

*Caribbean Marine Servs. Co. v. Baldrige*,
  844 F.2d 668 (9th Cir. 1988) ................................................................................ 17, 18
15

16

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) .................................................................................................... 19
17

18

*Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
  601 U.S. 416 (2024) .................................................................................................... 14
19

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2014) .................................................................................... 19
20

21

*Earth Island Inst. v. Carlton*,
  626 F.3d 462 (9th Cir. 2010) ........................................................................................ 6
22

23

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ................................................................................... 6, 17
24

*Goldie's Bookstore, Inc. v. Superior Court*,
  739 F.2d 466 (9th Cir. 1984) ...................................................................................... 18
25

26

*Great-W. Life & Annuity Ins. Co. v. Knudson*,
  534 U.S. 204 (2002) ...................................................................................................... 9
27

*I.N.S. v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*,
28
  510 U.S. 1301 (1993) ................................................................................................ 6, 7

*Int'l Union, UAW v. Donovan,*
   746 F.2d 855 (D.C. Cir. 1984) ................................................................................. 15

*Koller v. Brown,*
   224 F. Supp. 3d 871 (N.D. Cal. 2016) ....................................................................... 17

*Lane v. Pena,*
   518 U.S. 187 (1996) ...................................................................................................... 9

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) .................................................................................................... 11

*Lopez v. Brewer,*
   680 F.3d 1068 (9th Cir. 2012) ...................................................................................... 6

*Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,*
   634 F.2d 1197 (9th Cir. 1980) .................................................................................... 18

*Lucas R. v. Becerra,* No.,
   CV 18-5741, 2022 WL 2177454 (C.D. Cal. Mar. 11, 2022) ......................................... 5

*Lujan v. Defenders of Wildlife,*
   504 U.S. 555 (1992) .............................................................................................. 13, 14

*Lujan v. Nat'l Wildlife Fed'n,*
   497 U.S. 871 (1990) .................................................................................................. 6, 7

*Maryland v. King,*
   567 U.S. 1301 (2012) ................................................................................................. 20

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) ..................................................................................................... 7

*Megapulse, Inc. v. Lewis,*
   672 F.2d 959 (D.C. Cir. 1982) ................................................................................... 12

*Nken v. Holder,*
   556 U.S. 418 (2009) ................................................................................................... 19

*North Side Lumber v. Block,*
   753 F.2d 1482 (9th Cir. 1985) .................................................................................... 12

*Novak v. United States,*
   795 F.3d 1012 (9th Cir. 2015) .................................................................................... 13

*Pit River Tribe v. BLM,*
   793 F.3d 1147 (9th Cir. 2015) ...................................................................................... 7

*Renee v. Duncan,*
   686 F.3d 1002 (9th Cir. 2012) ................................................................. 13

*Salazar v. Ramah Navajo Chapter,*
   567 U.S. 182 (2012)............................................................................. 15

*Sampson v. Murray,*
   415 U.S. 61 (1974)............................................................................... 18

*Sharp v. Weinberger,*
   798 F.2d 1521 (D.C. Cir. 1986) ......................................................... 12

*Star Alaska v. United States,*
   14 F.3d 36 (9th Cir. 1994) ..................................................................... 9

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.,*
   240 F.3d 832 (9th Cir. 2001) ................................................................. 6

*the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ............................................................... 6

*United Aeronautical Corp. v. United States Air Force,*
   80 F.4th 1017 (9th Cir. 2023) ......................................................... 12, 13

*United States Conf. of Cath. Bishops v. U.S. Dep't of State,*
   No. 1:25-CV-00465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ....... 12

*United States ex rel. Accardi v. Shaughnessy,*
   347 U.S. 260 (1954)............................................................................. 15

*United States v. Mitchell,*
   463 U.S. 206 (1983).............................................................................. 9

*United States v. White Mountain Apache Tribe,*
   537 U.S. 465 (2003).............................................................................. 9

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008)............................................................................. 6, 17

**Immigration and Nationality Act of 1952, as amended:**

5 U.S.C. § 701................................................................................................ 2

5 U.S.C. § 701(a)(2)...................................................................................... 10

5 U.S.C. § 702................................................................................................ 9

6 U.S.C. § 279................................................................................................ 2

6 U.S.C. § 279(a) ................................................................................................ 2

6 U.S.C. § 279(b)(1) ...................................................................................... 3, 10

6 U.S.C. § 279(b)(1)(A) .................................................................................... 2, 3

6 U.S.C. § 279(b)(1)(I) ....................................................................................... 15

6 U.S.C. § 279(g)(2) ........................................................................................ 2, 3

8 U.S.C. § 1232(i) ............................................................................................. 10

8 U.S.C. § 1232 ........................................................................................ 1, 6, 19

8 U.S.C. § 1232(b)(1) .......................................................................................... 3

8 U.S.C. § 1232(c)(1) .......................................................................................... 7

8 U.S.C. § 1232(c)(2) .......................................................................................... 7

8 U.S.C. § 1232(c)(3) .......................................................................................... 7

8 U.S.C. § 1232(c)(4) .......................................................................................... 7

8 U.S.C. § 1232(c)(5) ................................................................................. 3, *passim*

8 U.S.C. § 1232(c)(6) .......................................................................................... 7

8 U.S.C. § 1362 ..................................................................................... 3, 7, 10, 16

28 U.S.C. § 1491(a)(1) ....................................................................................... 11

31 U.S.C. § 6305 ................................................................................................. 3

**The Homeland Security Act:**
Pub. L. No. 107-296 ............................................................................................. 2

**William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"):**
Pub. L. No. 110-457 ............................................................................................. 1

**Further Consolidated Appropriations Act:**
Pub. L. No. 118-47 ............................................................................................. 4, 10

**Full-Year Continuing Appropriations and Extensions Act, 2025:**
Pub. L. No. 119-4 ............................................................................................. 4, 10

# FEDERAL RULES OF APPELLATE PROCEDURE

Fed. R. Civ. P. 65(c) ............................................................................................................. 21

# REGULATIONS

45 C.F.R. Part 410............................................................................................................... 3

45 C.F.R. § 410 ................................................................................................................. 19

45 C.F.R. § 410.1309(a)(2)(i)-(v) ...................................................................................... 4

# OTHER AUTHORITIES

H.R. Rep. No. 1656, 94th Cong., 2d Sess. 13 .................................................................... 12

Standing Order, section 6 and L.R. 11-6.1 ........................................................................ 24

*Unaccompanied Children Program Foundational Rule*,
    89 Fed. Reg. 34384, 34,529 (Apr. 30, 2024) .............................................................. 15

89 Fed. Reg. at 34,529 .................................................................................................. 16, 17

## I. <u>INTRODUCTION</u>

The Court should deny Plaintiffs' extraordinary request for a temporary restraining order and preliminary injunction, ECF No. 7 ("motion"). Plaintiffs' motion is legally unfounded, factually overstated, and disregards both the statutory and regulatory discretion Congress expressly conferred upon the federal government. The relief they seek would not preserve the status quo, but instead disrupt the government's longstanding management of legal services for unaccompanied alien children ("UAC")—services that remain subject to available appropriations and the agency's judgment.

Plaintiffs are legal service providers seeking to compel the United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement ("ORR"), to indefinitely fund direct legal representation for UAC through specific contracting arrangements. But the governing statute—the William Wilberforce Trafficking Victims Protection Act of 2008 ("TVPRA"), Pub. L. No. 110-457 (codified in principal part at 8 U.S.C. § 1232)—expressly conditions any such representation on practicability and the availability of pro bono counsel. It does not create an enforceable right to government-funded representation, let alone compel the agency to maintain any particular scope of services or contractual relationship. Similarly, the regulatory language Plaintiffs cite, the Foundational Rule, codified at 45 C.F.R. § 410.1309(a)(4), confirms that ORR's obligation to fund direct representation is contingent on both available appropriations and ORR's discretionary determinations. Congress never mandated indefinite funding for these services, and nothing in the TVPRA or ORR's Foundational Rule suggests otherwise.

As a threshold matter, Plaintiffs seek to convert a discretionary, resource-dependent program into a judicially enforceable entitlement. That effort fails as a matter of law. Plaintiffs lack organizational standing, cannot show that the termination decision constitutes final agency action reviewable under the APA and can identify no statutory or regulatory provision that imposes a binding duty on the government to maintain uninterrupted direct representation contracts. At most, Plaintiffs disagree with the government's policy judgment to conserve resources and reallocate funding within the broad framework of the TVPRA—a judgment that courts have repeatedly held is committed to agency discretion.

Regardless, this Court lacks jurisdiction over what is, at bottom, a dispute over the partial termination of a federal contract. Under the Tucker Act and the Contract Disputes Act, challenges to

government contract terminations must be brought in the U.S. Court of Federal Claims. Plaintiffs' attempt to recast a contract termination as a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq*., cannot circumvent that exclusive remedial scheme. Moreover, decisions regarding whether and how to terminate government contracts—particularly for the government's convenience—are classic examples of actions committed to agency discretion and are not subject to judicial review under the APA.

Nor can Plaintiffs establish any of the equitable factors required for injunctive relief. Their claims of irreparable harm rest on speculative predictions about staffing decisions and funding shortfalls that are neither immediate nor irreversible. Nothing in the record suggests that Plaintiffs are barred from continuing their work, pursuing other funding sources, or seeking relief through the dispute resolution provisions of the contract, setting aside the fact that none of the plaintiffs are actually a party to that agreement. A TRO's extraordinary relief is not an appropriate mechanism for restructuring federal contract policy to align with a particular group of stakeholders' policy preferences, particularly where the asserted harms are financial and the underlying legal theory is without merit. The Court should therefore deny Plaintiffs' motion.

## II.    BACKGROUND

### A.    Legal Framework

The statutory and regulatory framework governing legal representation for UAC in federal care and custody reflects a coordinated scheme established by Congress to balance the protection of vulnerable children with the Executive's discretion over immigration and programmatic resource allocation. This framework primarily originates in two statutes: the Homeland Security Act of 2002 ("HSA") and the TVPRA.

In 2002, Congress enacted the HSA, Pub. L. No. 107-296, 116 Stat. 2135 (codified in relevant part at 6 U.S.C. § 279), abolishing the Immigration and Naturalization Service ("INS") and transferring the responsibility for the care and placement of UAC from INS to ORR. 6 U.S.C. §§ 279(a), (b)(1)(A), (g)(2).

The HSA defines a UAC as "a child who—(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom— (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide

care and physical custody." 6 U.S.C. § 279(g)(2). Further, it assigns ORR broad authority over the care and custody of UAC while they are in federal custody due to their immigration status, including coordinating their care and placement, ensuring their best interests in custodial decisions, and developing plans to "ensure that qualified and independent legal counsel is timely appointed to represent the interests of each such child." 6 U.S.C. § 279(b)(1)(A). These responsibilities are carried out through cooperative agreements and contracts with care providers under ORR policies and oversight. *See* 6 U.S.C. § 279(b)(1); 31 U.S.C. § 6305.

### 2.    The Trafficking Victims Protection Reauthorization Act ("TVPRA")

Congress enacted the TVPRA in 2008 to strengthen protections for UAC and support their safe repatriation or appropriate placement. The statute, consistent with the HSA, makes the Secretary of HHS responsible for the care and custody of UAC. 8 U.S.C. § 1232(b)(1). The TVPRA explicitly directs HHS to prioritize the utilization of pro bono counsel and does not mandate direct government-funded legal representation: Section 235 of the TVPRA encourages HHS to ensure UAC have counsel "to the greatest extent practicable" and "make every effort to utilize the services of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5).

Further, Section 235 encourages HHS to ensure that counsel is available to represent UAC in "legal proceedings or matters," expressly linking representation duties with protecting children from "mistreatment, exploitation, and trafficking." Additionally, it cross-references Section 292 of the Immigration and Nationality Act ("INA"), which specifies representation "at no expense to the Government." 8 U.S.C. § 1362. Therefore, it is clear that HHS is not required to fund access to legal counsel for UAC. The TVPRA's language and structure demonstrate Congress's intent to establish public-private partnerships and encourage pro bono counsel as the primary source of legal assistance for UC, and conferring on ORR exclusive discretion to determine when direct government-funded representation might be utilized (e.g., where pro bono resources are impractical or unavailable).

### 3.    The Foundational Rule

In April 2024, ORR promulgated the Unaccompanied Children Program Foundational Rule, codified at 45 C.F.R. Part 410, to establish comprehensive regulations governing its UAC program. The

Rule, which became effective July 1, 2024, formalized previously informal procedures and explicitly articulated ORR's discretion regarding legal representation funding. Specifically, the Rule provides that ORR "shall fund legal service providers to provide direct immigration legal representation for certain unaccompanied children" only "to the extent ORR determines that appropriations are available," and only if securing pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4).

In contrast, other subsections impose mandatory obligations. For instance, the Rule explicitly requires ORR to ensure UAC receive mandatory services such as a "presentation concerning the rights and responsibilities of undocumented children," "information regarding the availability of free legal assistance," and a "confidential legal consultation." 45 C.F.R. § 410.1309(a)(2)(i)-(v). This intentional distinction clarifies that direct funding for legal representation remains discretionary, conditional upon the availability of appropriations, and subject to agency determination. The Rule also reinforces congressional policy choices articulated in the TVPRA, highlighting the preferred reliance on pro bono counsel and emphasizing that direct representation services funded by ORR are not guaranteed and remain subject to the agency's discretionary resource management.

### 4. Appropriations Acts and Congressional Intent

Congress periodically appropriates funds to support ORR's UAC program, including legal services. Appropriations language, however, consistently remains broad and nonspecific regarding precise funding allocations. Ex. A, Declaration of Toby Biswas ("Biswas Decl."), ¶ 16. For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation. This general appropriation approach allows ORR flexibility in determining the allocation of resources based on agency priorities, the availability of pro bono counsel, and shifting immigration policy needs. Biswas Decl., ¶ 16.

Subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation. *Id.* This ongoing legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to prioritize resources efficiently and adaptively. *Id.* Such discretionary funding practices reflect a

longstanding Congressional policy to balance support for legal services with practical constraints, prioritizing public-private partnerships and pro bono resources where feasible, rather than imposing fixed or rigid funding mandates. *Id.*

Indeed, at least one other court has considered this issue and determined that Congress did not specify what types of legal services ORR must fund with the appropriations intended for carrying out Section 235 of the TVPRA. *Lucas R. v. Becerra*, No. CV 18-5741, 2022 WL 2177454, at *31 (C.D. Cal. Mar. 11, 2022). Rather, ORR is "entitled to prioritize what type of legal representation ORR supports with appropriated funds, in furtherance of the TVPRA." *Id.* The same analysis applies here: without a mandate from Congress in the most recent appropriations legislation, ORR has discretion to prioritize what types of services it funds to further the purpose of the TVPRA.

### 5. The Current Contract and Termination Decision

The present dispute arises from ORR's partial termination and descoping of a federal contract administered by the Department of the Interior ("DOI"), which serves as the contracting agent through its Interior Business Center. *Id.* ¶ 13. ORR directed DOI to partially terminate a contract previously funding direct legal representation services. *Id.* ¶¶ 12–13. This termination was executed through a formal decision memorandum signed by the Acting Assistant Secretary of the Administration for Children and Families ("ACF"). *Id.* ¶¶ 13–14.

ORR's decision reflects a deliberate exercise of statutory discretion to prioritize available appropriations and pro bono legal services. While general direct representation contract funding was terminated, ORR maintains other legally required activities, including "know your rights" presentations and confidential legal screening consultations. *Id.* ¶ 5, 11.

This contract termination aligns with ORR's statutory and regulatory discretion under the TVPRA, the Foundational Rule, and relevant appropriations acts, none of which mandate continuous, direct legal representation funding when viable alternatives, such as pro bono representation, exist. *Id.* ¶ 14. Additionally, the termination decision reflects ORR's commitment to fiscal responsibility, ensuring that limited resources are allocated effectively, prudently managing public funds, and preserving governmental flexibility to respond to evolving priorities and urgent programmatic needs. *Id.* ¶ 11, 16.

### III.    STANDARDS OF REVIEW

Preliminary injunctive relief "is an extraordinary and drastic remedy," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (internal quotation marks and citation omitted), that is "never awarded as of right," *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (internal quotation marks and citation omitted); *see also Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001) (noting that the standard for issuing a temporary restraining order is "substantially identical" to the standard for issuing a preliminary injunction). Thus, this relief "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez*, 680 F.3d at 1072 (internal quotation marks and citation omitted; emphasis in original). This is a "difficult task." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 469 (9th Cir. 2010). To prove their entitlement to such relief, Plaintiffs must establish that: (1) they are likely to succeed on the merits, (2) are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Under the Ninth Circuit's sliding scale test for preliminary injunctive relief, "serious questions going to the merits" and "a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

### IV.    ARGUMENT

**A.    Plaintiffs cannot demonstrate that they are likely to succeed on the merits.**

    **1.    Plaintiffs lack standing because they are not within the zone of interests that 8 U.S.C. § 1232 is intended to protect.**

Plaintiffs lack standing because the statutory provision that, according to Plaintiffs, ensures that UAC have access to legal counsel, 8 U.S.C. § 1232(c)(5), was not intended to protect Plaintiffs. When an organization challenges an agency action under the APA, the organization must show that it is within the "zone of interests" that the statute was meant to protect. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990); *I.N.S. v. Legalization Assistance Project of Los Angeles Cnty. Fed'n of Lab.*, 510 U.S. 1301, 1305 (1993). To fall within the "zone of interests" of a statutory provision, "the plaintiff must establish that the *injury* he complains of (*his* aggrievement, or the adverse effect *upon him*) falls within the 'zone of

1  interests' sought to be protected by the statutory provision whose violation forms the legal basis for his

2  complaint." *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 883 (1990); *Match-E-Be-Nash-She-Wish*

3  *Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). When a plaintiff brings an APA claim

4  against a federal agency, courts look to "the statute that [the plaintiff] says was violated," rather than the

5  APA itself to determine whether the party's injury is within the zone of interests. *Match-E-Be-Nash-She-*

6  *Wish*, 567 U.S. at 224 (quotation marks omitted). While an "explicit mention" of Congress's intent is not

7  required, something in the "particular provision of law upon which the plaintiff relies" must indicate that

8  Congress intended to protect the organization. *Pit River Tribe v. BLM*, 793 F.3d 1147, 1157 (9th Cir.

9  2015) (citation omitted). That an agency rule or policy may affect the way an organization allocates its

10 resources does not give standing to an entity which is not within the zone of interests the statute meant to

11 protect. *Legalization Assistance Project*, 510 U.S. at 1305.

12 Nothing in the text of 8 U.S.C. § 1232(c)(5), nor in the legislative history, indicates that Congress

13 enacted the legal-services provision to address the financial interests of organizations such as Plaintiffs in

14 this case. Rather, the plain text focuses on the interests of the UAC: it requires HHS, to the greatest extent

15 practicable and "consistent with 8 U.S.C. § 1362," to ensure that certain UAC "have counsel to represent

16 them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking."

17 *Id.* § 1232(c)(5). This provision protects UAC from mistreatment, not to line Plaintiffs' pocketbooks with

18 taxpayer funding. Indeed, when reviewing the statute as a whole, the only intended beneficiary of

19 subsection (c), entitled "Providing safe and secure placements for children," are UAC.[1]

20 Moreover, Congress's caveat that such legal services must be "consistent with 8 U.S.C. 1362"

21 demonstrates that Congress did not intend for the government to front the bill for legal services or to pay

22 organizations, such as Plaintiffs. 8 U.S.C. § 1362 provides that aliens have the right to representation in

23 immigration proceedings, as long as the representation is "at no expense to the Government." Congress's

24
_____

25 [1] Each sub-subsection provides safeguards for ensuring the safety of UAC who are in HHS's custody. *See*
   *id.* § 1232(c)(1) (requiring agencies to implement policies to protect UAC from trafficking, victimization,

26 and exploitation); *id.* § 1232(c)(2) (requiring UAC to be placed in the least restrictive setting that is in
   their best interest); *id.* § 1232(c)(3) (requiring that UAC be placed with custodians who will provide for

27 their well-being); *id.* § 1232(c)(4) (ensuring that custodians receive legal orientation explaining the
   custodian's responsibility to ensure that the UAC appear at immigration proceedings and are protected

28 from harm); *id.* § 1232(c)(5) (*see supra*); *id.* § 1232(c)(6) (authorizing HHS to appoint child advocates for
   UAC who are particularly vulnerable).

1    reference to this statutory provision allows no room for doubt: Congress directed HHS to refrain from

2    using taxpayer funding to pay for UAC legal services in immigration proceedings. Further, the second

3    part of § 1232(c)(5) confirms that Congress did not intend to financially benefit legal-services

4    organizations. Congress required that HHS "shall make every effort to utilize the services of *pro bono*

5    counsel" who will represent UAC "without charge." *Id.* § 1232(c)(5). Congress intended that HHS would

6    not spend money on legal services for UAC and, instead, would seek counsel who would represent UAC

7    without using taxpayer funding. *Id.*

8        Further, Congress's provision for funding child advocates in subsection (c) implies that Congress's

9    silence—or, indeed, prohibition—regarding funding for legal services confirms that Congress never

10   intended for legal-service providers to receive taxpayer funding. "[I]t is generally presumed that Congress

11   acts intentionally and purposely when it includes particular language in one section of a statute but omits

12   it in another." *BFP v. Resolution Trust Corp.*, 511 U.S. 531 (1994) (internal quotation marks omitted).

13   Congress explicitly provides federal funding for child advocates, and thereby intends to benefit child

14   advocates, in subsection (c)(6). By comparison, in subsection (c)(5), Congress discourages federal funding

15   for legal-service providers, mandating that HHS secure "pro bono" counsel and prohibiting federal

16   funding for counsel in immigration proceedings. The juxtaposition of these two subsections leaves no

17   doubt as to Congress's intent: federal funding should not be used to fund legal-service organizations like

18   Plaintiffs.

19       That Plaintiffs have lost funding and need to reallocate resources does not place them within the

20   zone of interests that Congress meant to protect. Accordingly, Plaintiffs likely cannot show that they have

21   standing to challenge HHS's funding decisions under the APA.

22

23       Plaintiffs are also unlikely to succeed on the merits of their claim because they seek monetary

24   relief, and the APA does not waive sovereign immunity over such claims. Although styled as a request

25   for declaratory and injunctive relief, the relief that they seek is simple: they want to compel the United

26   States to continue making payments—relief precluded under the APA.

27

28

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell,* 463 U.S. 206, 212 (1983). Accordingly, before a court may exercise jurisdiction over any suit against the United States, the plaintiff must unequivocally show that the United States has waived sovereign immunity, and that their claims fall squarely within the terms of that waiver. *United States v. White Mountain Apache Tribe,* 537 U.S. 465, 472 (2003) (citations omitted); *see also Lane v. Pena,* 518 U.S. 187, 192 (1996) (stating that the waiver of sovereign immunity cannot be implied, but "must be unequivocally expressed in statutory text.").

Relevant here, the APA only waives sovereign immunity over actions seeking relief "other than monetary damages." 5 U.S.C. § 702. The APA "does not waive sovereign immunity for contract claims seeking equitable relief." *N. Star Alaska v. United States*, 14 F.3d 36, 38 (9th Cir. 1994) (cleaned up). As a result, a court must carefully discern whether a request dressed up as a claim for injunctive or declaratory relief is actually seeking monetary relief, as "any claim for legal relief can, with lawyerly inventiveness, be phrased in terms of an injunction." *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 211 n.1 (2002).

The APA does not provide a waiver of sovereign immunity here because the relief Plaintiffs seek is payment. Specifically, Plaintiffs ask this Court to: (1) declare that "Defendants are required to *continue funding* legal representation to unaccompanied alien children, consistent with the TVPRA and ORR's Foundational Rule; (2) enjoin Defendants nationwide from *ceasing to fund counsel* to represent unaccompanied alien children in violation of the TVPRA and the Foundational Rule; (3) to declare that Defendants' actions violate the APA; and (4) to set aside Defendants' actions. ECF No. 1 at 39 (emphases added).[2]  Regardless of how Plaintiffs label their request for relief, the result of granting any of their requests is the same: HHS must continue paying Acacia, and consequently, continue paying Plaintiffs. The APA does not waive sovereign immunity for such a claim, and thus, this Court lacks jurisdiction to order Defendants to provide Plaintiffs with the monetary relief they seek. *N. Star Alaska*, 14 F.3d at 38.

---

[2] Page number references, when to filings on the Court's docket in this case, are to the page number in the header supplied by the Court's ECF system.

1      The APA also does not provide a waiver of sovereign immunity here because HHS's funding

2  decision under the TVPRA and the Foundational Rule are discretionary. The APA does not permit judicial

3  review of "agency action" that "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The

4  TVPRA provides HHS broad discretion in determining how to provide legal services to UAC. While

5  Section 235 mandates that HHS ensure that counsel is available to represent UAC "to the greatest extent

6  practicable" in "legal proceedings or matters," it also cross-references the provision of the INA—8 U.S.C.

7  § 1362—which specifies that "the privilege" of being represented in removal proceedings is "at no

8  expense to the Government." The TVPRA also directs HHS to "make every effort to utilize the services

9  of pro bono counsel who agree to provide representation without charge." 8 U.S.C. § 1232(c)(5). Likewise,

10  the Foundational Rule explicitly articulates ORR's discretion regarding legal representation funding. It

11  provides that ORR "shall fund legal service providers to provide direct immigration legal representation

12  for certain unaccompanied children" only "to the extent ORR determines that appropriations are

13  available," and only if securing pro bono counsel is impractical. 45 C.F.R. § 410.1309(a)(4). The decision

14  to fund direct legal services is "subject to ORR's discretion and available appropriations." *Id.*

15      Moreover, Congress's funding of ORR's UAC program, including legal services, demonstrates

16  that HHS has been allowed discretion in how it allocates resources. For example, the Further Consolidated

17  Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under

18  Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation. And

19  subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L.

20  No. 119-4, similarly maintain funding levels and provide broad discretion without altering statutory

21  obligations or imposing specific mandates for funding legal representation. *Id.* ¶ 16. This ongoing

22  legislative practice underscores Congress's intent to maintain flexibility for ORR, allowing the agency to

23  prioritize resources efficiently and adaptively. *Id.*; *see also* 6 U.S.C. 279(b)(1) (making the Director of

24  ORR responsible for activities including coordinating and implementing the care of UAC and

25  implementing policies with respect to the care and placement of unaccompanied alien children);

26  8 U.S.C. § 1232(i) (authorizing the Secretary of HHS to "award grants to, and enter into contracts with,

27  voluntary agencies to carry out this section and section 279 of title 6.").

28

The Court therefore lacks jurisdiction because decisions about the substance of HHS's decision to reallocate resources from direct representation into other aspects of the UAC program is firmly committed to the agency's discretion.  In *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision making standards.  *See id.* at 185–88.  The Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.* at 192.

Indeed, an agency's allocation of funds from a lump-sum appropriation requires "a complicated balancing of a number of factors which are peculiarly within its expertise": whether its "resources are best spent" on one program or another; whether it "is likely to succeed" in fulfilling its statutory mandate; whether a particular program "best fits the agency's overall policies"; and, "indeed, whether the agency has enough resources to fund a program at all."  *Id.* at 193 (internal citations omitted).  "Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes."  *Id.*  But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude."  *Id.*  Because the TVPRA confers HHS discretion to determine how best to allocate and administer the funding for the UAC program, HHS's decisions are not subject to review under the APA.

### 3. This Court lacks jurisdiction over Plaintiffs' claims because the rights they seek to enforce must be brought in the Federal Court of Claims.

Although Plaintiffs cite to the APA as the basis for their claims, the rights that they seek to enforce, and the relief that they seek, are only available to them through contract, and thus their claims are precluded by the Tucker Act.[3]

---

[3] The Tucker Act provides: "The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, *or upon any express or implied contract with the United States.*" 28 U.S.C. § 1491(a)(1) (emphasis added).

1   claim is based upon a contract with the United States and subject to the jurisdictional restrictions in the

2   Tucker Act. *North Side Lumber v. Block,* 753 F.2d 1482, 1486 (9th Cir. 1985), *cert. denied,* 474 U.S. 931

3   (1985) (citing *Megapulse, Inc. v. Lewis,* 672 F.2d 959, 967–68 (D.C. Cir. 1982)). The Tucker Act

4   "impliedly forbids" APA claims involving government contracts. *Id.* at 1485 (citing H.R. Rep. No. 1656,

5   94th Cong., 2d Sess. 13). To determine whether the Tucker Act precludes a contract claim "disguised" as

6   an APA claim, the Ninth Circuit employs the D.C. Circuit's *Megapulse* test. *United Aeronautical Corp.*

7   *v. United States Air Force*, 80 F.4th 1017, 1025–26 (9th Cir. 2023) (citing *Megapulse,* 672 F.2d at 967–

8   68). Under *Megapulse*, a court must decide whether "the source of the rights upon which the plaintiff

9   bases its claims" arises under a contract and whether "the type of relief sought" is normally available as a

10  contract remedy. *Id.* "If rights and remedies are *statutorily* or *constitutionally* based, then districts courts

11  have jurisdiction; if rights and remedies are *contractually* based then only the Court of Federal Claims

12  does, even if the plaintiff formally seeks injunctive relief." *Id.* (emphases in original).

13      Two weeks ago, a district court in the District of Columbia decided a case very similar to this one

14  and determined that the plaintiff organization's claims resounded in contact and, thus, had to be brought

15  in the Court of Federal Claims. *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 1:25-CV-

16  00465, 2025 WL 763738, at *2 (D.D.C. Mar. 11, 2025). Like here, the relief sought in *Conf. of Cath.*

17  *Bishops* was styled as a request for an injunction, yet the court correctly reasoned that, in actuality, the

18  relief sought was for "the Government to keep paying up." *Id.* at *5. The district court therefore held that

19  the claim was "founded upon a contract" and "must be heard in Claims Court." *Id.* at *7 (citing *Sharp v.*

20  *Weinberger*, 798 F.2d 1521, 1524 (D.C. Cir. 1986) (Scalia, J.) ("We know of no case in which a court has

21  asserted jurisdiction . . . to issue an injunction compelling the United States to fulfill its contractual

22  obligations.")). So too here.

23      As explained, Section IV.A.2, *supra*, the relief Plaintiffs seek is for "the Government to keep

24  paying up," *Conf. of Cath. Bishops*, 2025 WL 763738, at *2. Because they seek monetary relief, which is

25  unavailable under the APA but normally available in a contract dispute, their claim is precluded by the

26  Tucker Act. *Id.* at *7; *United Aeronautical Corp.*, 80 F.4th at 1025–26.

27      Not only does Plaintiffs' requested relief resound in contract, but the "source of rights" upon which

28  they base their claims arises from a contract. *Megapulse,* 672 F.2d at 967–68. Plaintiffs cannot separate

1    their causes of action from their contractual relationship with Acacia. Plaintiffs lack standing to assert

2    claims against the United States absent the contract that HHS has with Acacia because without it they

3    would have no injury. In other words, had Acacia never entered into a contract with HHS to provide direct

4    legal services to UAC, Plaintiffs would have never received funding to provide such legal services and

5    would have no injury to complain of. No statute or regulation requires HHS to compensate *Plaintiffs* for

6    their legal services. Absent a statutory or constitutional entitlement to the appropriated funds that they

7    seek, their injury arises from termination of a contract. Because Plaintiffs' "source of rights" for funding

8    from appropriations stems solely from their contract with Acacia, this Court lacks jurisdiction over their

9    claims. *Id.* at 967–68; *United Aeronautical Corp.*, 80 F.4th at 1025–26.

10       **4.    Plaintiffs cannot show that a favorable decision in this case would likely redress their alleged injuries.**

11

12           To the extent Plaintiffs argue that they are not challenging the government's decision to end the

13   contract with Acacia but, rather, the decision to discontinue providing appropriated funds to any legal-

14   services organization, they likewise lack standing to assert such a claim. The "irreducible constitutional

15   minimum" of Article III standing consists of (1) "injury in fact," (2) "a causal connection between the

16   injury and the conduct complained of," and (3) a likelihood "that the injury will be redressed by a favorable

17   decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks omitted). The

18   third element of Article III standing, redressability, requires that it "be likely, as opposed to merely

19   speculative, that the injury will be redressed by a favorable decision." *Lujan,* 504 U.S. at 561 (citation and

20   internal quotation marks omitted). To show a likelihood of redressability, Plaintiffs must "show that there

21   would be a 'change in a legal status' as a consequence of a favorable decision" and that this change would

22   significantly increase the likelihood that they would obtain the relief sought. *Novak v. United States*, 795

23   F.3d 1012, 1019–20 (9th Cir. 2015) (quoting *Renee v. Duncan,* 686 F.3d 1002, 1013 (9th Cir. 2012)).

24           The relief that Plaintiffs seek—if untethered to their contract claim—would not likely provide

25   them with the monetary relief they seek. Enforcing the statutory authority Plaintiffs rely on in arguing that

26   Congress intended to fund direct-legal services, 8 U.S.C. § 1232(c)(5), would have the opposite effect of

27   the relief Plaintiffs seek. As explained above, Congress did not intend to financially benefit Plaintiffs in

28   ensuring that UAC would have access to legal services; instead, Congress envisioned that such legal

services would generally be provided *pro bono* at no expense to the government. 8 U.S.C. § 1232(c)(5). If the Court were to enforce the plain language and purpose of Section 235 of the TVPRA, it would order the government to seek out *pro bono* counsel for direct legal services and, to the extent possible, avoid funding legal services at the government's expense. Of course, this result would not redress Plaintiffs' injuries, as they seek to be paid for their services and not acting in a *pro bono* capacity.

Likewise, because the Foundational Rule provides HHS with discretion as to whether and how to disburse appropriations for direct legal services, Plaintiffs cannot show that ordering HHS to comply with its regulation would redress their injury. Under the plain language of the regulation, HHS would maintain the discretion to determine whether to fund direct-legal services for UAC, and, using that discretion, it would likely continue to decline to continue funding. Biswas Decl., ¶ 17. And even if HHS changed course and decided to exercise favorable discretion by funding direct legal services, it could contract with organizations other than Acacia and Plaintiffs. *Id.* ¶ 19. There is nothing that Plaintiffs can cite to that would require or encourage HHS to continue funding the Plaintiffs *in this case*. *Id.* ¶¶ 17-19. In other words, even if the agency continued funding direct legal services, Plaintiffs cannot show that it is likely that HHS will continue to contract with Acacia or with any of the Plaintiffs in this case. *Id.* Thus, Plaintiffs' redressability—that HHS would continue funding Acacia or any of the Plaintiffs—is speculative at best and insufficient to establish standing. *Lujan*, 504 U.S. at 561. Accordingly, Plaintiffs fail to show that they likely have Article III standing because enforcing the relevant policies and statutes would not redress their alleged injury.

### 5.    The Termination Contract Termination at Issue Does Not Violate the APA

Plaintiffs erroneously argue that termination of direct legal services violate the APA. Although, the money was authorized by Congress, Congress never mandated its spending. When Congress does not require the agency to spend a certain amount of the appropriated fund, the agency has discretion over how much to spend up to the cap provided by Congress. *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) ("The appropriation of "sums not exceeding" a specified amount did not by itself mandate that the Executive spend that amount; as was the case in England, such appropriations instead provided the Executive discretion over how much to spend up to a cap."). When

courts determine whether money is mandatory or discretionary, they must look to the language of the appropriations bill to determine whether Congress required the funds appropriated to be used in a particular way. *Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012) ("An agency's discretion to spend appropriated funds is cabined only by the 'text of the appropriation,' not by Congress' expectations of how the funds will be spent, as might be reflected by legislative history.") (quoting *Int'l Union, UAW v. Donovan*, 746 F.2d 855, 860-61 (D.C. Cir. 1984) (Scalia, J.))

### 6. The Foundational Rule Does Not Require Funding for Taxpayer-funded Direct Immigration Legal Representation Consistent with Available Appropriations.

Plaintiffs contend that Defendants have "ended" funding for legal representation of unaccompanied alien children despite the availability of appropriated funds for this purpose through at least September 30, 2027, and that, by the supposed ending, Defendants violate what they believe is a mandate in the Foundational Rule to provide counsel for UAC to the extent there are appropriated funds available to do so. ECF No. 1 ¶ 139. As Plaintiffs note, to establish a claim under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 266–67 (1954), such a claim must show: (1) that the government has violated its own regulations; and (2) that Plaintiffs are substantially prejudiced by that violation. ECF No. 7 at 14 (citing *Al Otro Lado, Inc. v. Mayorkas*, 2024 WL 4370577, at *8–9 (S.D. Cal. Sept. 30, 2024)). To start, Plaintiffs have not shown that Defendants have violated their own regulations. Indeed, Plaintiffs overlook the fact that the funding at issue here is required only "insofar that it is not practicable for ORR to secure pro bono counsel." 45 C.F.R. § 410.1309(a)(4). As HHS noted in the preamble to its Foundational Rule, ORR, consistent with the TVPRA, makes every effort to use pro bono legal services "to the greatest extent practicable" to secure counsel for UAC in these contexts. Unaccompanied Children Program Foundational Rule, 89 Fed. Reg. 34384, 34,529 (Apr. 30, 2024). HHS notes that ORR-funded legal services providers may help coordinate referral to pro bono legal services and that ORR provides each UAC with a list of pro bono service providers.[4] *Id*. Historically, HHS has acknowledged that, in some cases, it is impracticable for ORR to secure pro bono legal services, such as in markets where demand exceeds supply, or during times of influx. *Id*. But where

---

[4] The list of pro bono service providers is statutorily required under the TVPRA. 6 U.S.C. § 279(b)(1)(I).

1    and when it is "impracticable" for ORR to secure pro bono legal services is a determination to be made

2    by ORR. *Id.* (noting that the decision is subject to ORR's "discretion."). Further, since ORR must be

3    selective in the kinds of legal services it funds, it therefore proposed to establish its discretion to fund

4    legal services for specific purposes "based on its judgment and priorities." 89 Fed. Reg. at 34,529.  The

5    clause "based on its judgment and priorities" reflects that ORR has considerable discretion to determine

6    how the provision of legal services to UAC is funded.  The determination of when such provision is

7    "impracticable" is a decision to be made exclusively by ORR, applying its expertise, and not by

8    Plaintiffs or the Court.

9        Plaintiffs next overlook the fact that ORR shall fund legal service providers *subject to ORR's*

10   *discretion,*[5]

11

12

13

14

15       Plaintiffs note that HHS has an obligation "to the greatest extent practicable" and consistent with

16   8 U.S.C. § 1362, to ensure that UAC have counsel in their immigration proceedings.  HHS interpreted

17   "to the greatest extent practicable" to open the door to a grant of authority to pay for legal services

18   beyond that available from pro bono legal service providers.  89 Fed. Reg. at 24,529.  "To the greatest

19   extent practicable," however, cannot reasonably be read as a mandate for HHS to pay for direct

20   immigration legal representation for all UAC, unconditionally.  In the preamble to the Foundational

21   Rule, HHS stated that it "understands that some commenters would like ORR "to fully fund legal

22   services to all [UAC]." *Id.*  HHS also observed that it received comments questioning ORR's legal

23   authority to pay for legal services for UAC and suggesting that ORR not use taxpayer funding for legal

24   representation for UAC. *Id.*  HHS concluded that its approach to providing legal services to UAC, by

25   enabling them to access ORR has determined that "its approach to providing legal services to

26   unaccompanied children by enabling them to access pro bono counsel 'to the greatest extent

27

28   ───────────────────────

[5] Defendants do not contest that the conditions "to the extent ORR determines that appropriations are available" and "subject to . . .available appropriations," in 45 C.F.R. § 410.1309(a)(4), are met here.

1    practicable' and funding legal services for additional unaccompanied children, as resources allow, is

2    consistent with ORR's statutory obligations." *Id*. HHS's interpretation of the INA and TVPRA – as

3    Congress's grant of discretion to ORR to provide funding for immigration services to UAC – is far

4    from a mandate to do provide such funding.

5        Similarly, and as Plaintiffs point out, HHS did acknowledge that most UAC need legal services

6    to resolve their immigration status, and such representation appears to have a significant impact on

7    court appearance. ECF No. 7 at 13 (citing 89 Fed. Reg. at 34,529). Further, as Plaintiffs note, HHS

8    affirmed that "legal services providers who represent unaccompanied children undertake an important

9    function" and explains ORR's goal of "100 percent legal representation of unaccompanied children."

10   *Id*. (citing 89 Fed. Reg. at 34,526). But Plaintiffs fail to explain why they believe that such services

11   must be funded by the taxpayer. HHS's shift to increased emphasis and reliance upon pro bono service

12   providers might not be Plaintiffs' preference, but it is consistent with the plain language of section

13   1309(a)(4) and HHS's explanations for why it sculpted the language in 1309(a)(4) as it did. In their

14   motion for a TRO, however, Plaintiffs are silent regarding the importance of pro bono counsel in

15   providing advice and legal representation for UAC, an importance reflected in both section 1309(a)(4)

16   and the preamble. ECF No. 7.

17       **B.    Plaintiffs Will Not Face Irreparable Harm Without a TRO**

18       The "most important" *Winter* factor is whether Plaintiffs demonstrate irreparable harm. *Caribbean*

19   *Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see also Koller v. Brown*, 224 F. Supp.

20   3d 871, 879 (N.D. Cal. 2016) (noting it is the "single most important prerequisite" for a TRO). The

21   "possibility" of harm is insufficient to secure a TRO; Plaintiffs must show that "irreparable injury is *likely*

22   in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). "Speculative injury" does

23   not suffice; Plaintiffs must show both immediacy and likelihood that they will be harmed absent a TRO.

24   *See Caribbean Marine Servs. Co*., 844 F.2d at 674. Where "[m]ultiple contingencies must occur" before

25   Plaintiffs' claimed injuries, the injuries are "too speculative" to justify a TRO. *Id.* at 675.

26       Plaintiffs have failed to make the requisite threshold "clear showing of irreparable harm." *See*

27   *Garcia*, 786 F.3d at 746 (reiterating that "[h]arm must be proved, not presumed"). Plaintiffs have failed

28   to demonstrate irreparable harm sufficient to warrant extraordinary injunctive relief. Although

Plaintiffs characterize their harm as damaging their ability to provide services, their harm is merely monetary. "Irreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980) ("Monetary injury is not normally considered irreparable."). Economic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[I]t seems clear that the temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury . . . ." (internal quotation omitted)); *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 676 (9th Cir. 1988) ("Subjective apprehensions and unsupported predictions of revenue loss are not sufficient to satisfy a plaintiff's burden of demonstrating an immediate threat of irreparable harm."); *Arcamuzi v. Continental Air Lines*, Inc., 819 F.2d 935, 938 (9th Cir. 1987) ("[Temporary economic loss alone generally is not a basis for injunctive relief."); *Goldie's Bookstore, Inc. v. Superior Court*, 739 F.2d 466, 471 (9th Cir. 1984) ("Mere financial injury . . . will not constitute irreparable harm if adequate compensatory relief will be available in the course of litigation.").

While Plaintiffs characterize their harm as "frustrating their mission," the actual harm that Plaintiffs allege is "lack of funding," which is plainly monetary harm. *See* ECF No. 7 at 16 ("There is no question that *ceasing funding* for legal representation services for UAC and terminating the existing services will cause imminent harm that cannot be later remediated.") (emphasis added); *id.* at 17 ("Plaintiffs have relied on Congress's and Defendants' assurances that *funding* for these critical resources will continue to be available.") (emphasis added); *id.* ("Sustaining these services without this *funding* will cost the Northwest Immigrant Rights Project *$200,000 a month*.") (emphasis added). Plaintiffs cannot avoid the well-established case law holding that monetary loss (even if significant), is not irreparable harm.

Plaintiffs next allege that "ceasing funding for legal representation services for UAC and terminating existing contracts will cause imminent harm" because it will cause them to cease providing certain legal services. ECF No. 7 at 16. But that too is without merit as the Cancellation Order does not prevent Plaintiffs from continuing to provide legal services – it merely prevents them from receipt of

federally funded payment for those services. Indeed, Plaintiffs may freely provide these services *pro bono*, which is in line with the plain language and purpose of 8 U.S.C. § 1232(c)(5), and would be welcomed by Defendants.

Plaintiffs' further assertion that "impacted attorneys and staff have years of individualized experience and wisdom with clients making rehiring layoffs impracticable" is speculative and attenuated. ECF No. 7 at 18. "Certain impending" injury cannot be shown when the asserted injury is based on a "speculative chain of possibilities," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013), or on "speculation about the decisions of independent actors," *id.* at 414. As the D.C. Circuit has cautioned: "Because of the generally contingent nature of predictions of future third-party action," a court should be "sparing in crediting claims of anticipated injury by market actors and other parties alike." *Arpaio v. Obama*, 797 F.3d 11, 23 (D.C. Cir. 2015). The Court should likewise decline to entertain Plaintiffs' speculative assertion about what third parties—individuals who *might* be laid off—would do if called back to work.

### C. The Balance of the Equities and Public Interest Weigh Against Entry of a Temporary Restraining Order.

Where the government is a party, the balance of equities and public interest factors merge. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Courts "explore the relative harms to applicant and respondent, as well as the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal quotation marks and citation omitted). In weighing these factors, Plaintiffs rely on their previous arguments pointing to their allegation that harm arises from Defendants' "shirking [of] their voluntarily undertaken obligations." Motion at 19. But as described above, neither the purported merit of their claims nor their alleged injury support entry of a TRO. This is particularly true because Plaintiffs make no attempt to explain how the broad relief requested in their proposed order (Dkt. 7-3) is tethered to the harms they claim. On the other hand, Defendants are legally entitled to make decisions about the disbursement of their federal grants. *See, e.g.*, 8 U.S.C. § 1232; 45 C.F.R. § 410.

Here, the balance of the equities and public interest tip decisively in Defendants' favor. If the status quo is preserved during the pendency of the case, Plaintiffs can still obtain any funding they may

1    be entitled to as a result of the case's ultimate resolution.  But the opposite is not true—if Plaintiffs are

2    given access now, and draw down the funds throughout the litigation, Defendants will be left with no

3    meaningful recourse even if they prevail.  Defendants will bear all the risk if the Court enters a preliminary

4    injunction, whereas Plaintiffs will bear none if it denies one. Such a proposition turns Plaintiffs' burden

5    of establishing irreparable harm on its head. In short, the equities clearly favor Defendants.

6         Plaintiffs' motion fails to acknowledge the governmental harm that will be imposed through

7    injunctive relief here, suggesting that the TRO is merely to spend appropriated funds. This ignores the

8    substantial harm an injunction imposes by usurping executive branch authority to manage complex

9    programs and allocate billions in taxpayer funds. Forcing continuation of one specific contract hinders

10   ORR's ability to adapt to potentially changing migration flows, shelter needs, health concerns, or to

11   implement potentially more cost-effective or impactful service models across the entire UAC program

12   spectrum.

13        What's more, the public interests at stake here include effective governance. While Plaintiffs

14   legitimately describe the public interest in protecting vulnerable children and upholding the TVPRA, the

15   public interest also encompasses the efficient, flexible, and responsible administration of federal

16   programs, interests which are opposed to forcing the government to continue to fund paid attorneys. It

17   includes ensuring ORR can make difficult choices to best serve the overall needs of all unaccompanied

18   alien children within its care, using its expertise and the discretion Congress provided. Judicial

19   micromanagement of appropriations allocation via Plaintiffs' requested TRO arguably undermines, rather

20   than serves, the broader public interest in competent government.

21        Indeed, an injunction here would effectively disable the administration from effectuating its

22   executive authority consistent with their constitutional and statutory authorities. *See Maryland v. King*,

23   567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (cleaned up) ("[a]ny time a [government] is

24   enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of

25   irreparable injury."). Where the Government is legally entitled to make decisions about the disbursement

26   or allocation of federal funds, but is nonetheless ordered to release the funds, such funds may not be

27   retrievable afterwards. While Plaintiffs emphasize the mandate in 8 U.S.C. § 1232(c)(5) that HHS "shall

28

DEFENDANTS' OPPOSITION TO MOTION FOR TRO
3:25-CV-02847- AMO                    20

ensure . . . that all unaccompanied alien children . . . have counsel," this mandate is explicitly qualified by "to the greatest extent practicable". This is not mere suggestion; it is the legal standard set by Congress, inherently requiring agency judgment. Here, "practicable" arguably necessitates balancing the goal of providing counsel against competing demands, resource limitations across the entire UAC program, administrative feasibility, and the effectiveness of different service delivery models. It does not mandate funding one specific contract indefinitely, irrespective of other considerations.

In sum, the decision to terminate funding under the contract represents a permissible exercise of the discretion afforded to ORR by Congress under 8 U.S.C. § 1232(c)(5), and codified in its own regulations, *see* 45 C.F.R. § 410.1309(a)(4). It is not contrary to law or arbitrary and capricious. An injunction would improperly substitute judicial preference for agency judgment, unduly restricting the executive's ability to allocate resources and adapt to evolving needs. As a result, the balance of equities and the public interest, properly considered, weigh against granting the extraordinary relief of a TRO.

**D.    If the Court issues a TRO, it should require Plaintiffs to Post Security.**

Finally, if the Court deems a TRO warranted (which it should not), Plaintiffs should be required to post bond.  Rule 65(c) provides that a court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).  The circumstances here warrant requiring Plaintiffs to provide security in an amount that could compensate Defendants for the losses caused by a preliminary injunction (in the event that Defendants are found to have been wrongfully enjoined).  To the extent that the Court grants relief to Plaintiff, Defendants respectfully request that the Court require Plaintiffs to post security for any taxpayer funds distributed during the pendency of the Court's Order. Since this case is ultimately about financial allocation, it thus follows that Rule 65(c)'s explicit requirements necessitate Plaintiffs' posting of security.

**V.    CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' motion for a temporary restraining order.

DATED: March 31, 2025

Respectfully submitted,

YAAKOV M. ROTH
Acting Assistant Attorney General

WILLIAM C. SILVIS
Assistant Director

CHRISTINA PARASCANDOLA
KATE MASETTA ALVAREZ
JONATHAN K. ROSS
Senior Litigation Counsels

ZACHARY A. CARDIN
Trial Attorney

/s/ Michael A. Celone
MICHAEL A. CELONE
Senior Litigation Counsel
U.S. Department of Justice, Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 878, Ben Franklin Station
Washington, DC 20044
(202) 305-2040
Michael.A.Celone@usdoj.gov

Attorneys for Defendants

1

2

## **CERTIFICATE OF COMPLIANCE**

3     The undersigned, counsel of record for Defendants certifies that this brief contains 22 pages,

4     which complies with the word limit of this Court's Standing Order, section 6 and L.R. 11-6.1.

5

6                                  Respectfully submitted,

7                                  */s/ Michael A. Celone*
                                   MICHAEL A. CELONE

8                                  Office of Immigration Litigation
                                   Civil Division

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

<div align="center">

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

</div>

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, *et al.,* | Case No: 3:25-cv-2847 (AMO) |
| Plaintiffs, | |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.,* | |
| Defendants. | |

<div align="center">

**DECLARATION OF TOBY BISWAS**

</div>

I, Toby Biswas, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1.       I am the Director of the Division of Unaccompanied Alien Children (UAC) Policy for the UAC Bureau of the Office of Refugee Resettlement (ORR), within the Administration for Children and Families (ACF), a component of the U.S. Department of Health and Human Services (HHS).

2.       I have held various roles within ORR since I first started working at the agency in November 2009, and I have held my current role since April 2023. My job duties include, among other things, responsibility for all aspects of the development and implementation of ORR's policies and procedures concerning the care and custody UAC, including those related to the provision of legal services to UAC.  In this capacity, I am responsible for ensuring ORR's implementation of and compliance with programmatic policy prerogatives and statutory responsibilities, such as those arising under the Trafficking Victims Protection Reauthorization Act of 2008 (TVPRA), 8 U.S.C. § 1232, and ORR's Foundational Rule, 45 CFR part 410, which include provisions related to the provision of UAC legal services.[1]

3.       This declaration is based upon my personal knowledge, information acquired by me in the course of performing my official duties, information contained in the records of ACF and ORR, and information conveyed to me by current agency employees and contractors.  Further, I have reviewed the pleadings in this matter, and am generally familiar with the facts and circumstances underlying plaintiffs'

---

[1] ORR policies with respect to UAC are also embodied in the ORR UAC Bureau Policy Guide ("UAC Policy Guide"), which is publicly available on ORR's website, and has recently been made available to the public in a Freedom of Information Act reading room:  https://acf.gov/e-reading-room

<div align="center">1</div>

allegations concerning the termination of a portion of the Acacia contract for the provision of UAC legal services in March.  I also have personal knowledge of the facts and circumstances leading to the termination decision at issue here.

4.    Acacia Center for Justice ("Acacia")[2] is an ORR contractor who provides legal services and other assistance to UAC in and released from ORR care in the sectors defined by ORR, as explained below.  Acacia may further sub-award ORR funds to other organizations to provide these services.  In this posture, ORR has no direct relationship with these sub-awardees. Rather, as the federal contractor, Acacia is responsible under HHS regulations for, among other things, clearly identifying every sub-award as such, evaluating each subrecipient's risk of noncompliance with Federal requirements, and monitoring subrecipient activities to ensure the subaward is used for authorized purposes, identifying sub-awardees as either subrecipients or sub-contractors. *See* 45 CFR 75.352; *see also* 45 CFR 75.101(b)(1) (making 75.352 applicable to HHS contracts).

6.    Acacia has provided these services pursuant to Contract 140D0422C0009.

7.    Collectively, these services cost ACF/ORR—and by extension U.S. taxpayers—a grand total of $796,720,624.01.

8.    On February 3, 2025, Acting HHS Secretary Dorothy Fink issued the "Secretarial Directive on Program Payment Integrity" ("Secretarial Directive"), which directed all HHS personnel to briefly pause all payments to contractors, vendors, and grantees related to immigration and refugee resettlement for internal review.  A true and correct copy of the Secretarial Directive is attached hereto as "Exhibit 1."

9.    Specifically, the Secretarial Directive directed that "Agency personnel shall briefly pause all payments made by the Administration for Children and Families to contractors, vendors, and grantees related to immigration and refugee resettlement for internal review for payment integrity.  Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts

---

[2] Acacia was previously known as the Vera Institute of Justice, or "Vera."

and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy." Exhibit 1.

10. In late February, all ORR contracts, including the contract for legal services, were evaluated for termination and modification to reduce overall Federal spending or reallocate spending to promote efficiency and advance the policies of the President's Administration. The evaluation consisted of making a determination of whether the contracted services were legally required, whether the services provided by the vendor aligned with the administration's priorities, and whether the services could be provided through other means more cost effectively. During that time period, ORR leadership determined that the contract for legal services was only partially required in order to meet statutory requirements and decided to reduce the scope of the contract in order to reduce spending and achieve more cost efficiency.

11. As a result of the program integrity review conducted pursuant to the Secretarial Directive, ACF and ORR leadership decided, on or about March 20, 2025, to partially terminate the Acacia contract—which was already set to expire on March 29, 2025—with respect to the funding of direct representation of UAC; however, ACF/ORR decided to renew the Acacia contract with respect to the provision of KYR trainings and legal screenings, based on its understanding of its non-discretionary obligations, and in keeping with the Administration's general policy of protecting the public fisc by ensuring taxpayer dollars are only spent on statutorily-required government-funded services.

12. Accordingly, on March 21, 2025, Acacia was notified of the partial termination decision by the Acquisition Services Directorate of the Interior Business Center within the Department of the Interior ("DOI"). A true and correct copy of the Acacia partial termination notice is attached hereto as "Exhibit 2."

13. DOI provides assisted acquisition services to HHS and its component agencies, including ACF/ORR, under the Interior Franchise Fund.[3] Simply put, DOI serves as the technical administrator of the Acacia contract, due to its greater capacity for contract management and administration, but ACF/ORR remains the decisionmaker with respect to all aspects of the Acacia contract, and, for that matter, the development and implementation of all UAC policies, as expressly directed by Congress. *See* 6 U.S.C. §279(a), 8 U.S.C. § 1232. DOI merely communicates those decisions to the contractor on ACF/ORR's behalf. Hence, the partial termination letter Acacia received was from DOI, not ACF/ORR.

Stay Motion Addendum 260

14.     As stated in the partial termination letter, ORR has determined to terminate aspects of the Acacia contract related to direct representation of UAC because the TVPRA does not require HHS/ORR to fund direct legal representation. Under the TVPRA, at 8 U.S.C. 1232(c)(5), the Secretary of HHS must "ensure, to the greatest extent practicable and consistent with section 292 of the INA (8 U.S.C. 1362)," that all unaccompanied alien children who are or have been in its custody or in the custody of DHS, with certain exceptions, have counsel "to represent them in legal proceedings or matters and protect them from mistreatment, exploitation, and trafficking." The Secretary of Health and Human Services "shall make every effort to utilize the services of pro bono counsel who agree to provide representation to such children without charge." 8 U.S.C. 1362 provides, "In any removal proceedings before an immigration judge and in any appeal proceedings before the Attorney General from any such removal proceedings, the person concerned shall have the privilege of being represented (*at no expense to the Government*) by such counsel, authorized to practice in such proceedings, as he shall choose." (emphasis added). ORR has for several years funded at great public expense direct legal representation services for unaccompanied alien children. The TVPRA which authorizes such funding, does not require it, and such services are entirely at the agency's discretion.

15.     ORR's regulations were written based on the understanding that it is responsible for providing access to counsel, but at no expense to the government. *See* 89 Fed. Reg. 34384, 34526-27 (prefacing discussion of 45 CFR 410.1309 with an explanation of requirements under the TVPRA). Thus, even where ORR regulations describe funding direct representation of UAC (e.g., 45 CFR 410.1309(a)(4)), the regulations state that such funding is provided "[t]o the extent ORR determines that appropriations are available, and insofar as it is not practicable for ORR to secure pro bono counsel." As a result, although historically ORR has funded direct representation, it has done so as a matter of its exclusive discretion.  Like many discretionary policies, this one has changed with the change in Administration, and ORR has now determined that it will no longer fund direct representation for UAC.

16.     Congress periodically appropriates funds to support ORR's UAC program, including legal services.  Appropriations language, however, consistently remains broad and nonspecific regarding precise funding allocations.  For example, the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, provides general appropriations to execute activities under Section 235 of the TVPRA without earmarking explicit amounts for direct legal representation.  This general appropriation approach allows ORR flexibility in determining the allocation of resources based on agency priorities, the availability of pro bono counsel, and shifting immigration policy needs.  Subsequent acts, including the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, similarly maintain funding

Stay Motion Addendum 261

levels and provide broad discretion without altering statutory obligations or imposing specific mandates for funding legal representation.

17.     Had Acacia never entered into a contract with the United States to provide direct legal services to UAC, Plaintiffs would have never received funding to provide such legal services. Under the Foundation Rule, HHS would maintain the discretion to determine whether to fund direct-legal services for UAC, and, using that discretion, it would likely continue to decline to continue funding. Moreover, while it has cancelled aspects of the Acacia contract pertaining to direct representation of UAC, ORR has not canceled those aspects pertaining to the provision of the KYR trainings and legal screenings because ORR's regulations require the provision of both the KYR presentation and the legal screening. *See* 45 CFR 410.1309(a)(2)(i) and (v).

18.     The termination of the Acacia contract is in the public's best interest as almost $800 million has been spent on legal services, much of which is not legally mandated, and to continue funding such services that are not legally required does not fulfill this Administration's policy goals of reducing unnecessary public expenditures. The law gives HHS discretion on how to use ORR's funding and given the priorities to reduce public expenditures, ORR has directed such funding be curtailed.

19.     ORR has not made any commitment or representation to Plaintiffs, including Acacia or any other entity involved in this case, that it would continue funding direct legal services through their contracts. The decision to fund such services, if continued, remains subject to the agency's discretion, appropriations, and programmatic priorities. There is no obligation under the applicable statutes or regulations that mandates HHS to maintain contractual relationships with specific service providers, including the Plaintiffs in this matter.

20.     Despite the recent change in the scope of the Acacia contract, ORR will continue to ensure UAC in the agency's custody are provided KYR presentations and legal screenings through the use of legal service providers whether through awards or subawards.

21.     Under the renewed contract, ACF/ORR will still pay $27,318.224.88 remaining costs to Acacia to provide KYR Trainings and legal screenings on a go-forward basis.

22.     UAC have, and remain, free to retain any attorney they wish to represent them in any matter they wish to contest at no cost to the Government, and Plaintiffs and any other legal service providers remains free to provide direct legal services on a truly pro bono basis. Legal service providers who wish to provide pro bono services may contact the agency to have their contact information updated and included in ORR's *Legal Resource Guide – Legal Service Provider List* which provides a state by state breakdown on legal service providers. Lists of local attorneys are provided to UAC when they enter care and when they leave it. The *Legal Service Guide* also provides weblinks to other pro bono resources

from the Immigration Advocates Network and the U.S. Department of Justice's List of Pro Bono Legal Service Providers. The *Legal Resource Guide* is provided to children within 24 hours of their admission into an ORR care provider.

23.     ACF/ORR complies with all federal laws and regulations. Requiring the agency to provide direct representation for UAC prohibits the discretion Congress intentionally conferred upon HHS.

24.     Further, ACF/ORR is concerned that large multimillion dollar contracts create a market for paid legal service providers to take on cases, which disincentivizes the recruitment of and the volunteering of pro bono counsel. Notably, many jurisdictions require or encourage attorneys to take on cases for indignant clients or cases in the public interest pro bono and have annual reporting requirements for attorneys to report those hours. A large influx of public funding for direct representation therefore may have the perverse effect of discouraging the utilization of pro bono counsel in the first instance.

Executed on March 31, 2025.

_____

Toby Biswas

Stay Motion Addendum 263

# Exhibit 1.



**DEPARTMENT OF HEALTH & HUMAN SERVICES**    Office of the Secretary
Washington, D.C. 20201

## SECRETARIAL DIRECTIVE ON PROGRAM AND PAYMENT INTEGRITY

February 3, 2025

In June 2022, at the request of Florida Governor Ron DeSantis, the Supreme Court of Florida impaneled a statewide grand jury to investigate the impact of illegal immigration on Florida. One of that grand jury's reports, published in March 2023, outlined over 100 allegations concerning deficiencies in the Office of Refugee Resettlement's (ORR) administration of the Unaccompanied Alien Children (UAC) Program. Allegations included sponsor vetting failures, identity verification lapses, instances of child trafficking, and fraud in the sponsorship process.

These are serious programmatic failures and yet it is currently impossible to access sufficient information from a centralized source within the Department of Health and Human Services to assess them. Specifically, there is no one method to determine whether payments the agency is making to contractors, vendors, and grantees for functions related to immigration and refugee settlement are contributing to the serious problems and acute harms the State of Florida identified in its investigation. It is also currently impossible to assess whether payments the Department is making are free from fraud, abuse, and duplication, as well as to assess whether current contractual arrangements, vendor agreements, and grant awards related to these functions are in the best interests of the United States. *See* FAR 12.403(b), 49.101; 45 C.F.R. § 75.371–372. Finally, it is also impossible to determine with current systems whether current contracts and grant awards are tailored to ameliorate these specific problems and the broader problem of illegal immigration—rather than exacerbate them. The Department has an obligation to ensure that no taxpayer dollars are lost to abuse or expended on anything other than advancing the best interests of the nation.

For these reasons, pursuant to, among other authorities, FAR 12.403(b) and 49.101 and 45 C.F.R. § 75.371–372, the Secretary of Health and Human Services hereby DIRECTS as follows:

> **Agency personnel shall briefly pause all payments made by the Administration for Children and Families to contractors, vendors, and grantees related to immigration and refugee settlement for internal review for payment integrity. Such review shall include but not be limited to a review for fraud, waste, abuse, and a review of the overall contracts and grants to determine whether those contracts or grants are in the best interest of the government and consistent with current policy priorities.**

This Directive shall be implemented through the Department's payment management system by personnel with responsibility for that system who shall, in doing so, comply with all notice and procedural requirements in each affected award, agreement, or other instrument. Whenever a payment is paused for review, Department personnel shall immediately send such payment to Principal Deputy Assistant Secretary Andrew Gradison at the Administration for Children and Families for prompt review to determine whether or not the payment is appropriate and should be made. Paused payments shall remain paused pending completion of that review to the maximum extent permitted by law and all applicable notice and procedural requirements in the affected award, agreement, or other instrument.

I thank you for your attention to this matter, as well as your efforts to ensure that no taxpayer dollars are misspent.

Dorothy A. Fink, M.D., Acting Secretary



# United States Department of the Interior

## INTERIOR BUSINESS CENTER
### Washington, DC 20240

March 21, 2025

To:        Leah Prestamo
Acacia Center for Justice
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

Subject:      Notice of Partial Termination for the Government's Convenience

Contract 140D0422C0009, awarded on March 29, 2022, by the United States Department of the Interior (DOI), Interior Business Center (IBC), Acquisition Services Directorate (AQD) on behalf of the Department of Health and Human Services (HHS), Administration for Children and Families (ACF), Office Refugee Resettlement (ORR) as a part of our Interagency Agreement for acquisition services, *is hereby **partially terminated** for the Government's convenience*. Contract Line Items (CLINs) 2 – Direct Representation, 3 – Recruitment, and 4 – Direct Representation Expansion are terminated for the Government's convenience.

In accordance with FAR 52.212-4 Contract Terms and Conditions – Commercial Items (Alternate I) (Nov 2021) – (l) *Termination for the Government's convenience*

"(l) Termination for the Government's convenience. The Government reserves the right to terminate this contract, or any part hereof, for its sole convenience. In the event of such termination, the Contractor shall immediately stop all work hereunder and shall immediately cause any and all of its suppliers and subcontractors to cease work. **Subject to the terms of this contract, the Contractor shall be paid an amount for direct labor hours (as defined in the Schedule of the contract) determined by multiplying the number of direct labor hours expended before the effective date of termination by the hourly rate(s) in the contract, less any hourly rate payments already made to the Contractor plus reasonable charges the Contractor can demonstrate to the satisfaction of the Government using its standard record keeping system that have resulted from the termination**. The Contractor shall not be required to comply with the cost accounting standards or contract cost principles for this purpose. This paragraph does not give the Government any right to audit the Contractor's records. The Contractor shall not be paid for any work performed or costs incurred that reasonably could have been avoided." Emphasis added.

*Recovery for any unpaid Firm-Fixed-Price work would be subject to the non-Alternate I version of FAR 52.212-4(l).

You are hereby notified to immediately stop work on CLINs 2, 3, and 4 and that effective close of business March 21, 2025, the Contracting Officer is terminating CLINs 2, 3, and 4 on Contract 140D022C0009 for the Government's convenience in accordance with FAR 52.212-4 (l) (Alternate I) for T&M work and paragraph (l) of the non-Alternate I version of FAR 52.212-4(l) for any Firm-Fixed-Price effort or products. CLIN 1 – Know Your Rights and Legal Screenings shall remain in full force and effect.

As defined in 44 U.S.C. § 3301, any Federal records created, received, or maintained by Acacia Center for Justice, or its subcontractors, pursuant to this ACF contract, are due back to the ORR No Later Than (NLT) 30 days from this notice. ACF owns the rights to all data and records produced as part of this order. Acacia Center for Justice is notified that any deliverables under the contract not specifically called out in this memo, are the property of the U.S. Government and are expected to be included in the records turnover NLT 30 days from this notice.

Any deliverables under CLINs 2, 3, and 4 that are scheduled for delivery after March 21, 2025, are hereby terminated for the Government's convenience in their entirety. Timely response to this request will be reflected in the CPARS evaluation. Additionally, the Government will ensure to include a narrative to explain the termination was not due to fault of the contractor.

Should you wish to submit a termination settlement proposal, the *final* <u>shall</u> be submitted to the Contracting Officer as promptly as possible, but no later than forty-five (45) calendar days from receipt of this notice. However, if after considering the costs incurred and the costs previously paid by the Government, Acacia Center for Justice determines a no-cost settlement is in the company's best interest, please contact the undersigned Contracting Officer.

Please acknowledge receipt of this notice, as provided below.

_____          _____
Shelita Saint-Louis, Contracting Officer                    Date
U.S. Department of the Interior
Interior Business Center / Acquisition Services Directorate
381 Elden St, Suite 2000A
Herndon, VA 20170

Shelita_Saint-Louis@ibc.doi.gov.

_____          _____
Acacia Center for Justice                                    Date
1025 Connecticut Avenue NW
Suite 1000A
Washington, DC 20036

(292 of 348), Page 292 of 348
Case: 25-2358, 04/14/2025, DktEntry: 5.1, Page 292 of 348
Case 3:25-cv-02847-AMO    Document 24-4    Filed 03/31/25    Page 1 of 1

1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT
9                        NORTHERN DISTRICT OF CALIFORNIA
10                            SAN FRANCISCO DIVISION
11
12                                              | No. 3:25-cv-02847-AMO
13  COMMUNITY LEGAL SERVICES IN                 | **[PROPOSED] ORDER REQUIRING**
    EAST PALO ALTO, ET AL.,                     | **SECURITY UNDER FED. R. CIV.**
14                                              | **P. 65(C)**
                  Plaintiffs,
15
                      v.
16                                              | Honorable Araceli Martínez-Olguín
17  UNITED STATES DEPARTMENT OF                 | United States District Judge
    HEALTH AND HUMAN SERVICES,
18  ET AL.,
19                Defendants.
20
21          The Court, having reviewed Defendants' request to issue preliminary injunction
22  bond pursuant to Federal Rule Civil Procedure 65(c), hereby enters the following order:
23          IT IS HEREBY ORDERED that the request is GRANTED.  The Court orders
24  Plaintiffs to post security as required under Federal Rule Civil Procedure 65(c).
25
26  DATED: _____          */s/*_____
27                          Honorable Araceli Martínez-Olguín
                            United States District Judge
28

1

2

3

4                       UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7   COMMUNITY LEGAL SERVICES IN             Case No.  25-cv-02847-AMO
    EAST PALO ALTO, et al.,
8
              Plaintiffs,                    **ORDER GRANTING PLAINTIFFS'**
9                                            **MOTION FOR TEMPORARY**
                                             **RESTRAINING ORDER**
10
    UNITED STATES DEPARTMENT OF              Re: Dkt. No. 7
11  HEALTH AND HUMAN SERVICES, et
    al.,
12
              Defendants.
13

14          This matter comes before the Court on a Motion for a Temporary Restraining Order filed

15  by Plaintiff nonprofit organizations that received funding from Defendants to provide legal

16  representation and other legal services to unaccompanied children in immigration courts across the

17  country.[1]  Plaintiffs challenge the actions of Defendants the United States Department of Health

18  and Human Services ("HHS"), HHS's Office of Refugee Resettlement ("ORR"), and the United

19  States Department of the Interior (collectively, "Government" or "Defendants") in the recent

20  termination of funding for counsel representing unaccompanied children in immigration

21  proceedings.  Having considered Plaintiffs' motion, Defendants' response, and the arguments of

22  the Parties at the April 1, 2025 hearing, the Court hereby **GRANTS** Plaintiffs' emergency Motion

23  for a Temporary Restraining Order, effective 8:00 a.m. on April 2, 2025.  The Court VACATES

24  the previous briefing schedule set at the conclusion of the hearing on April 1, 2025, and it SETS a

25  _____

26  [1] Plaintiffs include the following organizations: Community Legal Services in East Palo Alto,
    Social Justice Collaborative, Amica Center for Immigrant Rights, Estrella del Paso, Florence
27  Immigrant and Refugee Rights Project, Galveston-Houston Immigrant Representation Project,
    Immigrant Defenders Law Center, National Immigrant Justice Center, Northwest Immigrant
28  Rights Project, Rocky Mountain Immigrant Advocacy Network, and Vermont Asylum Assistance
    Project (collectively, "Plaintiffs").

preliminary injunction briefing schedule at the conclusion of this Order. The Court enters the following findings of fact and conclusions of law supporting the maintenance of status quo ante pending further briefing from the parties.

## I.    BACKGROUND

Plaintiffs previously received funding for their work from ORR disbursed through Acacia Center for Justice. Compl. ¶¶ 64-65; 88. Defendants issued a letter to Acacia Center for Justice on March 21, 2025, terminating the contract line items through which HHS and ORR provided funding for counsel for unaccompanied children in immigration court. Compl. ¶ 11; Biswas Decl., Ex. 2 (ECF 24-3, the "Cancellation Order"). The letter ordered Plaintiffs to "immediately stop all work" on their ongoing funded representations. *Id.* Plaintiffs share the mission of ensuring legal representation for the thousands of unaccompanied children in immigration proceedings throughout the country. Compl. ¶ 102. Congress has consistently appropriated funds for this purpose, including the most recent appropriation for over $5 billion to ensure "all children . . . have access to counsel in their immigration proceedings." Compl. ¶¶ 77-87.

Plaintiffs contend that the Government's Cancellation Order violates its obligations under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), which requires that the Government "shall ensure, to the greatest extent practicable," that all unaccompanied children receive legal counsel to represent them in "legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking." Pub. L. No. 110-457, § 235(c)(5), 122 Stat. 5044, 5079. Plaintiffs argue that the Cancellation Order additionally violates the Government's obligations under ORR's own "Foundational Rule," which requires the Government to "fund legal service providers to provide direct immigration legal representation" to unaccompanied children if there are "available appropriations" and to ensure children receive a legal orientation, consultation with a lawyer, and ongoing access to lawyers. 45 C.F.R. § 410.1309(a) (2024). Plaintiffs allege that Defendants' Cancellation Order conflicts with these legal requirements and thus violates the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Compl. ¶¶ 127-46.

United States District Court
Northern District of California

2

In response to the Cancellation Order, Plaintiffs state that they are forced to choose between few harsh alternatives, including continuing to provide unfunded legal representation in the face of limited resources; cutting other vital organizational programs; laying off, furloughing, or terminating staff; or seeking to withdraw from their ongoing representation duties. *See, e.g.*, VAAP Decl. ¶ 21.

## II.    DISCUSSION

The Court has jurisdiction over Defendants and the subject matter of this action. *See* Administrative Procedure Act, 5 U.S.C. § 702. Contrary to the Government's assertions, this is not a contract dispute in which Plaintiffs seek money damages such that their suit belongs before the Federal Court of Claims. *Pacito v. Trump*, No. 2:25-CV-255-JNW, 2025 WL 893530, at *4-7 (W.D. Wash. Mar. 24, 2025). A temporary restraining order against Defendants, as provided below, is necessary until the Court can consider Plaintiff States' forthcoming motion for a preliminary injunction.

### A.    Standing

United States District Court
Northern District of California

3

Case: 25-2358, 04/14/2025, DktEntry: 5.1, Page 296 of 348

1  'arguably within' the scope of the statute." *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640,

2  668 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209,

3  225 (2012)).  In sum, Plaintiffs have standing to bring this suit.

4      **B.**    **Entitlement to Temporary Relief**

5      Federal Rule of Civil Procedure 65 authorizes a trial court to grant a temporary restraining

6  order "to preserve the status quo and the rights of the parties until a final judgment issues in the

7  cause."  *See Ramos v. Wolf*, 975 F.3d 872, 887 (9th Cir. 2020) (quoting *U.S. Philips Corp. v. KBC

8  Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010)).  The status quo in this context "refers not simply

9  to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which

10  preceded the pending controversy[.]' "  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210

11  (9th Cir. 2000) (quoting *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir.

12  1963)).  "The standard for issuing a temporary restraining order is identical to the standard for

13  issuing a preliminary injunction."  *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F.

14  Supp. 1320, 1323 (N.D. Cal. 1995).

15      To obtain preliminary injunctive relief, the moving party must show: (1) a likelihood of

16  success on the merits, (2) a likelihood of irreparable harm to the moving party in the absence of

17  preliminary relief, (3) the balance of equities tips in the favor of the moving party, and (4) an

18  injunction is in the public interest.  *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

19  (2008).  Where the government is a party, courts merge the analysis of the final two *Winters*

20  factors, the balance of equities and the public interest.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d

21  1073, 1092 (9th Cir. 2014) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  Courts "explore the

22  relative harms to applicant and respondent, as well as the interests of the public at large."  *Barnes

23  v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991) (internal

24  quotation marks and citation omitted).  The *Winters* factors may be evaluated on a sliding scale,

25  such that preliminary relief may be issued when the moving party demonstrates "that serious

26  questions going to the merits were raised and the balance of hardships tips sharply in the

27  plaintiff's favor."  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011)

28  (citation omitted).

4

Here, the Court finds that Plaintiffs raise serious questions going to the merits.  In particular, the TVPRA requires that the government "shall ensure, to the greatest extent practicable," that all unaccompanied children receive legal "counsel to represent them in legal proceedings" and to "protect them from mistreatment, exploitation, and trafficking."  8 U.S.C. § 1232(c)(5).  The Government argues that HHS's funding decisions under the TVPRA and the Foundational Rule remain discretionary and do not mandate funding of direct legal representation such as that provided by Plaintiffs.  But this raises a "serious question" going to the merits – whether the TVPRA requires the Government to ensure the provision of counsel for unrepresented children in immigration proceedings prior to the cancellation of funding for direct legal representation by organizations such as Plaintiffs.  This serious question weighs in favor of reinstating the status quo ante while the record and the parties' arguments are developed further.

Plaintiffs have also shown that they are likely to suffer irreparable harm in the absence of preliminary relief.  Defendants' termination of funding has impacted Plaintiffs, forcing them to issue layoff notices and threatening to require them to dismiss their highly-specialized and seasoned attorneys.  *See* ImmDef Decl. ¶¶ 20-23.  Relevant to the issue of standing raised above, Defendants' termination of funding for direct legal representation directly interferes with Plaintiffs' missions, impeding their ability to provide the direct legal representation of unaccompanied children in immigration proceedings that is fundamental to Plaintiffs' core activities.  RMIAN Decl. ¶ 22; VAAP Decl. ¶¶ 21-22; NWIRP ¶¶ 13-15.  The irreparable harm resulting from Defendants' actions weighs in favor of temporary injunctive relief.

The Government argues that it would suffer harm in the form of being compelled to spend down congressionally appropriated funds for the unaccompanied children in immigration proceedings during the pendency of the preliminary injunctive relief.  Not so.  Terminating funding for direct legal representation for unaccompanied children, without any plan to ensure continuity in representation, potentially violates Congress's express directive in the TVRPA and ORR's own commitments in the Foundational Rule.  Moreover, courts regularly find that "[t]here is generally no public interest in the perpetuation of unlawful agency action."  *League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (citations omitted).  "To the

United States District Court
Northern District of California

5

1    contrary, there is a substantial public interest 'in having governmental agencies abide by the

2    federal laws that govern their existence and operations.' " *Id.* (quoting *Washington v. Reno*, 35

3    F.3d 1093, 1103 (6th Cir. 1994)).  The Government fails to convince that it would suffer harm at

4    this stage.

5         On the other hand, the maintenance of funding for direct legal representation services

6    furthers the critical public interests of ensuring children have access to legal representation and

7    protection from human trafficking.  Indeed, ORR itself recognizes "that most unaccompanied

8    children need legal services to resolve their immigration status and that representation appears to

9    have a significant impact on both the court appearance rate and the outcome of cases for

10   unaccompanied children."  Foundational Rule, 89 Fed. Reg. 34384, 34529; *see also id.* at 34526

11   (stating ORR's goal of "100 percent legal representation of unaccompanied children.").  The Court

12   additionally finds that the continued funding of legal representation for unaccompanied children

13   promotes efficiency and fairness within the immigration system.  *See generally* Br. for Amicus

14   Curiae Former Immigration Judges & Former Members of the Board of Immigration Appeals

15   (ECF 28).  A temporary restraining order enjoining the Cancellation Order serves the public

16   interest.

17        In sum, the balance of equities tips sharply toward the Plaintiffs and the public interest

18   strongly weighs in favor of entering temporary relief.

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

*United States District Court*
*Northern District of California*

6

**III.    TEMPORARY RESTRAINING ORDER**

For the foregoing reasons, the Court hereby **GRANTS** Plaintiffs' motion for Temporary Restraining Order.  The Court hereby **ORDERS** that:

> Defendants are **ENJOINED** from withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and ORR's Foundational Rule, 45 C.F.R. § 410.1309(a)(4), particularly ORR's provision of funds for direct legal representation services to unaccompanied children.  This injunction precludes cutting off access to congressionally appropriated funding for its duration.

The Court deems no security bond is required under Rule 65(c).  This injunction shall remain in effect until Wednesday, April 16, 2025, at 7:59 a.m. PST.

The Court **SETS** the following briefing schedule for Plaintiffs' Motion for Preliminary Injunction:

- Plaintiffs' opening brief shall be filed by no later than 4:00 p.m. on Friday, April 4, 2025.  Defendants' opposition brief shall be filed by no later than 4:00 p.m. on Friday, April 11, 2025.

- Plaintiffs' reply brief shall be filed by no later than noon on Monday, April 14, 2025.

The Court will set a remote hearing on Plaintiffs' Motion for Preliminary Injunction if it deems one necessary.


**IT IS SO ORDERED.**

Dated: April 1, 2025

_____
**ARACELI MARTÍNEZ-OLGUÍN**
**United States District Judge**

United States District Court
Northern District of California

7

1   YAAKOV M. ROTH
    Acting Assistant Attorney General
2   WILLIAM C. SILVIS
    Assistant Director
3   MICHAEL A. CELONE
4   CHRISTINA PARASCANDOLA
    KATE MASETTA ALVAREZ
5   JONATHAN K. ROSS
    Senior Litigation Counsels
6   ZACHARY A. CARDIN
7   Trial Attorney

8          U.S. Department of Justice, Civil Division
           Office of Immigration Litigation
9          General Litigation and Appeals Section
           P.O. Box 878, Ben Franklin Station
10         Washington, DC 20044
           (202) 305-2040
11         Michael.A.Celone@usdoj.gov

12

13  Attorneys for Defendants

14              UNITED STATES DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                 SAN FRANCISCO DIVISION

17
                                    )   Case No. 3:25-cv-02847-AMO
18  PALO ALTO,                      )
                                    )   **DEFENDANTS' MOTION TO DISSOLVE**
19          Plaintiffs,             )   **TEMPORARY RESTRAINING ORDER**
                                    )
20      v.                          )   Date: May 15. 2025
                                    )   Time: 2:00 p.m.
21  UNITED STATES DEPARTMENT OF     )   Location:  Courtroom 10
    HEALTH AND HUMAN SERVICES, *ET AL.*, )
22                                  )
                                    )
23          Defendants.             )
                                    )
24  _____ )

25

26

27

28

DEFENDANTS' MOTION TO DISSOLVE TRO
3:25-CV-02847-AMO

**DEFENDANTS' NOTICE OF MOTION AND MOTION**
**TO DISSOLVE TEMPORARY RESTRAINING ORDER**

PLEASE TAKE NOTICE that on May 15, 2025, at 2:00 p.m., or as soon thereafter as counsel may be heard, in the United States District Court for the Northern District of California, Courtroom 10, 19th Floor, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior will and hereby do move this Court to dissolve the Temporary Restraining Order (TRO) entered on April 1, 2025.

This motion is based upon this Notice of Motion, the accompanying memorandum of points and authorities, the pleadings and papers on file in this action, oral argument of counsel, and any other matters properly before the Court.

1   DATED: April 4, 2025                    Respectfully submitted,

2

3                                           YAAKOV M. ROTH
                                            Acting Assistant Attorney General
4
                                            WILLIAM C. SILVIS
5                                           Assistant Director

6                                           CHRISTINA PARASCANDOLA

7                                           MICHAEL A. CELONE
                                            Senior Litigation Counsels
8

9                                           ZACHARY A. CARDIN
                                            Trial Attorney
10

11                                          */s/ Jonathan K. Ross*
                                            JONATHAN K. ROSS
12                                          Senior Litigation Counsel
                                            U.S. Department of Justice, Civil Division
13                                          Office of Immigration Litigation
                                            General Litigation and Appeals Section
14                                          P.O. Box 878, Ben Franklin Station
                                            Washington, DC 20044
15                                          (202) 305-7662
                                            Jonathan.K.Ross@usdoj.gov
16
                                            Attorneys for Defendants
17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISSOLVE TRO
3:25-CV-02847- AMO                          2            Stay Motion Addendum 278

## INTRODUCTION

On April 1, 2025, this Court entered a Temporary Restraining Order ("TRO"), ECF No. 33, enjoining Defendants from "withdrawing the services or funds provided by the Office of Refugee Resettlement ("ORR") as of March 20, 2025, under the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(c)(5), and the United States Department of Health and Human Services ("HHS") Office of Refugee Resettlement's ("ORR") Unaccompanied Children Program Foundational Rule (codified at 45 C.F.R. § 410.1309(a)(4)) ("Foundational Rule") particularly ORR's provision of funds for direct legal representation services to unaccompanied children." TRO, 7. The Order also enjoins Defendants from "cutting off access to congressionally appropriated funding for its duration." *Id.*

In Defendants' opposition to Plaintiffs' motion requesting the TRO, Defendants argued that the Administrative Procedure Act ("APA") only waives sovereign immunity over actions seeking relief "other than monetary damages." 5 U.S.C. § 702; *see also N. Star Alaska v. United States*, 14 F.3d 36, 38 (9th Cir. 1994) (The APA "does not waive sovereign immunity for contract claims seeking equitable relief." ) (cleaned up); *see also RAJMP, Inc. v. United States*, No. 19-CV-876 AJB (WVG), 2020 WL 905592, at *4 (S.D. Cal. Feb. 25, 2020) ("The Ninth Circuit has held several times that the APA does not waive sovereign immunity over non-monetary, contract-based claims because the Tucker Act impliedly forbids equitable relief."). TRO Opp., 16 (ECF No. 24). Specifically, Defendants argued that the APA does not provide a waiver of sovereign immunity in this case because the relief Plaintiffs seek is payment. TRO Opp., 16. Additionally, Defendants argued that Plaintiffs' claims were barred by the Tucker Act because the rights that they seek to enforce and the relief that they seek is only available to them through contract. TRO Opp., 18-20 (citing *United States Conf. of Cath. Bishops v. U.S. Dep't of State*, No. 1:25-CV-00465, 2025 WL 763738, at *2, 7 (D.D.C. Mar. 11, 2025) (holding that claim requiring the government to keep paying, though styled as an injunction, was "founded upon a contract" and "must be heard in Claims Court.")). Despite the fact that a TRO would require Defendants to pay funds to Plaintiffs, and that their only entitlement to the funds was based on a contract, the Court ruled that "this is not a contract dispute

1  in which Plaintiffs seek money damages such that their suit belongs before the Federal Court of Claims,"
2  and granted the TRO. TRO, 3.

3       Only days after the Court issued the TRO, the Supreme Court issued a decision today that at least
4  severely undermines this Court's assertion of jurisdiction over this case—if it is not outright controlling
5  here. Specifically, the Supreme Court vacated a temporary restraining order enjoining the government
6  from terminating various education-related grants. *Dep't of Education v. California*, No. 24A910, 2025
7  WL 1008354, at *1 (U.S. Apr. 4, 2025) (Attached as "Ex. A"). Like this case, the plaintiffs there filed
8  their claims under the APA, even though they ultimately sought monetary relief under governmental
9  contracts. *Id.* The Court held that the government is "likely to succeed in showing the District Court lacked
10 jurisdiction to order the payment of money under the APA." *Id.* The Court reasoned that APA does not
11 waive sovereign immunity over cases where a statute either grants consent to suit expressly or impliedly
12 forbids the relief which is sought, such as the Tucker Act's implied preclusion of review over contract
13 claims in courts other than the Court of Federal Claims. *Id.* (citing 5 U. S. C. § 702). It further explained
14 that the APA does not waive sovereign immunity for suits involving monetary relief. *Id.* "Instead, the
15 Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "'any express or implied
16 contract with the United States.'" *Id.* (citing 28 U. S. C. § 1491(a)(1)).

17      The Supreme Court's decision confirms that Plaintiffs cannot show that they are likely to prevail
18 on the merits of their claims, and that this Court very likely lacked jurisdiction to issue a temporary
19 restraining order requiring the government to pay funds, where Plaintiffs' only entitlement to the funds
20 was through a contract. Rather, as the Court noted, Plaintiffs here must bring their claims in the Court of
21 Federal Claims. *Id.* The Supreme Court's decision is thus an intervening change in the controlling law that
22 warrants vacatur of this Court's TRO.

23                       **ARGUMENT**

24 **A.**   **Legal Standard for Dissolving a Temporary Restraining Order.**

25      A party may seek dissolution of a TRO or preliminary injunction based on a material change in
26 facts or law that warrants revision or dissolution. *See Karnoski v. Trump*, 926 F.3d 1180, 1198 (9th Cir.
27 2019) (per curiam) (citing *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000)). The test for dissolving
28 or modifying an injunction has two parts. The moving party must show: (1) a significant change in fact

1  or law; and (2) that in light of the significant change, the injunction should be dissolved or modified under

2  the legal standard that governed the issuance of the injunction in the first place.  S*ee Karnoski*, 926 F.3d

3  at 1198 & n.14; *Sharp*, 233 F.3d at 1170.  A subsequent challenge to a preliminary injunction "must rest

4  on grounds that could not have been raised before."  *Alto v. Black*, 738 F.3d 1111, 1120 (9th Cir. 2013)

5  (citation omitted).  Here, *Department of Education v. California* is a significant change warranting

6  dissolution, and it could not have been raised before because it was issued earlier today.

7

8  **B.** *Dep't of Education v. California* **is a Significant Change in Law.**

9  "[E]vents have largely overtaken this litigation."  *See Martinez v. Wilson*, 32 F.3d 1415, 1419 (9th

10  Cir. 1994).  The Supreme Court's decision in *Department of Education v. California* significantly shifted

11  the legal landscape governing the federal government's authority to terminate funding, affirming the

12  discretion of federal agencies to make funding determinations without judicial interference.  This decision

13  directly impacts the Court's prior issuance of the TRO in this case, as the TRO was based on a premise

14  that the government lacked discretion to terminate funding for legal representation under the TVPRA and

15  Foundational Rule.

16  The TRO enjoined Defendants from withdrawing ORR-funded legal representation services, based

17  in part on the Court's interpretation that the TVPRA mandates ongoing funding for legal services for

18  unaccompanied children.  However, the Supreme Court's decision clarified that federal agencies retain

19  the discretion to terminate or alter funding arrangements when they deem it necessary, particularly when

20  appropriations are limited or policy priorities evolve.  *Dep't of Education v. California*, 2025 WL

21  1008354, at *2 ("[T]he APA's limited waiver of immunity does not extend to orders 'to enforce a

22  contractual obligation to pay money[.]'") (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534

23  U. S. 204, 212 (2002)); *see id.* **1-2.

24  Additionally, the Supreme Court's ruling highlights that the Judiciary should not interfere with

25  agency funding decisions absent clear statutory mandates.  *Id.* at **1-2.  The decision emphasized that

1   maintaining funding contrary to agency determinations improperly encroaches on executive discretion.

2   *Id.* Therefore, the significant change in controlling law established by *Dep't of Education v. California*

3   warrants dissolving the TRO, as the legal basis for the Court's prior order has been substantially

4   undermined.

5   **C.      *Dep't of Education v. California* Warrants Dissolution of the TRO.**

6

7            When courts assess whether a change "warrants . . . dissolution of the injunction," the "inquiry

8   should be guided by the same criteria that govern the issuance of a preliminary injunction."[1]  *Karnoski*,

9   926 F.3d at 1198 (quoting *Sharp*, 233 F.3d at 1170).  District courts have applied these instructions from

10  *Karnoski* in several ways.  *See Lo v. Cnty. of Siskiyou*, 2022 WL 1505909, at *7 (E.D. Cal. May 12, 2022)

11  (listing cases).  The *Lo* Court observed that one district court required the movant to show an injunction

12  is unwarranted under each of the four criteria, whereas another district court concluded that the defendant

13  may prevail by disproving any one or more of the four criteria.  *Id.* (citing *CW Baice Ltd. v. Wisdomobile*

14  *Grp. Ltd.*, No. 20-03526, 2021 WL 3053147, at *4 (N.D. Cal. July 20, 2021); *Index Newspapers LLC v.*

15  *City of Portland*, No. 20-1035, 2022 WL 72124, at *9 (D. Or. Jan. 7, 2022)).  Ultimately, the *Lo* Court

16  "borrowed the terms of *Karnoski*," to conclude that a district court may be "guided by" the "traditional"

17  standard for injunctive relief and "address" each part of that standard without applying the standard

18  mechanically or as a checklist.  *Id.* (citing *Karnoski*, 926 F.3d at 1199, 1202) (cleaned up).  "This more

19  flexible interpretation recognizes district courts' wide discretion to ensure their injunctions are just and to

20  fit those injunctions to the evolving circumstances of each case."   *Id.* (quotations and internal

21  modifications omitted); *see also id.*, at *8 ("Viewing the question in this way demonstrates why a

22

23

24

25

---

26  [1] Under those criteria, plaintiffs seeking preliminary injunctions must establish that: (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  But "[w]here, as here, the government opposes a preliminary injunction, the third and fourth factors merge into one inquiry." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021).

DEFENDANTS' MOTION TO DISSOLVE TRO
3:25-CV-02847- AMO                    4

defendant who seeks to modify or dissolve an injunction should not be required to prove that each element of the four-part test weighs in its favor.").

As applied here, *Dep't of Education v. California* warrants dissolution of the TRO. *First*, Plaintiffs cannot demonstrate a likelihood of success on the merits. The Court's TRO was premised on the conclusion that Plaintiffs were likely to succeed on the merits of their claims under the APA. TRO, 3. The Court's TRO rested on the presumption that Plaintiffs could enforce ORR's funding obligations through the APA. However, under the Supreme Court's recent decision in *Department of Education v. California*, such relief is explicitly unavailable, as the APA's waiver of sovereign immunity does not extend to enforcing contractual obligations or compelling the government to pay money. See 2025 WL 1008354, at 2. Given that the APA provided the sole jurisdictional basis for the TRO, the Supreme Court's ruling eliminates Plaintiffs' likelihood of success on the merits.

*Second*, Plaintiffs cannot demonstrate irreparable injury because any funding-related harm can be remedied through monetary relief in the appropriate forum. As the Supreme Court emphasized in *Department of Education*, where plaintiffs retain the ability to seek reimbursement of withheld funds through an appropriate suit, the harm alleged is monetary and does not rise to the level of irreparable injury warranting injunctive relief. 2025 WL 1008354, at 2. Here, Plaintiffs' asserted injuries stem solely from the termination of funding—an injury explicitly remediable through monetary damages in the proper venue, such as a claim under the Tucker Act. Therefore, Plaintiffs fail to meet the irreparable harm threshold necessary to sustain the TRO.

Moreover, as the Supreme Court also observed, it is the government—not the Plaintiffs—that faces irreparable injury from the disbursement of funds unlikely ever to be recovered once they are disbursed. *Dep't of Education v. California,* 2025 WL 1008354, at 2. Like the plaintiffs in *Dep't of Education v. California*, none of the Plaintiffs here "promised to return withdrawn funds should its grant termination

1   be reinstated," and this Court declined to impose bond under Rule 65(c).  *Id.*; TRO, 7.  Thus, Plaintiffs

2   fail to satisfy the irreparable harm threshold necessary to sustain the TRO.

3       *Third*, the Supreme Court's decision underscores the government's significant interest in

4   maintaining discretion over funding decisions to ensure that appropriations reflect evolving policy

5   priorities and fiscal considerations.  *Dep't of Education v. California*, 2025 WL 1008354, at 2. Judicial

6   interference with this discretion not only disrupts agency management of limited resources but also

7   undermines the public interest by constraining the government's ability to effectively allocate taxpayer

8   funds.  Given the clarity of the Supreme Court's instruction, neither the balance of equities nor the public

9   interest favors continuation of the TRO.  On the contrary, these factors strongly support dissolving the

10  TRO to align with current controlling authority.

11      Alternatively, the Court should stay the TRO to prevent the government from losing funds that

12  this Court likely lacked jurisdiction to disburse.  *See Dep't of Education v. California*, 2025 WL 1008354,

13  at 2. For all of the same reasons explained above, in prior briefing, and now in *Department of Education*

14  *v. California*, a stay pending potential appeal is warranted here.

### CONCLUSION

15      The legal basis on which the TRO rested has, as the case law puts it, evaporated.  Accordingly, the

16  Court should dissolve the TRO. Alternatively, this Court should stay the TRO pending an appeal by the

17  government.

1  DATED: April 4, 2025                        Respectfully submitted,

2

3                                              YAAKOV M. ROTH
                                               Acting Assistant Attorney General

4
                                               WILLIAM C. SILVIS
5                                              Assistant Director

6                                              CHRISTINA PARASCANDOLA
                                               KATE MASETTA ALVAREZ
7                                              MICHAEL A. CELONE
                                               Senior Litigation Counsels
8

9                                              ZACHARY A. CARDIN
                                               Trial Attorney
10

11                                             */s/ Jonathan K. Ross*
                                               JONATHAN K. ROSS
12                                             Senior Litigation Counsel
                                               U.S. Department of Justice, Civil Division
13                                             Office of Immigration Litigation
                                               General Litigation and Appeals Section
14                                             P.O. Box 878, Ben Franklin Station
                                               Washington, DC 20044
15                                             (202) 305-7662
                                               Jonathan.K.Ross@usdoj.gov
16

17                                             Attorneys for Defendants

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION TO DISSOLVE TRO
3:25-CV-02847- AMO                    7                    Stay Motion Addendum 285

1

2                          UNITED STATES DISTRICT COURT

3                        NORTHERN DISTRICT OF CALIFORNIA

4                            SAN FRANCISCO DIVISION

5

6   COMMUNITY LEGAL SERVICES IN EAST  )   Case No. 3:25-cv-02847-AMO
    PALO ALTO,                        )
7                                     )   **[PROPOSED] ORDER GRANTING**
              Plaintiffs,             )   **DEFENDANTS' MOTION TO DISSOLVE**
8                                     )   **TEMPORARY RESTRAINING ORDER**
        v.                            )
9                                     )
    UNITED STATES DEPARTMENT OF       )
10  HEALTH AND HUMAN SERVICES, *ET AL.*, )
                                      )
11            Defendants.             )
                                      )
12  _____  )

13

14          Having read and considered Defendants' Motion to Dissolve the Temporary Restraining Order

15  and finding good cause therefor:

16          IT IS HEREBY ORDERED that Defendants' motion is GRANTED.  The Temporary

17  Restraining Order, ECF No. 33, is hereby DISSOLVED.

18          [Alternatively, should dissolution not be granted, the Court hereby ORDERS that the Temporary

19  Restraining Order be STAYED pending an appeal by the government.]

20
    Dated:
21

22                                              _____

23                                              Hon. Araceli Martínez-Olguín
                                                UNITED STATES DISTRICT JUDGE
24

25

26

27

28

                                                1               Stay Motion Addendum 286

1

2                    UNITED STATES DISTRICT COURT

3                  NORTHERN DISTRICT OF CALIFORNIA

4                     SAN FRANCISCO DIVISION

5

6    COMMUNITY LEGAL SERVICES IN EAST  )   Case No. 3:25-cv-02847-AMO
     PALO ALTO,                        )
7                                      )   **DEFENDANTS' EXHIBIT A**
              Plaintiffs,              )
8                                      )   *Dep't of Education v. California*, No. 24A910, 2025
         v.                            )   WL 1008354, at *1 (U.S. Apr. 4, 2025)
9                                      )
     UNITED STATES DEPARTMENT OF       )
10   HEALTH AND HUMAN SERVICES, *ET AL.*, )
                                       )
11            Defendants.              )
                                       )
12   _____ )

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cite as: 604 U. S. ____ (2025)          1

Per Curiam

# SUPREME COURT OF THE UNITED STATES

_____

No. 24A910

_____

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

ON APPLICATION TO VACATE THE ORDER ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[April 4, 2025]

PER CURIAM.

On March 10, 2025, the United States District Court for the District of Massachusetts issued what it styled as a temporary restraining order (TRO) enjoining the Government from terminating various education-related grants. The order also requires the Government to pay out past-due grant obligations and to continue paying obligations as they accrue. The District Court's conclusion rested on a finding that respondents are likely to succeed on the merits of their claims under the Administrative Procedure Act (APA), 60 Stat. 237. On March 26, the Government filed this application (which it had amended on March 24) and requested an immediate administrative stay. The application was presented to JUSTICE JACKSON and by her referred to the Court.

Although the Courts of Appeals generally lack appellate jurisdiction over appeals from TROs, several factors counsel in favor of construing the District Court's order as an appealable preliminary injunction. Among other considerations, the District Court's order carries many of the hallmarks of a preliminary injunction. See *Sampson* v. *Murray*, 415 U. S. 61, 87 (1974); *Abbott* v. *Perez*, 585 U. S. 579, 594 (2018). Moreover, the District Court's "basis for issuing the order [is] strongly challenged," as the Government is likely

2          DEPARTMENT OF EDUCATION *v.* CALIFORNIA

Per Curiam

to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA. *Sampson*, 415 U. S., at 87. The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U. S. C. §702. Nor does the waiver apply to claims seeking "money damages." *Ibid.* True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen* v. *Massachusetts*, 487 U. S. 879, 910 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U. S. C. §1491(a)(1).

As for the remaining stay factors, respondents have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed. No grantee "promised to return withdrawn funds should its grant termination be reinstated," and the District Court declined to impose bond. App. to Application To Vacate Order 15a, 17a. By contrast, the Government compellingly argues that respondents would not suffer irreparable harm while the TRO is stayed. Respondents have represented in this litigation that they have the financial wherewithal to keep their programs running. So, if respondents ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum. And if respondents instead decline to keep the programs operating, then any ensuing irreparable harm would be of their own making. "Such self-imposed costs are not properly the subject of inquiry on a motion for stay." *Cuomo* v. *NRC*, 772 F. 2d 972, 977 (CADC 1985) (*per curiam*).

Cite as: 604 U. S. ____ (2025)                    3

Per Curiam

We construe the application as seeking a stay pending appeal and grant the application. The March 10, 2025 order and March 24, 2025 extension of the United States District Court for the District of Massachusetts, case No. 1:25–cv–10548, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

*It is so ordered.*

(315 of 348), Page 315 of 348
Case: 25-2358, 04/14/2025, DktEntry: 5.1, Page 315 of 348
Case 3:25-cv-02847-AMO    Document 38-2    Filed 04/04/25    Page 5 of 23

Cite as: 604 U. S. ____ (2024) 1

KAGAN, J., dissenting

# SUPREME COURT OF THE UNITED STATES

_____

No. 24A910

_____

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

### ON APPLICATION TO VACATE THE ORDER ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[April 4, 2025]

JUSTICE KAGAN, dissenting.

It is a mistake for the Court to grant this emergency application. Nowhere in its papers does the Government defend the legality of canceling the education grants at issue here. And contra the *per curiam*, the respondent States have consistently represented that the loss of these grants will force them—indeed, has already forced them—to curtail teacher training programs. See, *e.g.,* Brief in Opposition to Application 39–40; App. to Application To Vacate Order 7a–8a, 34a–35a. The remaining issue is whether this suit, brought under the Administrative Procedure Act (APA), belongs in an ordinary district court or the Court of Federal Claims. As the Court acknowledges, the general rule is that APA actions go to district courts, even when a remedial order "may result in the disbursement of funds." *Ante,* at 2 (citing *Bowen* v. *Massachusetts*, 487 U. S. 879, 910 (1988)). To support a different result here, the Court relies exclusively on *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204 (2002). But *Great-West* was *not* brought under the APA, as the Court took care to note. See *id.,* at 212 (distinguishing *Bowen* for that reason). So the Court's reasoning is at the least under-developed, and very possibly wrong.

The risk of error increases when this Court decides

2          DEPARTMENT OF EDUCATION *v.* CALIFORNIA

KAGAN, J., dissenting

cases—as here—with barebones briefing, no argument, and
scarce time for reflection.  Sometimes, the Court must act
in that way despite the risk.  And there will of course be
good-faith disagreements about when that is called for.  But
in my view, nothing about this case demanded our immedi-
ate intervention.  Rather than make new law on our emer-
gency docket, we should have allowed the dispute to pro-
ceed in the ordinary way.  I respectfully dissent.

(317 of 348), Page 317 of 348
Case: 25-2358, 04/14/2025, DktEntry: 5.1, Page 317 of 348
Case 3:25-cv-02847-AMO    Document 38-2    Filed 04/04/25    Page 7 of 23

Cite as: 604 U. S. ____ (2025)          1

JACKSON, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 24A910

———————

## DEPARTMENT OF EDUCATION, ET AL. *v.* CALIFORNIA, ET AL.

### ON APPLICATION TO VACATE THE ORDER ISSUED BY THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

[April 4, 2025]

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, dissenting.

This application concerns the Department of Education's decision to cancel, with no meaningful explanation, more than 100 grants the Federal Government had previously awarded to public schools and universities across the country. The District Court issued a temporary restraining order (TRO) finding that the Department's decision was likely unlawful and pausing the grant cancellations while the court considers a pending motion for a preliminary injunction. The TRO expires in three days, and it will become moot even earlier if the District Court rules on the preliminary-injunction motion this week.

With the TRO on its last legs, a majority of this Court has chosen to dive into this dispute today, allowing the Department to implement immediately its new summary grant-termination policy. It does so even though the TRO preserves the pretermination status quo and causes zero concrete harm to the Government. By contrast, reinstating the challenged grant-termination policy will inflict significant harm on grantees—a fact that the Government barely contests. Worse still, the Government does not even deign to defend the lawfulness of its actions. Instead, it asks us to superintend the lower courts' real-time decisions about ancillary

2        DEPARTMENT OF EDUCATION *v.* CALIFORNIA

JACKSON, J., dissenting

threshold and remedial questions, which we could easily wait to address in the ordinary course.

It is beyond puzzling that a majority of Justices conceive of the Government's application as an emergency. It is likewise baffling that anyone is persuaded that the equities favor the Government when the Government does not even argue that the lower courts erred in concluding that it likely behaved unlawfully. This application should have been denied for numerous obvious and independent reasons, and the Court does itself—and the legal process—no favors in deciding to grant it.

## I

## A

To address a nationwide shortage of qualified teachers, Congress has enacted several competitive grant programs that facilitate the recruitment, training, and support of educators. This application concerns the Department's recent efforts to terminate grants that were awarded under two such programs: the Teacher Quality Partnership (TQP) program and the Supporting Effective Educator Development (SEED) program.

Congress established the TQP program in 2008, authorizing the Department to award grants to high-need educational agencies and schools for the purpose of training teachers. 20 U. S. C. §§1021(6), 1022a(a), 1022a(c)(1), 1022h. In the statute that creates this program, Congress made plain its intent to (1) "improve student achievement," "improve the quality of . . . teachers," (3) "hold teacher preparation programs at institutions of higher education accountable," and (4) "recruit highly qualified individuals, including minorities and individuals from other occupations, into the teaching force." §1022.

By statute, the Department awards each TQP grant based on a peer-review process "for a period of five years." §§1022b(a), (b)(3). Similarly, under the SEED program,

Cite as: 604 U. S. ____ (2025)          3

JACKSON, J., dissenting

Congress has mandated that the Department "shall award grants" to institutions of higher education and nonprofit entities that provide certain education-related services, including "evidence-based professional development activities" for teachers. §§6672(a)(2), (f). Congress dictated that SEED grants "shall be" awarded for up to a 3-year period, subject to a possible 2-year extension. §§6672(b)(1)–(2).

On February 5, 2025, the Acting Secretary of Education issued an internal directive requiring Department personnel to review "'issued grants'" to "'ensur[e] that Department grants do not fund discriminatory practices'" that are "'contrary to law or to the Department's policy objectives'" and that "'all grants are free from fraud, abuse, and duplication.'" App. to Application To Vacate Order 12a (App.). The directive expressly extends to "'practices . . . in the form of [diversity, equity, and inclusion ("DEI")].'" *Ibid.* (alteration in original).

Two days later, TQP and SEED grant recipients began to receive letters from the Department announcing the termination of their grant awards. The letters were identical, save for differences in the addressees, grant-award numbers, and termination dates. Each letter included a single paragraph regarding the Department's justification for the grant termination, which stated, in full, as follows:

> "'The grant specified above provides funding for programs that promote or take part in DEI initiatives or other initiatives that unlawfully discriminate on the basis of race, color, religion, sex, national origin, or another protected characteristic; that violate either the letter or purpose of Federal civil rights law; that conflict with the Department's policy of prioritizing merit, fairness, and excellence in education; that are not free from fraud, abuse, or duplication; or that otherwise fail to serve the best interests of the United States. The

4            DEPARTMENT OF EDUCATION *v.* CALIFORNIA

JACKSON, J., dissenting

grant is therefore inconsistent with, and no longer ef-
fectuates, Department priorities. See 2 C.F.R.
§200.340(a)(4); see also 34 C.F.R. §75.253. Therefore,
pursuant to, among other authorities, 2 C.F.R.
§200.339–43, 34 C.F.R. §75.253, and the termination
provisions in your grant award, the Department hereby
terminates grant No. [grant award number] in its en-
tirety effective [date of letter].'"  Complaint in No. 25–
cv–10548 (D Mass.), ECF Doc. 1, p. 35 (alterations in
original).

Most grantees also received revised grant-award notifica-
tion letters stating solely that their grants had been
"deemed to be inconsistent with, and no longer effectuat[e],
Department priorities. See 2 C.F.R. 200.340(a)(4); see also
34 C.F.R. 75.253." *Id.*, at 36–37.

                           B

   On March 6, 2025, eight States sued the Department in
the District of Massachusetts, claiming that this mass,
summary termination of TQP and SEED grants was arbi-
trary and capricious, and not in accordance with law, in vi-
olation of the Administrative Procedure Act (APA).
5 U. S. C. §706(2)(A).  The Plaintiff States alleged that, as
a result of the grant terminations, their public universities,
schools, and other institutions "now face abrupt shortfalls
to their current year budgets collectively exceeding ten mil-
lion dollars." ECF Doc. 1, at 41.  As relevant, the Plaintiff
States sought declaratory and injunctive relief to set aside
the termination of the previously awarded grants.  They
also sought a TRO to immediately block termination of the
grants.
   After holding a 2-hour hearing, the District Court issued
a TRO on March 10.  The order "restore[d] Plaintiff States
to the pre-existing status quo prior to the termination un-
der all previously awarded TQP or SEED grants for recipi-

Cite as: 604 U. S. ____ (2025)          5

JACKSON, J., dissenting

ents in Plaintiff States," and "temporarily enjoined" the De-
partment from terminating any previously awarded or in-
dividual TQP or SEED grants for recipients in Plaintiff
States. ___ F. Supp. 3d ___, ___–___ (Mass. 2025), App. 9a–
10a. The order also contained an exception permitting the
Department to make individual grant terminations con-
sistent with applicable law and regulations.

By its terms, the TRO was "effective immediately" and
would "remain in effect for 14 days," until March 24. *Id.*, at
10a. The District Court then separately construed the
Plaintiff States' TRO motion as a motion for a preliminary
injunction and set that motion for a hearing on March 28.
The District Court subsequently extended the TRO for an
additional 14 days, until April 7, while also expressing its
"intent that the TRO be temporary and short." ECF Doc.
79.

Seeking to enforce its termination decisions during the
period in which the TRO remained in effect, the Govern-
ment requested a stay pending appeal. The District Court
denied the request, as did a unanimous panel of the First
Circuit. The First Circuit panel assumed without deciding
that it had jurisdiction to review the TRO and made several
determinations, including: that the States were likely to
succeed on the merits of their claim that the Department's
termination of the grants was arbitrary and capricious; that
the Government's assertions of irreparable harm consisted
of "speculation and hyperbole"; and that the equitable stay
factors cut against the Government. ___ F. 4th ___, ___–___
(2025), App. 24a–35a. The Government then turned to us
for an emergency stay.

II

First and foremost, the Government's application should
have been swiftly denied because this Court lacks jurisdic-
tion over this interlocutory order. It is clear beyond cavil
that, ordinarily, "orders granting . . . temporary restraining

6          DEPARTMENT OF EDUCATION *v.* CALIFORNIA

JACKSON, J., dissenting

orders are not appealable." 16 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3922.1 (3d ed. 2012). This Court has recognized an exception for TROs and other interlocutory orders that are "potentially unlimited" in duration, *Sampson* v. *Murray*, 415 U. S. 61, 87 (1974), and risk imposing a "'serious, perhaps irreparable, consequence,'" *Carson* v. *American Brands, Inc.*, 450 U. S. 79, 84 (1981). But this time-limited TRO presents no such threat.

To start, the District Court has merely ordered restoration of the "pre-existing status quo prior to the termination" of the grants in the Plaintiff States. App. 9a. Its order comes in the form of an injunction only insofar as it has prohibited the Government from implementing the abruptly announced terminations—the District Court has *not* ordered that the Government do anything other than what was required by law before the termination letters issued.

Notably, the TRO also includes an exception that permits the Government to make individual grant terminations while the order is in effect "to the extent the final agency action is consistent with Congressional authorization and appropriations, relevant federal statute[s], including the requirements of the APA, the requirements of the relevant implementing regulations, [and] the grant terms and conditions." *Id.*, at 10a. Thus, the Government is only precluded from implementing what the Plaintiff States challenge as a "mass termination" of previously issued grants; the Government can still proceed with reasoned, individualized grant terminations under its usual review process.[1]

_____

The Department now rejects the "mass termination" characterization on the grounds that it allowed 5 TQP and SEED grants (out of 109) to remain in place. App. 14a. But Department employees previously informed grantees that "*[a]ll* the grants have been terminated." ECF Doc. 8–13, pp. 6, 60 (emphasis added). These inconsistent statements underscore the need for additional factual development below before this Court gets involved.

Cite as: 604 U. S. ____ (2025)          7

JACKSON, J., dissenting

This TRO is also expressly time limited and is set to expire just three days from now.  All agree that the order falls squarely within the time limitations prescribed by the Federal Rule of Civil Procedure governing TROs.  See Fed. Rule Civ. Proc. 65(b)(2) (providing that a TRO is "not to exceed 14 days" unless "the court, for good cause, extends it for a like period").  That is true even though the District Court has granted a one-time extension of the TRO while it considers and rules upon the Plaintiff States' motion for a preliminary injunction.  See *ibid*.  The Government provides no reason to believe that the District Court intends to extend the order again.  Quite to the contrary, the fact that the District Court construed the Plaintiff States' TRO motion as a motion for a preliminary injunction, and has already held a hearing, indicates that the court is moving with dispatch and is in no way attempting to shield its interim order from appellate review.

This TRO thus falls squarely within the "general congres-

### III

Even assuming that the TRO is reviewable on appeal, the Government's application does not demonstrate the sort of exigency that warrants emergency relief—what I have elsewhere called a "line-jumping justification," *Labrador* v. *Poe*, 601 U. S. ___, ___ (2024) (opinion dissenting from grant of stay) (slip op., at 1).  As explained above, TQP and SEED are statutorily authorized grant programs that have been implemented by the Department for more than a decade— since 2008 and 2015, respectively.  What is new here is the Department's insistence that it need not go through the notice and review procedures the agency has traditionally used to terminate grants it has awarded.  Instead, the Department now seeks to terminate the pending grants en masse, through the use of boilerplate language that is not

8        DEPARTMENT OF EDUCATION *v.* CALIFORNIA

JACKSON, J., dissenting

particularized to any grant recipient.

The Government has not provided any persuasive reason for why it urgently needs to be relieved of the lower court's requirement that it wait 14 days (and now 28) to execute its preferred grant-termination policy. Even if the Government is right about the merits of the arguments it raises in this application (which is doubtful), there is no reason why the Government cannot proceed through the usual litigation and appeals process to receive its vindication, as other litigants must. To reiterate, the TRO expires in three days, and the District Court held a hearing on the Plaintiff States' preliminary-injunction motion a week ago. The only hint of urgency that the Government offers to justify its unusual request for our intervention is that, during the waning days of the TRO period, some grant recipients might seek to draw down grant funds that the Government wants to terminate.

If true, that would be unfortunate, but worse things have happened. And that possibility does not come anywhere close to explaining why *this* Court must take the "'extraordinary'" step of intervening *now*. *Williams* v. *Zbaraz*, 442 U. S. 1309, 1311 (1979) (Stevens, J., in chambers); cf. *Nken* v. *Holder*, 556 U. S. 418, 433 (2009) ("'A stay is not a matter of right, even if irreparable injury might otherwise result'"). In my view, the patent lack of exigency alone warrants denying the Government's bid for emergency relief. See *Labrador*, 601 U. S., at ___ (JACKSON, J., dissenting from grant of stay) (slip op., at 1). But, wait, there's more.

The Government's assertions of harm are speculative, at best, and appear to be far from irreparable. Importantly, there is no evidence that grantees have rushed to draw down the remaining $65 million in grant funds since the District Court entered the TRO 25 days ago. If the past is the best predictor of the future, then there is no factual basis for concluding that any terminated-recipient grant runs are likely to occur in the three days remaining in the TRO.

Cite as: 604 U. S. ____ (2025)              9

JACKSON, J., dissenting

The Government's speculation is also contrary to the way that the TQP and SEED programs operate. As the Plaintiff States explain, TQP and SEED grantees typically "receive funds spread over the multi-year period of their grants" and "generally submit periodic draw-down requests for expenses they have already incurred." Brief in Opposition to Application 7. Grant recipients are also closely supervised with respect to such withdrawals: "The Department is authorized to monitor draw-down activity for all grants," and certain recipients are even "subject to an annual audit." *Id.*, at 8–9.

Finally, even if the feared flood of recipient withdrawals occurs, the Government has various legal mechanisms to recoup these kinds of funds. See, *e.g.*, 20 U. S. C. §§1234a, 1234b; 2 CFR §200.346 (2024); see also J. Shaffer & D. Ramish, Federal Grant Practice §36:29 (2024 ed.) ("In the end, the Government usually gets its money"). It is likely that, given the Department's new policy position with respect to terminations, it will be extra vigilant about recording any withdrawals made while the TRO is in effect, so that the money can be clawed back if appropriate. Thus, the alleged funding drain at which the Government gestures does not even appear to be irreparable. The Government has certainly not met its burden to show otherwise. See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*) (stay applicants bear the burden to show, among other things, "a likelihood [of] irreparable harm").

The Court nonetheless swoops in to stay a TRO that will be mooted imminently by either the District Court's ruling on the preliminary-injunction motion or the natural expiration of the TRO period. Instead of playing remedy police in this nascent case, I would permit the litigation to proceed in the lower courts as usual, as we would expect in any other case in which the Government was not the applicant.

(326 of 348), Page 326 of 348
Case: 25-2358, 04/14/2025, DktEntry: 5.1, Page 326 of 348
Case 3:25-cv-02847-AMO    Document 38-2    Filed 04/04/25    Page 16 of 23

10          DEPARTMENT OF EDUCATION *v.* CALIFORNIA

JACKSON, J., dissenting

## IV

To review, the Court has now granted the Government's request for "emergency" relief, staying a TRO that will expire in just three days in a case where appellate jurisdiction is wanting and the Government's assertions of harm are illusory. One might reasonably assume that, for the Supreme Court of the United States to step in and grant relief in this posture, the applicant would have at least presented a rock-solid argument in support of its underlying merits position. Thus, here, one would expect the Government to vigorously maintain that the Department was legally entitled to all but eliminate two grant programs that Congress established a decade ago. But in this Court, the Government offers *no defense* against the Plaintiff States' claim that the Department's erasure of the grants at issue was arbitrary and capricious. Instead, the Government raises several threshold and remedial questions about the scope of the District Court's power to review the Government's allegedly unlawful conduct.[2]

The Government's request for emergency relief from this Court—without presenting any defense as to the merits of the Plaintiff States' arbitrary-and-capricious challenge—is striking. And the Court now blesses this strategic decision to sidestep the underlying merits by reinstating grant terminations that both lower courts have said are likely unlawful. This seems like a development in our practices related to emergency applications that, at a minimum, requires further exploration. If the emergency docket has now become a vehicle for certain defendants to obtain this

---

[2] To be specific, the Government argues that the lawfulness of the terminations is irrelevant for present purposes because (1) the Court of Federal Claims, not the District Court, has original jurisdiction over this dispute; (2) the Department's grant-termination decisions are "committed to agency discretion by law" and thus not reviewable under the APA, 5 U. S. C. §701(a)(2); and (3) the TRO at issue is too broad.

Cite as: 604 U. S. ____ (2025)          11

JACKSON, J., dissenting

Court's real-time opinion about lower court rulings on various auxiliary matters, we should announce that new policy and be prepared to shift how we think about, and address, these kinds of applications.

I, for one, think it would be a grave mistake to permit parties seeking equitable emergency relief not only to make an inadequate showing of interim harm but also to seek relief on the basis of their concerns about issues that can be addressed later, in the ordinary course. In an appeals system that is supposed to provide prompt resolution of all legal challenges, this new avenue for piecemeal interlocutory review enables strategic delay and facilitates obfuscation of the weaknesses of the defendant's merits positions.

A

Take this case, for example. In my preliminary evaluation, the lower courts' early assessment that the Department's mass grant terminations were probably unlawful is not unreasonable, for the reasons I explain in this section. If the lower courts were left alone, they would be able to provide prompt rulings on the core legal question that we could then review, together with the Department's other arguments, in the ordinary course.

The APA requires, among other things, that an agency must not act arbitrarily or capriciously, and that it must explain its actions. See, *e.g.*, *FCC* v. *Prometheus Radio Project*, 592 U. S. 414, 423 (2021) ("The APA's arbitrary-and-capricious standard requires that agency action be reason-

12          DEPARTMENT OF EDUCATION *v.* CALIFORNIA

JACKSON, J., dissenting

ment's decisionmaking with respect to any individual termination decision. It also appears that the grant recipients did not receive any pretermination notice or any opportunity to be heard, much less a chance to cure, which the regulations seem to require. See, *e.g.*, 2 CFR §§200.339, 200.208(c) (permitting grant termination only after an agency "determines that noncompliance cannot be remedied by imposing additional conditions," such as by "[r]equiring additional project monitoring," by requiring that the recipient obtain technical or management assistance, or by "[e]stablishing additional prior approvals").

The Department's robotic rollout of its new mass grant-termination policy means that grant recipients and reviewing courts are "compelled to guess at the theory underlying the agency's action." *SEC* v. *Chenery Corp.*, 332 U. S. 194, 196–197 (1947). Moreover, the agency's abruptness leaves one wondering whether any reasoned decisionmaking has occurred with respect to these terminations at all.[3] These are precisely the kinds of concerns that the APA's bar on arbitrary-and-capricious agency decisionmaking was meant to address. See *Prometheus Radio Project*, 592 U. S., at 423 (explaining that the APA requires a reviewing court to ensure that "the agency . . . has reasonably considered the relevant issues and reasonably explained the decision").

It also seems clear that at least one of the items included on the Department's undifferentiated laundry list of possible reasons for terminating these grants—that the entity may have participated in unspecified DEI practices—would

---

[3] The Government suggested before the First Circuit that its retention of 5 of the 109 previously awarded grants proves that it engaged in reasoned decisionmaking. But the Government has not yet supplied an administrative record to facilitate judicial review. App. 30a; accord, ECF Doc. 69, p. 13. Without documentation of the Department's reasoning, its failure to terminate every single grant could just as easily reflect ne glect or even additional arbitrariness. Cf. ECF Doc. 76, p. 7, n. 1 (noting that one remaining grant "proposed to 'focus on culturally responsive practices'").

JACKSON, J., dissenting

not suffice as a basis for termination under the law as it currently exists. That is because termination is only permissible for recipient conduct that is inconsistent with the terms of the grants and the statutes that authorize them. But the TQP and SEED statutes *expressly contemplate* that grant recipients will train educators on teaching "diverse populations" in "traditionally underserved" schools, and on improving students' "social, emotional, and physical development." 20 U. S. C. §§1022e(b)(4), 6672(a)(1), 1022a(d)(1)(ii).[4] It would be manifestly arbitrary and capricious for the Department to terminate grants for funding diversity-related programs that the law expressly requires. Cf. *Motor Vehicle Mfrs. Assn. of United States, Inc.* v. *State Farm Mut. Automobile Ins. Co.*, 463 U. S. 29, 43 (1983) (explaining that an agency acts arbitrarily and capriciously if it relies "on factors which Congress has not intended it to consider").

## B

It is thus small wonder that the Government has chosen not to press its merits arguments in this emergency application. See n. 2, *supra*. What better way to avoid prompt consideration of the Plaintiff States' serious claims about the unlawful arbitrariness of the Government's conduct than to demand that jurists turn away from those core questions and entertain a host of side issues about the power of the District Court on an "emergency" basis?

---

[4]See also, *e.g.*, §1022a(d)(5) (encouraging TQP grantees to "recrui[t] into the teaching profession . . . individuals from under[-]represented populations," "former military personnel," and "individuals to teach in rural communities"); §1022a(e)(2)(A)(vi) (permitting TQP teacher-residency programs to consider choosing "applicants who reflect the communities in which they will teach as well as consideration of individuals from underrepresented populations"); §6672(b)(3) (requiring the Department to ensure that SEED grants are, to the extent practicable, "distributed among eligible entities that will serve geographically diverse areas, including urban, suburban, and rural areas").

(330 of 348), Page 330 of 348
Case: 25-2358    04/14/2025, DktEntry: 5.1, Page 330 of 348
Case 3:25-cv-02847-AMO    Document 38-2    Filed 04/04/25    Page 20 of 23

14        DEPARTMENT OF EDUCATION *v.* CALIFORNIA

JACKSON, J., dissenting

Courts that are properly mulling interim injunctive relief (to prevent imminent harms and thereby facilitate fair adjudication of potentially meritorious claims) should be wary of allowing defendants with weak underlying arguments to divert all attention to ancillary threshold and remedial questions. Children, pets, and magicians might find pleasure in the clever use of such shiny-object tactics. But a court of law should not be so easily distracted.

Yet, here we are. Instead of leaving the lower court judges alone to do the important work of efficiently adjudicating all of the parties' legal claims, the Supreme Court has decided to enter the fray. We have intervened to stay an almost-expired TRO that is plainly preventing the Plaintiff States from suffering imminent harm—*not* because the harms will not occur (no one seriously disputes this), and *not* because the Government has shown that any harm will actually befall it if the TRO remains in place for another three days, but because the Government has technical questions about which court is the proper forum to hear this case and what relief that court can order. Albeit interesting, and perhaps even ultimately dispositive, surely those nonurgent issues can get sorted out in the ordinary course as part of the lower court's expedited consideration of the legal claims both sides have made. There is no reason they have to be addressed by *this* Court at *this* moment. And it is truly bizarre that a Court that purports to be "a court of review, not of first view," *Cutter* v. *Wilkinson*, 544 U. S. 709, 718, n. 7 (2005), has seen fit to rouse itself to respond to the Government's queries by addressing these tangential legal issues and disturbing a well-justified, harm-based TRO in the process.[5]

_____

[5] Indeed, other than paving the way for the Plaintiff States' immediate suffering, it appears that the primary effect of today's emergency stay is to hand the Government an early "win"—a notch in its belt at the start of a legal battle in which the long-term prospects for its eventual success

JACKSON, J., dissenting

## V

Finally, even if this were a "close cas[e]," *Hollingsworth*, 558 U. S., at 190, the balance of the equities clearly counsel against staying the TRO and reinstating the grant terminations.  On one side of the balance, the Government's assertions of harm if the TRO remains in place amount to "speculation and hyperbole," as the First Circuit put it. App. 33a.  On the other, there is ample evidence that the loss of grants during the remaining days of the TRO period will inflict significant harm on the Plaintiff States and their instrumentalities.[6]

Those harms are concrete.  In Massachusetts, Boston Public Schools has already had to fire multiple full-time employees due to this loss of grant funding.  ECF Doc. 8–2, pp. 11–12.  In New Jersey, the College of New Jersey has canceled the remainder of its teacher-residency program for the same reason.  ECF Doc. 8–9, pp. 8–9.  In Illinois, Chi-

———————

seem doubtful.  And I don't blame the Government for trying.  If you're likely to lose on the merits, why not use the Court's procedures to fight on new and creative fronts?  The Government has now gotten this Court to nullify clearly warranted interim injunctive relief, deflecting attention away from the Government's own highly questionable behavior, all without any showing of urgency or need.  I worry that permitting the emergency docket to be hijacked in this way, by parties with tangential legal questions unrelated to imminent harm, damages our institutional credibility.

[6]The majority asserts that the Plaintiff States' harms may not be irreparable because they "have represented in this litigation that they have the financial wherewithal to keep their programs running."  *Ante*, at 2.  At most, the Plaintiff States represented below that the Department's decision to terminate grants would require their institutions to either "expend public funds . . . or suffer the obvious public harms resulting from a scarcity of qualified teachers."  Appellees' Opposition to Appellants' Motion for Stay in No. 25-1244 (CA1), p. 22.  In any event, the majority ignores the District Court's finding that the abrupt grant terminations have caused the Plaintiff States numerous harms that money cannot remedy.  App. 8a.

16          DEPARTMENT OF EDUCATION *v.* CALIFORNIA

JACKSON, J., dissenting

cago Public Schools—which already faces a multimillion-dol-
lar budget deficit—may have to shut down its successful
teacher-pipeline program.  ECF Doc. 8–13, p. 7.  In Califor-
nia, California State University has ended support for 26
students currently enrolled in its teacher-residency pro-
gram and has eliminated financial assistance for about 50
incoming students.  ECF Doc. 8–3, p. 7.

On the current record, I perceive no clear error in the Dis-

ens of programs upon which public schools, public universi-
ties, students, teachers, and faculty rely will be gutted."
App. 9a.  The harms that will result from permitting the
Department to reinstate these terminations are directly
contrary to Congress's goals in enacting the TQP and SEED
programs and in entrusting the Department with their im-
plementation.  It boggles the mind to equate the devasta-
tion wrought from such abrupt funding withdrawals with
the mere risk that some grantees might seek to draw down
previously promised funds that the Department wants to
yank away from them.

*          *          *

This Court's eagerness to insert itself into this early stage
of ongoing litigation over the lawfulness of the Depart-
ment's actions—even when doing so facilitates the infliction
of significant harms on the Plaintiff States, and even
though the Government has not bothered to press any ar-
gument that the Department's harm-causing conduct is
lawful—is equal parts unprincipled and unfortunate.  It is
also entirely unwarranted.  We do not ordinarily exercise
jurisdiction over TROs, and this one is no different.  The
Government has not articulated any concrete harm it will
suffer if the grant terminations are not implemented in the
next three days.  And this Court will have every opportunity
to address all of the legal issues the Government has hastily

(333 of 348), Page 333 of 348
Case: 25-2358    04/14/2025, DktEntry: 5.1, Page 333 of 348
Case 3:25-cv-02847-AMO    Document 38-2    Filed 04/04/25    Page 23 of 23

Cite as: 604 U. S. ____ (2025)          17

JACKSON, J., dissenting

shoved up the chain of review, and more, in due course. Because we could have and should have easily denied this application, I respectfully dissent.[7]

_____

[7]Apparently not content to insert itself into this action for no reason, the majority goes further, seizing on this opportunity. Without oral argument and with less than one week's worth of deliberation, the Court now has determined that, at least in this context, restoring the grants at issue might qualify as an order to "'enforce a contractual obligation to pay money'" such that it is the Court of Federal Claims, rather than the District Court, that has jurisdiction over the Plaintiff States' challenge. *Ante*, at 2 (quoting *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 212 (2002)). Even assuming that *Great-West* has any bearing on this issue, the majority's characterization of the relief granted by the District Court is dubious given what the Plaintiff States actually say in their complaint about the legal problem and the relief they are requesting. *See* ECF Doc. 1, pp. 46–47, 51–52; see also *Bowen* v. *Massachusetts*, 487 U. S. 879, 893 (1988) ("The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages'"). And the majority does not dispute the "basic reality" that some APA challenges to grant-related administrative action may proceed in district court, even if they have as their "natural consequence . . . the release of funds to the plaintiff down the road." *Department of State* v. *AIDS Vaccine Advocacy Coalition*, 604 U. S. ___, ___ (2025) (ALITO, J., dissenting from denial of application) (slip op., at 6).

In any event, the District Court in this case is now hard at work evaluating this and other arguments in the context of the pending preliminary-injunction motion. The majority's attempt to inject itself into the ongoing litigation by suggesting new, substantive principles for the District Court to consider in this case is unorthodox and, in my view, inappropriate.

YAAKOV M. ROTH
Acting Assistant Attorney General
WILLIAM C. SILVIS
Assistant Director
MICHAEL A. CELONE
CHRISTINA PARASCANDOLA
KATELYN MASETTA-ALVAREZ
JONATHAN K. ROSS
Senior Litigation Counsels
ZACHARY A. CARDIN
Trial Attorney

     U.S. Department of Justice, Civil Division
     Office of Immigration Litigation
     General Litigation and Appeals Section
     P.O. Box 878, Ben Franklin Station
     Washington, DC 20044
     (202) 514-0120
     Katelyn.Masetta.Alvarez@usdoj.gov

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *ET AL.*,<br><br>    Defendants. | Case No. 3:25-cv-02847-AMO<br><br>**DEFENDANTS' MOTION FOR RECUSAL OF A DISTRICT JUDGE PURSUANT TO 28 U.S.C. § 455 AND REASSIGNMENT**<br><br>Hearing Date: May 15. 2025<br>Time: 2:00 p.m.<br>Location: Courtroom 10 |

**DEFENDANTS' NOTICE OF MOTION AND MOTION**

**FOR RECUSAL OF A DISTRICT COURT JUDGE PURSUANT TO 28 U.S.C. § 455 AND**

**REASSIGNMENT**

PLEASE TAKE NOTICE that on May 15, 2025, at 2:00 p.m., or as soon thereafter as counsel may be heard, in the United States District Court for the Northern District of California, Courtroom 10, 19th Floor, located at 450 Golden Gate Avenue, San Francisco, CA 94102, Defendants United States Department of Health and Human Services, Office of Refugee Resettlement, and Department of the Interior will and hereby do move for the recusal of Honorable Araceli Martínez-Olguín and for reassignment.

This motion is based upon this Notice of Motion, the accompanying memorandum of points and authorities, the pleadings and papers on file in this action, oral argument of counsel, and any other matters properly before the Court.

The basis for this motion is that there is an appearance of bias toward Plaintiffs in this case because Judge Martínez-Olguín previously worked as a managing attorney at Community Legal Services in East Palo Alto (CLSEPA)—the lead Plaintiff in this case. As explained more fully in the accompanying memorandum, a reasonable person would likely question Judge Martínez-Olguín's impartiality, and accordingly, recusal is required under 28 U.S.C. § 455(a). In addition, due to Judge Martínez-Olguín's experience as a managing attorney at CLSEPA, she likely has personal knowledge of the irreparable harm that CLSEPA is alleging, which is a disputed fact in this proceeding. Thus, recusal is also required under 28 U.S.C. § 455(b)(1).

1   DATED: April 9, 2025                          Respectfully submitted,

2

3                                                 YAAKOV M. ROTH
                                                  Acting Assistant Attorney General

4                                                 WILLIAM C. SILVIS
                                                  Assistant Director
5

6                                                 CHRISTINA PARASCANDOLA
                                                  JONATHAN K. ROSS
7                                                 MICHAEL A. CELONE
                                                  Senior Litigation Counsel
8

9                                                 ZACHARY A. CARDIN
                                                  Trial Attorney
10

11                                                /s/ Katelyn Masetta-Alvarez

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Fair proceedings free from impartiality are critical to the integrity and legitimacy of the judiciary and to halt the inappropriate infringements into President Trump's exercises of Executive Power. In this involving President Trump's determinations on the appropriate expenditure of resources related to various immigration-related priorities.

Although recusal under 28 U.S.C. § 455 is normally undertaken by a judge sua sponte, counsel may bring the issue to a Judge's attention by formal motion or raise it informally.[1] Local Civil Rule 3 – 14 Commentary. Recusal is required in this case for at least three reasons. First, Judge Martínez-Olguín was previously employed as a managing attorney by the lead Plaintiff in this case, Community Legal Services in East Palo Alto (CLSEPA), so a reasonable person would likely question her impartiality. 28 U.S.C. § 455(a). Second, Judge Martínez-Olguín has made various statements critical of President Trump's immigration agenda, further underscoring the appearance of partiality in this case. And third, given Judge Martínez-Olguín's likely knowledge about CLSEPA's budget and organization, she presumably has personal knowledge regarding the irreparable harm that CLSEPA alleges it will suffer absent federal funding, an issue that is contested in this case. Because she likely has personal knowledge about a disputed fact, 28 U.S.C. § 455(b)(1) mandates recusal.

Defendants therefore respectfully request that Judge Martínez-Olguín recuse herself from presiding over this case, vacate the injunctive relief entered, and reassign the case to a different judge whose impartiality would not be questioned.

**STATEMENT OF RELEVANT FACTS**

From 2017 to 2018, Judge Martínez-Olguín was an attorney at CLSEPA. *See* Araceli Martínez-Olguín, Questionnaire for Judicial Nominees, at 2,

---

[1] Additionally, under California Rule of Professional Conduct 8.4(f), a lawyer engages in "professional misconduct" if she "knowingly assist[s], solicit[s], or induce[s] a judge or judicial officer in conduct that is a violation of an applicable code of judicial ethics or code of judicial conduct, or other law." Cal. Rules of Prof'l Conduct R. 8.4(f). Because no disclosures about possible conflicts of interest were made at the start of litigation, counsel for Defendants bring these issues to the Court's attention now.

1    https://www.judiciary.senate.gov/imo/media/doc/Martínez-Olguín%20SJQ%20Public%20Final.pdf (last

2    accessed Apr. 8, 2025). Specifically, in 2017, she was employed as a Senior Immigrants' Rights

3    Attorney and, in 2018, she was the "Managing Attorney" of CLSEPA's Immigrant Rights' Project. *Id.*

4    In 2018, Judge Martínez-Olguín began her career at the National Immigration Law Center, where she

5    was a staff attorney from 2018 to 2020 and then a Supervising Attorney from 2020 until her nomination

6    to the federal judiciary. *Id.* Notably, during her time at National Immigration Law Center, Judge

7    Martínez-Olguín represented a class of individuals who were eligible for Deferred Action for Childhood

8    Arrivals (DACA). *Id.* at 31. One of her co-counsel for that case was Karen C. Tumlin. *Id.* In February

9    2023, Judge Martínez-Olguín was confirmed as Judge for the Northern District of California.

10          On March 26, 2025, Plaintiff CLSEPA and other similar organizations filed this lawsuit

11   challenging the government's decision to withhold funding for direct legal services for unaccompanied

12   alien children. *See* ECF No. 1. Plaintiffs are represented by Judge Martinez-Olguin's former employer,

13   National Immigration Law Center, and Karen Tumlin, among others. The following day, Plaintiffs

14   moved for a Temporary Restraining Order (TRO). ECF No. 7. The Court ordered the government to file

15   a response to the TRO motion by noon on March 31, 2025. ECF No. 17. The government filed its

16   opposition accordingly. ECF No. 24. The next day, hours after a hearing on the TRO motion, the Court

17   granted Plaintiffs' TRO Motion. ECF No. 33.

18                                          **LEGAL STANDARD**

19          Recusal is mandatory where a judge's "impartiality might reasonably be questioned." 28 U.S.C.

20   § 455(a) (explaining that a federal judge "shall disqualify himself in any proceeding in which his

21   impartiality might reasonably be questioned"). Recusal under this subsection is appropriate where a

22   "reasonable person with knowledge of all the facts would conclude that the judge's impartiality might

23   reasonably be in question." *Yagman v. Republic Ins.*, 987 F.2d 622, 626 (9th Cir. 1993). That standard is

24   an objective one; the "reasonable person" for this inquiry is not "someone who is 'hypersensitive or

25   unduly suspicious,' but rather is a 'well-informed, thoughtful observer.'" *United States v. Holland,* 519

26   F.3d 909, 913 (9th Cir. 2008) (citations omitted). Whether a reasonable person would question a judge's

27   impartiality is not based on one single factor, but on the "totality of the circumstances." *See Yagman*,

28   987 F.2d at 626 (impartiality might be reasonably questioned considering "all the facts."); *see also Doe*

1   *v. Cabrera*, 134 F. Supp. 3d 439, 450 (D.D.C. 2015) (looking to the "totality of the circumstances" to

2   determine whether a reasonable person would question the judge's impartiality).

3     The touchstone for recusal under Section 455(a) is "not the reality of bias or prejudice but its

4   appearance." *Liteky v. United States*, 510 U.S. 540, 548 (1994). "The very purpose of § 455(a) is to

5   promote confidence in the judiciary by avoiding even the appearance of impropriety whenever

6   possible." *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir. 2003) (quoting *Liljeberg v. Health*

7   *Servs. Acquisition Corp.*, 486 U.S. 847, 865 (1988)). Thus, "any doubts must be resolved in favor of

8   recusal." *Id.*; *see also Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524 (11th Cir. 1988) ("It has been

9   stated on numerous occasions that when a judge harbors any doubts concerning whether his

10  disqualification is required he should resolve the doubt in favor of disqualification.").

11    A judge also "shall" recuse where she has "personal knowledge of disputed evidentiary facts

12  concerning the proceeding" or "has a personal bias or prejudice concerning a party." 28 U.S.C.

13  § 455(b)(1). Unlike 455(a), if one of the provisions of section 455(b) applies, then disqualification is

14  mandatory regardless of whether a reasonable person would question the judge's impartiality. *Liljeberg*,

15  486 U.S. at 859 n. 8. Section 455(b) applies a subjective standard for the judge to determine whether he

16  or she can be truly impartial when trying the case. If the judge believes there is a risk of prejudice, it is

17  "incumbent on him to recuse himself from the case as failure to do so would amount to an abdication of

18  duty" and would be "in clear derogation of the solemn promise he made when he took his oath of

19  office." *United States v. Holland*, 519 F.3d 909, 915 (9th Cir. 2008).

20            **DISCUSSION**

21    There is little doubt that a reasonable person would question Judge Martínez-Olguín's

22  impartiality in this case. CLSEPA is the lead Plaintiff in the case, yet Judge Martínez-Olguín served as

23  CLSEPA's managing attorney within Plaintiff's organizations from 2017-2018. In this role, Judge

24  Martínez-Olguín established and ran the Immigration Rights project where she "identified issues for

25  local or state policy advocacy and impact litigation, engaged in community education, and provided

26  advice and counsel to community groups." Araceli Martínez-Olguín, <u>Questionnaire for Judicial</u>

27  <u>Nominees</u>, at 24, https://www.judiciary.senate.gov/imo/media/doc/Martínez-

28

1    Olguín was part of CLSEPA's management team, where she set and implemented policies and practices.

2    *Id.* at 48.

3         The conflicts created by Judge Martínez-Olguín's affiliation with the lead Plaintiff is

4    unavoidable. Judge Martínez-Olguín held senior roles for at least one of the litigating parties; her

5    connection to the Plaintiffs is too substantial for a reasonable person to ignore or minimize the risk of

6    impropriety. Further underscoring the close entwinement between CLSEPA and Judge Martínez-Olguín,

7    upon her elevation to the bench in 2023, CLSEPA posted a public Facebook post celebrating that

8    "former CLSEPA attorney Araceli Martínez-Olguín ha[d] been confirmed as a U.S. district judge."

9    Community Legal Services in East Palo Alto, Facebook (Mar. 6, 2023), https://tinyurl.com/58nhrsna.

10   Indeed, at least one media outlet has noted the previous employment relationship between Judge

11   Martínez-Olguín and CLSEPA and has suggested that her recusal may be necessary. *See* Chuck Ross,

12   Federal Judge Orders Trump Admin To Resume Funding Left-Wing Immigration Groups—Including

13   _____                                _____

14   administration/federal-judge-orders-trump-admin-to-resume-funding-left-wing-immigration-groups-

15   including-her-former-employer ("Martínez-Olguín's work for one of the plaintiffs in the litigation could

16   lead to calls for her recusal from the case."). Recusal is thus warranted because the public would

17   reasonably question her ability to be impartial. The responsibility of the Court is not only to be fair and

18   impartial but to appear fair and impartial to the public.

19        Beyond her affiliation with CLSEPA, Judge Martínez-Olguín has not kept her disdain for

20   President Trump quiet. Instead, she has voiced her political views both inside and outside the courtroom.

21   In various past statements made in her capacity as an immigrant-rights advocate, Judge Martínez-Olguín

22   described President Trump's immigration policies implicating minor aliens as "unlawful and cruel,"

23   National Immigration Law Center, Facebook (Nov. 12, 2019), https://tinyurl.com/5c8jjmr3, and she

24   further rebuked President Trump for his views on various immigration issues, *e.g.*, *Trump admin*

25   *proposal would hike fees for immigration applications, impose asylum charge*, CBS News (Nov. 17,

26   2019), https://tinyurl.com/cnp7urvt. In other public fora, Judge Martínez-Olguín criticized Trump

27   "administration efforts to chip away at DACA" and disclaimed the INA's various jurisdictional

28

1  boundaries to judicial review of President Trump's immigration efforts. ACS Los Angeles 2019-2020

2  Supreme Court Review (Aug. 11, 2020), https://tinyurl.com/2kxe8jcc.

3       Those statements are directly germane to the issues Judge Martínez-Olguín is presiding over and

4  therefore would give a reasonable person pause as to whether she can be impartial. The instant case

5  involves the government's decision to discontinue providing direct legal services to unaccompanied

6  alien children. Plaintiffs filed a Motion for a TRO citing irreparable harm to their organization if the

7  funding stops. *See* Decl. of Marth Ruch, Lead Immigration Managing Attorney, CLSEPA, ECF No. 7-

8  16 ¶ 5 (attesting that "[w]ith [HHS] funding, CLSEPA employs six staff members dedicated to

9  providing legal services to unaccompanied immigrant children," and that representation of

10  unaccompanied children makes up a significant portion of the six staff members' case work). And

11  Defendants raised jurisdictional defects with Plaintiffs' claims that the court rejected outright. *See* Def's

12  Opp, ECF 24, at 1, 10–12. (Mar. 31, 2025).

13       In addition to her prior role as managing attorney for a party in this case and her professional

14  background, Judge Martínez-Olguín also has a relationship with the attorneys representing Plaintiffs in

15  this case. One of the organizations representing Plaintiffs is the National Immigration Law Center,

16  where Judge Martínez-Olguín worked as an attorney up until her confirmation as a district-court judge.

17  In her Senate Questionnaire for Judicial Nominees, she noted that "potential conflicts of interest could

18  be presented in matters being litigated before me by the lawyers from the National Immigration Law

19  Center. If a conflict were to arise, I would immediately recuse myself from the matter." Araceli

20  Martínez-Olguín, <u>Questionnaire for Judicial Nominees</u>, at 50,

21

22

23

24

25

26

27

28

DEFENDANTS' MOTION FOR RECUSAL AND REASSIGNMENT
3:25-CV-02847- AMO      5

1  Tumlin represented a class of individuals who qualified for DACA, challenging the first Trump

2  Administration's decision to restrict the DACA program. *See Batalla Vidal v. Wolf*, No.

3  16CV4756NGGVMS, 2020 WL 7121849, at *1 (E.D.N.Y. Dec. 4, 2020) (explaining the background of

4  the case). Similarly, Judge Martínez-Olguín represented DACA recipients alongside Ms. Tumlin in

5  *Arizona Dream Act Coalition v. Brewer*, 12-cv-2546 (D. Ariz.). While her representation alongside

6  Plaintiff's counsel in other cases involving foreign-national children may not be sufficient to create an

7  appearance of bias by itself, considering the totality of the circumstances—including her previous

8  employment with Plaintiff CLSEPA and relationship with National Immigration Law Center—a

9  reasonable person would question Judge Martínez-Olguín's impartiality here. *See Yagman*, 987 F.2d at

10  626; *see also Doe*, 134 F. Supp. 3d at 450 (looking to the "totality of the circumstances" to determine

11  whether a reasonable person would question the judge's impartiality).

12      Overall, a reasonable person would question whether a former managing attorney could be

13  impartial when deciding whether her previous employer and employees, represented by her former co-

14  counsel, will be irreparably harmed by a President's policies that the Judge has criticized in the public

15  square as an advocate. That appearance of impropriety mandates recusal.

16      Beyond positional conflicts, Judge Martínez-Olguín should recuse because she, as a former

17  managing attorney at Plaintiff CLSEPA, very likely has personal knowledge of the organization's

18  budget and operations and therefore has personal knowledge about CLSEPA's allegations regarding

19  irreparable harm—a disputed fact in this case. Judge Martínez-Olguín presumably has personal

20  knowledge about how CLSEPA obtains funding, its budget considerations, and its financial dependency

21  upon funding from the federal government. ECF 7-16 at 6. If Judge Martínez-Olguín does, in fact,

22  possess such knowledge based on her previous experience, her recusal is required by law. 28 U.S.C.

23  § 455(b)(1).

24  <div align="center">**CONCLUSION**</div>

25      Defendants deserve a court proceeding free from concerns about impartiality. To remove the

26  possibility of any impartiality to these proceedings and to maintain the public's confidence in the judicial

27  system, Defendants respectfully request that this Court recuse itself and return this matter to assignment

28

before a judge who does not have a personal connection to a party or counsel in this case. Moreover, given the partiality identified in this filing, Defendants request immediate dissolution of the Court's temporary restraining order, based on concerning conflicts of interest that have created a serious appearance of impropriety. *See Liljeberg*, 486 U.S. at 870 (holding the vacatur was proper remedy for violation of 28 U.S.C. § 455).

1   DATED: April 9, 2025                        Respectfully submitted,

2

3                                              YAAKOV M. ROTH
                                               Acting Assistant Attorney General

4
                                               WILLIAM C. SILVIS
5                                              Assistant Director

6                                              CHRISTINA PARASCANDOLA
                                               JONATHAN K. ROSS
7                                              MICHAEL A. CELONE
                                               Senior Litigation Counsel
8

9                                              ZACHARY A. CARDIN
                                               Trial Attorney
10
                                               /s/ Katelyn Masetta-Alvarez
11                                             KATELYN MASETTA-ALVAREZ
                                               Senior Litigation Counsel
12                                             U.S. Department of Justice, Civil Division
                                               Office of Immigration Litigation
13                                             General Litigation and Appeals Section
                                               P.O. Box 878, Ben Franklin Station
14                                             Washington, DC 20044
                                               (202) 514-0120
15                                             Katelyn.Masetta.Alvarez@usdoj.gov
16
                                               Attorneys for Defendants
17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2        I hereby certify that on April 9, 2025, I electronically filed the foregoing Notice of Motion for

3  Recusal and Reassignment and accompanying points and authorities with the Clerk of the Court using

4  the CM/ECF system, which sent notification of such filing to all counsel of record.

5

6                    *s/ Katelyn Masetta-Alvarez*
                     KATELYN MASETTA-ALVAREZ
7                    Senior Litigation Counsel

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, )<br><br>Plaintiffs, )<br><br>v. )<br><br>UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, *ET AL.*, )<br><br>Defendants. )<br>_____ ) | Case No. 3:25-cv-02847-AMO<br><br>**[PROPOSED] ORDER GRANTING DEFENDANTS' MOTION FOR RECUSAL PURSUANT TO 28 U.S.C. 455 AND FOR REASSIGNMENT** |

Having read and considered Defendants' Motion for Recusal Pursuant to 28 U.S.C. 455 and for Reassignment, and finding good cause therefore:

IT IS HEREBY ORDERED that Defendants' motion is GRANTED. Judge Araceli Martinez-Olguin is recused from presiding over this case, and the case will be reassigned to a judge within this district who does not have the appearance of impartiality.

In addition, the Court hereby VACATES the Temporary Restraining Order entered in Plaintiffs' favor, ECF No. 33.

Dated:

_____
Hon. Araceli Martínez-Olguín
UNITED STATES DISTRICT JUDGE

1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COMMUNITY LEGAL SERVICES IN EAST PALO ALTO, et al., | Case No.  25-cv-02847-AMO |
| Plaintiffs, | |
| v. | **ORDER EXTENDING TEMPORARY RESTRAINING ORDER, ORDERING FURTHER BRIEFING, AND RESETTING HEARINGS** |
| UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., | Re: Dkt. No. 47 |
| Defendants. | |

Before the Court is Defendants' motion for recusal and reassignment.  The Court must address this pending motion before further consideration of the case.  Thus, the Court finds that consideration of the motion for recusal constitutes good cause requiring extension of the Temporary Restraining Order dated April 1, 2025 ("TRO").  *See* ECF 33; Fed. R. Civ. Pro. 65(b)(2).  Accordingly, the Court hereby **EXTENDS** the TRO, and it shall remain in effect until Wednesday, April 30, 2025, at 7:59 a.m. PST.

Plaintiffs' response to the motion for recusal shall be filed by no later than Monday, April 14, 2025, at 5:00 p.m. PST.  The Government's reply in support of the motion for recusal shall be filed by no later than Thursday, April 17, 2025, at 9:00 a.m. PST.

The briefing schedule on Plaintiffs' motion for preliminary injunction remains in effect. *See* ECF 33.  The briefing schedule on Defendants' motion to dissolve the TRO remains in effect. *See* ECF 42.

Both Plaintiffs' motion for preliminary injunction and Defendants' motion to dissolve the TRO shall be heard on Wednesday, April 23, 2025, at 2:00 p.m. PST via Zoom if the case remains with the undersigned following resolution of the motion for recusal.  The Court **ORDERS**

1    declarants Toby Biswas and Sharon Roberts to appear on Zoom for the preliminary injunction

2    hearing.

3

4        **IT IS SO ORDERED.**

5    Dated: April 10, 2025

6

7                                        _____

8                                      **ARACELI MARTÍNEZ-OLGUÍN**

                                     **United States District Judge**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

2